UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| NIZAR S. NAYANI, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No.   1:22-cv-06833 |
| Plaintiff, | : : | <u>CLASS ACTION</u> |
| vs. | : : : | COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 |
| LIFESTANCE HEALTH GROUP, INC., MICHAEL K. LESTER, J. MICHAEL BRUFF, ROBERT BESSLER, DARREN BLACK, JEFFREY CRISAN, WILLIAM MILLER, JEFFREY RHODES, ERIC SHUEY, KATHERINE WOOD, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, JEFFERIES LLC, TPG CAPITAL BD, LLC, UBS SECURITIES LLC, and WILLIAM BLAIR & COMPANY, L.L.C., | : : : : : : : : : : : : : | |
| Defendants. | : : | |

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff Nizar S. Nayani ("plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by LifeStance Health Group, Inc. ("LifeStance" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of the common stock of LifeStance pursuant and/or traceable to the Registration Statement and Prospectus issued in connection with LifeStance's June 10, 2021 initial public stock offering (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o.  This Court has jurisdiction over this action pursuant to §22 of the Securities Act, 15 U.S.C. §77v, and 28 U.S.C. §1331.

3.     Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District as the co-lead book-running managers of LifeStance's IPO maintain their principal places of business in this District where they acted as representatives of the other Underwriter Defendants (defined below), in the IPO, conducting the IPO in and from this District, and closing the IPO in this District.  Furthermore, the Underwriting Agreement signed by LifeStance, the selling stockholders (defined below), and the Underwriter Defendants expressly provides, in pertinent part, that "[t]he Non-U.S. Selling Stockholder irrevocably submits to the non-exclusive

jurisdiction of any New York State or United States Federal court sitting in The City of New York (the 'Specified Courts') over any suit, action or proceeding arising out of or relating to this Agreement, the Time of Sale Prospectus, the Prospectus, the Registration Statement or the offering of the Shares (each, a 'Related Proceeding')," that "[t]he Non-U.S. Selling Stockholder irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any Related Proceeding brought in such a court and any claim that any such Related Proceeding brought in such a court has been brought in an inconvenient forum," and that "[t]o the extent that the Non-U.S. Selling Stockholder has or hereafter may acquire any immunity (on the grounds of sovereignty or otherwise) from the jurisdiction of any court or from any legal process with respect to itself or its property, the Non-U.S. Selling Stockholder irrevocably waives, to the fullest extent permitted by law, such immunity in respect of any such suit, action or proceeding."

4.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

5.     Plaintiff Nizar S. Nayani purchased LifeStance common stock traceable to the IPO, and was damaged thereby.

6.     Defendant LifeStance, through its subsidiaries, provides outpatient mental health services in 31 states.  Prior to its acquisition and reorganization in May 2020 by entities TPG Global LLC ("TPG"), Summit Partners, L.P. ("Summit"), and Silversmith Partners (collectively,

the "selling stockholders"), LifeStance had operated as LifeStance Health, LLC.  LifeStance admitted to being a "controlled company" at the time of its IPO.[1]

7.        Defendant Michael K. Lester ("Lester") is, and was at the time of the IPO, President and Chief Executive Officer ("CEO") of LifeStance.  Defendant Lester also serves as a senior advisor to Silversmith.

8.        Defendant J. Michael Bruff ("Bruff") is, and was at the time of the IPO, Chief Financial Officer ("CFO") of LifeStance.

