MB47NIZH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NIZAR S. NAYANI, *et al.*,

                Plaintiffs,

                                        22 Civ. 6833 (JSR)
            v.

LIFESTANCE HEALTH GROUP, INC.,
et al.,

                Defendants.             Hearing

------------------------------x
                                        New York, N.Y.
                                        November 4, 2022
                                        10:05 a.m.
Before:

                    HON. JED S. RAKOFF,

                                        District Judge

                        APPEARANCES

ROBBINS GELLER RUDMAN & DOWD, LLP
      Attorneys for Plaintiffs
BY:   SAMUEL H. RUDMAN
      DAVID A. ROSENFELD

POMERANTZ, LLP
      Attorney for Movant Jordan
BY:   JOSEPH ALEXANDER HOOD, II

BRONSTEIN GEWIRTZ & GROSSMAN, LLC
      Attorney for Movant Jordan
BY:   EITAN KIMELMAN

ROPES & GRAY, LLP
      Attorney for Defendants
BY:   MARTIN J. CRISP

DAVIS POLK & WARDWELL, LLP
      Attorney for Defendants
BY:   ESTHER C. TOWNES

Also Present:  Nizar S. Nayani (Remote), Brittny Jordan

MB47NIZH

(Case called)

MR. RUDMAN:  Good morning, your Honor.  Samuel Rudman for plaintiff Nizar Nayani from Robbins, Geller, Rudman & Dowd.

MR. ROSENFELD:  Good morning, your Honor.  David Rosenfeld also of Robbins Geller on behalf of plaintiff Nayani.

MR. HOOD:  Good morning, your Honor.  Alex Hood, Pomerantz, LLP, on behalf of lead plaintiff-movant, Brittny Jordan.

MR. KIMELMAN:  Good morning, your Honor.  Eitan Kimelman from Bronstein, Gewirtz & Grossman on behalf of Ms. Jordan.

MR. CRISP:  Good morning, your Honor.  Martin Crisp from Ropes & Gray on behalf of the LifeStance defendants.

MS. TOWNES:  Good morning, your Honor.  Esther Townes from Davis Polk on behalf of the defendants.

THE COURT:  All right.  So I'm very sorry for the screw-up yesterday.  For some reason, I didn't know about the hearing until the last minute and, you could see, I was charging a jury.  So I appreciate your putting this over to today.

So we have competing candidates for lead plaintiff. My understanding is that Mr. Nayani is going to appear telephonically.

MR. RUDMAN:  Yes.  He was here yesterday, Judge. Unfortunately, he couldn't stay.  I believe he's on the phone

right now.

THE COURT:  Okay.  Mr. Nayani, can you hear me?

MR. NAYANI:  Yes, your Honor, I can.

THE COURT:  All right.  Let's turn up the volume as far as he can go.

(Witness sworn)

NIZAR NAYANI,

     called as a witness, having been duly sworn,

     testified as follows:

EXAMINATION

BY THE COURT:

Q.  Very good.  So what led you to get involved in this case?

A.  Your Honor --

Q.  I'm sorry?

A.  Yes.  So I started -- are you able to hear me okay?

THE DEPUTY CLERK:  Yes, we can hear you.

A.  Okay.  Yeah.  Yes, your Honor.  So I purchased the -- the stock in a very -- in the early time.  And then over the time, I learned the practice LifeStance had presented that wasn't the -- wasn't normal and wasn't right, and that's what led me to get involved in this case.

Q.  Did you contact counsel or did they first contact you?

A.  I contacted them.

Q.  And how did you know whom to contact?

A.  Where the platform that I used to trade the stock,

MB47NIZH                    Nayani - The Court

LifeStance and the other one, it had the information in there, in that platform.

Q.  The information about just one counsel?

A.  There were several.

Q.  And what kind of information was it?

A.  It stated where the LifeStance had practiced something out of the ordinary, or something not normal, and these are the attorneys filing complaints towards LifeStance and can help you better understand.

Q.  So they had already indicated they were planning to file a complaint?

A.  Yes, your Honor.

Q.  Okay.  So after you contacted them, who contacted you from the lawyers?

A.  After that I contacted them?

Q.  Yes.

A.  Miss Mary did.

Q.  And what were you -- how did it come about that you were asked to be lead plaintiff?

A.  As we got more involved in the case, which was a while ago, and the information that I was gathering, the knowledge that I was acquiring and the losses that I had, this is where we kind of agreed, and then counsel asked if I'd be okay.  I said, I would love to because I really care about this class, and I studied a lot and I gathered a lot of knowledge on this.

