UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

NIZAR S. NAYANI, Individually and on
Behalf of All Others Similarly Situated,

                 Plaintiff,

vs.

LIFESTANCE HEALTH GROUP, INC.,
MICHAEL K. LESTER, J. MICHAEL
BRUFF, ROBERT BESSLER, DARREN
BLACK, JEFFREY CRISAN, WILLIAM
MILLER, JEFFREY RHODES, ERIC
SHUEY, KATHERINE WOOD, MORGAN
STANLEY & CO., LLC, GOLDMAN SACHS
& CO. LLC, J.P. MORGAN SECURITIES
LLC, JEFFERIES LLC, TPG CAPITAL BD,
LLC, UBS SECURITIES LLC and WILLIAM
BLAIR & COMPANY, L.L.C.,

                 Defendants.

———————————————————— x

Master File No. 1:22-cv-6833-JSR

<u>CLASS ACTION</u>

**AMENDED COMPLAINT FOR
VIOLATIONS OF FEDERAL
SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Lead Plaintiff Nizar Nayani ("Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon information and belief as to the investigation conducted by Lead Plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by LifeStance Health Group, Inc. ("LifeStance" or the "Company"), interviews of former LifeStance employees, securities analyst reports, press releases, and other public statements issued by or about the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.       This is a federal securities class action on behalf of a class consisting of all persons, other than Defendants (defined below) and their affiliates, who purchased LifeStance common stock ("common stock" or "common shares") in and/or traceable to the Company's initial  public offering ("IPO") on or about June 10, 2021(the "Class"), seeking damages for violations of §§11 and 15 of the Securities Act of 1933 ("Securities Act").

## JURISDICTION AND VENUE

2.       The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o. This Court has jurisdiction over this action pursuant to §22 of the Securities Act, 15 U.S.C. §77v, and 28 U.S.C. §1331.

3.       Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District. The offer and sale of the securities occurred in this District, with the IPO having been conducted, and closed, in this District. LifeStance has at least 15 clinical locations in this District, and one of the Individual Defendants (defined below), Darren Black, owns an apartment here. The

representatives of the Underwriter Defendants (defined below) in the IPO maintain their principal places of business in this District.

4.      In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NASDAQ Stock Market, LLC ("NASDAQ"), a national Securities Exchange.

## PARTIES

5.      Lead Plaintiff Nizar S. Nayani purchased LifeStance common stock traceable to the IPO, as set forth in his certification previously filed with this Court and incorporated by reference herein, and was damaged thereby.

6.      Defendant LifeStance, through its subsidiaries, offers its patients a suite of mental health services, including psychiatric evaluations and treatment, psychological and neuropsychological testing, as well as individual, family, and group therapy.  LifeStance has at least 15 clinical locations in this District.  LifeStance common stock trades on the NASDAQ stock market under the ticker symbol "LFST."

7.      Defendant Michael K. Lester ("Lester") served as the President, Chief Executive Officer ("CEO"), and Chairman of LifeStance's Board of Directors at the time of the IPO. Defendant Lester served in such capacities from 2017 until his retirement on September 7, 2022.

8.      Defendant J. Michael Bruff ("Bruff") served as the Chief Financial Officer ("CFO") and Treasurer of LifeStance at the time of the IPO.  Defendant Bruff served in such capacities from 2017 until November 10, 2022, when he assumed the role of LifeStance's Business Transformation Officer.

9.      Defendants Robert Bessler ("Bessler"), Darren Black ("Black"), Jeffrey Crisan ("Crisan"), William Miller ("Miller"), Jeffrey Rhodes ("Rhodes"), Eric Shuey ("Shuey"), and

Katherine Wood ("Wood") each served as members of LifeStance's Board of Directors at the time of the IPO.  Defendant Black owns an apartment in this District.

10.     Defendants Lester, Bruff, Bessler, Black, Crisan, Miller, Rhodes, Shuey, Wood are collectively referred to herein as the "Individual Defendants."  Each of the Individual Defendants signed the Registration Statement, as defined herein, issued in connection with the IPO.

11.     Defendants Morgan Stanley & Co., LLC ("Morgan Stanley"), Goldman Sachs & Co. LLC ("Goldman Sachs"), J.P. Morgan Securities LLC ("J.P. Morgan"), Jefferies LLC ("Jefferies"), TPG Capital BD, LLC ("TPG Capital BD"), UBS Securities LLC, and William Blair & Company, L.L.C., are among the investment banking firms that acted as underwriters of LifeStance's IPO (collectively the "Underwriter Defendants").

12.     Defendants Morgan Stanley, Goldman Sachs, J.P. Morgan and Jefferies are each headquartered, and conducted the IPO out of their offices, in this District as representatives of the other Underwriter Defendants.  Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public securities offerings;

(b)     The Underwriter Defendants participated in the drafting and dissemination of the Registration Statement and collectively received discounts and commissions of more than $45.5 million in connection with the IPO.  The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize LifeStance stock in the IPO;

(c)     The Underwriter Defendants arranged a multi-city roadshow before the IPO during which they, and representatives from LifeStance, met with potential investors and presented highly favorable information about the Company, its operations, and its financial prospects;

(d)     The Underwriter Defendants participated in the filing of the Registration Statement with the SEC;

(e)     The Underwriter Defendants demanded and obtained an agreement from LifeStance pursuant to which LifeStance would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.  They also required that LifeStance purchase directors' and officers' liability insurance;

(f)     Representatives of the Underwriter Defendants also assisted LifeStance and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of LifeStance, an undertaking known as a "due-diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to participate in the IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning LifeStance's operations and financial prospects; and

(g)     The Underwriter Defendants met with LifeStance's lawyers, management, and top executives and engaged in "drafting sessions" between, at least, February 2021 and June 2021. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which LifeStance stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about LifeStance would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and LifeStance management and top executives, the Underwriter Defendants knew, or were negligently unaware, of the inaccurate representations and/or omissions in the Registration Statement detailed herein.

- 4 -

13.     The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement was prepared properly, accurately and free from misstatements or omissions of material fact.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

14.     Defendant LifeStance, the Individual Defendants, and the Underwriter Defendants are sometimes collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

15.     Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of himself and all persons other than Defendants and their affiliates who purchased the common shares of LifeStance in, or traceable to, the IPO.  Excluded from the Class are Defendants, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

16.     The members of the Class are so numerous that joinder of all members is impracticable.  The Company and certain selling stockholders collectively sold 46 million LifeStance common shares in  the IPO.  The precise number of Class members is unknown to Lead Plaintiff at this time but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of LifeStance or its transfer agent or the underwriters to the IPO.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

17.     Lead Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Lead Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

18.     Lead Plaintiff's claims are typical of the claims of the other members of the Class because Lead Plaintiff and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Lead Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

19.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether the Registration Statement issued by Defendants to the investing public in connection with the IPO omitted and/or misrepresented material facts about LifeStance and its business; and

(c)      the extent of injuries sustained by members of the Class and the proper measure of damages.

