**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| NIZAR S. NAYANI, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>LIFESTANCE HEALTH GROUP, INC., MICHAEL K. LESTER, J. MICHAEL BRUFF, ROBERT BESSLER, DARREN BLACK, JEFFREY CRISAN, WILLIAM MILLER, JEFFREY RHODES, ERIC SHUEY, KATHERINE WOOD, MORGAN STANLEY & CO., LLC, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, JEFFERIES LLC, TPG CAPITAL BD, LLC, UBS SECURITIES LLC, and WILLIAM BLAIR & COMPANY, L.L.C.,<br><br>　　　　　　　　　　　Defendants. | Civil Action No. 1:22-cv-06833-JSR |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT FOR**
**VIOLATIONS OF FEDERAL SECURITIES LAW**

| | |
|---|---|
| **ROPES & GRAY LLP**<br>Martin J. Crisp<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Tel: (212) 596-5000<br>Fax: (212) 596-9090<br>Martin.Crisp@ropesgray.com | **DAVIS POLK & WARDWELL LLP**<br>Brian S. Weinstein<br>450 Lexington Avenue<br>New York, NY 10017<br>Tel: (212) 450-4000<br>Brian.Weinstein@davispolk.com |
| Daniel V. McCaughey (admitted *pro hac vice*)<br>William T. Davison (admitted *pro hac vice*)<br>Cole A. Goodman (admitted *pro hac vice*)<br>Sara A. Bellin (admitted *pro hac vice*)<br>Prudential Tower | *Attorney for Defendants Morgan Stanley & Co., LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Jefferies LLC, TPG Capital BD, LLC, UBS Securities LLC, and William Blair & Company, L.L.C.* |

800 Boylston Street
Boston, MA 02199
Tel: (617) 951-7000
Fax: (617) 951-7050
Daniel.McCaughey@ropesgray.com
William.Davison@ropesgray.com
Cole.Goodman@ropesgray.com
Sara.Bellin@ropesgray.com

*Attorneys for Defendants LifeStance Health Group, Inc., Michael K. Lester, J. Michael Bruff, Robert Bessler, Darren Black, Jeffrey Crisan, William Miller, Jeffrey Rhodes, Eric Shuey, and Katherine Wood*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 3

I.      THE IPO AND REGISTRATION STATEMENT................................................... 3

        A.      Disclosures Regarding Clinician Retention and Recruitment ............................... 5

        B.      Disclosures Regarding COVID-19 ........................................................................ 6

II.     LIFESTANCE'S POST-IPO DISCLOSURES ................................................... 7

III.    PROCEDURAL HISTORY AND ALLEGATIONS ......................................... 9

ARGUMENT ........................................................................................................................ 10

I.      PLAINTIFF'S CLAIMS MUST BE DISMISSED UNDER FED. R. CIV. P. 9(B) ........ 10

II.     THE COMPLAINT DOES NOT PLEAD ANY ACTIONABLE MISSTATEMENT OR
        OMISSION ....................................................................................................... 11

        A.      LifeStance's Statements of Accurate, Historical Data Are Not False or Misleading
                ........................................................................................................................... 12

        B.      LifeStance Did Not Have a Duty to Disclose Interim Data on Clinician Retention
                ........................................................................................................................... 15

        C.      Any Alleged Omission Is Immaterial Given the Registration Statement's
                Cautionary Language ............................................................................................. 19

        D.      The Complaint Does Not Allege Any Actionable Omission Under Items 303 or
                105 of Regulation S-K ........................................................................................... 22

III.    PLAINTIFF'S SECTION 15 CLAIM FAILS FOR THE SAME REASONS AS HIS
        SECTION 11 CLAIM............................................................................................. 25

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arfa v. Mecox Lane Ltd.*,
2012 WL 697155 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F. App'x 14 (2d Cir. 2012) ...................................................................................................................................17

*Asay v. Pinduoduo Inc.*,
2020 WL 1530745 (S.D.N.Y. Mar. 30, 2020), *aff'd*, 2021 WL 3871269 (2d Cir. Aug. 31, 2021) .............................................................................................................17

*Asay v. Pinduoduo Inc.*,
2021 WL 3871269 (2d Cir. Aug. 31, 2021).........................................................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................................11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................................................11, 15

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ...................................................................22, 24

*Caiafa v. Sea Containers Ltd.*,
331 F. App'x 14 (2d Cir. 2009) ..........................................................................................11

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
2022 WL 2872671 (E.D.N.Y. July 21, 2022).......................................................................11

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
586 F. Supp. 3d 199 (E.D.N.Y. 2022), *reconsid. denied*, 2022 WL 2872671 (E.D.N.Y. July 21, 2022) ......................................................................................................11

*In re Coty Inc. Sec. Litig.*,
2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ............................................................. *passim*

*DeMaria v. Andersen*,
318 F.3d 170 (2d Cir. 2003)......................................................................................12, 20, 21

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)................................................................................................25

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)..................................................................................22

*Floyd v. Filipowski*,
   2022 WL 2657173 (S.D.N.Y. July 8, 2022) ...............................................................6

*In re Focus Media Holding Ltd. Litig.*,
   701 F. Supp. 2d 534 (S.D.N.Y. 2010).......................................................................17

*Gamm v. Sanderson Farms, Inc.*,
   944 F.3d 455 (2d Cir. 2019)..................................................................................3, 4

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
   422 F. Supp. 3d 821 (S.D.N.Y. 2019)..................................................................17, 23

*In re HEXO Corp. Sec. Litig.*,
   524 F. Supp. 3d 283 (S.D.N.Y. 2021)...............................................10, 19, 22, 25

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)....................................................................................24

*Jiajia Luo v. Sogou, Inc.*,
   465 F. Supp. 3d 393 (S.D.N.Y. 2020)....................................................................12

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005).....................................................................11

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
   2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)....................................................10, 11

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011)...................................................................................22

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010)....................................................................................12

*Nguyen v. MaxPoint Interactive, Inc.*,
   234 F. Supp. 3d 540 (S.D.N.Y. 2017)......................................................................22

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012).....................................................................................23

*Paskar v. City of New York*,
   3 F. Supp. 3d 129 (S.D.N.Y. 2014) ..........................................................................6

*Public Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*,
   714 F. Supp. 2d 475 (S.D.N.Y. 2010).......................................................................25

*Rombach v. Chang*,
   355 F.3d 164 (2d. Cir. 2004)..............................................................................10, 11

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017)......................................................................................12, 16, 20, 23

*Steamfitters Local 449 Pension Plan v. Sketchers U.S.A., Inc.*,
    412 F. Supp. 3d 353 (S.D.N.Y. 2019), *aff'd sub nom. Cavalier Fundamental*
    *Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020) ...............................16

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
    202 F. Supp. 2d. 8 (S.D.N.Y. 2001).............................................................................................16

*United States v. Flores*,
    2021 WL 3682054 (S.D.N.Y. Aug. 19, 2021)...................................................................6, 18

*Willard v. UP Fintech Holding Ltd.*,
    527 F. Supp. 3d 609 (S.D.N.Y. 2021)............................................................... *passim*

**Rules and Other Authorities**

Fed. R. Civ. P. 9(b) ..............................................................................................2, 10, 11

Fed. R. Civ. P. 12(b)(6)............................................................................................2, 11, 17

Maury Gittleman, *The "Great Resignation" in Perspective*, U.S. Bureau of Labor
    Statistics: Monthly Labor Review (July 2022) ..........................................................................6

Defendant LifeStance Health Group, Inc. ("LifeStance" or the "Company"); Defendants Michael K. Lester, J. Michael Bruff, Robert Bessler, Darren Black, Jeffrey Crisan, William Miller, Jeffrey Rhodes, Eric Shuey, and Katherine Wood (the "Individual Defendants"); and Defendants Morgan Stanley & Co., LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Jefferies LLC, TPG Capital BD, LLC, UBS Securities LLC, and William Blair & Company, L.L.C. (together with LifeStance and the Individual Defendants, "Defendants") respectfully submit this memorandum of law in support of their Motion to Dismiss Plaintiff's Amended Complaint for Violation of Federal Securities Laws (the "Complaint" or "Compl.") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act.