9.        Defendants Robert Bessler, Darren Black ("Black"), Jeffrey Crisan ("Crisan"), William Miller, Jeffrey Rhodes ("Rhodes"), Eric Shuey, and Katherine Wood ("Wood") are, and were at the time of the IPO, directors of LifeStance.  In addition to serving as directors of LifeStance at the direction of TPG, defendant Wood then served as a principal at TPG and defendant Rhodes then served as a partner at TPG where he co-led the firm's healthcare group.  In addition to serving as a director of LifeStance at the direction of Summit, defendant Black then served as a managing director at Summit.  In addition to serving as a director of LifeStance at the

---

[1]        A Shareholders Agreement LifeStance entered into with the selling stockholders provides the selling stockholders with significant control, including that: (a) for so long that TPG owns at least 50% of the shares of LifeStance common stock, TPG will be entitled to designate four individuals for nomination, including two directors not employed by TPG; (b) for so long as TPG owns less than 50% but at least 35% of the shares of LifeStance common stock, TPG will be entitled to designate three individuals for nomination, including one director not employed by TPG; (c) for so long as TPG owns less than 35% but at least 20% of the shares of LifeStance common stock, TPG will be entitled to designate two individuals for nomination; (d) for so long as TPG owns less than 20% but at least 5% of the shares of LifeStance common stock, TPG will be entitled to designate one individual for nomination; (e) for so long as Summit and its affiliates owns at least 20% of the shares of LifeStance common stock, Summit will be entitled to designate one individual for nomination; and (f) for so long as Silversmith and its affiliates owns at least 50% of the shares of LifeStance common stock, Silversmith will be entitled to designate one individual for nomination.  The Shareholders Agreement further provides that TPG and Silversmith, along with Summit, will have the exclusive right to remove their respective designees and to fill vacancies created by the removal or resignation of their designees.

direction of Silversmith, defendant Crisan had founded and then served as a managing partner of Silversmith.

10.     The defendants named in ¶¶7-9 are referred to herein as the "Individual Defendants."  The Individual Defendants each signed the Registration Statement.

11.     Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), Goldman Sachs & Co. LLC ("Goldman Sachs"), J.P. Morgan Securities LLC ("J.P. Morgan"), Jefferies LLC ("Jefferies"), TPG Capital BD, LLC ("TPG Capital"), UBS Securities LLC, and William Blair & Company, L.L.C. are investment banking firms that acted as underwriters of LifeStance's IPO, helping to draft and disseminate the offering documents (collectively, the "Underwriter Defendants").[2]  Co-lead book-running managers of the IPO, Morgan Stanley, Goldman Sachs, J.P. Morgan, and Jefferies are all headquartered in this District and conducted the IPO out of their offices in this District as representatives of the other Underwriter Defendants.  Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize, inter alia, in underwriting public offerings of securities.  They served as the underwriters of the IPO and shared more than $45.5 million in fees collectively.  The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize LifeStance stock in the IPO.  The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from LifeStance, met with potential investors and presented highly favorable information about the Company, its operation, and its financial prospects;

---

[2]     Defendant TPG Capital is an affiliate of selling stockholder TPG.

(b)     The Underwriter Defendants also demanded and obtained an agreement from LifeStance that LifeStance would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.  They also made certain that LifeStance had purchased millions of dollars in directors' and officers' liability insurance;

(c)     Representatives of the Underwriter Defendants also assisted LifeStance and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of LifeStance, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning LifeStance's operations and financial prospects;

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with LifeStance's lawyers, management, and top executives and engaged in "drafting sessions" between at least February 2021 and June 2021.  During these sessions, understandings were reached as to: (a) the strategy to best accomplish the IPO; (b) the terms of the IPO, including the price at which LifeStance stock would be sold; (c) the language to be used in the Registration Statement; (d) what disclosures about LifeStance would be made in the Registration Statement; and (e) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and LifeStance management and top executives, the Underwriter Defendants knew, or should have known, of LifeStance's existing problems as detailed herein; and

- 5 -

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to plaintiff and the Class (defined below).

## SUBSTANTIVE ALLEGATIONS

12.     Defendant LifeStance is one of the nation's largest providers of virtual and in-person outpatient mental health care.  At the time of its IPO, the Company operated 370 centers and employed 3,300 psychiatrists, advanced practice nurses, psychologists, and therapists across 27 states.  The Company provides virtual and in-person outpatient mental health care for children, adolescents, and adults experiencing a variety of mental health conditions including depression, anxiety disorder, schizophrenia, and post-traumatic stress disorder.