Q.   Did you sign a retainer agreement?

A.   Yes, your Honor, I have.

           THE COURT:  Let me ask counsel, do you have a copy?

           MR. RUDMAN:  I do, your Honor.

           THE COURT:  Hand it up.

Q.   So, Mr. Nayani, tell me a little bit about yourself.  What do you do for a living?

A.   Your Honor, I'm a managing director and a partner at a wireless company called Cricket Wireless here in Houston, Texas, and I've been managing and been with the company for -- going on about 15 years.

Q.   I won't ask you whether you're an Astros fan because I don't want to introduce religion into this matter, but have you managed any litigation in the past?

A.   Not in this capacity, but I had interaction with the lawyers and I've experienced how to go about it, yes, your Honor.

Q.   The original agreement that you signed with the Robbins Geller firm, which purports to be attorney-client privilege—which it clearly is not—says nothing about the percentage of the fee that they will take as their attorney's fees if they're successful on your behalf.  When you signed this on or about December 1 -- actually, you signed it on December 15, 2021.  Weren't you curious to know how much they would be charging in attorney's fees?

A.   I was.  And your Honor, in the early age, I think it was more of the understanding how the class would work, and he also had a small issue with my name.  So I was trying to get the name correct before we moved forward.

Q.   I should have asked you that before.  Spell your name for the record.

A.   N-I-Z-A-R.  Last name is N-A-Y-A-N-I.

Q.   Okay.  So I noticed it wasn't until October 19, 2022, that there was a subsequent agreement that you signed electronically that sets the contingent fee percentage.  So I'm still not clear what it was that led to your not being provided with that for, what, more than a year.

A.   Verbally, your Honor, we did discuss that, but it was never put down on paper.

Q.   So --

A.   The main focus -- I'm sorry.

Q.   So this says that they get an ever higher fee if they recover more money for the class.

     Do you see that?

A.   I do, your Honor.

Q.   So did you attempt to negotiate that in any respect or just accept what they gave to you?

A.   I did discuss, your Honor.

Q.   And what did you say?

A.   Somewhere around -- I don't remember exactly, but it was

more of this is the normal fees --

Q.   That's what they were saying to you?

A.   Yeah.  We didn't -- I didn't negotiate much, I just understood that this was their market value, or this was the fair amount for the class, so.

Q.   Now, did you read the complaint?

A.   Yes.

Q.   So what is your understanding of the claims that you're bringing?

A.   My understanding is when LifeStance started during the pandemic, it was acquiring a lot of small clinics and was very successful, one of the biggest in telehealth and in mental behavior health.  And they were doing really well around the COVID timing, and this is where I got interested in the company to look into it as an investment.

Right after, when the lockdown was no longer as important, they actually started declining their patients and their practices, they start losing money a lot where they weren't -- their physicians weren't sticking around because of the workload, and then they were not -- they weren't as profitable as they actually were before.  And none of that was disclosed in their registration on their statement when they initially opened their IPO.

Q.   Do you have any idea, if I appoint you the plaintiff, how many shareholders you will be representing?

A.   I have an idea that it will be a lot.

Q.   Have you had any contact with any of the other shareholders?

A.   No, your Honor.

Q.   How do you propose to manage this case if, for example, supposing there's a proposed settlement and your attorneys want to go ahead with the settlement, what would you do at that point?

A.   As far as my duty, I would make sure that I understand before making any decisions.

     When it comes to management and communication, I have a very good record, at least that's what I think.  And I have a very comfortable relationship with my counsel now.  We've been working for a while.

Q.   So supposing they say, We think this is a good settlement, and you don't think it is, you understand you have the right to tell them no; yes?

A.   I understand that, yes, your Honor.

Q.   And if you say no, are they still required to represent you in the class?

A.   Yes, your Honor.

Q.   Now, supposing I don't certify the class, do you know whether or not, under your agreement, they still have to represent you?

A.   Under the agreement, yes, they do, your Honor.

MB47NIZH                    Nayani – The Court

Q.  Do they?

A.  Yes.

Q.  So I'm looking at that agreement.  Do you have that agreement in front of you?

A.  No.

Q.  All right.  Well, it says, "If the Court does not certify the case as a class action, we will discuss our continued representation of you on an individual basis.  If we do agree to go forward with the case, representing you on an individual basis, you will likewise have no responsibility for legal fees and expenses."