## SUBSTANTIVE ALLEGATIONS

### The Company And Its Business

21.      Defendant LifeStance is one of the nation's largest providers of virtual and in-person outpatient mental and behavioral health services, with operations in 27 states as of March 31, 2021.

22.      The Company operates its business through clinical practices or "centers" that are either: (i) wholly owned by its subsidiaries; or (ii) in those states where applicable law requires ownership of the centers by physicians, its "affiliated practices."  The Company owns substantially all of the assets of its affiliated practices and enters into a long-term management services contract with each center pursuant to which LifeStance provides all the services to the center that it needs to operate, with the exception of medical or clinical services.

23.      As of December 31, 2020, LifeStance employed approximately 3,100 licensed mental health clinicians through its subsidiaries and affiliated practices across the U.S.  The Company's clinicians offer patients a comprehensive suite of mental health services, spanning psychiatric evaluations and treatment, psychological and neuropsychological testing, and individual, family and group therapy, and treat a broad range of mental health conditions, including anxiety, depression, bipolar disorder, eating disorders, psychotic disorders, and post-traumatic stress disorder.  Patients can receive care virtually through LifeStance's online delivery platform or in-person at one of its centers.

24.      The Company has established more than 200 payor relationships, including national agreements with multiple payors, whereby patients can utilize their in-network benefits when they receive care from LifeStance clinicians.

### The IPO

25.    On May 17, 2021, LifeStance filed the Form S-1 Registration Statement with the SEC.

26.    On June 9, 2021, the SEC declared effective LifeStance's Form S-1 registration statement, as amended, which incorporated a prospectus (the "Registration Statement"), offering to sell to the public at a proposed price of $18.00 per share 32,800,000 LifeStance common shares by the Company and 13,200,000 additional LifeStance common shares (including 6 million common shares pursuant to overallotment options issued to the Company's underwriters) collectively owned by TPG VIII Lynnwood, Summit Partners and its affiliates, and Silversmith and its affiliates.

27.    On June 14, 2021, the IPO was completed with the Company and TPG VIII Lynnwood, Summit Partners and its affiliates, and Silversmith and its affiliates respectively selling 32,800,000 and 7,200,000 LifeStance common shares to the public at a price of $18.00 per share. The underwriters exercised in full their option to purchase 6 million additional shares from TPG VIII Lynnwood, Summit Partners and its affiliates, and Silversmith and its affiliates, and the sale of such shares was completed on June 25, 2021.

### At the Time of the IPO, Unbeknownst to Investors, LifeStance Was Experiencing A Material Decrease In Its Clinician Retention Rate

28.    LifeStance generates revenue on a per-visit basis when a patient receives care from one of its clinicians.  The Registration Statement notes that "[r]ecruiting new clinicians ***and retaining existing clinicians*** in our existing centers enables us to see more patients per center by expanding our patient visit capacity."[1]

---

[1]    Unless otherwise noted, all emphasis herein is added.

29.     Accordingly, the Company's revenue growth is directly related to the growth in, and retention of, the clinicians it employs.

30.     As illustrated in the chart below, LifeStance experienced a 97% clinician compounded annual growth rate ("CAGR") during the 2018 to 2020 timeframe, which led to a 94% revenue CAGR during the same period:



31.     The Registration Statement indicates that, in addition to being directly correlated with the Company's reported revenue, clinician retention is an important element in the calculus of LifeStance's earnings margins, noting, in pertinent part:

> We seek to grow our Center Margin through a combination of (i) **growing revenue through clinician hiring and retention**, patient growth and engagement, hybrid virtual and in-person care, existing office expansion, and in-network reimbursement levels, and (ii) leveraging on our fixed cost base at each center.[2]

---

[2]     The Registration Statement defines Center Margin as income (loss) from operations excluding depreciation and amortization and general and administrative expenses, and states: "[w]e consider Center Margin to be an important measure to monitor our performance relative to the direct costs of delivering care."

32.     Accordingly, clinician retention is an essential element in the evaluation of LifeStance's financial performance.

33.     Unbeknownst to investors, LifeStance experienced a significant increase in the resignation of its clinicians during the period leading up to the IPO.  This increase in clinician resignation in the weeks before the IPO was primarily attributable to three factors: (1) compensation discontentment; (2) credentialing delays; and (3) COVID-19 fatigue.

34.     The increase in clinician resignations before the IPO was not localized, but rather occurred across the Company's national footprint, and was common knowledge within the Company.  In fact, the increase in clinician resignations before the IPO was a frequent topic of discussion in meetings held among senior LifeStance managers, including meetings attended by the Company's Regional Presidents, Regional Clinical and Medical Directors, and Senior Clinical and Medical Directors, as well as meetings attended by the Company's Chief Growth Officer, Chief Medical Officer, and Senior Clinical and Medical Directors.

35.     The first known cause of clinician turnover was a discontentment with LifeStance's compensation arrangement with its clinicians.

36.     During the clinician recruiting process, LifeStance told prospective clinicians that they would receive a "base salary" during their first year of employment with the Company.  The Company's standard clinician employment agreement provides that such base salary is actually an advance on compensation to be paid in equal installments over the clinician's initial twelve-month employment period in accordance with Company's standard payroll policies.  As clinicians render patient services, they earn a gross fee equal to 60% of the relevant billing amount listed in the Company's compensation schedule.  These earned fees are then offset against the compensation previously advanced to the clinicians by LifeStance.

37.     During the period leading up to the IPO, many clinicians were unable to earn fees sufficient to offset the amounts advanced to them pursuant to their employment agreements.  Former LifeStance clinicians state that the reasons for that inability were multi-fold.

38.     First, as detailed below, it generally takes between 4 to 6 months for each newly employed clinician to be enrolled in insurance provider networks.  During the period clinicians are waiting to be enrolled in provider networks, they see few patients.  Accordingly, the fees they earn from rendering patient services are severely constrained, resulting in the accumulation of large amounts of advanced compensation that must, in the absence of earned fees, be repaid.  This accumulating debt was the source of acute stress to new clinicians, and was described by some former clinicians as a form of "indentured servitude."