## PRELIMINARY STATEMENT

This action is premised on the untenable notion that Section 11 of the Securities Act of 1933 required LifeStance's initial public offering ("IPO") registration statement and incorporated prospectus (the "Registration Statement") to predict the effects of the COVID-19 pandemic on employee retention based on a purported "trend" that allegedly began to occur at almost the ***exact same time*** that the Registration Statement became effective.  Plaintiff further seeks to use LifeStance's post-IPO financial results to punish the Company for reporting accurate historical data in the Registration Statement, even though the Registration Statement provided no future financial guidance, explicitly cautioned investors not to rely on the Company's previous financial results, and adequately warned about the risks that allegedly materialized following the IPO.  But the law does not permit such pleading by hindsight.

LifeStance is one of the nation's largest providers of virtual and in-person mental health services.  In June 2021, during its second fiscal quarter, LifeStance conducted its IPO.  On August 11, 2021, LifeStance disclosed its financial results for that quarter, which reflected a substantial year-over-year increase in revenue, Center Margin, and Adjusted EBITDA.  However, in

forecasting guidance for the rest of 2021, LifeStance stated that it expected growth in Center Margin and Adjusted EBITDA to be offset by a COVID-19-driven increase in clinician turnover that, according to Plaintiff, began "in the *weeks before* the IPO." Compl. ¶ 33.[1] LifeStance's stock price declined the following day. One year later, Plaintiff filed this lawsuit, alleging that the Registration Statement contained false or materially misleading statements and omissions concerning clinician turnover and its purported "immediate" impact on LifeStance's financial growth prior to the IPO. *See, e.g., id.* ¶ 74.

Plaintiff's allegations regarding the Registration Statement all fail to support a Section 11 claim under either Rule 9(b)'s heightened pleading standard—which should govern despite Plaintiff's disclaimers of fraud—or Rule 12(b)(6). *First*, Plaintiff's claim that the Registration Statement was inaccurate and materially misleading because it included LifeStance's historical clinician retention rate of 87% has no basis under the securities laws. The Registration Statement expressly states that the clinician retention rate reflects data from 2017 to 2020. Accurate recitations of historical data cannot support a Section 11 claim.

*Second*, Plaintiff's claim rests on the flawed presumption that Section 11 required LifeStance to guess—prior to the end of Q2 2021—both the intra-quarter impact of the COVID-19 pandemic on the Company's retention of clinicians and how that impact would affect the Company's future financial performance. Courts are rightly reluctant to penalize companies for failing to include intra-quarter financial data in IPO disclosures, as premature disclosures could be misleading. The fact that LifeStance opined on the effects of COVID-19 on LifeStance's Q1 2021 financial position did not obligate LifeStance to disclose increases in clinician turnover that

---

[1] Unless otherwise noted, all alterations, citations, and internal quotation marks are omitted, and all emphasis is added.

allegedly began ***mere weeks*** ahead of the IPO (let alone guess at the attendant impact that turnover might have on LifeStance's future financial performance).

***Third***, the disclosure of a very recent increase in clinician resignations would not have significantly altered the total mix of information available to a reasonable investor given the ample cautionary language included in the Registration Statement. The Registration Statement made clear to investors that LifeStance might not grow at its then-current rates and that clinician retention could affect its growth. Set against the Registration Statement's clear warnings about the unpredictability of COVID-19, which was one of the key drivers of clinician turnover, no reasonable investor would find material the omission of an alleged recent, intra-quarter downturn in clinician retention.

***Fourth***, an event that allegedly started to occur just a few weeks before an IPO is not a "trend" requiring disclosure under Items 303 and 105 of Regulation S-K and thus cannot form the basis of a Section 11 claim. For these reasons, as explained more fully herein, the Complaint fails to state a claim pursuant to any standard of review and should be dismissed with prejudice.

**FACTUAL BACKGROUND**

## I. THE IPO AND REGISTRATION STATEMENT

LifeStance is a nationwide provider of virtual and in-person mental and behavioral health services. Compl. ¶ 21. As one of the largest providers of outpatient mental health care in the United States, LifeStance operates in twenty-seven states; employed 3,300 clinicians as of March 31, 2021; and, in 2020, serviced 357,000 patients. *See* Ex. A at 111 (LifeStance's June 9, 2021 Prospectus). [2]

---

[2] "Ex. __" refers to the exhibits attached to the Declaration of Sara A. Bellin, Esq., submitted in support of this Motion. The Court may consider the full text of the Registration Statement and other documents incorporated in the Complaint by reference. *See Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019). The Court also may take judicial notice of LifeStance's

On June 14, 2021, LifeStance conducted its IPO at an $18.00 per share offering price. Compl. ¶ 27. In preparation for the IPO, LifeStance filed the first public version of the Registration Statement on May 17, 2021, which became effective on June 9, 2021. *Id.* ¶¶ 25–26. The Registration Statement incorporated a prospectus detailing LifeStance's business model and providing a summary of its financial results from the previous two years, including audited consolidated financial statements. *See* Ex. A at iii, 9. The Registration Statement also disclosed unaudited consolidated financial statements for Q1 2021. *See id.* at 15.

The Registration Statement did ***not*** project LifeStance's financial results for Q2 2021—its first quarter as a public company—or for the remainder of fiscal year 2021. To the contrary, the Registration Statement expressly cautioned investors that "our historical results are not necessarily indicative of the results that may be expected for any other period in the future and ***our interim results for the three months ended March 31, 2021 are not necessarily indicative of results to be expected for the full year ending December 31, 2021, or any other period*.*" See id.* It also explained that LifeStance's "quarterly results of operations have varied and may vary significantly" such that "our quarterly results should not be relied upon as an indication of future performance," *id.* at 30, and that LifeStance's "stock price may be volatile," *id.* at 49.

The Registration Statement contained 32 pages of specific risk factors, including, as described below, clear risk disclosures regarding clinician retention and recruitment and COVID-19, and disclosures stating how those risks could potentially affect the Company's financial performance. *See id.* at 19–50.