13.     LifeStance benefitted from the state and local lockdown orders necessitated by the COVID-19 pandemic starting in the spring of 2020.  Total patient visits increased from 931,934 in 2018 to 1,353,285 in 2019, all the way to 2,290,728 in 2020.  Meanwhile, the Company's total revenue grew from $100.3 million in 2018 to $212.5 million in 2019 and all the way to $377.2 million in 2020 on a pro forma basis.

14.     By December 2020, several COVID-19 vaccines were being approved and administered, meaning LifeStance's access to clients seeking virtual mental health services would significantly decline while demand for in-person services would increase.  Meanwhile, LifeStance internal company records demonstrated that providing virtual services cost LifeStance far less as its service providers could work from home, avoiding the costs of high rents for offices, office personnel staff, and related expenses.  Also, because LifeStance had been utilizing physicians from around the country to meet strong patient demand during the COVID-19 lockdowns, increasing inpatient service demand was increasing the workload on certain of its physicians, many of whom were getting burned out and resigning, requiring that new physicians be hired and trained.

15.     On or about February 16, 2021, LifeStance filed with the SEC a Registration Statement on Form S-1, which, after several amendments made pursuant to comments from the SEC, would later be utilized for the IPO.  Initially, defendants stated they intended to sell a total of 40 million shares at a price range of between $15.00 and $17.00 per share, however, based on the defendants' strong marketing efforts to sell the IPO – when on June 9, 2021 the SEC declared the Registration Statement effective, and on or about June 11, 2021 when LifeStance, the selling stockholders, and the Underwriter Defendants priced the IPO and filed the final Prospectus for the IPO, which forms part of the Registration Statement (collectively, the "Registration Statement") with the SEC – they were able to price the shares sold in the IPO at $18.00 per share and to sell 46 million shares in the IPO.

16.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

17.     The Registration Statement detailed the Company's historical revenue growth, stating that "[t]otal revenue increased from $100.3 million in 2018 to $212.5 million in 2019, was $111.7 million in the Predecessor 2020 Period, was $265.6 million in the Successor 2020 Period, and increased to $377.2 million in 2020 on a pro forma basis," and that "[t]otal revenue increased from $73.1 million for the three months ended March 31, 2020 to $143.1 million for the three months ended March 31, 2021."[3]  The Registration Statement also highlighted the Company's

---

[3]     The Registration Statement presents LifeStance's financial statements for the fiscal year ended December 31, 2019, the three months ended March 31, 2020, and the period from April 1, 2020 to May 14, 2020 (such period from January 1, 2020 to May 14, 2020) when TPG acquired LifeStance and the selling stockholders reorganized the Company as the "Predecessor 2020 Period."  For the period from April 13, 2020 to December 31, 2020 (the "Successor 2020 Period")

purportedly then-present profitability, stating in pertinent part that LifeStance's "Adjusted EBITDA increased from $6.5 million in 2018 to $24.4 million in 2019, was $12.7 million in the Predecessor 2020 Period, was $37.5 million in the Successor 2020 Period, and was $50.1 million in 2020 on a pro forma basis," adding "Adjusted EBITDA increased from $8.2 million for the three months ended March 31, 2020 to $12.6 million for the three months ended March 31, 2021." The Registration Statement highlighted the then-present growth, stating in pertinent part as follows:

### *We Have Experienced Significant Growth*

We have a demonstrated track record of growth.

- Our total patient visits increased from 931,934 in 2018 to 1,353,285 in 2019, and to 2,290,728 in 2020.

- Our number of total centers increased from 125 as of December 31, 2018 to 170 as of December 31, 2019, and to 370 as of December 31, 2020.

- Our number of employed clinicians increased from 794 as of December 31, 2018 to 1,404 as of December 31, 2019, and to 3,097 as of December 31, 2020.