THE COURT:  Counsel is rising.  You didn't think I read that accurately?

MR. RUDMAN:  I didn't say that, your Honor, I just wanted to point out the addendum.

THE COURT:  Excuse me?

MR. RUDMAN:  I just wanted to make sure you saw the addendum.

THE COURT:  I'm sorry.  The addendum?

MR. RUDMAN:  Well, the second agreement.

THE COURT:  I'm sorry.  Let me look at the second agreement.

MR. RUDMAN:  Beneath the chart on the first page.

THE COURT:  All right.  Hold on.

Okay.  Thank you very much.

So the second agreement says, in addition, the firm agrees to continue to represent you if the class's motion for certification is denied.

Okay. So that answers my question, and you are correct.

BY THE COURT:

Q.  Was that the result of your raising a question of what happens if I don't certify the class or was it something that counsel suggested to you they were going to offer?

A.  I asked him, your Honor, that if that doesn't -- because initially, this is where I reached out to them for it.  So I did, your Honor.

Q.  Okay.

THE COURT:  Those were the only questions I have for Mr. Nayani, but if any counsel wants to put any questions to him, now is the time to do so.

MR. HOOD:  Thank you, your Honor, I'd like to.

THE COURT:  You may need to sit down and speak into the microphone so he can hear you better.

EXAMINATION

BY MR. HOOD:

Q.  Mr. Nayani, it is Alexander Hood, counsel for Brittny Jordan.

Can you hear me all right?

A.  Yes.

MB47NIZH                    Nayani - Hood

Q.  So was Robbins Geller the only firm that you spoke to in connection with this litigation?

A.  Yes.

Q.  And the press release, or I should say the news item that you saw online, that was a Robbins Geller published news item or press release?

A.  On the TD Ameritrade?

Q.  Yes.  The release that you referenced that prompted you to contact counsel, I was asking if that was published by Robbins Geller.

A.  I don't remember.

Q.  Now, when you filed the initial complaint in this action, was your understanding at that time that you were submitting an application to serve as lead plaintiff?  And to be clear, I'm asking about your decision at that time as opposed to anything that you've learned after the fact.

A.  Say that again.  I'm sorry.

Q.  Sure.  My question is when you filed the initial complaint in this action back in August, I believe, at that time, did you understand that you were putting in an application to serve as a class representative?

A.  Yes.

Q.  After you filed the complaint, what was your next involvement in this litigation?

A.  Me and the counsel at the firm started digging in, started

communicating, understanding what had gone wrong, yeah.

Q.  And if you could -- I realize you don't have to give me exact dates here, but can you tell me approximately when you would have been having those discussions?

A.  On a weekly basis, really.

Q.  And were you aware that, in addition to yourself, any member of the class could also seek appointment as lead plaintiff on or before October 11 of this year?

A.  Yes, I'm aware of that.  Yes, sir.

Q.  Now, as that October 11 deadline approached, was your counsel in touch with you about next steps?

A.  Yes.

Q.  Why did you choose not to file a motion on October 11?

A.  Why didn't we file; is that what your question is?

Q.  The question is why did you not file a motion for lead plaintiff appointment on October 11?

THE COURT:  What he's getting at, Mr. Nayani, is there's an argument that, even though in the complaint you indicate—implicitly at least, if not explicitly—that you want to be lead plaintiff, you didn't actually file a motion for that until I think it was October 14 or something like that, arguably after a deadline had passed.

What he wants to know is what input you have had into that timing.  If the answer is none, tell me that.  If the answer is you did have some input, any further inquiry about

MB47NIZH                      Nayani - Crisp

that would invade attorney-client privilege.  So just tell me whether you had further input into that filing of that motion, yes or no.

THE WITNESS:  No.  I --

THE COURT:  Okay.  That's the answer.  Thank you.

Any other questions?

MR. HOOD:  Nothing further.

Thank you, Mr. Nayani.

THE COURT:  Anything from defense counsel?

MR. CRISP:  Briefly, your Honor.

THE COURT:  Okay.

EXAMINATION

BY MR. CRISP:

Q.  Mr. Nayani, this is Martin Crisp.  I represent the LifeStance defendants.

Can you hear me okay?

A.  Yes, I can, sir.

Q.  Thank you.

Briefly, you mentioned earlier that you spoke with the Robbins Geller attorney, Ms. Blasy, I believe.  Can you tell us when that occurred, roughly?