39.     Second, the Company's rapid expansion in 2020 and the beginning of 2021 resulted in numerous operational constraints, including: (i) inadequate IT system training; (ii) inexperienced, disorganized, and/or insufficient support staff; and (iii) billing-related issues.  In fact, former LifeStance clinicians stated that their ability to earn fees from rendering patient services was significantly compromised because, in addition to rendering medical services, they were required to perform functions typically assigned to support staff – often without compensation.

40.     Third, former LifeStance clinicians complained that the Company presented them with wholly unrealistic projections of potential earnings to induce them to join LifeStance, leading them to believe they would have little difficulty offsetting the compensation advanced to them.

41.     The nature of LifeStance's compensation arrangements with its clinicians, coupled with operational inefficiencies associated with the Company's rapid expansion, resulted in the accumulation of large debt balances owed to the Company by its clinicians, which, in turn, resulted in an increase in clinician resignations before the IPO.  Indeed, during the period leading up to the

IPO, approximately one third of newly-hired LifeStance clinicians resigned within the first three months of their employment, based on data collected at the Company beginning in early 2021.

42.     In addition to compensation-related dissatisfaction, many LifeStance clinicians resigned over frustrations with insurance credentialing during the period leading up to the IPO. Insurance credentialing, also referred to as provider enrollment, is the process by which clinicians apply to health insurance networks for inclusion in their provider network.   For commercial insurance networks, this process involves two steps: (1) credentialing – or application and approval for the provider to participate in a health plan; and (2) contracting – or the review, negotiation, and agreement to reimbursement rates.   Provider credentialing is a regulated process that must be undertaken each time a clinician is hired by a new employer, even if that provider has previously been credentialed by the same insurer.

43.     During the period leading up to the IPO, operational constraints at LifeStance contributed to the prolongation of delays in clinician insurance credentialing.  As a result, clinicians saw a reduced number of patients, which contributed to the accumulation of the large debt balances they owed the Company.  During the period leading up to the IPO, many LifeStance clinicians resigned over frustration with delays in obtaining insurance credentialing.

44.     In addition to the foregoing, clinician fatigue resulting from the COVID-19 pandemic resulted in an increase of clinician turnover before the IPO.

45.     The COVID-19 pandemic has had an unparalleled effect on the U.S. healthcare system, with medical providers facing new sources of stress, including fear of the virus, an inability to handle increased workloads, and changes in childcare and eldercare responsibilities.  These factors have led to clinician exhaustion and burnout, and a heightened degree of turnover and exit from their medical practice.

46.     According to a National Academy of Medicine ("NAM")[3] report issued in October 2019, it is estimated between 35% and 54% of U.S. nurses and physicians have substantial symptoms of burnout − a workplace syndrome that is characterized by high emotional exhaustion, high depersonalization (*i.e.*, cynicism), and a low sense of personal accomplishment.  According to the report, "numerous work system factors (*i.e.*, job demands and job resources) either contribute to the risk of burnout or have a positive effect on professional well-being.  The factors are varied and are context-dependent – factors in one setting may not be present in another."

47.     Similarly, a first quarter 2021 Washington Post-Kaiser Family Foundation survey found that nearly 30% of heatlcare workers are considering leaving their profession altogether, and nearly 60% reported impacts to their mental health stemming from their work during the COVID-19 pandemic.

48.     The medical professionals at LifeStance were no different from other healthcare workers that were afflicted by burnout, which caused an increase in clinician resignations before the IPO.  In fact, just a few weeks after the IPO, LifeStance's executive managers admitted as much.

**LifeStance Knew About the Increase Clinician**
**Turnover Before the IPO and that It Was Reasonably**
**Likely to Have a Material Adverse Effect on Its Financial Performance**

49.     On August 11, 2021, LifeStance held the Q2 conference call with securities analysts and investors, its first earnings call as a public company, to discuss the Company's June 30, 2021 quarterly financial results and operations (the "Q2 conference call").

_____

[3]   The NAM is a non-profit, non-governmental organization that provides advice on issues relating to health, medicine, health policy, and biomedical science.  It aims to provide unbiased, evidence-based, and authoritative information and advice concerning health and science policy to policy-makers, professionals, leaders in every sector of society, and the public at large.

50.     During the Q2 conference call, LifeStance's Chief Growth Officer, Danish Qureshi ("CGO Qureshi"), stated that the COVID-19 pandemic had increased employee turnover within the healthcare industry generally, and that LifeStance was not immune from such industry dynamics:

> However, **as the COVID-19 pandemic continues to play out, there's been a recent increase in turnover** across industries and **especially within health care**. **LifeStance is not immune to these industry dynamics, and we've experienced an increase in clinicians retiring or leaving for personal reasons**.

51.     Later during the Q2 conference call, CGO Qureshi stated that the Company's executive managers "really believe" the recent "uptick" in clinician turnover at LifeStance is "very clearly tied to the [COVID-19 pandemic]." The following exchange occurred between a securities analyst following LifeStance and CGO Qureshi:

> Ryan Scott Daniels, Partner, William Blair & Company L.L.C.:
>
> **I want to stick with the higher physician turnover**. Can you go into a bit more detail, **that's obviously going to be the clear investor question**, **on what level of turnover you're seeing versus historically**, maybe the percentage increase? And then **how certain are you that the industry versus not being company specific**? And if you're seeing it all regions or anywhere in specific in the country?
>
> CGO Qureshi:
>
> Yes.  So first off, **we really believe that this increased level of turnover is very clearly tied to COVID** and kind of the market dynamics that are going on currently.  It's both impacting multiple industries and particularly health care.  **And again, LifeStance is not immune to those sort of changes**.  Where **we're seeing the uptick in turnover is really clinicians leaving for personal reasons, like early retirement, family priorities, lifestyle changes, et cetera.**  And that, again, is very consistent with what the overall market is seeing.

52.     During the Q2 conference call, CGO Qureshi stated that LifeStance knew about the increase in clinician turnover before the IPO because the Company has "early warning" procedures in place that allow it to monitor clinician turnover, and because the Company conducts exit interviews with every resigning clinician to "understand really what's going on":

> So **we actually have a lot of those early warning signs or kind of triggers in place already to be able to monitor what's going on in our clinician base**, including

monthly touch points with all clinicians. **So that we're having both a data-driven approach to seeing what's going on with turnover**, but more importantly, the personal approach to understand what's going on in every single clinician's life to see what's impacting them.