---

quarterly earnings materials (including press releases and earnings presentations) filed with the SEC, even if they are not cited in the Complaint. *See id.*

### A.    Disclosures Regarding Clinician Retention and Recruitment

Both before and after LifeStance's IPO, LifeStance has maintained a competitive clinician retention rate. In the Registration Statement, LifeStance noted that "we have hired 1,746 clinicians through our subsidiaries and affiliated practices since our inception in March 2017 through December 31, 2020, with a clinician retention rate of over 87% compared to the industry average of 77%." *Id.* at 75; *see also* Compl. ¶ 68. Correspondingly, the Registration Statement warned against risks associated with a potential downturn in clinician retention, including the possible impact of retention on the Company's financial performance.

For example, the Registration Statement stated that LifeStance "may not grow at the rates we historically have achieved or at all, even if our key metrics may imply future growth" and explicitly warned: "[f]uture revenue may not grow at historic rates or may decline. ***Our future growth will depend, in part, on* . . . *our ability to attract and retain a sufficient number of qualified clinicians and support personnel***." Ex. A at 19; *see also id.* at 9, 51. The Registration Statement provided numerous additional warnings regarding clinician turnover:

- "***[T]he loss or dissatisfaction of* . . . *clinicians may* . . . *reduce our revenue, and impair our ability to attract or retain* . . . *clinicians***." *Id.* at 29.
- LifeStance's "quarterly financial results may fluctuate as a result of a variety of factors, many of which are outside of our control, including . . . our ability to ***effectively manage the size and composition of our clinician base*** . . . ." *Id.* at 30.
- Because LifeStance "compete[s] in a highly fragmented market with direct and indirect competitors that offer varying levels of impact to key stakeholders such as . . . clinicians," LifeStance's "competitive success is contingent on our ability to address the needs of key stakeholders," and "[c]ompetition in our market involves . . . changes in clinician and patient needs. ***If we are unable to keep pace with the evolving needs of our* . . . *clinicians* . . .**, demand for our services may be reduced and ***our business, financial condition and results of operations would be harmed***." *Id.* at 21.
- "The principal competitive factors in our industry include: . . . [the] ***ability to attract and retain quality clinicians***." *Id.* at 121.

The Registration Statement further warned investors about the delays and costs associated

with onboarding new clinicians.  The Registration Statement noted: "[a]s we expand and make related upfront capital expenditures, including leasing new centers, developing our platform, and *hiring clinicians within those centers, our margins may be reduced* during those periods as we will not recognize patient service revenue until those centers open and begin patient visits."  *Id.* at 20.  The Registration Statement also emphasized that risk by noting that LifeStance is "dependent on credentialing our clinicians under our insurance contracts at the time of hire," and "*[a]ny delay in completing credentialing will result in a delay in clinicians seeing patients and a concomitant delay in generating revenue, which may materially affect our business*."  *Id.* at 25.

### B.    Disclosures Regarding COVID-19

As the Complaint acknowledges, the COVID-19 pandemic disrupted the global economy and caused unparalleled, unforeseen challenges to the mental health care industry and employees' attitudes towards employment.  *See* Compl. ¶ 45; *Floyd v. Filipowski*, 2022 WL 2657173, at *5 (S.D.N.Y. July 8, 2022) ("[T]he only certainty about the future course of this pandemic is uncertainty.").  Workers nationwide quit their jobs at the highest rates ever recorded from March to November 2021 as part of the "Great Resignation."  *See* Maury Gittleman, *The "Great Resignation" in Perspective*, U.S. Bureau of Labor Statistics: Monthly Labor Review (July 2022).[3] The COVID-19 vaccine rollout and rapid spread of the Delta variant during this same period caused even further uncertainty.  *See United States v. Flores*, 2021 WL 3682054, at *2 (S.D.N.Y. Aug. 19, 2021) (discussing the "uncertainties presented by the Delta variant and breakthrough infections").

When it filed the Registration Statement, LifeStance "believ[ed] the COVID-19 pandemic did not have a material impact on our results of operations, cash flows and financial position as of

---

[3] The Court may take judicial notice of documents published by government authorities.  *See Paskar v. City of New York*, 3 F. Supp. 3d 129, 134 (S.D.N.Y. 2014).

or for the three months ended March 31, 2021." *See* Ex. A at 81.  Even though that statement was expressly limited to the prior quarter's financial results, the Company still cautioned investors that it could not predict the effects of COVID-19 in Q2 2021 and beyond:

> This pandemic, as well as intensified measures undertaken to contain the spread of COVID-19, ***could cause disruptions and severely impact our business***, including, but not limited to: . . . ***negatively impacting our ability to forecast our business's financial outlook [and] harming our business, results of operations and financial condition*** . . . .  We cannot predict with any certainty whether and to what degree the disruption caused by the COVID-19 pandemic and reactions thereto will continue, and expect to face difficulty accurately predicting our internal financial forecasts. ***The pandemic also presents challenges as our workforce, including both clinicians and support personnel, is largely working remotely***.
>
> ***It is not possible for us to accurately predict the duration or magnitude of the adverse results of the pandemic and its effects on our business, results of operations or financial condition at this time, but such effects may be material***. . . . ***It is also not possible to predict whether any vaccine will mitigate any adverse results of the pandemic or accelerate a restoration of normal operations***.  The COVID-19 pandemic may also have the effect of heightening many of the other risks identified elsewhere in this prospectus.

*Id.* at 28.

## II.   LIFESTANCE'S POST-IPO DISCLOSURES

LifeStance's Q2 2021 closed on June 30, 2021, approximately two weeks after the IPO. *See* Compl. ¶ 49.  On August 11, 2021, LifeStance announced its financial results for Q2 2021. *Id.*  Exceeding analyst expectations, LifeStance reported a year-over-year ***increase*** in: (1) revenue by 91%; (2) total clinician numbers by 94%; (3) Adjusted EBITDA by 39%; and (4) Center Margin[4] by 100%.  *See* Ex. B, Ex. 99.1 at 1–2 (Aug. 11, 2021 8-K); Compl. ¶ 110.

LifeStance also announced, for the first time, its guidance for the rest of 2021.  For fiscal

---

[4] Center Margin is a metric used by LifeStance to track earnings related to LifeStance's centers and delivery of care.  It is defined in the Registration Statement as "income (loss) from operations excluding depreciation and amortization and general administrative expenses."  *See* Ex. A at 82. Center Margin is "not a financial measure of, nor does it imply, profitability" and thus is "not necessarily indicative of future profitability from operations."  *Id.*

year 2021, LifeStance anticipated that revenue would increase from $377 million in 2020 to $668-678 million in 2021; Adjusted EBITDA would be similar between 2020 ($50 million) and 2021 ($47-53 million); and Center Margin would increase from $119 million in 2020 to $198-208 million in 2021. *See* Ex. B, Ex. 99.2 at slide 18. For Q3 2021, LifeStance guided an increase in revenue but a possible decrease in Adjusted EBITDA and Center Margin as compared to Q2. *See id.* Ex. 99.1 at 3.