*        *        *

We see exciting growth opportunities for our business. We have a significant opportunity to scale within our existing footprint. We estimate there are approximately 650,000 mental health clinicians in the United States, which provides us with a meaningful runway to grow from our base of more than 3,300 employed clinicians as of March 31, 2021. We have identified an additional 28 MSAs for near-term expansion, which could grow our reach to approximately 57% of the U.S. population.

18.     The Registration Statement also represented that the virtual side of the Company's business would continue to grow, stating in pertinent part as follows:

---

and for the three months ended March 31, 2021, it presents the financial statements of LifeStance and its consolidated subsidiaries and affiliated practices.

*As we scale, we believe our digital investments and virtual care capabilities would allow us to leverage our platform to rapidly extend our reach, unlocking potential latent demand for mental health care across our markets*.

*       *       *

**We Have a Significant Opportunity**

We estimate that the *outpatient mental healthcare market* in the United States was approximately $116 billion as of 2020. *We expect that the market will nearly double from 2020 to 2025 at a compound annual growth rate of 14%, to approximately $215 billion, driven by significant, long-term tailwinds, including increased incidence of mental health-related disease, increased awareness and acceptance driving treatment demand, increased access and pursuit of integration with physical care, and increased support from federal and state level regulations*.

19.     The Registration Statement expressly stated that the COVID-19 lockdown orders

had provided no financial benefit to the Company, stating in pertinent part as follows:

*We believe the COVID-19 pandemic did not have a material impact on our results of operations, cash flows and financial position as of or for the three months ended March 31, 2021*. While the impact of the COVID-19 pandemic has increased stressors associated with mental health, *we believe that a combination of factors contribute to our total patient visits and related revenue, including, among others, long-term trends in reduced stigmatization of mental health*. Even before the pandemic, we saw the need to have a platform supported by leading technology to give us the ability to treat patients virtually or in-person. Our prior investment in our technology platform, most notably in our digital capabilities, became an essential component for continuing to deliver care to our patients during the pandemic. We observed an impact on appointments in mid-March 2020 as patients moved to shelter-at-home and increased cancellations. By the end of March 2020, appointments and visits had returned to normal levels. Our clinician recruitment opportunities have also increased as a result of the pandemic, driven by an increase in clinician supply from those seeking more stable employment models. With independent clinicians facing higher technology costs, shifting consumer behavior and challenges from the uncertain economic environment, our pipeline of acquisition targets grew and assisted in our 2020 footprint expansion.

*Even prior to the COVID-19 pandemic, our payor contracts or payor policies typically provided for rate parity for our care services regardless of whether visits are conducted in-person or virtually. As a result, even if temporary rate parity provisions that were enacted in response to the COVID-19 pandemic are not permanently extended, we do not expect such actions to have a meaningful impact on our business*.

We believe COVID-19 will represent a paradigm shift in the importance of and focus on mental health care.  We have seen significant increase in patient demand as well as payor and employer adoption of mental health coverage options during the pandemic and it is now integrated into health care offerings more than ever before.  ***We feel the spotlight the pandemic has put on the need for mental health care will have a positive impact on our industry and business for years to come***.

20.    The Registration Statement repeatedly emphasized the Company's very strong "87%" physician retention rate, a rate it claimed was stronger than other mental healthcare companies in the same industry due to the Company's exemplary technological and operating systems.  In this regard, the Registration Statement repeatedly stated in pertinent part as follows:

***Employer of Choice for Licensed Mental Health Clinicians***

We believe we are an employer of choice in mental health, allowing us to employ highly qualified clinicians.  Our success is demonstrated by our track record – in addition to the clinicians we have gained through our acquisitions, since our inception in March 2017 through December 31, 2020, we have hired 1,746 clinicians through our subsidiaries and affiliated practices, ***with a clinician retention rate of over 87% compared to the industry average of 77%***.