A.  I don't remember the exact date.  It must have been a little over a year ago.

Q.  Would it be have been before you signed your retainer agreement originally on December 15 of last year?

MB47NIZH                         Jordan - The Court

A.   Yes.

Q.   And you waited until August of this year to file your complaint; is that right?

A.   Yes.

Q.   And then two months after that, you signed your supplemental agreement with the Robbins Geller firm; is that correct?

A.   Yes.

          MR. CRISP:   Thank you.   Nothing further.

          THE COURT:   All right.   So, Mr. Nayani, you can stay on the phone if you'd like while we continue this hearing or you're free to sign off, whichever you prefer.   But we will now continue.

          (Witness excused)

          THE COURT:   Let's get Ms. Jordan on the stand.

BRITTNY JORDAN,

     called as a witness, having been duly sworn,

     testified as follows:

EXAMINATION

BY THE COURT:

Q.   So, Ms. Jordan, thank you for coming to this hearing.

          What do you do for a living?

A.   I'm a mental health therapist.

Q.   And are you with some sort of organization?

A.   I have my own private practice.

MB47NIZH                          Jordan - The Court

Q.   Okay.  Where did you go to school?

A.   Illinois State University.

Q.   And where do you now reside?

A.   In Lawrence, Kansas.

Q.   What can you tell me about this lawsuit?

A.   What I can tell you is that a year ago, when LifeStance released their IPO, they had certain financial figures in that statement, of course.  And it's my understanding that certain of those figures weren't reported accurately, particularly the amount of psychiatrists that they had on staff.  There were also some discrepancies came forward about the amount of clientele that they expected to have, particularly clientele that were using telehealth services.  So they thought their overhead would be lower than it actually was.

Q.   You worked previously for LifeStance, yes?

A.   Yes.

Q.   Were you involved in any way, shape, or form in the financial end of the company?

A.   No, I was not.

          THE COURT:  Counsel, do you have a retainer agreement?

          MR. HOOD:  We do, your Honor, yes.

          THE COURT:  Please hand it up.

Q.   Now, this is dated October 7.  And it also incorrectly recites that it's subject to attorney-client privilege.  I should hope some day to find some counsel in securities class

MB47NIZH                     Jordan - The Court

action who has actually read the law on attorney-client privilege.

        But in any event, did you reach out originally to them or did they reach out to you?

A.  I reached out to them.

Q.  And what prompted you to contact them?

A.  It was also through a news feed update on the financial app that I use to invest with.

Q.  This says that they will seek a fee, if they're successful, of one-third -- up to one-third.

        Did you negotiate that in any way?

A.  No, I did not.

Q.  They just said this is standard, sign here.

A.  That was -- I guess that was also my understanding, that one-third is the standard fee in this case.

Q.  And then I add, "Bronstein Gewirtz & Grossman will jointly prosecute the litigation with Pomerantz and will share 15 percent of the net fees awarded to Pomerantz in this action."

        Did they tell you why they were -- want to share fees with another law firm?

A.  What they shared with me is that my initial contact was with Bernstein and then they wanted to pull in Pomerantz as another additional resource that they thought would serve me best.

Q.  Okay.  Now, when was it, if ever, that they told you that

MB47NIZH                         Jordan - The Court

they were going to be applying to have you be lead counsel?

A.  It was during the initial callback that I received from them.

Q.  Did you discuss with them what that might involve?

A.  Yes, I did ask some questions.

Q.  What does it involve?

A.  So I know that it involves me maintaining a fiduciary obligation to the class members of this class action suit to be that representative of the other class members.

Q.  So have you had any prior experience in managing attorneys in litigation?

A.  No, I have not.

Q.  So how do you think you're going to -- just for your background, the law in this area expects the client to be a tough-minded, heavily involved client.

How are you going to do that if you don't have the experience?

A.  That's something that -- I really want to stay connected with my legal team about that, that I feel confident that they're going to be able to guide me in the ways that will help this case move forward.

Q.  Now, eventually, a motion was made to have you appointed lead plaintiff.

Did you read that motion?

A.  Yes.

MB47NIZH                          Jordan - The Court

Q.   Let me show you first the cover page.  That's the declaration of counsel for appointment.  And let me also show you the cover page of their memorandum of law.

Did you read either of these documents?

A.   Yes.

Q.   So did you read the cover page of these documents?

A.   Yes, yeah.

Q.   So they misspelled your name; yes?

A.   Yes, initially.

Q.   Is this the first time you've noticed that?

A.   No.

Q.   Did you bring that to their attention?

A.   It was something that came to my attention, and it was really taken care of rather quickly after it was noticed by both of us.  We really kind of came together about the same time, noticing that it was the --

Q.   Well, let me grab this back from you.  And in the declaration of Mr. Lieberman, there's attached as Exhibit D a declaration.