*       *       *

We make sure that we always take clinicians leaving very seriously. **So we do exit interviews with every single clinician before they leave to be able to understand really what's going on** and are there things that are controllable that we can affect to change those decisions.

53.     In addition to these admissions by CGO Qureshi, LifeStance's financial statements in the Registration Statement make clear that the Company's outpatient mental health practice acquisition agreements provide for additional cash consideration in the form of earnouts that are contingent upon the acquirees achieving certain performance and operational targets, including employee retention and growth.  As a result, LifeStance measures its contingent consideration liability on a recurring basis using a valuation methodology that depends, in part, on the rate of full-time employee retention.  This exercise also provided LifeStance's executives with knowledge about the increase in clinician turnover before the IPO.

54.     Moreover, the increase in clinician resignations before the IPO was not localized, but occurred across the Company's national footprint, and was common knowledge within the Company.  The increase in clinician resignations before the IPO was a frequent topic of discussion in meetings held among senior LifeStance managers, including meetings attended by the Company's Regional Presidents, Regional Clinical and Medical Directors, and Senior Clinical and Medical Directors, as well as meetings attended by the Company's Chief Growth Officer, Chief Medical Officer, and Senior Clinical and Medical Directors.

55.     In fact, in May 2021 – weeks before the IPO – CGO Qureshi participated in a C-suite meeting with high-ranking LifeStance executive managers to discuss the difficulties the Company was experiencing with clinician retention.  During the meeting, data about the reasons for the

ongoing increase in clinician resignations, gathered from across approximately half of the Company's national footprint since early 2021, was presented and discussed among its senior managers.

56.     Later, during the Q2 conference call held in August 2021, Defendant Bruff issued a series of statements acknowledging that the increase in clinician turnover: (i) began no later than May 2021; and (ii) would have an immediate, and material, adverse effect on LifeStance's financial performance.

57.     Bruff stated that the increase in clinician turnover began "midway through the second quarter" – *i.e.*, May 2021 – commenting:

> In our first quarter, we were in line with our growth expectations from a clinician and revenue perspective.  And **the second quarter is** when we saw an uptick in the clinician growth momentum, and it's also **where we saw the increase in turnover**.  And the turnover is relatively consistent with what was happening in the market.  For that quarter, I think it's just worth pointing out that we didn't really have any material impact from a financial perspective.
>
> *            *            *
>
> Look, we are struggling to really take this [LifeStance financial guidance] out beyond 2021 right now because ***the increase in turnover that we saw midway through the second quarter***, I can only project out through this year the data that I have in front of me and the data that we have in front of us.  I don't know if it's going to continue or – beyond this year or if it's going to be shorter than the projection that we have right now, which is through the end of this year because as Danish mentioned, this is market driven.

58.     Defendants knew the costs directly associated with clinician turnover were immediate and significant.  These costs include: (i) recruitment costs, such as recruiting fees, advertising, interviewing, and screening; (ii) onboarding costs, such as training and management time; (iii) the costs associated with getting new clinicians enrolled in health insurance networks; and (iv) the lack of productivity during a clinician's first year of employment.

59.     In fact, during the Q2 conference call, Defendant Bruff acknowledged – twice – that clinician turnover has an immediate, adverse effect on LifeStance's financial performance, pressuring both company revenue and earning margins, stating:

> . . . from a clinician perspective, **we got to remember that when a clinician leaves the company, it has** – that clinician has **an immediate impact, downward impact, on the financial performance** as leaving clinicians are typically at full capacity. The – **that gives us downward pressure on both revenue and Center Margin dollars**. . . .
>
> *     *     *
>
> So when we get into looking forward into the back half of this year, from a clinician perspective, we got to remember that **when a clinician leaves the company, it has** – **that clinician has an immediate impact, downward impact, on the financial performance** as leaving clinicians are typically at full capacity. **The** – **that gives us downward pressure on both revenue and Center Margin dollars in both the quarters in the back half of this year**.

60.     In addition, Bruff explained that, generally, the productivity of newly hired clinicians is impaired, as it typically takes them 4 to 6 months to ramp to full capacity, which also pressures LifeStance's earnings margins, stating:

> . . . **with respect to hired clinicians**, **it typically takes those clinicians 4 to 6 months to ramp to that full capacity**. And **acquired clinicians, it takes about the same period** for those clinicians to benefit from rate synergies that LifeStance provides. So **that's why you're seeing a greater margin pressure** . . . .

61.     Later during the Q2 conference call, Defendant Bruff corrected himself and stated that new clinicians take 12 months to ramp to full capacity: "**clinician ramp is a key component of the Center Margin rate for sure**, right? We – **clinicians ramp to maturity over a 12-month period**."

62.     As CGO Qureshi clarified during the same call, a 4-to-6 months ramp-up period for new clinicians to become familiar with patients and get enrolled in insurance company networks is really a best-case scenario:

But what you see **with new clinicians** is that when they're coming on board and **they are establishing relationships with their patient base**, even if those were patients that were previously being seen by another LifeStance Health clinician, the visit times are longer, right?  So follow up visits are shorter, quicker.  **Initial visits are longer and take more time.  And so there's a natural ramp that has to happen as new clinicians get on boarded.  In addition, there's a national ramp as credentialing plays out for new clinicians** and we get them on panel with different payers in their region.  **So I would argue that the 4- to 6-month ramp is really best-in-class** and better than what I would assume kind of the market average is.

63.     The increase in clinician departures during the period leading up to LifeStance's IPO was expected to, and did, have a material adverse effect on the Company's future operating performance.

64.     Center Margin and adjusted EBITDA are two key financial performance measures that LifeStance routinely discloses to investors and securities analysts to aid them in evaluating the performance of its operations.[4]

65.     LifeStance's Center Margin and adjusted EBITDA during the first six months of 2021 totaled $95.2 million and $27.1 million respectively.  During the Q2 conference call, Defendant Bruff stated that the effect of clinician turnover would negatively impact Center Margin and adjusted EBITDA by approximately $7 million to $9 million during second half of 2021:

> And while we are assuming a continuation of lower retention rates for the remainder of the year, our ongoing recruiting and acquisition momentum is expected to deliver a higher-than-expected clinician base for the full year.  **However, new clinician additions have lower productivity for the first 4 to 6 months and therefore, will not immediately offset the impact from higher turnover, a dynamic we expect to negatively impact Center Margin and adjusted EBITDA by approximately $7 million to $9 million**.