The same day, LifeStance held an earnings call for investors and securities analysts. Compl. ¶ 49. Plaintiff alleges that LifeStance's then-Chief Financial Officer, Defendant Bruff, conveyed that LifeStance observed an "increase" in clinician turnover due to COVID-19 burnout "midway through the second quarter" of 2021—*i.e.*, during the same quarter as the IPO—that did not "really have any material impact from a financial perspective" in Q2 2021. *Id.* ¶ 57. LifeStance's then-Chief Growth Officer, Danish Qureshi, noted that while the "increased level of turnover is very clearly tied to COVID[-19]" and industry-wide "market dynamics," "[w]here we're seeing the uptick in turnover is really clinicians leaving for personal reasons, like early retirement, family priorities, lifestyle changes, et cetera." Ex. C at 10 (Aug. 11, 2021 Earnings Call Tr.). Defendant Bruff also emphasized that LifeStance's "clinician value proposition remains strong as evidenced by the net addition of nearly 700 clinicians in the quarter, which is above company expectations." *Id.* at 7. But because new clinicians have lower productivity for the first four to six months, Defendant Bruff acknowledged that the increase in clinician recruitment "will not immediately offset the impact from higher turnover, a dynamic we expect to negatively impact Center Margin and adjusted EBITDA by approximately $7 million to $9 million" in Q3 and Q4 2021. Compl. ¶ 65; *see also id.* ¶ 59.

Following these disclosures, Plaintiff alleges that the price of LifeStance's common stock

declined more than 46%.  Compl. ¶ 109.  By the next quarter, LifeStance's clinician retention rate stabilized to 80%—three percentage points higher than the industry average cited in the Registration Statement.  *Id.* ¶ 114.

On March 10, 2022, LifeStance reported its financial results for the full fiscal year 2021. *Id.* ¶ 118.  LifeStance's total revenue fell within the guidance announced in August 2021, representing a year-over-year increase of 61%.  *Id.*; *see also* Ex. D at 47 (Mar. 17, 2022 10-K); Ex. E, Ex. 99.1 at 1 (Mar. 10, 2022 8-K).  LifeStance also achieved an Adjusted EBITDA of $49.2 million and Center Margin of $201.5 million for 2021, both well within the guided ranges.  *See* Ex. E, Ex. 99.1 at 1.

## III.     PROCEDURAL HISTORY AND ALLEGATIONS

On August 10, 2022, Plaintiff filed the original complaint in this action.  ECF No. 1. Following his appointment as Lead Plaintiff on November 17, 2022, ECF No. 40, Plaintiff filed the Complaint on December 19, 2022, ECF No. 45.

The Complaint alleges that the Registration Statement was false and misleading for three reasons: (1) the statement of LifeStance's historical 87% clinician retention rate was an inaccurate statement of material fact, Compl. ¶ 69; (2) the opinion statement about COVID-19's impact on LifeStance's financial position for Q1 2021 created a "duty to disclose the known fact that, before the effective date of the Registration Statement, the COVID-19 pandemic was one of three factors inducing clinician turnover during Q2 2021, which was having a known, immediate, and material impact on the Company's Q2 2021 financial position," *id.* ¶ 74; and (3) the Registration Statement failed to disclose the impact of allegedly known costs associated with clinician turnover— recruiting and retaining new clinicians—on LifeStance's operating performance, as required under Items 303 and 105 of Regulation S-K, *id.* ¶¶ 92, 94.  Because these theories fail to state a claim under Sections 11 or 15 of the Securities Act, the Complaint should be dismissed with prejudice.

## ARGUMENT

### I.     PLAINTIFF'S CLAIMS MUST BE DISMISSED UNDER FED. R. CIV. P. 9(B)

As an initial matter, Plaintiff's claims are subject to Rule 9(b)'s heightened pleading standard because they "sound in fraud," *i.e.*, they contain "wording and imputations" that "are classically associated with fraud." *See Rombach v. Chang*, 355 F.3d 164, 171–72 (2d. Cir. 2004). Plaintiff alleges that Defendants *knew* of a material decline in clinician retention yet prepared an inaccurate and misleading Registration Statement that touted the Company's historical clinician retention rate and omitted data about an ongoing decline.[5]   Neither his boilerplate disclaimers of fraud and scienter, Compl. ¶¶ 121, 129, nor his occasional use of the word "negligently," Compl. ¶¶ 67, 69, 96, can reverse what the "wording and imputations of the complaint" make clear. *Rombach*, 355 F.3d at 172; *see also id.* at 171–72 (holding allegations of "untrue statements of material facts" and "misleading written statements" are "classically associated with fraud"); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 299 n.17 (S.D.N.Y. 2021) (applying 9(b) standard where plaintiffs "disclaim[ed] fraud" because Section 11 claim rested on whether defendants "knew" purchase contract would not be enforced).

Accordingly, Plaintiff's "classic allegations of fraud . . . must be pled with particularity." *Ladmen Partners, Inc. v. Globalstar, Inc.*, 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008).

---

[5] *See, e.g.*, Compl. ¶ 52 ("LifeStance *knew* about the increase in clinician turnover before the IPO because the Company has early warning procedures in place that allow it to monitor clinician turnover . . . ."); *id.* ¶ 69 ("The statements in the Registration Statement . . . were *inaccurate statements of material fact that created a materially false impression* about clinician retention and turnover at the time of the IPO."); *id.* ¶ 72 ("[T]he Registration Statement contained *inaccurate statements of material fact* and *omitted known material facts necessary to make the statement*s contained therein *not misleading* . . . ."); *id.* ¶ 87 ("Defendants *knew* the costs directly associated with clinician turnover were immediate and significant."); *id.* ¶ 90 ("LifeStance's senior executive managers *possessed contemporaneous knowledge* about the events and uncertainties associated [sic] clinician turnover" and "*knew those events and uncertainties were reasonably likely to have a material adverse effect* on LifeStance's profit margins . . . .").

This means that Plaintiff must "(1) specify the statements that [he] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* He also must plead facts raising "a strong inference of scienter." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005); *see also In re Chembio Diagnostics, Inc. Sec. Litig.*, 2022 WL 2872671, at \*7 (E.D.N.Y. July 21, 2022) ("[C]ourts in [the Second] [C]ircuit have consistently applied *Rombach* to dismiss Securities Act claims that sound in fraud but fail to plead scienter."). Because Plaintiff does not allege "motive and opportunity to commit fraud" or "strong circumstantial evidence" of "conscious misbehavior or recklessness" as to ***any*** Defendant, his claims must be dismissed under Rule 9(b). *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 218–20, 224, 227 (E.D.N.Y. 2022) (dismissing Section 11 claim where plaintiff did not allege any "individualized benefit to officer and director defendants" or facts "approximat[ing] actual intent"), *reconsid. denied*, 2022 WL 2872671 (E.D.N.Y. July 21, 2022); *see also Caiafa v. Sea Containers Ltd.*, 331 F. App'x 14, 16 (2d Cir. 2009) (dismissing Section 11 claim for failure to plead scienter based on "cursory allegations" of alleged wrongdoing).

## II.     THE COMPLAINT DOES NOT PLEAD ANY ACTIONABLE MISSTATEMENT OR OMISSION

Even if the Court applies the Rule 12(b)(6) pleading standard, Plaintiff must still plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 616 (S.D.N.Y. 2021). The Complaint cannot survive this standard where it relies on unreasonable inferences, "[t]hreadbare recitals of the elements of a cause of action," or "mere conclusory statements." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009).