21.    The statements referenced above in ¶¶17-20 were inaccurate statements of material fact because they failed to disclose the following material facts which existed at the time of the IPO:

(a)    that the number of virtual visits clients were undertaking utilizing LifeStance was decreasing as the COVID-19 lockdowns were being lifted, thereby flatlining the Company's out-patient/virtual revenue growth;

(b)    that the percentage of in-person visits clients were undertaking utilizing LifeStance was increasing as the COVID-19 lockdowns were being lifted, thereby causing the Company's operating expenses to increase substantially;

(c)    that LifeStance had lost a large number of physicians due to burn-out and, as a result, its physician retention rate had fallen significantly below the 87% highlighted in the

- 10 -

Registration Statement and the Company had been expending additional costs to onboard new physicians who were less productive than the outgoing physicians they were replacing; and

(d)     as a result of the foregoing, LifeStance's business metrics and financial prospects were not as strong as the Registration Statement represented.

22.     Under the rules and regulations governing the preparation of the Registration Statement, LifeStance was required to disclose at the time of the IPO that: (a) its virtual/outpatient revenue growth was declining while its inpatient service costs were growing exponentially; and (b) that the Company was incurring additional costs to recruit and retain new physicians due to a recent massive decline in physician retention, with both factors significantly reducing its profitability.  The Registration Statement, however, contained no such disclosures.  Pursuant to Item 303 of Regulation S-K, 17 C.F.R. §229.303, and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any "known trends," that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.  At the time of the IPO, LifeStance's out-patient/virtual services revenue growth had flatlined and its inpatient operating costs had grown exponentially.  The Company's physician retention rate had declined significantly below the 87% highlighted in the Registration Statement.  The adverse events and uncertainties associated with these declining trends were known and reasonably likely to have a material impact on LifeStance' profitability, and, therefore, were required to be disclosed in the Registration Statement.

23.     Moreover, pursuant to Item 105 of Regulation S-K ("Item 105"), 17 C.F.R. §229.105, issuers are required to disclose the most significant factors that make an investment in the registrant or offering speculative or risky.  Item 105 expressly states that registrants must set forth each risk factor under a sub-caption that adequately describes the risk.  Additionally, Item

105 directs registrants to explain how each risk affects the registrant or the securities being offered and discourages disclosure of risks that could apply to any registrant.  Here the Offering's Registration Statements' purported risk warnings concealed that LifeStance's out-patient/virtual services revenue growth was decreasing while its inpatient service costs were increasing, dramatically driving up operating expenses and driving down its profitability.  They also failed to warn that physician retention had declined dramatically below the 87% highlighted in the Registration Statement, increasing costs to recruit and retain and lowering productivity.

24.     The IPO was successful for the Company, the selling stockholders, and the Underwriter Defendants, who sold 46 million shares of LifeStance common stock to the public at $18.00 per share, raising $828 million in gross proceeds (approximately $782.5 million in net proceeds from the IPO after deducting underwriting discounts, commissions and offering costs). Indeed, due to defendants' particularly strong selling efforts, the shares were priced and sold well above the $15.00 to $17.00 per share range defendants had originally indicated they would sell just 40 million shares at in the IPO – with all of the additional 6 million shares being sold by the selling stockholders.

25.     On August 11, 2021, less than two months after the IPO, LifeStance announced its second quarter 2021 ("2Q21") financial results for the period ended June 30, 2021 (*just days after the IPO*), disclosing a net loss of $70 million, compared to net loss of just $27.6 million for the period from April 1, 2020 to May 14, 2020 (Predecessor) and $4.3 million for the period from April 13, 2020 to June 30, 2020 (Successor).  Critically, during the 2Q21, the Company's operating expenses had more than tripled.  LifeStance also guided for full fiscal year 2021 total revenue of just $668 million to $678 million ($168 million to $173 million in the third quarter 2021 and $196 million to $201 million in the fourth quarter 2021) and Adjusted EBITDA of just $47 million to

$53 million ($8 million to $11 million in the third quarter 2021 and $12 million to $15 million in the fourth quarter 2021).  There were multiple reasons for the massive increase in LifeStance's operating expenses during the 2Q21.