Do you see that?

A.   Yes.

Q.   And that's a declaration given by you under penalties of perjury.

Did you understand that?

A.   Yes.

MB47NIZH                    Jordan - Rudman

Q.   And it says -- at the end, counsel has written in your name, J-O-R-D-O-N, although you signed it I think electronically, but signed it properly, J-O-R-D-A-N.

Do you see that?

A.   Mm-hmm.

Q.   I'm sorry.  You have to say yes or no.

A.   Yes.  Oh, yes.

Q.   Did you tell them --

A.   Well, I --

Q.   -- you're signing -- you're asking me to sign something that says I will supervise you, but you can't even get the spelling of my name right?  Did you have any discussion like that with them?

A.   Not necessarily quite like that.  But what had really stood out to me is that when I had signed the documents, I got a copy of it, and that's -- you know, I wanted to continue to review what was gonna come up, and that's where I noticed the name change and the name got spelled right.

THE COURT:  All right.  Let me ask counsel if they have any questions for this witness.

MR. RUDMAN:  Yes, your Honor, just a few questions.

THE COURT:  Go ahead.

EXAMINATION

BY MR. RUDMAN:

Q.   You testified that you first contacted the Bronstein firm

MB47NIZH                      Jordan - Rudman

about this case; is that correct?

A.  Yes.

Q.  Okay.  Why is it that you need two law firms to represent you in this case?

A.  That's the way that they felt they could work in my best interest.

Q.  When you say "they," who are you referring to?

A.  The two firms, between the two of them.

Q.  When was the first time you spoke to a lawyer from the Pomerantz firm?

A.  Was maybe about a week later than the first contact that I had.

Q.  What was the date of the first contact that you had with Bronstein firm?

A.  I know -- I don't know if I know the exact date, but I know it was before October 11, in the beginning of October.

Q.  I believe you signed your certification and declaration October 9.

        Did you talk to them before you signed those papers, the Pomerantz firm, I mean?

A.  Yes.

Q.  Did you have any input in deciding to select the Pomerantz firm as the counsel?

A.  No, I didn't.

Q.  Did you ask the Bronstein firm if there were any other

MB47NIZH                      Jordan - Rudman

firms that they should consider to serve as lead counsel?

A.  No.  That didn't come up.

Q.  Did you conduct any investigation into the qualifications as to the qualifications of the Pomerantz firm?

A.  Yes.

Q.  Okay.  What steps did you take?

A.  I reviewed their website and their legal counsel.  I know that information is up there for each lawyer.

Q.  When did you do that?

THE COURT:  Anything -- I'm sorry.  What was the last question?

MR. RUDMAN:  I asked her when she reviewed the website, your Honor.

A.  After I received the first outreach.

Q.  Did you read the complaint that was filed in this case?

A.  Yes.

Q.  Okay.  Did you read it before you signed your certification and declaration?

A.  I knew -- they said briefly what it was like on the news feed update, that there was a complaint being filed.

Q.  No.  But did you actually read the complaint, the document that was filed in federal court, before you signed the papers?

A.  Yes.

Q.  Who provided you the complaint?

A.  My legal team.

MB47NIZH

Q.   Now, how long did you work at LifeStance?

A.   It ended up being about a year and a half.  They had purchased the agency that I worked at before that, so there was kind of a -- I worked at the agency for this other -- under another name, and then it was LifeStance.

          MR. RUDMAN:  I have no further questions, your Honor.

          THE COURT:  Anything from the defense?

          MR. CRISP:  No, your Honor.

          THE COURT:  Thank you so much.  You may step down.

          (Witness excused)

          THE COURT:  All right.  So let me hear from counsel if they want to make any argument on this issue.

          MR. RUDMAN:  May it please the Court.  Can I stay here or do you want me to go to the lectern?

          THE COURT:  Yes, you can stay there, but be seated because we can't really hear you well enough for the reporter to pick up everything if you don't speak right into the microphone.

          MR. RUDMAN:  As long as it's okay with you, Judge.