---

[4]     Adjusted EBITDA (earnings before interest, taxes, depreciation, and amortization) is a non-Generally Accepted Accounting Principles ("GAAP") financial measure utilized by LifeStance to gauge its financial performance that it routinely provides to investors.  The Company defines Adjusted EBITDA as its net profit (loss) adjusted for certain specifically identified gains, losses, and expenses.

66.     As detailed below, the expected diminution in LifeStance's Center Margin and adjusted EBITDA resulting from clinician resignations during the second half of 2021 was material.

**The Registration Statement Contained Materially Inaccurate
Statements and Omitted Material Information Required to Be Disclosed Therein**

67.     The Registration Statement was negligently prepared and, as a result: (i) contained untrue statements of material fact; (ii) contained a statement of opinion imposing a duty of additional disclosure that went unmet; and (iii) omitted to disclose material information that was required to be disclosed pursuant to the regulations governing its preparation.

68.     **The Registration Statement Contained Inaccurate Statements of Material Fact**: The Registration Statement repeatedly highlighted the Company's very strong "87%" physician retention rate as of March 31, 2021.  For example:

> ***Employer of Choice for Licensed Mental Health Clinicians***
>
> We believe we are an employer of choice in mental health, allowing us to employ highly qualified clinicians.  Our success is demonstrated by our track record – in addition to the clinicians we have gained through our acquisitions, since our inception in March 2017 through December 31, 2020, we have hired 1,746 clinicians through our subsidiaries and affiliated practices, **with a clinician retention rate of over 87% compared to the industry average of 77%**.  [First emphasis in the original.]

69.     The statements in the Registration Statement referenced above in ¶68 were inaccurate statements of material fact that created a materially false impression about clinician retention and turnover at the time of the IPO.  Indeed, such statements repeatedly highlighted a better-than-average clinician turnover rate at LifeStance by distinguishing the Company's 87% physician retention rate from the 77% industry average.  The Registration Statement negligently failed to disclose that the Company's clinician retention rate declined materially before the IPO, and that, as a result, the represented 87% clinician retention rate prevailing as of March 31, 2021 was materially misleading when the Registration Statement was declared effective by the SEC on June 9, 2021.

70.     As detailed herein, after March 31, 2021 and before the IPO, LifeStance experienced a material increase in clinician turnover.  As Defendant Bruff admitted during the Q2 conference call, the Company was experiencing an increase in clinician turnover beginning in May 2021, which LifeStance expected to have a materially adverse effect on its operating performance during the second half of 2021.

71.     On November 8, 2021, LifeStance held a conference call with securities analysts and investors to discuss its quarterly financial results and operations for the period ending September 30, 2021 (the "Q3 conference call").  During the Q3 conference call, Defendant Lester admitted that the Company had *expected* its clinician retention rate to decline by approximately 10% from the 87% retention rate represented in the Registration Statement, and then stabilize at an 80% annualized rate during the second half of 2021:

> As far as retention rates, so as we said in our roadshow in 2020, we saw an 87% retention rate.  And **due to COVID**, we had indicated that **we saw we had more clinicians leaving than we had seen historically in 2020.  And so we felt like that [the clinician retention rate] was going to shake out around 80%.**  We, in fact, have stabilized at around 80%.

> \*        \*        \*

> During the quarter, we added 400 net clinicians, **stabilized clinician retention to 80% annualized aligned with our expectations**, opened 29 de novo centers and completed 6 acquisitions.

72.     Accordingly, the Registration Statement contained inaccurate statements of material fact and omitted known material facts necessary to make the statements contained therein not misleading as of the date it was declared effective by the SEC.  Once Defendants chose to use the Registration Statement to speak about clinician retention, they had a duty to ensure the Registration Statement spoke completely and truthfully, including about the increase in clinician resignations after March 31, 2021, and the adverse effects of that turnover on LifeStance's operations, so that

representations in the Registration Statement were not misleading as of the date it was declared effective by the SEC.

73.     **The Registration Statement Contained a Statement of Opinion Regarding the COVID-19 Pandemic That Raised a Duty of Additional Disclosure**: The Registration Statement asserted LifeStance's opinion that the COVID-19 pandemic did not have a material impact on the Company's operating results as of March 31, 2021:

> **We believe the COVID-19 pandemic did not have a material impact on our results of operations, cash flows and financial position as of or for the three months ended March 31, 2021**.  While the impact of the COVID-19 pandemic has increased stressors associated with mental health, we believe that a combination of factors contribute to our total patient visits and related revenue, including, among others, long-term trends in reduced stigmatization of mental health.  Even before the pandemic, we saw the need to have a platform supported by leading technology to give us the ability to treat patients virtually or in-person.  Our prior investment in our technology platform, most notably in our digital capabilities, became an essential component for continuing to deliver care to our patients during the pandemic.  We observed an impact on appointments in mid-March 2020 as patients moved to shelter-at-home and increased cancellations.   By the end of March 2020, appointments and visits had returned to normal levels.  Our clinician recruitment opportunities have also increased as a result of the pandemic, driven by an increase in clinician supply from those seeking more stable employment models.  With independent clinicians facing higher technology costs, shifting consumer behavior and challenges from the uncertain economic environment, our pipeline of acquisition targets grew and assisted in our 2020 footprint expansion.

74.     Regardless of the truth or falsity of the opinion expressed in the Registration Statement regarding the impact of the COVID-19 pandemic on LifeStance's financial position during Q1 2021, by asserting that opinion, the Registration Statement created a duty to disclose the known fact that, before the effective date of the Registration Statement, the COVID-19 pandemic was one of the three factors inducing clinician turnover during Q2 2021, which was having a known, immediate, and material impact on the Company's Q2 2021 financial position.

75.     As CGO Qureshi acknowledged in August 2021, during the Q2 conference call, "we really believe that ***this increased level of turnover is very clearly tied to COVID***," and "as the

COVID-19 pandemic continues to play out, there's been a recent increase in turnover across industries and especially within health care.  LifeStance is not immune to these industry dynamics."

76.     During the same call, Defendant Bruff made the connection between increased turnover and negative financial results, noting that the Company assumed "a continuation of lower retention rates for the remainder of the year," which it expected to "negatively impact Center Margin and adjusted EBITDA by approximately $7 million to $9 million" during the second half of 2021.