Section 11 imposes liability only if a registration statement (1) "contained an untrue statement of a material fact," (2) "omitted to state a material fact required to be stated therein," or (3) "omitted information . . . necessary to make the statements therein not misleading." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 36 (2d Cir. 2017). In evaluating a Section 11 claim, a court must "review the documents holistically and in their entirety." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365−66 (2d Cir. 2010). The inquiry "does not focus on whether particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities." *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003).

Here, Plaintiff seeks to penalize LifeStance for failing to disclose an increase in clinician turnover that allegedly began to occur in the same quarter as the IPO. But "[t]he Securities Act requires candor in disclosures, not clairvoyance." *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 411 (S.D.N.Y. 2020). No reasonable investor would have been misled by the Registration Statement where (i) its statements on clinician retention reflected accurate historical data; (ii) it contained no promises about LifeStance's future financial performance; and (iii) it contained clear warnings regarding the uncertainty of LifeStance's financial outlook, the risks associated with clinician turnover, and the unknown impacts of COVID-19 on the Company's financial performance. The Court should not credit Plaintiff's hindsight pleading, and should dismiss his claims.

A.    **LifeStance's Statements of Accurate, Historical Data Are Not False or Misleading**

Plaintiff's claim that the 87% clinician retention rate noted in the Registration Statement was an "inaccurate statement[] of material fact that created a materially false impression about

clinician retention and turnover at the time of the IPO" is simply wrong.  Compl. ¶ 69.  Plaintiff concedes the accuracy of the statement that LifeStance had an 87% clinician retention rate from the Company's "inception in *March 2017 through December 31, 2020*."  *Id.* ¶ 68.  Plaintiff's claim instead relies on the premise that LifeStance should have identified a few weeks of real-time data regarding clinician retention, which Plaintiff apparently believes would have trumped LifeStance's historical retention rates from the four prior years.  But courts in the Second Circuit have made clear that "disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."  *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016); *see also Willard*, 527 F. Supp. 3d at 617 n.3 (noting "it is well established that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data").

LifeStance's Registration Statement did not state that LifeStance expected its clinician retention rate to remain at 87% in the future.  In fact, the Registration Statement did not offer any guidance regarding LifeStance's fiscal year 2021 financial outlook and expressly warned that LifeStance's historical results are "*not necessarily indicative of results to be expected for the full year ending December 31, 2021*."  *See* Ex. A at 15.  LifeStance then *met* its financial guidance for 2021 once it was announced.  *See* Compl. ¶ 118; Ex. D at 47; Ex. E, Ex. 99.1 at 1.  Plaintiff's falsity claim thus appears to be based exclusively on an alleged promise, unsupported by any text of the Registration Statement, that LifeStance's rate of clinician retention (and the corresponding effect on LifeStance's financial growth) would continue at its 2017-2020 level following the IPO.

The court in *In re Coty Inc. Securities Litigation* rejected this exact argument.  In *Coty*, the stockholder plaintiff claimed that the defendant's registration statement misleadingly touted that net revenues and operating income for the company's color cosmetic products had increased year

over year for the nine months ending in Q1 2013. 2016 WL 1271065, at \*5. The plaintiff conceded that these historical financial figures were "technically accurate" but argued that they were still misleading because they were "materially declining" by the time of the IPO one month later. *Id.* The court disagreed and dismissed the plaintiff's Section 11 and Section 15 claims, finding "no basis in securities law" for the proposition that the registration statement's recitation of historical financial data somehow "created an implicit promise that Coty's net revenues and operating income would continue to increase." *Id.* at \*6.[6]

Like in *Coty*, the "truthful facts" in the Registration Statement about LifeStance's past clinician retention rate are not false or misleading merely because the rate of clinician retention later declined. *See id.* No reasonable investor would believe that the Registration Statement's recital of LifeStance's historical clinician retention rate was a forward-looking guarantee that LifeStance's financial growth would continue at pre-IPO levels, particularly given the explicit warnings not to rely on past financial results for fiscal year 2021.

Plaintiff also appears to allege that the inclusion of the 87% clinician retention rate was misleading because Defendant Lester, LifeStance's former President, Chief Executive Officer, and Chairman, stated on a conference call on November 8, 2021—over five months after the IPO—that "due to COVID, we had indicated that we saw we had more clinicians leaving than we had seen historically in 2020" and "we felt like" the clinician retention rate "was going to shake out around 80%." Compl. ¶ 71. According to Plaintiff, this implies that LifeStance "*expected* its clinician retention rate to decline by approximately 10%." *Id.* (emphasis in original). Setting aside

---

[6] While the *Coty* plaintiffs also failed to allege that sales of color cosmetics were actually declining at the time of the IPO, the court found that even if they had, they had not plausibly alleged "that the [r]egistration [s]tatement was false or misleading merely because it stated that net revenues in the first three quarters of the 2013 fiscal year . . . had increased over the same time period in the previous fiscal year." *Coty*, 2016 WL 1271065, at \*6.

that LifeStance made no promise that the 87% clinician retention rate would hold post-IPO, LifeStance previously announced the increase in COVID-19-driven clinician turnover and its anticipated impact on LifeStance's Center Margin and Adjusted EBITDA on August 11, 2021, two months *after* the IPO closed. *See id.* ¶¶ 49, 57. Defendant Lester's Q3 2021 statements self-evidently refer to that post-IPO disclosure in which the Company had, in his very words, "indicated" the 2021 decrease in clinician retention—and the Complaint alleges no facts supporting a contrary conclusion.[7] Accordingly, these statements cannot "nudge[] [Plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Because the Registration Statement did not include any inaccurate statements of fact regarding LifeStance's historical clinician retention rate, Plaintiff's claim on this basis must fail.

### B. LifeStance Did Not Have a Duty to Disclose Interim Data on Clinician Retention

Plaintiff next contends that LifeStance's statement of opinion regarding the impact of COVID-19 on the Company's Q1 2021 financial performance created an additional duty to disclose the pandemic's impact on clinician turnover in Q2 2021 and the "immediate" effect on LifeStance's financial position. Compl. ¶ 74. This claim must fail for two independent reasons. First, the Complaint fails to allege facts raising a reasonable inference that clinician turnover actually had an immediate and material impact on LifeStance's financial results. Second, the securities laws did not require LifeStance to disclose—even if it was possible to do so—intra-quarter rates of clinician retention and their corresponding effect on the Company's quarterly performance.

As a threshold matter, Plaintiff's assertion that the alleged increase in clinician turnover

---

[7] The same goes for similar post-IPO statements made by Defendant Bruff that LifeStance "saw" an increase in clinician turnover "midway" through Q2 2021, Compl. ¶ 57, which do not actually identify when the Company made this observation, *see infra* Argument Section II.D at 24.

had an immediate and material negative impact on LifeStance's financial performance in Q2 2021 is unsupported by any allegation in the Complaint.[8]  To the contrary, the Complaint concedes that LifeStance "***came in above expectations***" and experienced year-over-year ***increases of 91%*** in revenue, ***100%*** in Center Margin and ***39%*** in Adjusted EBITDA during Q2 2021.  *See* Compl. ¶ 110 (emphasis in original); Ex. B, Ex. 99.1 at 1–2.  LifeStance therefore could not have disclosed the purportedly "immediate" and "material" adverse effects of clinician turnover on LifeStance's operations in the Registration Statement because the growth metrics allegedly impacted—Center Margin and Adjusted EBITDA—were increasing during the quarter of the IPO.  *See* Compl. ¶ 74.