26.     Defendants also disclosed on August 11, 2021 that the Company had experienced a significant, negative "recent change in clinician retention levels" during the 2Q21.  As defendant Bruff explained on the conference call held with investors and stock analysts that day,

> [W]hile we are assuming *a continuation of lower retention rates* for the remainder of the year, our *ongoing recruiting and acquisition momentum* is expected to deliver a higher-than-expected clinician base for the full year.  However, *new clinician additions have lower productivity for the first 4 to 6 months and therefore, will not immediately offset the impact from higher turnover, a dynamic we expect to negatively impact Center Margin and adjusted EBITDA by approximately $7 million to $9 million*.

27.     On November 8, 2021, the Company reported its third quarter 2021 results, now explaining in its press release that "[c]linician retention [had] *stabilized to approximately 80%* annualized in the third quarter."  Defendants further lamented that LifeStance was also having to increase spending on "enhanced clinician engagement and continued support for workplace and work-life flexibility," *i.e.* lowering physician productivity, in order to keep its existing physicians.

28.     Defendants reported LifeStance's fiscal 2021 results on March 10, 2022.  During the conference call held with investors and stock analysts that day, defendant Lester admitted that a recent large clinical study by Stanford had confirmed that three quarters of mental health patients prefer in-person services, stating that "[w]hen COVID first emerged in 2020, our patient visits moved from 5% virtual to over 90% virtual within weeks," but that "[t]hrough 2021, our telehealth mix trended downward to the low 80s, and we expect that mix to be approximately 50-50 virtual versus in-person over the long term."  Notably, the Company stated that it would be reducing the number of brick & mortar facilities that it would be building in the immediate future expressly in order to increase its profitability.

29.     At the time of the filing of this Complaint, LifeStance common stock trades in a range of $4.77-$7.70, a reduction of upwards of 73% from the price the shares were sold at in the IPO.

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action as a class action on behalf of a class consisting of all those who purchased LifeStance common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO (the "Class").  Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

31.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by LifeStance or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

33.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

34.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the Securities Act;

(b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

35.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

**For Violation of §11 of the Securities Act**
**Against LifeStance, the Individual Defendants, and the Underwriter Defendants**

36.     Plaintiff repeats and realleges each and every allegation set forth above.

37.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against LifeStance, the Individual Defendants, and the Underwriter Defendants.

38.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

39.     Defendant LifeStance is strictly liable to plaintiff and the Class for the misstatements and omissions.

40.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

41.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

42.     Plaintiff acquired LifeStance common stock traceable to the IPO.

43.     Plaintiff and the Class have sustained damages.  The value of LifeStance common stock has declined substantially subsequent to and due to these defendants' violations.

44.     At the time of their purchases of LifeStance common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff commenced this action.

## COUNT II

### For Violation of §15 of the Securities Act
### Against LifeStance and the Individual Defendants

45.     Plaintiff repeats and realleges each and every allegation set forth above.

46.     This Count is brought pursuant to §15 of the Securities Ac, 15 U.S.C. §77o, against LifeStance and the Individual Defendants.

47.     The Individual Defendants each were control persons of LifeStance by virtue of their positions as directors and/or senior officers of LifeStance.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of LifeStance.  The Company controlled the Individual Defendants and all of LifeStance's employees.

48.     Defendants LifeStance and the Individual Defendants each were culpable participants in the violations of §11 of the Securities Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  August 10, 2022          ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                   SAMUEL H. RUDMAN
                                   MARY K. BLASY

*s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

NIZAR S. NAYANI ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of August, 2022.



NIZAR S. NAYANI

LIFESTANCE HEALTH

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 06/10/2021 | 23 | $20.19 |
| 06/30/2021 | 11 | $28.42 |
| 07/08/2021 | 4 | $27.74 |

Prices listed are rounded to two decimal places.