          Well, we heard today from two of the lead plaintiffs. I think as you can tell from Mr. Nayani, he's serious about this case.  He was here last week.  He came yesterday. Unfortunately he couldn't be here in person today, but he wanted to be.  He made a well-thought-out and considered investment.  He feels wronged.  He's been committed to the

MB47NIZH

case.  He's been involved, in contact with his lawyers.  I don't think we got to this, but he's been investing in the market for quite some time.  I think he clearly shows he has an understanding of his roles and responsibilities of lead plaintiff and as a class rep.  And he has overseen his lawyers to date and will continue to do so.

By contrast, now, his losses are $385.  We haven't talked about losses today.  Ms. Jordan's losses are $608.  In relative terms, your Honor, I would say those are roughly equal.

THE COURT:  Do you have any idea how large their class is?

MR. RUDMAN:  It's got to be many thousands, tens of thousands.

THE COURT:  Okay.

MR. RUDMAN:  I would say it's roughly equal.

And under recent cases that you've decided in the lead plaintiff area, when the loss is roughly equal, we go right to adequacy.  And I think when we look here, Mr. Nayani is simply a better pick.  Ms. Jordan filed papers with her name spelled wrong, which clearly shows either she's too busy -- she's a fine person, but she must be too busy or wasn't able to properly supervise her lawyers.  And filing a document under penalties of perjury with your name spelled wrong right above where your name is, either she must have read the papers too

MB47NIZH

quickly or simply wasn't giving it the proper diligence that it requires.

Similarly, it's not really excusable to not mention that you worked at LifeStance, even if you think that your role at LifeStance didn't put you in possession of any material nonpublic information or any information that's going to be relevant in the lawsuit—which I dispute, by the way—because it just -- that's something you would think that somebody would mention, I worked at a company affiliated with the defendant.

And we didn't get into it when she testified, but the allegations here, your Honor, were linked directly to the network of psychiatrists that were being employed by LifeStance. And one of the key allegations is that the retention rate at the time of the IPO—and that is how many psychiatrists they were keeping instead of quitting—was dropping. So they were losing a lot of psychiatrists, and that was going to be detrimental to their financial performance going forward. Ms. Jordan was one of those psychiatrists, your Honor. She left two weeks after she purchased her stock. She left LifeStance. So these are just issues that the class does not need to be burdened with in this case. And by contrast, Mr. Nayani doesn't have any of those issues.

Now, the defendants have raised a couple arguments. I don't know if your Honor wants me to address them.

THE COURT: Let's hear from the defense and then I'll

MB47NIZH

have --

MR. RUDMAN:  Unless your Honor has any questions for me, I have nothing further.

THE COURT:  Okay.  Go ahead.

MR. HOOD:  Your Honor, there really is no dispute that Ms. Jordan has alleged the largest financial interest in this litigation.  Her loss is not roughly equivalent to Mr. Nayani's, it is nearly twice as large.  And the proper inquiry under the PSLRA is not to turn this into an adequacy contest.  Two-step inquiry is, first, you identify the largest financial interest and then you determine whether that movant has also *prima facie* demonstrated adequacy and typicality.  And I submit that Ms. Jordan has made both of those showings.

The only challenges for appointment, at least from counsel for Mr. Nayani, are this typographical error regarding the spelling of her name and her employment history at LifeStance.

There has been no question that there's been any false attestation at stake with respect to matters of substance in any of the papers submitted by Ms. Jordan.  I think there's a myopic focus on this typographical error which was made on the part of counsel and was quickly remedied before opposing counsel or the Court *sua sponte* needed to correct it.  I'm not aware of any authority to the effect that an error of that degree is disqualifying in any case cited in Mr. Nayani's

MB47NIZH

papers.  With respect to errors being disqualifying, you've got errors of significantly greater substance impacting the movant's losses, some false statements in the certification, for example, with respect to prior participation in actions, things of that nature, and that simply isn't the case here.

Now, regarding her former employment of LifeStance, she was a psychotherapist.  She dealt only with patients.  She had no direct reports.  She was not in a managerial capacity.  She had no insights into the various financial metrics that are at issue in this complaint.  Adopting defendants' position would effectively -- not defendants', Mr. Nayani's position would come close to adopting a per se rule that any former employee of that company would be barred from serving as a lead plaintiff in an action against that company.

Now, regarding Mr. Nayani's own adequacy—and I in no way mean to cast any aspersions upon him—at this stage of the litigation, he has presented as an informed and certainly motivated litigant.  We appreciate that he's tried to get here, and it's through no fault of his own that he's not.  However, I would say that the circumstances of Mr. Nayani's involvement in this litigation do raise legitimate questions as to what he understood his role to be.