77.     In addition, LifeStance knew that COVID-19 clinician fatigue was having "an immediate impact, downward impact" on the Company's operations before the IPO because, as CGO Qureshi stated during the Q2 conference call, the Company has "early warning" procedures in place that allow it to monitor clinician turnover, and because the Company conducts exit interviews with every resigning clinician to "understand really what's going on."  LifeStance also measures its contingent consideration payable to the sellers of the medical practices it acquires on a recurring basis, using a valuation methodology that depends, in part, on the rate of employee retention. Moreover, during May 2021, CGO Qureshi participated in a C-suite meeting with high-ranking LifeStance executive managers to discuss the difficulties the Company then was experiencing with clinician retention and its primary causes.

78.     As Defendant Lester stated during the Q3 conference call, "**due to COVID**, we had indicated that we saw we had more clinicians leaving than we had seen historically in 2020," as noted in ¶71 above.

79.     Accordingly, the Registration Statement omitted material information required to be provided about the effects of the COVID-19 pandemic on clinician turnover and the Company's operations during Q2 2021, rendering the Registration Statement materially misleading.  Once Defendants chose to use the Registration Statement to speak about the impact of the COVID-19

pandemic on the Company's results, they had a duty to ensure the Registration Statement spoke completely and truthfully, including about the impact of COVID-19 on clinician turnover during Q2 2021, and the adverse effects of that turnover on LifeStance's operations.

80.     **The Registration Statement Failed to Identify And Disclose Known Events and Uncertainties Required to be stated therein**: Item 11 of Form S-1 required the Registration Statement to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A").

81.     The Registration Statement was materially inaccurate because the MD&A contained therein failed to disclose known material events and uncertainties associated with the increase in clinician turnover that were reasonably likely to, and did, have a material adverse effect on the Company's operating results, as alleged herein.

82.     In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K, which states, in pertinent part, as follows:

> **A disclosure duty exists where a** trend, demand, commitment, **event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's** financial condition or **results of operation**.

83.     On December 29, 2003, the SEC issued an additional interpretative release to Item 303 of Regulation S-K (the "2003 Interpretive Release"), reiterating that the purpose of MD&A is to provide investors with information necessary to an understanding of a company's results of operations, including the identification and disclosure of known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on a company's operating performance.

- 23 -

84.     The instructions to Item 303(a) of Regulation S-K require that the Registration Statement provide disclosure about and "focus specifically" on material events and uncertainties that would cause LifeStance's reported financial information not to be necessarily indicative of future operating results, including "matters that would have an impact on future operations and [matters that] have not had an impact in the past," stating, in pertinent part, as follows:

> The discussion and analysis shall **focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results** or of future financial condition.  **This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past**, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

85.     The 2003 Interpretive Release also provides that the Registration Statement ***was required*** to provide disclosures about known demands, events or uncertainties, ***except for*** those that management determined: (i) were not reasonably likely to occur; or (ii) would not have a material effect on LifeStance's operating results.  The 2003 Interpretive Release states, in pertinent part, as follows:

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty **is required unless** a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

86.     Based on this guidance, the MD&A in the Registration Statement was materially inaccurate and failed to disclose events and uncertainties then known to management about the Company's clinician retention rate that was required to be disclosed therein.

87.     Defendants knew the costs directly associated with clinician turnover were immediate and significant.  These costs included: (i) recruitment costs, such as recruiting fees, advertising, interviewing, and screening; (ii) onboarding costs, such as training and management time; (iii) the

- 24 -

costs associated with the process of getting new clinicians enrolled in health insurance networks; and (iv) the lack of productivity during a clinician's first twelve months of employment.

88.     Indeed, a recent *Gallup* analysis found that the cost of replacing exiting workers is one-half to two times the employee's annual salary.  For example, the cost of a replacing a person with a salary of $50,000 was found to be between $25,000 and $100,000.

89.     As detailed herein, before the IPO LifeStance's senior executive managers were aware of events and uncertainties associated with increased clinician turnover, matters directly associated with the Company's core business operations.

90.     LifeStance's senior executive managers possessed contemporaneous knowledge about the events and uncertainties associated clinician turnover sufficient for them to determine that those events and uncertainties would have an "immediate" adverse effect on the Company's operations. Accordingly, they knew those events and uncertainties were reasonably likely to have a material adverse effect on LifeStance's profit margins and operating results during the second half of 2021.

91.     During the Q2 conference call, ***which was held to discuss the Company's operations for the period ending just 12 business days after the closing of the IPO***, Defendant Bruff acknowledged that clinician turnover was expected to negatively affect LifeStance's Center Margin and adjusted EBITDA by approximately $7 million to $9 million, respectively, during the second half of 2021.

92.     Under the rules and regulations governing the preparation of the Registration Statement, LifeStance was required to disclose at the time of the IPO that the Company was incurring additional costs to recruit and retain new physicians due to a recent massive decline in physician retention, and that those costs were reasonably likely to (and ultimately did) adversely

affect LifeStance's future operating performance.  The Registration Statement, however, contained no such disclosures.

93.     As a result, the Registration Statement was materially inaccurate and failed to disclose events and uncertainties then known to management about the Company's clinician retention rate, which were required to be disclosed therein.

94.     **The Registration Statement Contained Inaccurate Risk Disclosures**: Item 3 of Form S-1 required the Registration Statement to furnish the information called for under Item 105 of Regulation S-K [17 C.F.R. §229.105], *Risk factors*, including, among other things, a "discussion of the material factors that make an investment in the registrant or offering speculative or risky."  None of the risk disclosures in the Registration Statement were meaningful or advised investors in the IPO of the risks associated with the increase in clinician turnover before the IPO.

95.     In fact, to the contrary, the Registration Statement minimized LifeStance's business risks associated with clinician turnover by repeatedly distinguishing the Company's 87% physician retention rate from the 77% industry average.

96.     Accordingly, the Registration Statement negligently failed to disclose the material factors that made an investment in the IPO risky or speculative, as required by Item 3 of Form S-1.

### The Misstatements and Omissions of Fact Were Material

97.     As detailed above, the Registration Statement omitted to state material information about clinician retention that was necessary to make the statements contained therein not misleading to investors and failed to disclose information that was required to be stated therein pursuant to the rules governing its preparation.

98.     Indeed, numerous statements in the Registration Statement, and during conference calls with investors and securities analysts following the IPO, underscore the significance of clinician retention on the Company's financial operations.

99.     For example, the Registration Statement discloses that "[t]he principal competitive factors in [LifeStance's] industry include" the "ability to attract and retain quality clinicians[.]" The Registration Statement also states that the Company "seek[s] to grow" its Center Margin – a metric which "best reflects the economics of [LifeStance's] model as it includes all direct expenses associated with our patients' care" – in a number of ways, including "growing revenue through clinician hiring and retention[.]"