In any event, the law rightfully recognizes that the "instantaneous disclosure" of intra-quarter data in an IPO is "unworkable and potentially misleading," as that disclosure would "require the immediate release of data without the benefit of reflection or certainty provided by the traditionally recognized reporting periods."  *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d. 8, 13 (S.D.N.Y. 2001);[9] *see also Vivint Solar*, 861 F.3d at 36 (noting SEC Regulation S-X "requires only that a registration statement include financial statements that are more than 135 days old").  Courts are therefore "reluctant to impose liability based upon a failure

---

[8] Plaintiff mistakenly relies on a statement by Defendant Bruff during the Q2 2021 earnings call to support this allegation.  *See* Compl. ¶ 59.  When describing the Company's future earnings guidance—***not*** the Q2 impact of clinician turnover—Defendant Bruff said that "when a clinician leaves the company, it has—that clinician has an immediate impact, downward impact, on the financial performance as leaving clinicians are typically at full capacity.  The—that gives us downward pressure on both revenue and Center Margin dollars ***in both the quarters in the back half of this year***."  *Id.*  Immediately prior to making this statement, Defendant Bruff noted that clinician turnover "didn't really have any material impact from a financial perspective" in Q2.  Ex. C at 9.  Considered in context, these statements cannot support Plaintiff's Section 11 claim.

[9] Although *Turkcell* applied a materiality test that was later not followed by *Vivint Solar*, 861 F.3d at 37–38, *Turkcell*—and the common-sense concept that intra-quarter disclosures are potentially dangerous—has since been cited approvingly by several courts.  *See, e.g.*, *Willard*, 527 F. Supp. 3d at 621; *Steamfitters Local 449 Pension Plan v. Sketchers U.S.A., Inc.*, 412 F. Supp. 3d 353, 368 (S.D.N.Y. 2019), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020).

to disclose financial data for a fiscal quarter in progress," *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 540 (S.D.N.Y. 2010), even when that financial data was theoretically available *before* the registration statement became effective, *see, e.g.*, *Asay v. Pinduoduo Inc.*, 2020 WL 1530745, at *9 (S.D.N.Y. Mar. 30, 2020) (holding that omission of Q2 2018 interim expense data from IPO registration statement that was filed one month after the close of Q2 was not actionable in part because the quarterly results could be "audited or . . . subject to significant revision"), *aff'd*, 2021 WL 3871269 (2d Cir. Aug. 31, 2021); *Arfa v. Mecox Lane Ltd.*, 2012 WL 697155, at *9 n.1 (S.D.N.Y. Mar. 5, 2012) (rejecting "the proposition that the [d]efendants were obligated to disclose the results of a quarter in progress"), *aff'd*, 504 F. App'x 14 (2d Cir. 2012).

Plaintiff does not contest that LifeStance complied with the SEC's financial reporting requirements. Instead, the Complaint asserts that LifeStance began to experience an increase in clinician turnover driven by clinician discontentment, credentialing delays, and COVID-19 fatigue "in the *weeks* before the IPO"—or, more specifically, in "May 2021" ("midway" through the same quarter as the IPO) at the earliest, when Mr. Qureshi allegedly met with unnamed C-suite executives "to discuss the difficulties the Company was experiencing with clinician retention." Compl. ¶¶ 33, 55, 57. Even if the Court credits these allegations,[10] the Complaint concedes that

---

[10] This and other meetings among senior management at LifeStance (if they occurred) are not in the public record, and so the Complaint's allegations about them are presumably sourced from an unnamed confidential witness. A confidential witness must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," and the complaint must allege that "the confidential sources would have known what information was communicated to senior executives." *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 850–51 (S.D.N.Y. 2019). Because the Complaint does not identify *any* information about the person who witnessed these alleged executive meetings, these confidential witness allegations cannot support a Section 11 claim under any standard of review. *See, e.g.*, *Coty*, 2016 WL 1271065, at *8–9 (applying Rule 12(b)(6) and holding "temporally nonspecific and substantively vague assertions of destocking by one confidential informant is not enough to establish the falsity of the [r]egistration [s]tatement or the existence of an omitted known trend,"

competing circumstances present at the time of the IPO would have made it nearly impossible for LifeStance to have predicted the impact of a very recent increase in clinician resignations on the Company's future financial growth. *See* Compl. ¶ 45. This underscores why the law does not require intra-quarter disclosures in IPO filings.

For instance, Plaintiff alleges that the Q2 2021 increase in clinician turnover was caused in part by the resignation of *new* clinicians "during the period leading up to the IPO" who saw few patients, were unable to repay fees advanced by the Company, and left the Company within the first three months of their employment. *See* Compl. ¶¶ 41–43. Their resignations would have a substantially different impact on LifeStance's financial outlook than the resignations of high-performing, long-standing clinicians. Moreover, LifeStance was simultaneously experiencing higher-than-expected "revenue and clinician base growth" due to substantial *increases* in clinician hiring, causing Center Margin to *double* in Q2 2021 as compared to Q2 2020. Ex. B, Ex. 99.1 at 3; Ex. C at 7; *see also* Compl. ¶ 57 (noting "the second quarter is when we saw an uptick in the clinician growth momentum, and it's also where we saw the increase in turnover"). Plaintiff does not allege that LifeStance knew in advance of its standard quarter close process that this Center Margin growth would be, as the Company later announced in its Q2 2021 earnings release on August 11, 2021, "partially offset by a recent change in clinician retention levels that is consistent with the broader healthcare industry for 2021." Ex. B, Ex. 99.1 at 3.

Finally, LifeStance conducted its IPO in the middle of the COVID-19 pandemic, when vaccines were just becoming widely available and the Delta variant was injecting chaos into economic recovery plans. *See Flores*, 2021 WL 3682054, at *2. Indeed, the Complaint asserts repeatedly that COVID-19 was one of the causes of clinician turnover. *E.g.*, Compl. ¶¶ 44–45,

---

even where that informant's position was identified in the complaint).

50–51, 71, 75–79.  While Plaintiff seeks to use COVID-19 as a weapon, in reality, the pandemic made it—as the Registration Statement explicitly warned—"not possible for [LifeStance] to accurately predict the duration or magnitude of the adverse results of the pandemic" (such as clinician burnout) "and its effects on [LifeStance's] business."  Ex. A at 28.  This is especially true of clinician departures during the "Great Resignation," which, as the Company explained, were driven by highly unique and "personal reasons" of individual clinicians.  *See* Ex. C at 10.