His retainer was dated December 15, 2021.  That's roughly eight months before the complaint was filed the following August.  And I think it's telling that that retainer

MB47NIZH

had no fee provisions whatsoever.  That strongly suggests that there was no expectation that Mr. Nayani would be serving any leadership role in this case.

October 11, the lead plaintiff motion deadline came and went.  Mr. Nayani made no application.  From testimony, it's unclear why that was the case.  However, it was only eight days later that Mr. Nayani executed a supplemental retainer addendum that does contemplate some fee provision.  So it seems as though it's very late in the game that Mr. Nayani was prepared to --

THE COURT:  Is it relevant that the percentage that was ultimately worked out with Mr. Nayani was considerably less than the maximum percentage that your retainer agreement contemplates?

MR. HOOD:  I would submit no, your Honor.  Our retainer contemplates -- as you've said, it's merely a maximum. And the same paragraph, it makes very clear that we would be required to consult with and obtain approval from Ms. Jordan and, of course, from the Court -- first of all, from Ms. Jordan before making any fee application, which will then, of course, need to be approved by the Court.

I would say that the fact that Ms. Jordan agreed to fee provisions in the first instance indicates that she had agreed with her involvement and had an understanding of her role in this litigation from an earlier stage.

MB47NIZH

THE COURT:  Regardless of whether I appoint her lead plaintiff, if the class is not certified, are you still going to represent her?

MR. HOOD:  Yes, your Honor.  We've had that discussion.  It's not reflected in the retainer, but we have committed to doing so.

THE COURT:  Okay.  Is there anything defense counsel would like to say?

MR. CRISP:  Briefly, your Honor.

THE COURT:  Go ahead.

MR. CRISP:  I don't intend to restate anything that we've made in our written submission or that Mr. Hood or Mr. Rudman have already stated.  But to amplify one brief point regarding Mr. Nayani, Mr. Hood mentioned the delay between the initial engagement letter and the filing of the complaint in August.  I'd offer a slightly different perspective on that. It's not just the matter of the terms of the engagement letter. But also as your Honor pointed out in the *Lockheed Martin* case, when a plaintiff delays substantially and then filed on the last day of the limitations period, that does indicate that the person with the hands on the wheel is not the client but, rather, the attorney.

And obviously, under the statute in interpreting case law, the size of the losses can be deemed a proxy for adequacy or a presumption of adequacy.  Here, neither plaintiff has

MB47NIZH

anything larger than *de minimus* losses.  And I'd say, respectfully, given the submissions from Ms. Jordan and the timing from Mr. Nayani's submission, that we've seen nothing that would actually show a viable sort of real client, as your Honor indicated, either in *Razorfish* or in *TG Therapeutics*.

THE COURT:  Well, based on those comments, I want to raise a broader point which any counsel may want to comment on.

The PSLRA creates a rebuttable presumption in favor of the plaintiff who suffered the greatest loss because it contemplates that there will be—as in many large securities fraud class actions—institutional investors or other very sophisticated investors who can play a greater role in the management of the case than might be true of an individual investor.  But in a case where there aren't such big institutional investors, or at least none that chooses to come forward to serve as lead plaintiff, I wonder whether a different kind of consideration operates.

The whole point of contingent fees is so that people who have suffered small injuries can still have their day in court.  The whole point of class actions is so that the people in that situation, who might hesitate just because of the small loss to bring an action or who might have trouble finding an attorney who would take their case because of the small individual losses involved, could instead collectively bring a class action for the alleged wrongdoing which would serve both

MB47NIZH

the collective interest of the victims as well as overall securities enforcement goals.

So it looks to me that this case fits more of that second pattern. It doesn't really seem to me to be a case that easily fits within the PSLRA, or I should say fits within the policies that generated the PSLRA.

Now, that doesn't mean that it's not important that the client be someone who can manage the litigation. That's very important. But I'm wondering whether the model of an albeit rebuttable presumption in favor of the greatest loss is really the right way to look at a case like this. So maybe I should address that first to counsel for Ms. Jordan.

MR. HOOD: Certainly, your Honor.

I think, contrary to defendants' suggestion, $600, it may not be a lot of money to LifeStance or to its corporate C-suite, but to a small investor, that's precisely the type of plaintiff that the PSLRA was trying to protect.

THE COURT: Well, and that -- I'm making no rulings today, but at least my tentative notion is that the idea that there can be a case in which there's no adequate plaintiff, lead plaintiff is not this case.