100.    In addition, CGO Qureshi explained on the Q2 conference call that "clinicians are a critical part of our growth[.]"  Similarly, on an investor conference call held November 12, 2021, Defendant Lester explained that the "growth driver is super simple, number of clinicians . . . that's our unit economic."  He continued, "it's all about the number of clinicians.  That's the key driver for us.  That's why we're so laser-focused on making this the destination of choice for a mental health clinician to work."

101.    Accordingly, there can be no dispute that clinician retention was a critical element of the Company's core operations and financial performance.

102.    Moreover, Generally Accepted Accounting Principles, as reflected in the SEC's Staff Accounting Bulletin No. 99 ("SAB No. 99"), provide that materiality in the context of financial information includes not only an assessment of the magnitude of the misstatement in percentage terms, but also an assessment of the factual context in which the user of financial statements would view the financial information (referred to in accounting and auditing literature as "quantitative" and "qualitative" factors).

103.    Thus, SAB No. 99 notes, in pertinent part, that:

The FASB rejected a formulaic approach to discharging "the onerous duty of making materiality decisions" in favor of an approach that takes into account all the relevant considerations.  In so doing, it made clear that –

[M]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment.  [Footnotes omitted.]

104.    Accordingly, SAB No. 99 provides that "the staff believes that there are numerous circumstances in which [financial] misstatements below 5% could well be material.  Qualitative factors may cause [financial] misstatements of quantitatively small amounts to be material."

105.    As noted herein, Center Margin and adjusted EBITDA are two key financial performance measures that LifeStance regularly discloses to investors and securities analysts to aid them in evaluating the performance of its operations.

106.    LifeStance's Center Margin and adjusted EBITDA during the first six months of 2021 totaled $95.2 million and $27.1 million, respectively.  During the Q2 conference call, Defendant Bruff stated that the effect of clinician turnover would negatively impact Center Margin and adjusted EBITDA by approximately $7 million to $9 million, respectively, during the second half of 2021.

107.    Accordingly, LifeStance determined that clinician turnover would cause its reported Center Margin during the second half of 2021 to be between 7.4% and 9.5% less than what it reported during the first half of 2021.  Similarly, LifeStance determined that clinician turnover would cause its reported adjusted EBITDA during the second half of 2021 to be between 25.9% and 33.2% less than what it reported during the first half of 2021.

108.    Thus, by LifeStance's own admission, the impact of clinician turnover on future key financial performance measures issued by the Company to investors was quantitatively material and was required to be disclosed in the Registration Statement pursuant to the rules governing its preparation.

109.    Moreover, SAB No. 99 provides that the "volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."  When LifeStance disclosed the financial

impact of clinician turnover on its operations to the market during the Q2 conference call, the price of its common stock declined more than **46%**, eviscerating more than ***$2.5 billion dollars*** of its market capitalization.  The following chart depicts the price of LifeStance common stock from the IPO through December 31, 2021:



110.   Following the issuance of LifeStance's 2021 second quarter financial results, securities analysts downgraded and reduced their stock price targets for the Company.  For example:

Morgan Stanley & Co. LLC – August 16, 2021:

**Growth & Margin Trajectory Pushed Out, Downgrade to Equal-weight**

New disclosures lead us to take a more conservative view on topline growth and cost structure.  **We now model higher SG&A as lower retention could signal higher recruitment costs**, not factored into guidance.  [First emphasis in the original.]

*      *      *

**First earnings report was a major setback, marred by costly attrition, leading us to lower our revenue estimates and increase SG&A for 2021-2023**.  For CY21, we lower our revenue estimate to $658mn from $672mn, below guidance ($668-678mn) and consensus ($667mn).  We reduce our 3Q21 estimates to $169mn from $176 mn, in-line with lower end of guidance: $168-173 mn and below, consensus' $175 mn. We lower our 4Q21 estimates to $186mn from $196mn, below guidance of $196-201mn and consensus' $193 mn.  **This reflects lower clinician retention** (~80% vs. previous ~87%) **and decreased productivity and reimbursement for newly hired replacements.  Recall, management commented on the earnings call and in our follow up conversations that it takes 6-12 months to fill the panel for a newly hired clinician and 4 to 6 months to get new providers credentialed with payors at LifeStance's higher negotiated rates.  As such, we assume the decrease in productivity per clinician that was disclosed in 2Q** worsens to a trough in 3Q, but begins to recover in 4Q.  [First emphasis in the original.]

**Altogether, we reduce CY22/CY23 revenues estimates** to $869mn/$1113mn from $935mn/$1244mn.  We are **also updating our G&A estimates** for 2021/2022/2023 to $200/200/245 mn from $150/203/241 mn to reflect incremental investments **that we think will be necessary to retain and on board clinicians**.

<u>J. P Morgan – August 12, 2021:</u>

LifeStance reported 2Q21 results yesterday evening, its first quarter out of the box as a public company.  **Key metrics, including revenue, center margin, adjusted EBITDA and clinician count came in above expectations in the quarter**.  While the FY21 revenue guidance came in above Bloomberg consensus, **the guidance ranges for center margin and adjusted EBITDA were below expectations, with the company citing recent changes in clinician retention levels and investments in infrastructure and operations to support and sustain long-term growth.**

*      *      *

**Lower retention is a key development impacting the outlook for the balance of 2021.**  Retention rates have moved to ~80%, down from 87% previously.  The company notes that it is unclear at this point how long weaker retention levels will continue, and is currently assuming similar levels of attrition through the remainder of 2021.  Of note, **attrition is consistent across the entire clinician base, across all provider types, geographies and not tied to either acquired groups or legacy sites**.  The also company noted that this trend is consistent with the broader healthcare industry and not company specific.  [Emphasis in the original.]

**Post-IPO Events**

111.     Less than two months after the IPO, on August 11, 2021, LifeStance announced its 2Q21 financial results for the period ended June 30, 2021 – just days after the IPO – acknowledging a "recent change in clinician retention levels" during 2Q21.

112.     On the Q2 conference call discussing the financial results, Defendant Bruff provided the Company's outlook for the remainder of 2021, announcing that LifeStance "expect[ed] total revenues of $668 million to $678 million, Center Margin of $198 million to $208 million, adjusted EBITDA of $47 million to $53 million." Defendant Bruff explained that the outlook took into consideration a number of factors, and assumed "a continuation of lower retention rates for the remainder of the year[.]" He further explained that "new clinician additions have lower productivity for the first 4 to 6 months and therefore, will not immediately offset the impact from higher turnover, a dynamic we expect to negatively impact Center Margin and adjusted EBITDA by approximately $7 million to $9 million."