Given these circumstances, a real-time disclosure in the Registration Statement of clinician turnover and its alleged "immediate" impact on LifeStance's financial operations could have led LifeStance to make a misleading disclosure, and was not required by the securities laws.  *See HEXO*, 524 F. Supp. 3d at 301 (finding prospectus was not false or misleading for failing to disclose that Canadian governmental entity would not fulfill purchase order for newly-legalized marijuana as prospectus was filed "just three months after the Legalization, when it was reasonably difficult to anticipate demand").  The Complaint thus fails to plausibly allege that LifeStance had a duty to disclose contemporaneous data on clinician resignations in the Registration Statement, even if clinician turnover began to increase weeks before the Registration Statement became effective.  *See Willard*, 527 F. Supp. 3d at 615, 620 (dismissing Section 11 claim based on decline in trading volume during same quarter that registration statement became effective, even though quarter closed two weeks later); *Coty*, 2016 WL 1271065, at *6 ("Defendants were not required to disclose a drop in sales that began in June, merely two weeks before the [r]egistration [s]tatement became effective.").

## C.  Any Alleged Omission Is Immaterial Given the Registration Statement's Cautionary Language

The Complaint also fails to state a Section 11 claim because it does not plausibly allege that the omission of the purported increase in clinician turnover from the Registration Statement

-19-

was material to a reasonable investor—that is, there is not a "substantial likelihood that the disclosure of the omitted information would have been viewed by the reasonable investor as having **significantly altered** the total mix of information made available.'" *DeMaria*, 318 F.3d at 180. Where, as here, the Registration Statement was "replete with warnings and explanations of risks associated with the company's past financial history and future expectations," no reasonable investor would have been surprised by the impact of pandemic-related clinician burnout on LifeStance's financial growth. *Id.* at 182; *see also Vivint Solar*, 861 F.3d at 39 (finding that a registration statement was not materially misleading when it "contained ample warnings and disclosures that explained shareholder revenue and earning fluctuations").

In particular, the Registration Statement explicitly warned that:

- Investors should not rely on LifeStance's historical growth as "indicative of results to be expected for the full year ending December 31, 2021," since LifeStance "may not grow at the rates we have historically achieved or at all." *See* Ex. A at 9, 15, 19.

- LifeStance's estimates of market growth and forecasts "may prove to be inaccurate," and LifeStance's stock price and quarterly results may vary significantly such that investors should not make period-to-period comparisons of LifeStance's financial results. *See id.* at 19, 22, 30, 49, 51.

- LifeStance's future growth "will depend" on its "ability to attract and retain a sufficient number of qualified clinicians," *id.* at 19, and "the loss or dissatisfaction" of clinicians could "reduce [the Company's] revenue, and impair [its] ability to attract or retain" clinicians, *id.* at 29; *see also id.* at 30 (warning that quarterly results could be affected by LifeStance's "ability to effectively manage the size and composition of our clinician base"); *id.* at 121 (recognizing the "ability to attract and retain quality clinicians" as one of "[t]he principal competitive factors in [the] industry").

- There are significant costs associated with recruiting and onboarding physicians that could affect LifeStance's financial performance, including the costs of credentialing physicians. *See id.* at 20 (warning that as a result of "hiring clinicians" in new centers, "our margins may be reduced" and LifeStance may "not recognize patient service revenue"); *id.* at 25 (noting that credentialing clinicians under insurance is "out of our control" and a "delay in completing credentialing will result in a delay in clinicians seeing patients and a concomitant delay in generating revenue").

These disclosures alone sufficiently warned investors that an inability to retain clinicians could impact future growth, that onboarding replacement clinicians could be time-consuming and

expensive, and that investors should not rely on the historical clinician retention rates and LifeStance's past financial performance as indicators of fiscal year 2021 financial growth. *See, e.g.*, *DeMaria*, 318 F.3d at 181–82 (holding that nearly identical disclosures regarding quarterly results provided adequate caution against an "unrealistically optimistic picture" of future performance); *Willard*, 527 F. Supp. 3d at 622 (mid-quarter declines in revenue were not material in part because registration statement cautioned investors about the "volatility in trading volume on a quarterly basis and the risks that such volatility might pose to UP Fintech's revenue growth"). But the Registration Statement went even further by providing clear warnings about COVID-19. The Company explained that COVID-19 not only could "severely impact our business" and "present[] challenges [to] our workforce," but also prevented LifeStance from both "predict[ing] with any certainty whether and to what degree the disruption . . . will continue" and making accurate internal financial forecasts. *See* Ex. A at 28; *see also id.* ("It is not possible for us to accurately predict the duration or magnitude of the adverse results of the pandemic and its effects on our business . . . at this time, but such effects may be material.").

In other words, LifeStance warned investors of the exact risks that allegedly materialized—COVID-19 impacted LifeStance's business and workforce in an unexpected way (via increased clinician burnout), affecting the growth of an emerging company with limited financial history whose quarterly results may experience significant volatility post-IPO. The disclosure of a very recent increase in clinician resignations—when it was unclear at the time whether that increase would continue or have any effect on the Company's financials—thus would not have been viewed by a reasonable investor as significantly altering the total mix of information available. *See Asay v. Pinduoduo Inc.*, 2021 WL 3871269, at *4 (2d Cir. Aug. 31, 2021) (omission of interim financial data was not material because company "cautioned investors that [marketing cost] increases could

-21-

continue into the future and materially and adversely affect the Company's operating results");

*HEXO*, 524 F. Supp. 3d at 303 (dismissing Section 11 claim where company "made clear to its

investors in its Prospectus that it was operating within a newly legalized industry").

D.    **The Complaint Does Not Allege Any Actionable Omission Under Items 303
      or 105 of Regulation S-K**

Plaintiff's Section 11 claim cannot be salvaged by his attempted reliance on Items 303 or

105 of Regulation S-K.  Plaintiff must demonstrate "actual knowledge of an ***existing trend, event,***

***or risk*** to allege violations of [Items] 303 and 105."  *HEXO*, 524 F. Supp. 3d at 302.  An increase

in clinician turnover that allegedly began to occur in May 2021—just weeks before LifeStance's

IPO—cannot establish a "trend" as a matter of law.  *See* Compl. ¶ 57; *Nguyen v. MaxPoint*

*Interactive, Inc.*, 234 F. Supp. 3d 540, 546 (S.D.N.Y. 2017) ("[E]vents occurring within a ***two***

***month period of time*** do not establish a trend for purposes of the disclos[ur]es required by Item

303."); *Coty*, 2016 WL 1271065, at *7 (finding a "decline in growth rate" that "would have been

***almost contemporaneous with the IPO***" was "clearly an insufficient time period to establish a

trend"); *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *10 (S.D.N.Y. Jan.

14, 2010) ("As a matter of law, a ***two[-]month period*** of time does not establish a trend for purposes

of the disclosures required by Item 303.").[11]  This alone is fatal to Plaintiff's Items 303 and 105

claims.

---

[11] The alleged May-to-June increase in clinician turnover is also easily distinguishable from the trends in *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706 (2d Cir. 2011), and *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487 (S.D.N.Y. 2013).  In *Litwin*, the increase in sub-prime mortgage default rates started in 2005, ***two years*** before the company's June 2007 IPO.  634 F.3d at 710–11, 716.  In *Facebook*, the adverse trend—the increasing mobile usage of Facebook—was identified by the company in its initial registration statement in February 2012 and continued over the next three months until its May IPO.  986 F. Supp. 2d at 494–95, 497, 500–01.  By contrast, the Complaint asserts only that clinician turnover began on some unspecified date in May 2021, mere weeks before the Registration Statement became effective.  Compl. ¶ 55.