MR. HOOD: Thank you, your Honor.

I don't think that it's accurate to characterize loss as a proxy for adequacy. It's a factor to be taken into account whether a movant's loss is sufficient to ensure

MB47NIZH

vigorous advocacy.  I would say here, $600 was enough to motivate Ms. Jordan to seek appointment as lead plaintiff.  It was enough to get her across the country from Kansas to New York for this hearing.  Mr. Nayani, even a smaller loss, he's now flown from Houston twice.  So certainly, the small investor—as the statute was designed to protect—they see these losses as certainly meaningful.

I agree with your Honor's suggestion that the purpose of class actions is to aggregate a number of small claims and that adopting a ruling where a *de minimus* loss would be insufficient certainly undermines that regime to some extent. Theoretically, a small enough company with many small investors could theoretically defraud many small investors with impunity if no single investor incurred a large amount of loss to actually motivate them -- pardon me, to reach any threshold criteria.

THE COURT:  Okay.

MR. RUDMAN:  Your Honor, I can tell you I agree with your statement completely, the question that you posed initially.  I have a different take on the PSLRA.

One of the policy goals was to -- one of the problems that was perceived by the institutional community was that they were learning about these cases when they were settled, and there were small shareholders running them.  And at the time the case is settled, it's too late.  Most judges don't want to

MB47NIZH

hear about it.  That's why we have the notice.  Okay.  Now you learned about the case before -- you want to do something, you can come in at that time and take over the case.  Well, how are we going to decide who takes it over?  Whoever has the largest financial interest.  For the most part in all of these cases, that's what occurred.

But I have to tell you, in getting prepared for this hearing, there are many, many cases around the country where these shareholders have very modest losses.  Just last year, Judge Oetken appointed a lead plaintiff in the *Kirkland Gold* case with a $139 loss.  It happens all the time.

With respect to these two clients, if I may make a couple of comments.  I do think that the numbers are relatively comparable.  As your Honor held in *TG Therapeutics*, what you really should look for is the adequacy.

I want to just comment on one thing that the defense lawyer said, and this is something that I argued with your Honor about in the *Lockheed* case about the statute of limitations.  There's never been any concession made by us, your Honor, Mr. Nayani's counsel, that the statute of limitations would, in effect -- that we actually filed a day before it would run.  All we say in our papers is that we avoided any timeliness concerns that that August 11th disclosure by LifeStance may have created.

As you are well aware, your Honor, the statute of

MB47NIZH

limitations is a very complex factual issue.  And it's very likely that the statute of limitations in this case, that your Honor, after looking at all the evidence, might find it wouldn't have run for another six months given the different things that LifeStance was announcing.  There are no corrective disclosures pled in the complaint.  There's just announcements by LifeStance revealing what was happening in their business.  Loss causation is not an element of claim.  So this argument that there's somehow a tactical advantage to filing, that the filing was somehow done in a way to benefit Mr. Nayani, or that he sat on his rights simply is not true.

THE COURT:  Yes.  Well, I should say I try to make up for any delay in bringing a lawsuit by bringing it to trial rapidly, as all counsel are very well aware.

Anything defense counsel wanted to add?

MR. CRISP:  Briefly, your Honor.

And I say this in recognition of your tentative instincts and in terms of our motion.  But I would agree with Mr. Hood in the sense that I don't know that this is naturally a case where the rebuttable presumption needs to be the focus. That said, there is still the statutory overlay of adequacy where the size of the loss is often the proxy for adequacy. And when we don't have that, that's not to say that any individual investor with relatively modest losses could never be an appropriate lead plaintiff under the PSLRA, but that lead

MB47NIZH

plaintiff still has to make a preliminary showing of adequacy that would imply a course of conduct in terms of vigorous oversight on timing of filings, on the content of filings that I would respectfully submit we haven't seen from testimony.

THE COURT:  First of all, I'm not making any rulings today and, certainly, I'm not making a ruling that there can never be a case where a court could conclude that there is no adequate plaintiff.  I think if I recall correctly, among other cases, there is one from Magistrate Judge Mann in the Eastern District, and since she and I served in the U.S. Attorney's Office together for seven years, I have to give very great attention to her determinations.

But in any event, I thank all counsel, and I thank Ms. Jordan, and I thank Mr. Nayani.  And I will decide this motion of motions——depending how you look at it——by no later than the day before Thanksgiving, and then we will set a schedule for where we go from there, if anywhere.

So thank you again, and that concludes this proceeding.

(Adjourned)