113.     Later on the Q2 conference call, in response to a question concerning the $7 million to $9 million figure, Bruff explained that making projections beyond 2021 was difficult given the higher turnover experienced by the Company, which LifeStance "saw midway through the second quarter[.]"

114.     On November 8, 2021, the Company reported its third quarter 2021 results, explaining in its press release ("Q3 press release") that "[c]linician retention [had] stabilized to approximately 80% annualized in the third quarter." The Q3 press release also disclosed, "Center Margin as a percentage of revenue declined as expected as new clinicians ramp to maturity."

115.     In outlining LifeStance's Full Year 2021 Guidance, the Q3 press release explained, "The company expects full year revenue toward the lower end of the previously guided $668 million to $678 million range, **primarily due to the expectation that clinicians will take additional time**

**off at the holidays due to fatigue from COVID**.  The company supports clinician flexibility and well-being, including incremental time off as needed, **in an industry environment in which many clinicians are experiencing burnout.**"  The Company further guided, "Center Margin in the range of $198 million to $208 million and Adjusted EBITDA in the range of $47 million to $53 million."

116.    On the Q3 conference call, Defendant Lester further spoke to this clinician burnout and explained that the Company had "escalated focus on our clinician value proposition" and discussed the steps taken to combat clinician burnout and turnover.  He explained:

> "To this end, many employees are planning to take more time off than usual during the holidays given the difficult year. and we've adjusted our projections accordingly.  **We now expect our full year 2021 revenue to land toward the lower end of the $668 million to $678 million range to which we previously guided**, still representing a growth rate in excess of 75%."

117.    Attempting to soften the blow that LifeStance expected to hit the lower end of its guidance, Defendant Lester reassured, "Our efforts are paying off. . . . [R]etention rates have stabilized at a level consistent with our expectations of approximately 80% annualized within the quarter.  This was driven by our laser focus on our clinician value proposition."  As the call continued, Defendants were peppered with questions regarding "productivity and retention," "incremental recruitment," and "the 80% annualized retention figure."

118.    Defendants reported LifeStance's fiscal 2021 results on March 10, 2022.  Defendant Lester's prediction on the Q3 conference call that revenue would land at the lower end of the Company's projection came true, as the Company announced revenue of $668 million.  On a conference call held on March 10 to discuss the FY2021 results, Lester explained that "retention has continued to be stable."

119.    When the initial Complaint was filed on August 10, 2022, LifeStance common stock traded in a range of $5.85-$7.86.  As this Amended Complaint is being filed, LifeStance common stock is trading in a range of $4.66-$5.14.

## COUNT I

### Violations of §11 of the Securities Act
### Against All Defendants

120.     Lead Plaintiff repeats, reincorporates, and realleges each and every allegation set forth above as if fully set forth herein.

121.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, and is asserted against all Defendants.  This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a §11 claim, and any implication of fraud or scienter is disclaimed.

122.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

123.     LifeStance is the registrant for the IPO.  As issuer of the shares, LifeStance is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

124.     The Individual Defendants each signed the Registration Statement either personally or through an Attorney-in-Fact and/or caused its issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements misleading, and that the documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement, and also should have known of the omissions of

material fact that were necessary to make the statements made therein not misleading. As such, the Individual Defendants are liable to the Lead Plaintiff and the Class.

125.    The Underwriter Defendants were each underwriters, as that term is used in §11(a)(5) of the Securities Act, with respect to the IPO and the common stock sold by the Company and selling shareholders through the Registration Statement. The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts. None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Registration Statement, were true, were without omission of any material facts, and/or were not misleading.

126.    By reasons of the conduct herein alleged, each Defendant named in this Count violated §11 of the Securities Act.

127.    Lead Plaintiff acquired LifeStance common stock traceable to the IPO, and in reliance on, the Registration Statement and without knowledge of the untruths and/or omissions alleged herein. Lead Plaintiff and the Class sustained damages when the price of LifeStance's common stock declined substantially due to material misstatements and omissions in the Registration Statement as alleged herein.

## COUNT II

### Violation of §15 of the Securities Act
### Against the Individual Defendants

128.    Lead Plaintiff repeats, reincorporates, and realleges each and every allegation set forth above as if fully set forth herein.

129.    This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against the Individual Defendants. This Count does not allege, and does not

intend to allege, fraud or scienter, which are not elements of a §15 claim, and any implication of fraud or scienter is disclaimed.

130.    Where a violation of §11 occurs, §15 gives rise to liability as to "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l [§11 or §12(a)(2)] . . . ." 15 U.S.C. §77o(a).  Additionally, control persons under §15 are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ." *Id*.

131.    Each of the Individual Defendants committed primary violations of the 1933 Act and are directly responsible and primarily liable for any such violations.  In addition, the Individual Defendants acted as controlling persons of LifeStance within the meaning of §15 of the Securities Act by virtue of their position as a director and/or senior officer of LifeStance.  By reason of their senior management positions and/or directorships at the Company, as alleged above, these Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause LifeStance to engage in the conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act.

132.    Each of the Individual Defendants was a culpable participant in the violations of §11 alleged in Count I above.  Because of the Individual Defendants' senior executive management and/or director positions with LifeStance, they each had access to the undisclosed adverse information about the Company's business, operations, market trends, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and

committees thereof.  Based on this knowledge and (i) having signed and/or authorized the signing of the Registration Statement, (ii) being named in the Registration Statement and identified as a director and/or executive officer, and/or (iii) playing a material role or otherwise participating in the process which allowed the IPO to be successfully completed, each of the Individual Defendants was a culpable participant in the violations of §11 alleged in Count I above.

133.   By reason of the conduct alleged herein, the Individual Defendants violated §15 of the 1933 Act, and Lead Plaintiff and the Class have suffered harm as a result.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.   Declaring this action to be a class action properly maintained pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.   Awarding Lead Plaintiff and other members of the Class damages together with interest thereon;

C.   Awarding Lead Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.   Awarding Lead Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED:  December 19, 2022

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARK T. MILLKEY
MARY BLASY
BRENT E. MITCHELL


*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mmillkey@rgrdlaw.com
mblasy@rgrdlaw.com
bmitchell@rgrdlaw.com

*Counsel for Lead Plaintiff*