The Complaint also does not plausibly assert that the increase in clinician turnover in Q2 2021 and any alleged "costs associated," Compl. ¶ 87, were "known to management" at the time of the IPO. *Vivint Solar*, 861 F.3d at 39. As discussed herein, Plaintiff cannot rely on allegations concerning purported meetings with Mr. Qureshi because the Complaint does not provide any identifying information about the unnamed confidential witness from whom those allegations were presumably sourced. *See supra* Argument Section II.B at n.10; *see also AMC Ent. Holdings*, 422 F. Supp. 3d at 850–51; *Coty*, 2016 WL 1271065, at *8–9.

In any event, the Complaint asserts only that Mr. Qureshi and other unnamed LifeStance employees were possibly aware of raw, unanalyzed "***data*** about the reasons for the ongoing increase in clinician resignations." Compl. ¶ 55; *see also id.* at ¶ 77 (alleging LifeStance knew clinician fatigue was having an "immediate" impact because the "Company conducts exit interviews with every resigning clinician").[12] These allegations are simply too conclusory to raise an inference that, at the time of the IPO, LifeStance's managers knew an increase in clinician resignations starting several weeks before the IPO would amount to a material adverse "trend" impacting the Company's future financial growth. *Compare Coty*, 2016 WL 1271065, at *7 (rejecting allegations of knowledge as "sketchy at best" where plaintiffs "merely allege that there were meetings [with senior management] and describe only in broad, conclusory terms what was discussed at those meetings"), *with Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121 (2d Cir. 2012) (finding inference of knowledge where, before offering, defendant received

---

[12] Plaintiff also alleges that LifeStance must have known about the downward impact of clinician burnout on the Company's operations at the time of the IPO because LifeStance calculates the contingent consideration it pays to the previous owners of its centers "on a recurring basis" using a "valuation methodology that depends, in part, on the rate of employee retention." Compl. ¶ 77. This assertion fares no better because it "does not identify any specific trend that [LifeStance's] management was alerted to" or whether management would have known about these calculations. *See Coty*, 2016 WL 1271065, at *7.

numerous calls about defective product, gathered board to discuss the defect, and flew to Japan to address defect with manufacturer).

Plaintiff also alleges that Defendant Bruff stated during LifeStance's Q2 2021 earnings call that LifeStance "saw" the increase in clinician turnover "midway through the second quarter." Compl. ¶ 57. But this statement—which was made by Defendant Bruff with the benefit of hindsight, after a thorough post-IPO review and analysis of the Company's Q2 2021 performance ahead of its August 2021 earnings announcement—does not identify when (or if) LifeStance's senior management actually learned of the alleged downturn in clinician retention and its impact on LifeStance's financial operations. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) (confirming Item 303 "requires the registrant's actual knowledge of the relevant trend or uncertainty"); *Blackmoss*, 2010 WL 148617, at *9 (actual knowledge under Item 303 must be pleaded "with some specificity"). Likewise, the Complaint does not articulate when (or if) management learned prior to the IPO of the three purportedly "known" causes of clinician turnover—clinician dissatisfaction, frustration with insurance credentialing, and COVID-19 fatigue—and their alleged impact on the Company's financial condition. *See, e.g.*, Compl. ¶¶ 35, 42–45.[13] Against this backdrop, it is unreasonable to infer that, just weeks before the IPO, LifeStance's management was able to discern a nationwide "trend" in clinician turnover with a "fairly substantial probability" of having a material effect on future financial operations. *See Willard*, 527 F. Supp. 3d at 619 (noting the "reasonably likely" standard resembles "if not a more-likely-than-not standard, then something not too much below that").

Finally, the Complaint does not plausibly allege that the Registration Statement's risk

---

[13] Indeed, the Complaint does not even allege when these causes began other than "[d]uring the period leading up to the IPO." Compl. ¶¶ 37, 41–43.

disclosures were deficient under Item 105. As explained in Section II.C, the Registration Statement explicitly warned that LifeStance's future growth was dependent on clinician retention and that clinician dissatisfaction could lead to reduced revenue and an inability to attract or retain clinicians. *See also* Ex. A at 19, 29. These risk factors provided more than adequate caution concerning "the risks associated with the increase in clinician turnover before the IPO." Compl. ¶ 94; *see also HEXO*, 524 F. Supp. 3d at 302–03 (dismissing Item 105 claim where company "explained that the cannabis industry in Canada was new and that its success was dependent on demand by government dispensaries").

## III. PLAINTIFF'S SECTION 15 CLAIM FAILS FOR THE SAME REASONS AS HIS SECTION 11 CLAIM

Because the Complaint does not plausibly plead a "primary violation" of Section 11, Plaintiff's Section 15 claim for control-person liability must fail, too. *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 207 (2d Cir. 2009). In addition, it is not sufficient under Section 15 "to simply allege, as the Complaint does allege, that [the Individual Defendants] were all either officers or directors of [LifeStance] at relevant times." *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010). Because Plaintiff has made no effort to allege "meaningful culpable conduct by an individual defendant beyond mere status as a director or officer," the Court should dismiss his Section 15 claim regardless of the outcome of his Section 11 claim. *See id.*

### CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety with prejudice.

-25-

Dated: January 18, 2023                                    Respectfully submitted,


*/s/ Martin J. Crisp*                                      */s/ Brian S. Weinstein*
**ROPES & GRAY LLP**                                       **DAVIS POLK & WARDWELL LLP**
Martin J. Crisp                                            Brian S. Weinstein
1211 Avenue of the Americas                                450 Lexington Avenue
New York, NY 10036                                         New York, NY 10017
Tel: (212) 596-5000                                        Tel: (212) 450-4000
Fax: (212) 596-9090                                        Brian.Weinstein@davispolk.com
Martin.Crisp@ropesgray.com

                                                           *Attorney for Defendants Morgan Stanley &*
Daniel V. McCaughey (admitted *pro hac vice*)              *Co., LLC, Goldman Sachs & Co. LLC, J.P.*
William T. Davison (admitted *pro hac vice*)               *Morgan Securities LLC, Jefferies LLC, TPG*
Cole A. Goodman (admitted *pro hac vice*)                  *Capital BD, LLC, UBS Securities LLC, and*
Sara A. Bellin (admitted *pro hac vice*)                   *William Blair & Company, L.L.C.*
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 951-7000
Fax: (617) 951-7050
Daniel.McCaughey@ropesgray.com
William.Davison@ropesgray.com
Cole.Goodman@ropesgray.com
Sara.Bellin@ropesgray.com

*Attorneys for Defendants LifeStance Health*
*Group, Inc., Michael K. Lester, J. Michael Bruff,*
*Robert Bessler, Darren Black, Jeffrey Crisan,*
*William Miller, Jeffrey Rhodes, Eric Shuey, and*
*Katherine Wood*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically

to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: January 18, 2023                    */s/ Sara A. Bellin*
                                           Sara A. Bellin