# EXHIBIT A

**Filed Pursuant to Rule 424(b)(4)**
**Registration No. 333-256202**

**Prospectus**

# 40,000,000 shares



# LifeStance Health Group, Inc.

Common stock                                                                                      $18.00 per share

This is the initial public offering of our common stock. We are offering 32,800,000 shares of our common stock and the selling stockholders are offering an additional 7,200,000 shares of our common stock. We will not receive any of the proceeds from the sale of shares by the selling stockholders.

The selling stockholders have granted the underwriters an option to purchase up to 6,000,000 additional shares of our common stock within 30 days of the date of this prospectus.

After the completion of this offering, certain of our existing stockholders that are affiliates of TPG Global, LLC, Summit Partners and Silversmith Capital Partners will own a majority of the voting power of our outstanding shares of common stock. As a result, we expect to be a "controlled company" within the meaning of the corporate governance standards of The Nasdaq Stock Market LLC ("Nasdaq"). See "Principal and Selling Stockholders."

Prior to this offering, there has been no public market for shares of our common stock. Our common stock has been approved for listing on Nasdaq under the symbol "LFST."

We are an "emerging growth company" as defined under the federal securities laws and, as such, we have elected to comply with certain reduced reporting requirements for this prospectus and may elect to do so in future filings. See "Prospectus Summary— Implications of Being an Emerging Growth Company."

|  | Per share | Total |
|---|---|---|
| Initial public offering price | $ 18.00 | $720,000,000 |
| Underwriting discounts and commissions(1) | $ 0.99 | $ 39,600,000 |
| Proceeds to us before expenses | $ 17.01 | $557,928,000 |
| Proceeds to the selling stockholders | $ 17.01 | $122,472,000 |

(1) We have agreed to reimburse the underwriters for certain expenses in connection with this offering. See "Underwriters (Conflicts of Interest)" for additional information regarding underwriting compensation.

Investing in our common stock involves risk. See "Risk Factors" beginning on page 19.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed on the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.

The underwriters expect to deliver the shares of common stock to investors on or about June 14, 2021.

| **Morgan Stanley** | **Goldman Sachs & Co. LLC** | **J.P. Morgan** | **Jefferies** |
|---|---|---|---|
| **TPG Capital BD, LLC** | **UBS Investment Bank** | | **William Blair** |
| **Capital One Securities** | **AmeriVet Securities** | **Drexel Hamilton**   **R. Seelaus & Co., LLC** | **Siebert Williams Shank** |

Prospectus dated June 9, 2021

**Basis of Presentation**

*Organizational Structure*

As further described herein, on May 14, 2020, affiliates of TPG Global, LLC (collectively, "TPG") acquired a majority equity interest in LifeStance Health Holdings, Inc., a subsidiary of LifeStance Health, LLC, in a series of transactions referred to in this prospectus as the "TPG Acquisition." Prior to the TPG Acquisition, our business was conducted by LifeStance Health, LLC and its consolidated subsidiaries and affiliated practices. From the TPG Acquisition until the organizational transactions described herein, our business has been conducted by LifeStance TopCo, L.P. and its consolidated subsidiaries and affiliated practices.

LifeStance Health Group, Inc., the issuer in this offering, was incorporated in connection with this offering to serve as a holding company that will wholly own LifeStance TopCo, L.P. and its subsidiaries. LifeStance Health Group, Inc. has not engaged in any business or other activities other than those incidental to its formation, the organizational transactions described herein and the preparation of this prospectus and the registration statement of which this prospectus forms a part. Following this offering, LifeStance Health Group, Inc. will remain a holding company, it will wholly own the equity interests of LifeStance TopCo, L.P., and it will operate and control all of the business and affairs and consolidate the financial results of LifeStance TopCo, L.P. and its subsidiaries and affiliated practices. Unless stated otherwise or the context otherwise requires, all information in this prospectus reflects the consummation of the organizational transactions described herein, which we refer to collectively as the "Organizational Transactions." See "Organizational Structure" for a description of the Organizational Transactions and a diagram depicting our corporate structure after giving effect to the Organizational Transactions and this offering. Following the completion of this offering, we intend to include the financial statements of LifeStance Health Group, Inc. and its consolidated subsidiaries and affiliated practices in our periodic reports and other filings required by applicable law and the rules and regulations of the Securities and Exchange Commission (the "SEC").

*Presentation of our Financial Results*

For the year ended December 31, 2019, the three months ended March 31, 2020, and the period from April 1, 2020 to May 14, 2020 (such period from January 1, 2020 to May 14, 2020, the "Predecessor 2020 Period"), we present the financial statements of LifeStance Health, LLC and its consolidated subsidiaries and affiliated practices in this prospectus. Affiliates of TPG formed LifeStance TopCo, L.P. on April 13, 2020 for the purpose of facilitating the TPG Acquisition. For the period from April 13, 2020 (the date of formation of LifeStance TopCo, L.P.) to December 31, 2020 (the "Successor 2020 Period") and for the three months ended March 31, 2021, we present the financial statements of LifeStance TopCo, L.P. and its consolidated subsidiaries and affiliated practices in this prospectus. For the period from April 13, 2020 through May 13, 2020, the operations of LifeStance TopCo, L.P. were limited to those incident to its formation and the TPG Acquisition, which were not significant. Because it resulted in a change of control, the TPG Acquisition was accounted for as a business combination using the acquisition method of accounting, which requires, among other things, that assets and liabilities be recognized on the consolidated balance sheet at their fair value as of the acquisition date. Accordingly, the financial information provided in this prospectus is presented as "Predecessor" or "Successor" to indicate whether it relates to the period preceding the TPG Acquisition or the period succeeding the TPG Acquisition, respectively. Due to the change in the basis of accounting resulting from the TPG Acquisition, the consolidated financial statements for the Predecessor and Successor periods, included elsewhere in this prospectus, are not necessarily comparable.

We have supplemented the discussion of historical results for these periods with pro forma information for key financial metrics and results of operations for the full year ended December 31, 2020, as we believe it is useful to investors to compare a pro forma twelve-month 2020 period to the annual 2019 historical period presented. The pro forma financial information presented in this prospectus is derived from the "Unaudited Pro Forma Financial Information" and gives pro forma effect to the TPG Acquisition, the Organizational Transactions and this offering in presenting results of operations for the twelve months ended December 31, 2020. The pro forma financial

iii

Table of Contents

**Summary of Risks Related to Our Business**

An investment in our common stock involves a high degree of risk. Among these important risks are the following:

- we may not grow at the rates we historically have achieved or at all, even if our key metrics may imply future growth, including if we are unable to successfully execute on our growth initiatives and business strategies;

- if we fail to manage our growth effectively, our expenses could increase more than expected, our revenue may not increase proportionally or at all, and we may be unable to execute on our business strategy;

- if reimbursement rates paid by third-party payors are reduced or if third-party payors otherwise restrain our ability to obtain or deliver care to patients, our business could be harmed;

- we conduct business in a heavily regulated industry and if we fail to comply with these laws and government regulations, we could incur penalties or be required to make significant changes to our operations or experience adverse publicity, which could have a material adverse effect on our business, results of operations and financial condition;

- we are dependent on our relationships with affiliated practices, which we do not own, to provide health care services, and our business would be harmed if those relationships were disrupted or if our arrangements with these entities became subject to legal challenges;

- we operate in a competitive industry, and if we are not able to compete effectively, our business, results of operations and financial condition would be harmed;

- the impact of healthcare reform legislation and other changes in the healthcare industry and in health care spending on us is currently unknown, but may harm our business;

- if our or our vendors' security measures fail or are breached and unauthorized access to our employees', patients' or partners' data is obtained, our systems may be perceived as insecure, we may incur significant liabilities, including through private litigation or regulatory action, our reputation may be harmed, and we could lose patients and partners;

- our business depends on our ability to effectively invest in, implement improvements to and properly maintain the uninterrupted operation and data integrity of our information technology and other business systems;

- our existing indebtedness could adversely affect our business and growth prospects;

- our Principal Stockholders control us, and their interests may conflict with ours or yours; and

- the other factors set forth under "Risk Factors."

**Implications of Being an Emerging Growth Company**

As a company with less than $1.07 billion in revenue during our last fiscal year, we qualify as an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). An emerging growth company may take advantage of exemptions from some of the reporting requirements that are otherwise applicable to public companies that are not emerging growth companies. These exemptions include:

- being permitted to present only two years of audited consolidated financial statements and only two years of related Management's Discussion and Analysis of Financial Condition and Results of Operations in this prospectus;

Table of Contents

**Summary Consolidated Financial Data**

The following table sets forth summary consolidated financial data for the periods and as of the dates indicated below. The summary consolidated balance sheet data as of December 31, 2020 are derived from the audited consolidated financial statements of LifeStance TopCo, L.P. and its consolidated subsidiaries (the "Successor") included elsewhere in this prospectus. The summary consolidated balance sheet data as of March 31, 2021 are derived from the unaudited consolidated financial statements of the Successor included elsewhere in this prospectus.

The summary consolidated statement of operations data presented below for the year ended December 31, 2019 and the period from January 1 to May 14, 2020 relate to LifeStance Health, LLC and its consolidated subsidiaries (the "Predecessor") and are derived from the audited consolidated financial statements of the Predecessor that are included elsewhere in this prospectus. The summary consolidated statement of operations data for the period from April 13 to December 31, 2020 relate to the Successor and are derived from the audited consolidated financial statements of the Successor that are included elsewhere in this prospectus. For the period from April 13, 2020 through May 13, 2020, the operations of LifeStance TopCo, L.P. were limited to those incident to its formation and the TPG Acquisition, which were not significant. The summary consolidated statement of operations data for the three months ended March 31, 2021 are derived from the unaudited consolidated financial statements of the Successor included elsewhere in this prospectus. The summary consolidated statement of operations data for the three months ended March 31, 2020 are derived from the unaudited consolidated financial statements of the Predecessor included elsewhere in this prospectus.

We have prepared the unaudited interim consolidated financial statements on the same basis as the audited financial statements and have included, in our opinion, all adjustments, consisting only of normal recurring adjustments that we consider necessary for a fair statement of the financial information set forth in those statements. Our historical results are not necessarily indicative of the results that may be expected for any other period in the future and our interim results for the three months ended March 31, 2021 are not necessarily indicative of results to be expected for the full year ending December 31, 2021, or any other period.

LifeStance Health Group, Inc. was formed as a Delaware corporation on January 28, 2021 in anticipation of this offering and has not, to date, conducted any activities other than those incidental to its formation, the Organizational Transactions and the preparation of this prospectus and the registration statement of which this prospectus forms a part. As such, summary consolidated financial data for LifeStance Health Group, Inc. has not been provided.

15

Table of Contents

**Risk Factors**

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks and uncertainties described below together with all of the other information contained in this prospectus, including our consolidated financial statements and the related notes included elsewhere in this prospectus, before deciding to invest in our common stock. If any of the following risks should occur, our business, prospects, operating results and financial condition could suffer materially, the trading price of our common stock could decline and you could lose all or part of your investment. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties that we are unaware of or that we do not currently deem material may also become important factors that adversely affect our business.*

**Risks Related to Our Business and Our Industry**

***We may not grow at the rates we historically have achieved or at all, even if our key metrics may imply future growth, including if we are unable to successfully execute on our growth initiatives and business strategies.***

We have experienced significant growth since our inception in 2017. We continually execute a number of growth initiatives, strategies and operating plans designed to enhance our business. For example, our strategy includes growing our business by opening de novo centers, acquiring high-quality existing centers, recruiting new clinicians, building our relationships with payors and developing strategic relationships with other primary care and specialist physicians to offer an integrated care model. The anticipated benefits from these efforts are based on several assumptions that may prove to be inaccurate. Moreover, we may not be able to successfully complete these growth initiatives, strategies and operating plans and realize all of the benefits, including growth targets, that we expect to achieve, or it may be more costly to do so than we anticipate.

Future revenue may not grow at historic rates or may decline. Our future growth will depend, in part, on our ability to continue to successfully identify and execute on expansion opportunities, our ability to demonstrate the value of our platform, and our ability to attract and retain a sufficient number of qualified clinicians and support personnel. A variety of risks could cause us not to realize some or all of these growth plans and benefits. These risks include, among others, delays in the anticipated timing of activities related to such growth initiatives, strategies and operating plans, increased difficulty and cost in implementing these efforts, including difficulties in complying with evolving regulatory requirements, and the incurrence of other unexpected costs associated with operating the business. Moreover, our continued implementation of these programs may disrupt our operations and performance. As a result, we cannot assure you that we will realize these benefits. If, for any reason, the benefits we realize are less than our estimates or the implementation of these growth initiatives, strategies and operating plans negatively impacts our operations or costs more or takes longer to effectuate than we expect, or if our assumptions prove inaccurate, our business, results of operations and financial condition may be harmed.

***If we fail to manage our growth effectively, our expenses could increase more than expected, our revenue may not increase proportionally or at all, and we may be unable to execute on our business strategy.***

Our significant growth in recent periods may put strain on our business, operations and employees. For example, we added an additional 200 centers through our subsidiaries and affiliated practices in 2020 and grew from 1,404 employed active clinicians as of December 31, 2019 to 3,097 clinicians as of December 31, 2020, and to 3,301 clinicians as of March 31, 2021. We have also significantly increased the number of patient visits conducted over this period. We anticipate that our operations will continue to rapidly expand. To manage our current and anticipated future growth effectively, we must continue to maintain and enhance our financial and accounting systems and our IT infrastructure. In addition, in order for our clinicians to effectively provide virtual services to patients, we need to provide them with adequate IT and technology support.

19

Table of Contents

Failure to effectively manage our growth could also lead us to over-invest or under-invest in development and operations, result in or exacerbate weaknesses in our infrastructure, systems or controls, give rise to operational mistakes, financial losses, loss of productivity or business opportunities and result in loss of employees and reduced productivity of remaining employees. Our growth is expected to require significant capital expenditures. As we expand and make related upfront capital expenditures, including leasing new centers, developing our platform, and hiring clinicians within those centers, our margins may be reduced during those periods as we will not recognize patient service revenue until those centers open and begin patient visits. If our management is unable to effectively manage our growth, our expenses may increase more than expected, our revenue may not increase or may grow more slowly than expected and we may be unable to implement our business strategy, which would adversely affect our business, results of operations and financial condition.

*Our growth depends on our ability to open de novo centers. To the extent we are unable to successfully identify suitable locations or secure space or if our lessors are unable to obtain permits and complete construction in a timely manner, our growth may be negatively impacted.*

We may be unable to keep existing centers in current locations or open new centers in desirable locations in the future. We compete with other businesses for suitable locations for our centers. Local land use, local zoning issues, environmental regulations and other regulations may affect our ability to find suitable locations and also influence the cost of leasing or building our centers. We also may have difficulty negotiating real estate leases on acceptable terms or at all.

Opening de novo centers requires us to hire clinicians and establish a patient base in order to produce a return on investment. When we open centers in new markets, we may encounter difficulties in attracting new clinicians due to competition and area demographics and may encounter difficulties in attracting new patients due to a lack of patient familiarity with our brand, our lack of familiarity with local patient preferences, and preexisting relationships between patients and clinicians who are not affiliated with our Company. We cannot be certain that new centers will produce the anticipated revenues or return on investment or that existing centers will not be materially adversely affected by new or expanded competition in their market areas.

*We plan to acquire existing high-quality centers as part of our business strategy and may acquire other companies or technologies, which could divert our management's attention, result in dilution to our stockholders and otherwise disrupt our operations, and we may have difficulty integrating any such acquisitions successfully or realizing the anticipated benefits therefrom.*

Historically, a part of our business strategy has been the acquisition of existing high-quality centers with in-network payor relationships. We plan to continue to evaluate and make acquisitions pursuant to our strategy and may also seek to acquire or invest in businesses or technologies that we believe could complement or expand our business and our platform, enhance our capabilities or otherwise offer growth opportunities. The pursuit of potential acquisitions may divert the attention of management and cause us to incur various expenses in identifying, investigating and pursuing suitable acquisitions, whether or not they are consummated.

We also may not achieve the anticipated benefits from acquired centers due to a number of factors, including, but not limited to:

- unanticipated costs or liabilities associated with acquisitions;

- difficulty integrating or migrating accounting systems, operations and personnel of acquired businesses;

- diversion of management's attention from other business matters;

- use of resources that are needed in other parts of our business; and

- use of substantial portions of our available cash to consummate acquisitions.

20

Table of Contents

Our inability to successfully integrate or realize the anticipated benefits from acquisitions could adversely affect our business, results of operations and financial condition.

In addition, a significant portion of the purchase price of companies we acquire may be allocated to acquired goodwill and other intangible assets, which must be assessed for impairment at least annually. If our acquisitions do not yield expected returns, we may be required to take charges to our results of operations based on this impairment assessment process, which could adversely affect our results of operations.

We may decide to incur additional debt in connection with an acquisition or issue our common stock or other securities to the equity holders of the acquired business, which would potentially dilute the ownership of our existing stockholders. We cannot predict the number, timing or size of future acquisitions or the effect that any such transactions might have on our operating results.

***We operate in a competitive industry, and if we are not able to compete effectively, our business, results of operations and financial condition would be harmed.***

The market for mental health care is competitive. We compete in a highly fragmented market with direct and indirect competitors that offer varying levels of impact to key stakeholders such as patients, clinicians, payor partners, and primary care and other specialist physician partners. Our competitive success is contingent on our ability to address the needs of key stakeholders efficiently and with superior outcomes at scale compared with competitors. We compete across various segments within the mental health care market, including with respect to traditional health care providers and medical practices, technology platforms, care management and coordination, digital health, telehealth and health information exchange. Competition in our market involves changing technologies, evolving regulatory requirements and industry expectations, and changes in clinician and patient needs. If we are unable to keep pace with the evolving needs of our patients and clinicians and the evolving competitive landscape in a timely and efficient manner, demand for our services may be reduced and our business, financial condition and results of operations would be harmed.

Each of the individual geographic areas in which we operate has a different competitive landscape. In each of our markets, we compete with other outpatient mental health providers for patients and in contracting with commercial payors. In addition, we face intense competition from other clinical practices, hospitals, health systems and other outpatient mental health providers in recruiting psychiatrists, advanced practice nurses ("APNs"), psychologists, therapists, and other health care professionals. The inability to attract new clinicians would negatively affect our financial results.

Our competitors primarily include other outpatient mental health providers that deliver care in-person or through virtual visits. Our indirect competitors also include episodic consumer-driven point solutions, such as in-person and virtual life coaching, digital therapy and support tools and other technologies related to mental health care services. In addition to established mental health providers, we may face additional competition from new market entrants, including major retailers that have recently begun to offer in-person and virtual mental health care in certain markets. Generally, practices, certain hospitals, and other outpatient mental health providers in the local communities we serve provide services similar to those we offer, and, in some cases, our competitors may offer a broader array of services, more flexible hours or more desirable locations to patients and outpatient mental health providers than ours, and may have larger or more specialized medical staffs to serve patients. Furthermore, health care consumers are now able to access patient satisfaction data, as well as standard charges for services, to compare competing outpatient mental health providers; if any of our centers or our affiliated practices achieve poor results (or results that are lower than our competitors') on patient satisfaction surveys, or if our standard charges are or are perceived to be higher than our competitors, we may attract fewer patients. Additional quality measures and trends toward clinical or billing transparency, including recently enacted price transparency rules that would require third-party payors to make their pricing information publicly available, may have a negative impact on our competitive position and patient volumes, as patients may prefer to use lower-cost health care providers if they deliver services that are perceived to be similar in quality to ours. Competition from specialized providers, medical practices, retailers, digital health companies and other parties could negatively impact our revenue and market share.

21

Table of Contents

We may encounter competitors that have greater name recognition, longer operating histories or more resources than us. Further, our current or potential competitors may be acquired by third parties with greater available resources. As a result, our competitors may be able to respond more quickly and effectively than we can to new or changing opportunities, technologies, standards or patient or clinician requirements and may have the ability to initiate or withstand substantial price competition. In light of these factors, even if our model is more effective than those of our competitors, current or potential patients or clinicians may choose to turn to our competitors. If we are unable to successfully compete in the mental healthcare market, our business and prospects would be materially harmed.

***The estimates of market opportunity and revenue growth and forecasts of market growth included in this prospectus may prove to be inaccurate, and even if the markets in which we compete achieve the forecasted growth, our business could fail to grow at similar rates, if at all.***

Market opportunity estimates and growth forecasts are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate. In particular, the size and growth of the overall U.S. mental healthcare market is subject to significant variables, including a changing regulatory environment and population demographics, which can be difficult to measure, estimate or quantify. Estimating and forecasting growth opportunities in any given market are difficult and affected by multiple variables such as population growth, concentration of prospective patients and population density, among other things. Further, there can be no assurance that we will be able to sufficiently penetrate certain market segments included in our estimates and forecasts, including due to limited deployable capital, ineffective marketing efforts or the inability to develop sufficient presence in a given market to attract patients or contract with payors or primary care and other specialist physician partners in that market. In addition, increased unemployment may lead to a loss of insurance benefits for patients, negatively impacting their ability to access our services and, in turn, our financial performance. For these reasons, the estimates and forecasts in this prospectus relating to the size and expected growth of our target markets may prove to be inaccurate. Even if the markets in which we compete meet our size estimates and forecasted growth, our business could fail to grow at similar rates, if at all.

***If reimbursement rates paid by third-party payors are reduced or if third-party payors otherwise restrain our ability to obtain or deliver care to patients, our business could be harmed.***

Private third-party payors pay for the services that we provide to many of our patients. During the twelve months ended December 31, 2020, 93% of our patients were commercially insured as of their latest visit. If any commercial third-party payors reduce their reimbursement rates or elect not to cover some or all of our services, our business, results of operations and financial condition may be harmed. Third-party payors may also elect to create narrow networks, which may exclude our clinicians. Three payors individually exceeded 10% of our total revenue for the twelve months ended December 31, 2020, comprising 23%, 19% and 11% of our total revenue for such period. UnitedHeathcare and Anthem comprised 20% and 17% of our total revenue, respectively, for the three months ended March 31, 2021. Our payor relationships generally operate across multiple independent regional contracts. Changes in reimbursement rates from these or other large commercial payors could adversely impact our business and results of operations.

Our commercial payor contracts are typically structured as fee-for-service arrangements, pursuant to which we, or our affiliated practices, collect the fees for patient services. Under these arrangements, we assume financial risks related to changes in the mix of insured and uninsured patients and patients covered by government-sponsored health care programs, third-party reimbursement rates and patient volume.

A portion of our revenue comes from government health care programs. Payments from federal and state government programs are subject to statutory and regulatory changes, administrative rulings, interpretations and determinations, requirements for utilization review and federal and state funding restrictions, each of which could increase or decrease program payments, as well as affect the cost of providing services to patients and the timing of payments. We are unable to predict the effect of recent and future policy changes on our operations. In addition, the uncertainty and fiscal pressures placed upon federal and state governments as a result of, among

22

Table of Contents

other things, deterioration in general economic conditions and the funding requirements from federal healthcare reform legislation, may affect the availability of taxpayer funds for Medicare and Medicaid programs. Changes in government health care programs may reduce the reimbursement we receive from them or private payors and could adversely impact our business and results of operations.

A substantial decrease in patient volume, an increase in the number of uninsured or underinsured patients or an increase in the number of patients covered by government health care programs, as opposed to commercial plans that have higher reimbursement levels, could reduce our profitability and adversely impact future growth. In addition, we may be unable to enter new payor contracts on favorable terms, or at all. In some cases, our revenue decreases if our volume or reimbursement decreases, but our expenses, including clinician compensation, may not decrease proportionately.

There has also been a recent trend in the healthcare sector of payors shifting to new models and value-based care arrangements. Changing legislation and other regulatory and executive developments have led to the creation of new models of care and other initiatives in both the government and private sector. Value-based care incentivizes health care providers to improve both the health and well-being of their patients while concurrently managing the medical expenses or "spend" of a particular population. Value-based care reimbursement models implemented by government health care programs or private third-party payors could materially change the manner in which mental health providers are reimbursed. Any failure on our part to adequately implement strategic initiatives to adjust to these marketplace developments could have a material adverse impact on our business.

A nominal number of our current contracts provide for incremental payments tied to the attainment of quality or performance metrics. If we fail to obtain these metrics in future periods, our revenue may decrease relative to past periods. In addition, we may enter into contracts in the future that may include parallel or full risk sharing for identified populations. These agreements would expose us to significant financial downside in the event that we are not able to improve outcomes and reduce total cost of care for the populations. These contracts may include components of medical spending, increasing the size of potential downside risk relative to traditional fee-for-service mental health spending.

*The federal government and several states have enacted laws restricting the amount out-of-network providers of services can charge and recover for such services.*

In December 2020, in connection with the Consolidated Appropriations Act of 2021, the No Surprises Act introduced national limitations on physician billing for certain services furnished by providers who are not in-network with the patient's self-insured health plan, individual or group health plan (including fully-insured plans) that will go into effect on January 1, 2022. In addition, several states where we conduct business have enacted or are considering similar laws that would apply to patients having state-regulated insurance. For example, Florida, Ohio and Texas have adopted their own balance billing laws that, in certain cases, prohibit out-of-network providers from billing patients in excess of in-network rates. These measures could limit the amount we can charge and recover for services we furnish where we have not contracted with the patient's insurer, and therefore could have a material adverse effect on our business, financial condition, results of operations and cash flows. Moreover, these measures could affect our ability to contract with certain payors and under historically similar terms and may cause, and the prospect of these changes may cause, payors to terminate their contracts with us and our affiliated practices, further affecting our business, financial condition, results of operations and cash flows. There is also risk that additional legislation at the federal and state level will give rise to major third-party payors leveraging this legislation or related changes as an opportunity to terminate and renegotiate existing reimbursement rates.

*Financial pressures on patients, as well as economic conditions, may adversely affect our patient volume.*

We may be adversely affected by patients' unwillingness to pay for treatment by our clinicians. Higher numbers of unemployed individuals generally translate into more individuals without health care insurance to

23

Table of Contents

help pay for services, thereby increasing the potential for persons to elect not to seek treatment if they cannot afford to self-pay. Growth of patient receivables or deterioration in the ability to collect on these accounts, due to changes in economic conditions or otherwise, could have an adverse effect on our business, results of operations and financial condition. In addition, patients with high deductible insurance plans may be less likely to seek treatment as a result of higher expected out-of-pocket costs.

*We may receive reimbursement for virtual services that is less than for comparable in-person services, which would negatively impact revenue and results of operations.*

From time to time, we may operate in states that have not adopted laws related to parity between reimbursement rates for virtual services and in-person care. If we are not able to enter into regional payor contracts that provide for reimbursement parity between in-person and virtual services, private payors may not reimburse for virtual services at the same rates as in-person care for all patients within that market. Currently, our reimbursement rates for virtual services and in-person care are substantially similar. This is driven by contractual arrangements with our payor partners or payor policies. If we are not able to enter into or renew payor contracts on these terms or if payor policies change, we may receive reimbursement for virtual services that is less than comparable to in-person services in such states, which would negatively impact our revenue with respect to such markets, and as a result, our business, financial condition and results of operations.

*Failure to timely or accurately bill for our services could have a negative impact on our patient service revenue, bad debt expense and cash flow.*

Billing for our services is complex. The practice of providing mental health services in advance of payment or prior to assessing a patient's ability to pay for such services may have a significant negative impact on our patient service revenue, bad debt expense and cash flow. We bill numerous and varied payors, including self-pay patients and various forms of commercial insurance providers. Different payors typically have differing forms of billing requirements that must be met prior to receiving payment for services rendered. Self-pay patients and third-party payors may fail to pay for services even if they have been properly billed. Reimbursement to us is typically conditioned, among other things, on our providing the proper procedure and diagnosis codes. Incorrect or incomplete documentation and billing information could result in non-payment for services rendered or reduction in reimbursement. Additional factors that could complicate our billing include variation in coverage for similar services among various payors and the difficulty of adherence to specific compliance requirements, coding and various other procedures mandated by responsible parties. To the extent the complexity associated with billing for our services causes delays in our cash collections, we assume the financial risk of increased carrying costs associated with the aging of our accounts receivable as well as the increased potential for bad debt expense.

*We face inspections, reviews, audits and investigations under our commercial payor contracts and pursuant to federal and state programs. These audits could have adverse findings that may negatively affect our business, including our results of operations, liquidity, financial condition and reputation.*

We are subject to various inspections, reviews, audits and investigations to verify our compliance with applicable laws and regulations and any payor-specific requirements. Commercial payors and government programs reserve the right to conduct audits. We also periodically conduct internal audits and reviews of our regulatory compliance. An adverse inspection, review, audit or investigation could result in:

- refunding amounts we have been paid from payors;

- state or federal agencies imposing fines, penalties and other sanctions on us;

- temporary suspension of payment for new patients to the practice;

- decertification or exclusion from participation in one or more payor networks;

- self-disclosure of violations to applicable regulatory authorities;

24

Table of Contents

- damage to our reputation;

- the revocation of a clinician's or a practice's license; and

- loss of certain rights under, or termination of, our contracts with commercial payors.

We have in the past and may in the future be required to refund amounts we have been paid and/or pay fines and penalties as a result of these inspections, reviews, audits and investigations. If adverse inspections, reviews, audits or investigations occur and any of the results noted above occur, it could have a material adverse effect on our business, financial condition and results of operations. Furthermore, the legal, document production and other costs associated with complying with these inspections, reviews, audits or investigations could be significant.

### *We are dependent on credentialing our clinicians under our insurance contracts at the time of hire.*

We are responsible for credentialing our existing and new clinicians, and all of our clinicians need to be credentialed, either by us or by a contracted third party. The amount of time required to complete credentialing varies substantially between payor and region and is largely out of our control. Any delay in completing credentialing will result in a delay in clinicians seeing patients and a concomitant delay in generating revenue, which may materially affect our business. We may not be able to delegate credentialing for new centers that we may acquire in the future, which could result in delays in entry to new markets. Any failure of our clinicians to maintain credentials and licenses could result in delays in our ability to deliver care to patients, and therefore adversely affect our reputation and our business.

### *Our business depends on our ability to effectively invest in, implement improvements to and properly maintain the uninterrupted operation and data integrity of our information technology and other business systems.*

Our business is dependent on maintaining effective information systems as well as the integrity and timeliness of the data we use to serve our patients, support our clinicians and payor partners and operate our business. Because of the large amount of data that we collect and manage, it is possible that hardware failures or errors in our systems could result in data loss or corruption or cause the information that we collect to be incomplete or contain inaccuracies that our partners regard as significant. If our data were found to be inaccurate or unreliable due to fraud or other error, or if we, or any of the third-party vendors we engage, were to fail to maintain information systems and data integrity effectively, we could experience operational disruptions that may impact our patients and clinicians and hinder our ability to provide care to patients, retain and attract patients, establish reserves, report financial results timely and accurately and maintain regulatory compliance, among other things.

Our information technology strategy and execution are critical to our continued success. We must continue to invest in long-term solutions that will enable us to anticipate patient needs and expectations, enhance the patient experience, act as a differentiator in the market, protect against rapidly changing cybersecurity risks and threats, and keep pace with evolving privacy and security laws, requirements and regulations, including changes in payment regimes such as the Payment Card Industry Data Security Standard ("PCI DSS"). Our success is dependent, in large part, on maintaining the effectiveness of existing technology systems and continuing to deliver and enhance technology systems that support our business processes in a cost-efficient and resource-efficient manner. We have identified certain weaknesses with respect to our IT function. See "—Risks Related to Our Common Stock and This Offering—We have identified material weaknesses in our internal control over financial reporting and may identify additional material weaknesses in the future or fail to maintain an effective system of internal control over financial reporting. If our remediation of the material weaknesses is not effective, or we fail to develop and maintain effective internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired, which could harm our business and negatively impact the value of our common stock."

25

Table of Contents

Increasing regulatory and legislative changes will place additional demands on our information technology infrastructure that could have a direct impact on resources available for other projects tied to our strategic initiatives for our technology platform. In addition, recent trends toward greater patient engagement in health care require new and enhanced technologies, including more sophisticated applications for mobile devices. Connectivity among technologies is becoming increasingly important. We and our third-party vendors must also develop new systems to meet current market standards and keep pace with continuing changes in information processing technology, evolving industry and regulatory standards and patient needs. Failure to do so may present compliance challenges and impede our ability to deliver care to patients in a competitive manner. Further, because system development projects are long-term in nature, they may be more costly than expected to complete and may not deliver the expected benefits upon completion. Even if successful, there can be no assurance that additional development projects will not be needed or arise in the future or that we have the necessary resources to complete such development projects. Further, the technological advances of our competitors or future competitors may result in our technologies or future technologies become uncompetitive or obsolete. Our failure to effectively invest in, implement improvements to and properly maintain the uninterrupted operation and data integrity of our information technology and other business systems could adversely affect our results of operations, financial position and cash flow. Similarly, if our third party vendors fail to effectively invest in, implement improvements to and properly maintain the uninterrupted operation and data integrity of their own information technology systems, interruptions in their systems or network may result in disruptions of our own systems and business operations.

*If we cannot license rights to use technologies on reasonable terms, our ability to provide digital services, including virtual visits, and develop our technology platform would be inhibited.*

We license certain rights to use technologies related to our digital services, including virtual visits, patient visit scheduling, patient-clinician matching, and other services, and, in the future, we may identify additional third-party intellectual property that we may need to license in order to engage in our business. However, such licenses may not be available on acceptable terms or at all. The licensing or acquisition of third-party intellectual property rights is a competitive area, and several more established companies may pursue strategies to license or acquire third-party intellectual property rights that we may consider attractive or necessary. These established companies may have a competitive advantage over us due to their size, capital resources and greater development or commercialization capabilities. In addition, such licenses may be non-exclusive, which could give our competitors access to the same intellectual property licensed to us. If we are unable to enter into the necessary licenses on acceptable terms or at all, if any necessary licenses are subsequently terminated, if our licensors fail to abide by the terms of the licenses, if our licensors fail to prevent infringement by third parties, or if the licensed intellectual property rights are found to be invalid or unenforceable, our business could be adversely affected. Moreover, we could encounter delays and other obstacles in our attempt to develop alternatives.

*We lease all of our centers and may experience risks relating to lease termination, lease expense escalators, lease extensions and special charges.*

We currently lease all of our centers. Our leases are typically on terms ranging from one to seven years. Each of our leases provides that the lessor may terminate the lease, subject to applicable cure provisions, for a number of reasons, including failure to pay rent as specified or default of terms of the lease that are not cured within a specified notice period including, but not limited to, abandonment of the space, use of the space of a purpose not permitted under the lease, failure to maintain the premises in good condition, or creation and maintenance of a nuisance. If a lease agreement is terminated, there can be no assurance that we will be able to enter into a new lease agreement on similar or better terms or at all.

Our lease obligations often include annual fixed rent escalators ranging between 2% and 3% or variable rent escalators based on a consumer price index. These escalators could impact our ability to satisfy certain obligations and financial covenants and place an additional burden on our results of operations, liquidity and financial position, particularly if such escalator rates outpace growth in our operating results.

26

**Table of Contents**

As we continue to expand and have leases with different start dates, it is likely that some number of our leases will expire each year. Our lease or license agreements often provide for renewal or extension options. There can be no assurance that these rights will be exercised in the future or that we will be able to satisfy the conditions precedent to exercising any such renewal or extension. If we are not able to renew or extend our leases at or prior to the end of the existing lease terms, or if the terms of such options are unfavorable or unacceptable to us, our business, financial condition and results of operations could be adversely affected.

Leasing centers pursuant to binding lease agreements may limit our ability to exit markets. For instance, if a center subject to a lease becomes unprofitable, we may be required to continue operating such center or, if allowed by the landlord, to close such center, we may remain obligated for the lease payments on such center. We could incur special charges relating to the closing of such center, including lease termination costs or impairment charges, which would reduce our profits and adversely affect our business, financial condition or results of operations.

Upon an event of default, remedies available to our landlords generally include, without limitation, terminating such lease agreement, repossessing and reletting the leased properties and requiring us to remain liable for all obligations under such lease agreement, including the difference between the rent under such lease agreement and the rent payable as a result of reletting the leased properties, or requiring us to pay the net present value of the rent due for the balance of the term of such lease agreement. The exercise of such remedies could adversely affect our business, financial position, results of operations and liquidity.

*We depend on our executive team, and the loss of one or more of our executive officers or key employees or an inability to attract and retain highly skilled employees could harm our business.*

Our success depends largely upon the continued service of our key executive officers. These executive officers are at-will employees and therefore they may terminate employment with us at any time with no advance notice. We also do not maintain any key person life insurance policies. From time to time, there may be changes in our executive team resulting from the hiring or departure of executives, which could disrupt our business. The replacement of one or more of our executive officers or other key employees would likely involve significant time and costs and may significantly delay or prevent the achievement of our business objectives. Our business would be harmed if we fail to adequately plan for succession of our executives or if we fail to effectively recruit, integrate, retain and develop key talent and/or align our talent with our business needs.

*Litigation arising in the ordinary course of business, including in connection with commercial disputes or employment claims, against us could be costly and time-consuming to defend.*

We are subject, and in the future may become subject from time to time, to legal proceedings and claims that arise in the ordinary course of business such as claims brought by our partners in connection with commercial disputes, consumer class action claims, employment claims made by our current or former employees or other claims or proceedings. Litigation may result in substantial costs, settlement and judgments and may divert management's attention and resources, which may substantially harm our business, financial condition and results of operations. Insurance may not cover such claims, may not provide sufficient payments to cover all of the costs to resolve one or more such claims and may not continue to be available on terms acceptable to us. A claim brought against us that is uninsured or underinsured could result in unanticipated costs, thereby leading analysts or potential investors to reduce their expectations of our performance, which could reduce the market price of our common stock.

*Natural or man-made disasters and other similar events, including the COVID-19 pandemic, may significantly disrupt our business and negatively impact our business, financial condition and results of operations.*

Our centers may be harmed or rendered inoperable by natural or man-made disasters, including earthquakes, power outages, fires, floods, nuclear disasters and acts of terrorism or other criminal activities, which make it

27

Table of Contents

difficult or impossible for us to operate our business for some period of time. Although we deliver care in both in-person and digital settings, such disruptions in our operations could negatively impact our business and results of operations and harm our reputation. Although we maintain an insurance policy covering damage to property we lease, such insurance may not be sufficient to compensate for losses that may occur. Any such losses or damages could harm our business, financial condition and results of operations. In addition, our physician partners' facilities may be harmed or rendered inoperable by such natural or man-made disasters, which may cause disruptions, difficulties or other negative effects on our business and operations, with respect to our integrated care model.

In March 2020, the World Health Organization declared COVID-19 a global pandemic. This contagious pandemic, which has continued to spread, and the related adverse public health developments, including orders to shelter-in-place, travel restrictions and mandated business closures, have adversely affected workforces, organizations, customers, economies and financial markets globally, leading to an economic downturn and increased market volatility. It has also disrupted the normal operations of many businesses, including ours, although we have been able to mitigate the disruption by enabling clinicians to deliver care in a digital setting.

This pandemic, as well as intensified measures undertaken to contain the spread of COVID-19, could cause disruptions and severely impact our business, including, but not limited to:

- financial pressures on our patients;

- negatively impacting collections of accounts receivable;

- negatively impacting our ability to provide services to patients due to unpredictable demand;

- negatively impacting our ability to forecast our business's financial outlook;

- potential adverse impacts to capital markets, which could impede our liquidity;

- creating regulatory uncertainty if certain regulations are adopted that are adverse to the business;

- harming our business, results of operations and financial condition; and

- loss of insurance coverage.

We cannot predict with any certainty whether and to what degree the disruption caused by the COVID-19 pandemic and reactions thereto will continue, and expect to face difficulty accurately predicting our internal financial forecasts. The pandemic also presents challenges as our workforce, including both clinicians and support personnel, is largely working remotely.

It is not possible for us to accurately predict the duration or magnitude of the adverse results of the pandemic and its effects on our business, results of operations or financial condition at this time, but such effects may be material. Additionally, it is not possible for us to accurately determine the extent to which COVID-19 impacted our patient visits and related revenues, and if these impacts, if any, will continue. It is also not possible to predict whether any vaccine will mitigate any adverse results of the pandemic or accelerate a restoration of normal operations. The COVID-19 pandemic may also have the effect of heightening many of the other risks identified elsewhere in this prospectus.

***We, our clinicians and affiliated practices may become subject to medical liability claims, which could cause us to incur significant expenses and may require us to pay significant damages if not covered by insurance.***

Our business entails the risk of medical liability claims against us, our clinicians and our affiliated practices. Although we, our clinicians and our affiliated practices carry insurance covering medical malpractice claims in amounts that we believe are appropriate in light of the risks attendant to our business, successful medical liability claims could result in substantial damage awards that exceed the limits of our and our clinicians' insurance

28

coverage. Our affiliated practices and clinicians carry professional liability insurance, and we separately carry a professional liability insurance policy, which covers medical malpractice claims. In addition, professional liability insurance is expensive and insurance premiums may increase significantly in the future, particularly as we expand our services. As a result, adequate professional liability insurance may not be available to our clinicians, our affiliated practices or to us in the future at acceptable costs or at all.

Any claims made against us that are not fully covered by insurance could be costly to defend against, result in substantial damage awards against us and divert the attention of our management and our affiliated medical group from our operations, which could have a material adverse effect on our business, financial condition and results of operations. In addition, any claims may adversely affect our business or reputation.

*If we fail to cost-effectively develop widespread brand awareness and maintain our reputation, or if we fail to achieve and maintain market acceptance for our mental health services, our business could suffer.*

We believe that developing and maintaining widespread awareness of our brand and maintaining our reputation for delivering high-quality care to patients is important to attract new patients and clinicians and maintain existing patients and clinicians. In addition, we have a growing number of strategic relationships with primary care and other specialist physician partners to develop our integrated care model and referral networks. Market acceptance of our services and patient acquisition depends on educating people, as well as payors and partners, as to the distinct features, ease-of-use, positive lifestyle impact, efficacy, quality and other perceived benefits of our platform as compared to alternatives. In particular, market acceptance is dependent on our ability to sufficiently saturate a particular geographic area to deliver care to local patients. The level of saturation required depends on the needs of the local market and the preferences of the patients in that market. Further, we rely on referrals and placed advertisements to spread brand awareness. Referrals are dependent on patients relaying positive experiences with our services and clinicians. If we are not successful in demonstrating to existing and potential patients, clinicians and payors the benefits of our platform, if we are not able to sufficiently saturate a market in convenient locations for patients, or if we are not able to achieve the support of payors and physician partners for our model and services, we could experience lower than expected patient retention. Further, the loss or dissatisfaction of patients or clinicians may substantially harm our brand and reputation, inhibit widespread adoption of our services, reduce our revenue, and impair our ability to attract or retain patients and clinicians.

Our brand promotion activities may not generate awareness or increase revenue and, even if they do, any increase in revenue may not offset the expenses we incur in building our brand. If we fail to successfully promote and maintain our brand, we may fail to attract or retain patients, clinicians, payors and physician partners necessary to realize a sufficient return on our brand-building efforts or to achieve the widespread brand awareness we seek.

*If our trademarks and trade names are not adequately protected, we may not be able to build name recognition in our markets of interest and our competitive position may be harmed.*

The registered or unregistered trademarks or trade names that we own may be challenged, infringed, circumvented, declared generic, lapsed or determined to be infringing on or dilutive of other marks. We may not be able to protect our rights in these trademarks and trade names, which we need in order to build name recognition with potential patients and clinicians. In addition, third parties have filed, and may in the future file, for registration of trademarks similar or identical to our trademarks, thereby impeding our ability to build brand identity and possibly leading to market confusion. If they succeed in registering or developing common law rights in such trademarks, and if we are not successful in challenging such third-party rights, we may not be able to use these trademarks to develop brand recognition of our technology platform or other services. In addition, there could be potential trade name or trademark infringement claims brought by owners of other registered trademarks or trademarks that incorporate variations of our registered or unregistered trademarks or trade names. If we are unable to establish or protect our trademarks and trade names, or if we are unable to build name

29

Table of Contents

recognition based on our trademarks and trade names, we may not be able to compete effectively, which could harm our competitive position, business, financial condition, results of operations and prospects.

***Our quarterly results may fluctuate significantly, which could adversely impact the value of our common stock.***

Our quarterly results of operations have varied and may vary significantly in the future, and period-to-period comparisons of our results of operations may not be meaningful. Accordingly, our quarterly results should not be relied upon as an indication of future performance. Our quarterly financial results may fluctuate as a result of a variety of factors, many of which are outside of our control, including, without limitation, the following:

- the addition or loss of contracts with, or modification of contract terms with, payors, including the reduction of reimbursement rates for our services or the termination of our network contracts with payors;

- fluctuations in unemployment rates and economic conditions, which could result in reductions in patient visits;

- the timing of recognition of revenue;

- the amount and timing of operating expenses related to the maintenance and expansion of our business, operations and infrastructure, including upfront capital expenditures and other costs related to expanding in existing markets or entering new markets, as well as providing administrative and operations support services to our affiliated practices under our management contracts;

- our ability to effectively manage the size and composition of our clinician base relative to the level of demand for services from our patients;

- the timing and success of introductions of new applications and services by us or our competitors;

- changes in the competitive dynamics of our industry, including consolidation among competitors;

- the timing of expenses related to acquisition or other expansion opportunities and potential future charges for impairment of goodwill from acquired practices; and

- the number of business days in the quarter.

***Our failure to raise additional capital or generate cash flows necessary to execute our growth strategy in the future could reduce our ability to compete successfully and harm our results of operations.***

We may need to raise additional funds, and we may not be able to obtain additional debt or equity financing on favorable terms or at all. If we raise additional equity financing, our security holders may experience significant dilution of their ownership interests. If we engage in additional debt financing, we may be required to accept terms that restrict our ability to incur additional indebtedness, force us to maintain specified liquidity or other ratios or restrict our ability to pay dividends or make acquisitions. In addition, the covenants in the Credit Agreement among LifeStance Health Holdings, Inc., Lynnwood Intermediate Holdings, Inc., Capital One, National Association, and each lender party thereto, dated May 14, 2020 (the "Existing Credit Agreement"), may limit our ability to obtain additional debt, and any failure to adhere to these covenants could result in penalties or defaults that could further restrict our liquidity or limit our ability to obtain financing. If we need additional capital and cannot raise it on acceptable terms, or at all, we may not be able to, among other things:

- continue to expand our organization;

- hire, train and retain clinicians and other employees;

- respond to competitive pressures or unanticipated working capital requirements; or

- pursue acquisition opportunities.

30

**Table of Contents**

As a result, failure to raise additional capital or generate cash flows necessary to execute our growth strategy in the future could reduce our ability to compete successfully and harm our results of operations.

**Risks Related to Healthcare and Data Privacy Regulation**

*We conduct business in a heavily regulated industry and if we fail to comply with these laws and government regulations, we could incur penalties or be required to make significant changes to our operations or experience adverse publicity, which could have a material adverse effect on our business, results of operations and financial condition.*

The U.S. healthcare industry is heavily regulated and closely scrutinized by federal and state governments. Comprehensive statutes and regulations govern the manner in which we provide and bill for services and collect reimbursement from governmental programs and private payors, our contractual relationships with affiliated clinicians, vendors and patients, our marketing activities and other aspects of our operations. Of particular importance are:

- the federal Ethics in Patient Referrals Act, commonly referred to as the Stark Law, that, unless one of the statutory or regulatory exceptions apply, prohibits physicians from referring Medicare or Medicaid patients to an entity for the provision of certain "designated health services" if the physician or a member of such physician's immediate family has a direct or indirect financial relationship (including an ownership interest or a compensation arrangement) with the entity, and prohibit the entity from billing Medicare or Medicaid for such designated health services. Sanctions for violating the Stark Law include denial of payment, civil monetary penalties of up to $25,820 per claim submitted and exclusion from the federal health care programs. Failure to refund amounts received as a result of a prohibited referral on a timely basis may constitute a false or fraudulent claim and may result in civil penalties and additional penalties under the False Claims Act. The statute also provides for a penalty of up to $172,137 for a circumvention scheme;

- the federal Anti-Kickback Statute that prohibits the knowing and willful offer, payment, solicitation or receipt of any bribe, kickback, rebate or other remuneration for referring an individual, in return for ordering, leasing, purchasing or recommending or arranging for or to induce the referral of an individual or the ordering, purchasing or leasing of items or services covered, in whole or in part, by any federal health care program, such as Medicare and Medicaid. Remuneration has been interpreted broadly to be anything of value, and could include compensation, discounts or free marketing services. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation. In addition, the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act. Violations of the federal Anti-Kickback Statute may result in civil monetary penalties up to $104,330 for each violation, plus up to three times the remuneration involved. Civil penalties for such conduct can further be assessed under the federal False Claims Act. Violations can also result in criminal penalties, including criminal fines of up to $100,000 and imprisonment of up to 10 years. Similarly, violations can result in exclusion from participation in government health care programs, including Medicare and Medicaid;

- the criminal health care fraud provisions of the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended by the Health Information Technology for Economic and Clinical Health Act ("HITECH"), and their implementing regulations, which we collectively refer to as HIPAA, and related rules that prohibit knowingly and willfully executing a scheme or artifice to defraud any health care benefit program or falsifying, concealing or covering up a material fact or making any material false, fictitious or fraudulent statement in connection with the delivery of or payment for health care benefits, items or services. Similar to the federal Anti-Kickback Statute, a person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation;

31

Table of Contents

- HIPAA, and its implementing regulations, which also imposes certain regulatory and contractual requirements regarding the privacy, security and transmission of protected health information ("PHI");

- the federal False Claims Act that imposes civil and criminal liability on individuals or entities that knowingly submit false or fraudulent claims for payment to the government or knowingly making, or causing to be made, a false statement in order to have a false claim paid, including qui tam or whistleblower suits;

- the federal Civil Monetary Penalties Law prohibits, among other things, the offering or transfer of remuneration to a Medicare or state health care program beneficiary if the person knows or should know it is likely to influence the beneficiary's selection of a particular provider, practitioner, or supplier of services reimbursable by Medicare or a state health care program, unless an exception applies;

- reassignment of payment rules that prohibit certain types of billing and collection practices in connection with claims payable by the Medicare or Medicaid programs;

- similar state law provisions pertaining to Anti-Kickback, self-referral and false claims issues, some of which may apply to items or services reimbursed by any third party payor, including commercial insurers or services paid out-of-pocket by patients;

- state laws that prohibit general business corporations, such as us, from practicing medicine, controlling physicians' medical decisions or engaging in some practices such as splitting fees with physicians and psychologists;

- the Federal Trade Commission Act and federal and state consumer protection, advertisement and unfair competition laws, which broadly regulate marketplace activities and activities that could potentially harm consumers;

- laws that regulate debt collection practices as applied to our debt collection practices;

- a provision of the Social Security Act that imposes criminal penalties on health care providers who fail to disclose or refund known overpayments;

- federal and state laws that prohibit providers from billing and receiving payment from Medicare and Medicaid for services unless the services are medically necessary, adequately and accurately documented, and billed using codes that accurately reflect the type and level of services rendered;

- risks related to employing or contracting with individuals or entities that are sanctioned or excluded from participation in government health care programs;

- the Federal Substance Abuse Confidentiality Regulations known as 42 C.F.R. Part 2;

- federal and state laws and policies that require health care providers to maintain licensure, certification or accreditation to provide physician and other professional services, to enroll and participate in the Medicare and Medicaid programs, to report certain changes in their operations to the agencies that administer these programs, as well as state insurance laws; and

- state and federal statutes and regulations that govern workplace health and safety.

Because of the breadth of these laws and the need to fit certain activities within one of the statutory exceptions and safe harbors available, it is possible that some of our business activities could be subject to challenge under one or more of such laws. Achieving and sustaining compliance with these laws may prove costly. Failure to comply with these laws and other laws can result in civil and criminal penalties such as fines, damages, overpayment recoupment, loss of enrollment status and exclusion from the Medicare and Medicaid programs. The risk of our being found in violation of these laws and regulations is increased by the fact that many of them have not been fully interpreted by the regulatory authorities or the courts, and their provisions are sometimes open to a variety of interpretations. Our failure to accurately anticipate the application of these laws

32

and regulations to our business or any other failure to comply with regulatory requirements could create liability for us and negatively affect our business. Any action against us for violation of these laws or regulations, even if we successfully defend against it, could cause us to incur significant legal expenses, divert our management's attention from the operation of our business and result in adverse publicity.

To enforce compliance with the federal laws, the U.S. Department of Justice and the U.S. Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") have continued their scrutiny of health care providers, which has led to a number of investigations, prosecutions, convictions and settlements in the healthcare industry. Dealing with investigations can be time- and resource-consuming and can divert management's attention from the business. Any such investigation or settlement could increase our costs or otherwise have an adverse effect on our business. In addition, because of the potential for large monetary exposure under the federal False Claims Act, which provides for treble damages and mandatory minimum penalties of $11,665 to $23,331 per false claim or statement, health care providers often resolve allegations without admissions of liability for significant and material amounts to avoid the uncertainty of treble damages that may be awarded in litigation proceedings. Such settlements often contain additional compliance and reporting requirements as part of a consent decree, settlement agreement or corporate integrity agreement. Given the significant size of actual and potential settlements, it is expected that the government will continue to devote substantial resources to investigating health care providers' compliance with the health care reimbursement rules and fraud and abuse laws.

We are, and may in the future be, a party to various lawsuits, demands, claims, *qui tam* suits, governmental investigations and audits (including investigations or other actions resulting from our obligation to self-report suspected violations of law) and other legal matters, any of which could result in, among other things, substantial financial penalties or awards against us, mandated refunds, substantial payments made by us, required changes to our business practices, exclusion from future participation in Medicare, Medicaid and other health care programs and possible criminal penalties, any of which could have a material adverse effect on our business, results of operations, financial condition and cash flows and materially harm our reputation. In March 2020, we received a Civil Investigative Demand from the U.S. Attorney's Office of the Northern District of Georgia involving an investigation of a laboratory arrangement. We do not believe that we are a target of the investigation or that there is any material exposure based on our internal review. We do not know how the investigation will be resolved, to what extent it may be expanded, or whether we or our employees will be subject to further investigation, enforcement action or related penalties that could have a material adverse effect on our business, results of operations and financial condition.

The laws, regulations and standards governing the provision of health care services may change significantly in the future. We cannot assure you that any new or changed health care laws, regulations or standards will not materially adversely affect our business. We cannot assure you that a review of our business by judicial, law enforcement, regulatory or accreditation authorities will not result in a determination that could adversely affect our operations.

***Regulations related to health care are evolving. To the extent regulations revert to their pre-COVID-19 state, particularly with respect to state licensure laws, our ability to provide virtual service across regions will be hampered.***

In a regulatory climate that is uncertain, our operations may be subject to direct and indirect adoption, expansion or reinterpretation of various laws and regulations. Compliance with these future laws and regulations may require us to change our practices at an undeterminable and possibly significant initial monetary and recurring expense. These additional monetary expenditures may increase future overhead, which could have a material adverse effect on our results of operations and our ability to provide virtual services in certain jurisdictions. Areas of government regulation that, if changed, could be costly to us include: rules governing the practice of medicine by physicians; laws relating to licensure requirements for psychiatrists and other licensed mental health professionals; laws limiting the corporate practice of medicine and professional fee-splitting; laws

33

Table of Contents

governing the issuance of prescriptions in an online setting; cybersecurity and privacy laws; and laws and rules relating to the distinction between independent contractors and employees.

In addition, a few states have imposed different, and, in some cases, additional, standards regarding the provision of services virtually. The unpredictability of this regulatory landscape means that sudden changes in policy regarding standards of care and reimbursement are possible. If a successful legal challenge or an adverse change in the relevant laws were to occur, and we were unable to adapt our business model accordingly, our operations in the affected jurisdictions would be disrupted, which could have a material adverse effect on our business, financial condition and results of operations. If we are required to adapt our business model, we may be limited to only in-person services, which may have a material adverse effect on our business, financial condition and results of operations.

*We are dependent on our relationships with affiliated practices, which we do not own, to provide health care services, and our business would be harmed if those relationships were disrupted or if our arrangements with these entities became subject to legal challenges.*

The corporate practice of medicine prohibition exists in some form, by statute, regulation, board of medicine or attorney general guidance, or case law, in certain of the states in which we operate. These laws generally prohibit the practice of medicine or practice of psychology by lay-persons or entities and are intended to prevent unlicensed persons or entities from interfering with or inappropriately influencing providers' professional judgment. Due to the prevalence of the corporate practice of medicine doctrine, including in certain of the states where we conduct our business, we enter into management services contracts with our affiliated practices to provide a wide range of administrative and operations support services to these practices. Under the management contracts between LifeStance and each affiliated practice, we provide various administrative and management services in exchange for management fees set forth in our management services contracts. To the extent our ability to receive cash fees from the affiliated practices is limited, our ability to use that cash for growth, debt service or other uses may be impaired and, as a result, our results of operations and financial condition may be adversely affected. In addition, the affiliated practices are owned by our Chief Medical Officer and other licensed clinical leadership employees. In the event of any such employee's death or disability or upon certain other triggering events, we maintain the right to direct the transfer of the ownership of the affiliated practices to another licensed physician.

Our ability to perform medical and virtual services in a particular U.S. state is directly dependent upon the applicable laws governing the practice of medicine, health care delivery and fee splitting in such locations, which are subject to changing political, regulatory and other influences. The extent to which a U.S. state considers particular actions or relationships to constitute the practice of medicine is subject to change and to evolving interpretations by professional boards and state attorneys general, among others, each of which has broad discretion. There is a risk that U.S. state authorities in some jurisdictions may find that our contractual relationships with outpatient mental health practices, which govern the provision of medical and virtual services and the payment of administrative and operations support fees, violate laws prohibiting the corporate practice of medicine and fee-splitting. The extent to which each state may consider particular actions or contractual relationships to constitute improper influence of professional judgment varies across the states and is subject to change and to evolving interpretations by state boards of medicine and state attorneys general, among others. Accordingly, we must monitor our compliance with laws in every jurisdiction in which we operate on an ongoing basis, and we cannot provide assurance that our activities and arrangements, if challenged, will be found to be in compliance with the law. Additionally, it is possible that the laws and rules governing the practice of medicine, including the provision of virtual services, and fee splitting in one or more jurisdictions may change in a manner adverse to our business. While the management contracts prohibit us from controlling, influencing or otherwise interfering with the practice of medicine by the affiliated clinicians, and provide that clinicians retain exclusive control and responsibility for all aspects of the practice of medicine and the delivery of medical services, there can be no assurance that our contractual arrangements and activities with affiliated practices will be free from scrutiny from U.S. state authorities, and we cannot guarantee that subsequent interpretation of the corporate practice of medicine and fee-splitting laws will not circumscribe our business operations. State corporate practice

34

Table of Contents

of medicine doctrines also often impose penalties on health care clinicians themselves for aiding the corporate practice of medicine, which could discourage clinicians from participating in our network. If a successful legal challenge or an adverse change in relevant laws were to occur, and we were unable to adapt our business model accordingly, our operations in affected jurisdictions would be disrupted, which could harm our business.

While we expect that our relationships with our affiliated practices will continue, a material change in our relationship with these entities, or among the affiliated practices, whether resulting from a dispute among the entities, a challenge from a governmental regulator, a change in government regulation, or the loss of these relationships or contracts with outpatient mental health practices, could impair our ability to provide services to our patients and could harm our business.

*The impact of healthcare reform legislation and other changes in the healthcare industry and in health care spending on us is currently unknown, but may harm our business.*

Our revenue is dependent on the healthcare industry and could be affected by changes in health care spending, reimbursement and policy. The healthcare industry is subject to changing political, regulatory and other influences. The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act (the "Affordable Care Act" or the "ACA") in 2010 made major changes in how health care is delivered and reimbursed, and increased access to health insurance benefits to the uninsured and underinsured population of the United States.

Since its enactment, there have been judicial and Congressional challenges to certain aspects of the ACA as well as efforts to repeal or replace certain aspects of the ACA. For example, the Tax Cuts and Jobs Act of 2017 included a provision repealing, effective January 1, 2019, the tax-based shared responsibility payment imposed by the ACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate." Since the enactment of the Tax Cuts and Jobs Act of 2017, there have been additional amendments to certain provisions of the ACA, and it is possible that the current Biden administration and Congress will likely continue to seek to modify or build on certain provisions of the ACA. In December 2019, a federal appeals court held that the individual mandate portion of the ACA was unconstitutional and left open the question whether the remaining provisions of the ACA would be valid without the individual mandate. On November 10, 2020, the Supreme Court heard oral arguments, but it is unknown when the Supreme Court will issue a decision. We continue to evaluate the effect that the ACA and its possible modification or repeal and replacement has on our business. It is uncertain the extent to which any such changes may impact our business or financial condition. In addition to these legal challenges, the Biden administration may advance new healthcare policy goals and objectives through statute, regulation and executive order. For example, the Biden administration could propose a public health insurance option, which, if enacted, could significantly change the competitive landscape among commercial insurance carriers. It is uncertain the extent to which any such changes may impact our business or financial condition.

Other legislative changes to provider reimbursement have been proposed and adopted since the ACA was enacted. These changes include aggregate reductions to Medicare payments to providers of up to 2% per fiscal year pursuant to the Budget Control Act of 2011 (known as Medicare sequestration) and subsequent extensions, which began in 2013 and will remain in effect through 2029 unless additional Congressional action is taken. In January 2013, the American Taxpayer Relief Act of 2012 was signed into law, which, among other things, further reduced Medicare payments to several types of providers, including hospitals, imaging centers and cancer treatment centers, and increased the statute of limitations period for the government to recover overpayments to providers from three to five years. New laws may result in additional reductions in Medicare and other health care funding, which may materially adversely affect customer demand and affordability for our products and, accordingly, the results of our financial operations. Additional changes that may affect our business include the expansion of new programs such as Medicare payment for performance initiatives for physicians under the Medicare Access and CHIP Reauthorization Act of 2015 ("MACRA"), which will not be fully implemented until 2022. At this time, it is unclear how the introduction of the MACRA program will impact overall physician reimbursement.

35

**Table of Contents**

The Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") and subsequent legislation including the Consolidated Appropriations Act, 2021 and the American Rescue Plan Act of 2021, provides temporary reimbursement relief for health care providers that, when terminated, could have a material impact on our business. Among other things, Medicare sequestration cuts were temporarily suspended through March 31, 2021, although Congress could act to extend the moratorium further; there is also a one-time overall 3.75% increase in payments across all services and specialties listed in the final 2021 Medicare Physician Fee Schedule; however actual increases or decreases vary across specialties. When these enhanced reimbursement provisions sunset, it is uncertain what impact that will have on our business.

Such changes in the regulatory environment may also result in changes to our payor mix that may affect our operations and revenue. In addition, certain provisions of the ACA authorize voluntary demonstration projects, which include the development of bundling payments for acute, inpatient hospital services, physician services and post-acute services for episodes of hospital care. Further, the ACA may adversely affect payors by increasing medical costs generally, which could have an effect on the industry and potentially impact our business and revenue as payors seek to offset these increases by reducing costs in other areas. Certain of these provisions are still being implemented and the full impact of these changes on us cannot be determined at this time.

Uncertainty regarding future amendments to the ACA as well as new legislative proposals to reform health care and government insurance programs, along with the trend toward managed health care in the United States, could result in reduced demand and prices for our services. We expect that additional state and federal health care reform measures will be adopted in the future, any of which could limit the amounts that federal and state governments and other third party payors will pay for health care products and services, which could adversely affect our business, financial condition and results of operations.

***If our or our vendors' security measures fail or are breached and unauthorized access to our employees', patients' or partners' data is obtained, our systems may be perceived as insecure, we may incur significant liabilities, including through private litigation or regulatory action, our reputation may be harmed, and we could lose patients and partners.***

Our business involves the storage and transmission of proprietary information and sensitive or confidential data, including personal information of employees and others, as well as the PHI of our patients. Several laws and regulations require us to keep this information secure. Because of the extreme sensitivity of the information we store and transmit, the security features of our and our third-party vendors' computer, network and communications systems infrastructure are critical to the success of our business. We cannot be sure that our security features and processes or that our vetting and oversight of third parties will be sufficient. We also exercise limited control over third-party vendors, which increases our vulnerability to problems with the technology and information services they provide. Determined threat actors would likely be able to penetrate our security or the security of our vendors with enough skills, resources, and time. A breach or failure of our or our third-party vendors' network, hosted service providers or vendor systems could result from a variety of circumstances and events, including third-party action, employee negligence or error, malfeasance, computer viruses, cyber-attacks by computer hackers such as denial-of-service and phishing attacks, nation-state attacks, political protests, failures during the process of upgrading or replacing software and databases, power outages, hardware failures, telecommunication failures, user errors or catastrophic events. Information security risks have generally increased in recent years because of the proliferation of new technologies and the increased sophistication and activities of perpetrators of cyber-attacks. We are also dependent on a technology supply chain that involves many third parties, some of whom may not be known to us, and each of these companies may also be a source of potential risk to our patients, operations and reputation. Hackers and data thieves are increasingly sophisticated and operating large-scale and complex automated attacks, including on companies within the healthcare industry. As cyber threats continue to evolve, we and our third-party vendors may be unable to anticipate all potential threats. We may be required to expend additional resources to further enhance our information security measures and/or to investigate and remediate any information security vulnerabilities. If our or our third-party vendors' security measures fail or are breached, it could result in unauthorized persons

36

Table of Contents

accessing sensitive patient data (including PHI), a loss of or damage to our data, or an inability to access data sources, process data or provide our services to our patients. A security incident may even remain undetected for an extended period, and we or our third-party vendors may be unable to anticipate such threats and attacks or implement adequate preventive measures. Such failures or breaches of our or our third-party vendors' security measures, or our or our third-party vendors' inability to effectively resolve such failures or breaches in a timely manner, could severely damage our reputation, adversely affect patient, provider or investor confidence in us, and reduce the demand for our services from existing and potential patients. In addition, we could face litigation, damages for contract breach, monetary penalties or regulatory actions for violation of applicable laws or regulations, and incur significant costs to comply with applicable data breach notification laws and to implement remedial measures to prevent future occurrences and mitigate past violations. Although we maintain insurance covering certain security and privacy damages and related expenses, we may not carry insurance or maintain coverage sufficient to compensate for all liability and in any event, insurance coverage would not address the reputational damage that could result from a security incident.

Our Board of Directors is briefed periodically on cybersecurity and risk management issues and we have implemented a number of processes to avoid cyber threats and to protect privacy. However, the processes we have implemented in connection with such initiatives may be insufficient to prevent or detect improper access to confidential, proprietary or sensitive data, including personal data. In addition, the competition for talent in the data privacy and cybersecurity space is intense, and we may be unable to hire, develop or retain suitable talent capable of adequately detecting, mitigating or remediating these risks. Our failure to adhere to, or successfully implement processes in response to, evolving cybersecurity threats and changing legal or regulatory requirements in this area could result in legal liability or damage to our reputation in the marketplace.

Should an attacker gain access to our network or the network of our third-party vendor, including by way of example, using compromised credentials of an authorized user, we are at risk that the attacker might successfully leverage that access to compromise additional systems and data. Certain measures that could increase the security of our systems, such as data encryption (including data at rest encryption), heightened monitoring and logging, scanning for source code errors or deployment of multi-factor authentication, take significant time and resources to deploy broadly, and such measures may not be deployed in a timely manner or be effective against an attack. As cybersecurity threats continue to evolve, we may be required to expend significant additional resources to continue to modify or enhance our protective measures or to investigate and remediate any information security vulnerabilities. The inability to implement, maintain and upgrade adequate safeguards could have a material adverse effect on our business.

Our information systems must be continually updated, patched and upgraded to protect against known vulnerabilities. The volume of new vulnerabilities has increased markedly, as has the criticality of patches and other remedial measures. In addition to remediating newly identified vulnerabilities, previously identified vulnerabilities must also be continuously addressed. Accordingly, we are at risk that cyber-attackers exploit these known vulnerabilities before they have been addressed. Due to the systems and platforms that we operate, the increased frequency at which vendors are issuing security patches to their products, the need to test patches and, in some cases, coordinate with clients and vendors, before they can be deployed, we continuously face the substantial risk that we cannot deploy patches in a timely manner. These risks can be heightened as we acquire and work to integrate additional centers. We are also dependent on third-party vendors to keep their systems patched and secure in order to protect our information systems and data. Any failure related to these activities and any breach of our information systems could result in significant liability and have a material adverse effect on our business, reputation and financial condition.

37

Table of Contents

***Our use and disclosure of PII, including PHI, is subject to federal and state privacy and security regulations, and our failure to comply with those regulations or to adequately secure such information we hold could result in significant liability or reputational harm and, in turn, substantial harm to our affiliated practices, affiliated clinicians, patient base and revenue.***

The privacy and security of personally identifiable information ("PII") stored, maintained, received or transmitted electronically is a major issue in the United States. While we strive to comply with all applicable privacy and security laws and regulations, as well as our own posted privacy policies, legal standards for privacy, including but not limited to "unfairness" and "deception," as enforced by the Federal Trade Commission and state attorneys general, continue to evolve and any failure or perceived failure to comply may result in proceedings or actions against us by government entities or others, or could cause us to lose customers, which could have a material adverse effect on our business. Recently, there has been an increase in public awareness of privacy issues in the wake of revelations about the activities of various government agencies and in the number of private privacy-related lawsuits filed against companies. Any allegations about us, our affiliated practices or our affiliated clinicians with regard to the collection, processing, use, disclosure, or security of PII or other privacy-related matters, even if unfounded and even if we are in compliance with applicable laws, could damage our reputation and harm our business.

We also publish statements to our patients and stakeholders that describe how we handle and protect personal information. If federal or state regulatory authorities or private litigants consider any portion of these statements to be untrue or misleading, we may be subject to claims of deceptive practices, which could lead to significant liabilities and consequences, including, without limitation, costs of responding to investigations, defending against litigation, settling claims and complying with regulatory or court orders.

Numerous foreign, federal and state laws and regulations govern collection, dissemination, use and confidentiality of personally identifiable health information, including state privacy and confidentiality laws (including state laws requiring disclosure of breaches) and HIPAA.

HIPAA establishes a set of basic national privacy and security standards for the protection of PHI, by health plans, health care clearinghouses and certain health care providers, referred to as covered entities, and the business associates with whom such covered entities contract for services, which includes us. Certain of our entities and affiliated practices are covered entities, while our management service entities are business associates.

HIPAA requires covered entities and business associates to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical and technical safeguards to protect such information. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic health care transactions, including activities associated with the billing and collection of health care claims.

HIPAA imposes mandatory penalties for certain violations. Penalties for violations of HIPAA and its implementing regulations include civil monetary penalties of up to $59,522 per violation, not to exceed approximately $1.8 million for violations of the same standard in a single calendar year (as of 2020, and subject to periodic adjustments for inflation). However, a single breach incident can result in violations of multiple standards, which could result in significant fines. A person who knowingly obtains or discloses individually identifiable health information in violation of HIPAA may face a criminal penalty of up to $50,000 and up to one-year of imprisonment. The criminal penalties increase if the wrongful conduct involves false pretenses or the intent to sell, transfer, or use identifiable health information for commercial advantage, personal gain, or malicious harm. HIPAA also authorizes state attorneys general to file suit on behalf of their residents. While HIPAA does not create a private right of action allowing individuals to sue us in civil court for violations of HIPAA, its standards have been used as the basis for duty of care in state civil suits such as those for negligence or recklessness in the misuse or breach of PHI. Any such penalties or lawsuits could harm our business, financial condition, results of operations and prospects.

38

**Table of Contents**

In addition, HIPAA mandates that the Secretary of Health and Human Services ("HHS") conduct periodic compliance audits of HIPAA covered entities or business associates for compliance with the HIPAA Privacy and Security Standards. It also tasks HHS with establishing a methodology whereby harmed individuals who were the victims of breaches of unsecured PHI may receive a percentage of the Civil Monetary Penalty fine paid by the violator.

HIPAA further requires that patients be notified of any unauthorized acquisition, access, use or disclosure of their unsecured PHI that compromises the privacy or security of such information, with certain exceptions related to unintentional or inadvertent use or disclosure by employees or authorized individuals. HIPAA specifies that such notifications must be made "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." If a breach affects 500 patients or more, it must be reported to HHS without unreasonable delay, and HHS will post the name of the breaching entity on its public website. Breaches affecting 500 patients or more in the same state or jurisdiction must also be reported to the local media. If a breach involves fewer than 500 people, the covered entity must record it in a log and notify HHS at least annually. We have experienced minor breaches of PHI in the ordinary course of business, but none have involved more than 500 individuals. Further, the HHS Office for Civil Rights ("OCR") published a proposed rule in January of 2021, which, among other things calls for greater care coordination and an individual's rights to access patient records. The proposed rule specifically encourages the disclosure of PHI when needed to help individuals experiencing substance use disorder, serious mental illness and in emergency circumstances. The proposed rule is subject to a regulatory suspension announced by the Biden administration and we do not know when (or if) the final rule will be published or whether there may be additional changes to the regulations, but when it is, we will need to evaluate and potentially update our HIPAA regulatory programs and documentation to ensure compliance with such requirements.

Additionally, we may be required to comply with the Federal Substance Abuse Confidentiality Regulations known as 42 C.F.R. Part 2. In July 2020, new regulations overhauled these laws to better align with HIPAA and make other updates to facilitate better coordination of care in response to the opioid epidemic. The federal government could initiate criminal charges for violations of Part 2, which include $500 for the first offense; and $5,000 for all subsequent offenses and seek fines up to $5,000 per violation for individuals and $10,000 per violation for organizations. Under the CARES Act, Congress also gave HHS the authority to issue civil money penalties for violations of Part 2, ranging from $100 to $50,000 per violation depending on the level of culpability.

Further, the U.S. federal government and various states and governmental agencies have adopted or are considering adopting various laws, regulations and standards regarding the collection, use, retention, security, disclosure, transfer and other processing of sensitive and personal information. For example, California implemented the California Confidentiality of Medical Information Act, that imposes restrictive requirements regulating the use and disclosure of health information and other personally identifiable information. These laws and regulations are not necessarily preempted by HIPAA, particularly if a state affords greater protection to individuals than HIPAA. Where state laws are more protective, we have to comply with the stricter provisions. In addition to fines and penalties imposed upon violators, some of these state laws also afford private rights of action to individuals who believe their personal information has been misused. California has also implemented the California Consumer Privacy Act, or CCPA, which came into effect on January 1, 2020 and, which increases privacy rights for California residents and imposes obligations on companies that process their personal information. Among other things, the CCPA requires covered companies to provide new disclosures to California consumers and provide such consumers new data protection and privacy rights, including the ability to opt-out of certain sales of personal information. The CCPA provides for civil penalties for violations, as well as a private right of action for certain data breaches that result in the loss of personal information. This private right of action may increase the likelihood of, and risks associated with, data breach litigation. The CCPA has been amended from time to time, and it is possible that further amendments will be enacted, but even in its current format remains unclear how various provisions of the CCPA will be interpreted and enforced. Additionally, the recently passed California Privacy Rights Act ("CPRA"), which will become operational in 2023, will significantly

39

Table of Contents

modify the CCPA, including expanding consumers' rights with respect to certain sensitive personal information, and creating a new state agency that will be vested with authority to implement and enforce the CCPA and CPRA. We will need to evaluate and potentially update our privacy regulatory programs to ensure compliance with such requirements, and our review and update may not be able to achieve full compliance within the allowed period of time.

The Virginia Consumer Data Protection Act ("CDPA") was signed into law on March 2, 2021 and will go into effect on January 1, 2023. The CDPA provides consumers with new rights to access, correct, delete and obtain a copy of the personal information a covered business holds about them, and to opt out of certain data processing activities. Significantly, covered business will also be required to obtain opt-in consent before collecting or processing "sensitive data" and to conduct "Data Protection Assessments" in specified circumstances. The state attorney general can assess penalties up to $7,500 per violation. We are assessing the effects that CDPA will have on our business.

There are many other state-based data privacy and security laws and regulations that may impact our business. All of these evolving compliance and operational requirements impose significant costs that are likely to increase over time, may require us to modify our data processing practices and policies, divert resources from other initiatives and projects and could restrict the way services involving data are offered, all of which may adversely affect our results of operations. Certain state laws may be more stringent or broader in scope, or offer greater individual rights, with respect to sensitive and personal information than federal, international or other state laws, and such laws may differ from each other, which may complicate compliance efforts. State laws are changing rapidly and there is discussion in Congress of a new federal data protection and privacy law to which we may be subject.

The interplay of federal and state laws may be subject to varying interpretations by courts and government agencies, creating complex compliance issues for us and our clients and potentially exposing us to additional expense, adverse publicity and liability. Further, as regulatory focus on privacy issues continues to increase and laws and regulations concerning the protection of personal information expand and become more complex, these potential risks to our business could intensify. Changes in laws or regulations associated with the enhanced protection of certain types of sensitive data, such as PHI or PII, along with increased customer demands for enhanced data security infrastructure, could greatly increase our cost of providing our services, decrease demand for our services, reduce our revenue and/or subject us to additional liabilities.

In addition to the applicable federal and state laws, we are also subject to PCI DSS, a self-regulatory standard that requires companies that process payment card data to implement certain data security measures. If we or our payment processor fail to comply with the PCI DSS, we may incur significant fines or liability and lose access to major payment card systems. Our systems are subject to annual review under the PCI DSS requirements, and we have historically had, may now have, and may have in the future have items that require improvement. Industry groups may in the future adopt additional self-regulatory standards by which we are legally or contractually bound.

Because of the breadth of these laws and the narrowness of their exceptions and safe harbors, it is possible that our business activities can be subject to challenge under one or more of such laws. The scope and enforcement of each of these laws is uncertain and subject to rapid change in the current environment of health care reform. Federal, state and foreign enforcement bodies have recently increased their scrutiny of interactions between health care companies and health care providers, which has led to a number of investigations, prosecutions, convictions and settlements in the healthcare industry. Any such investigations, prosecutions, convictions or settlements could result in significant financial penalties, damage to our brand and reputation, and a loss of customers, any of which could have an adverse effect on our business.

**Table of Contents**

***Laws regulating scope of clinician practices and supervision requirements may constrain our ability to grow and meet patient needs.***

Each state regulates the scope of practice under our clinicians' licenses. There is substantial variation across states in scope of practice for many clinician types, including nurse practitioners. In a number of states in which we operate, nurse practitioners are required to have physician supervisors, in particular in connection with the prescription of Schedule II drugs. The need to provide supervisors may constrain our ability to add new clinicians to the practice, meet patient need or serve specific geographic regions. Further, supervision and scope of license laws are subject to frequent change by state legislative bodies. Changes decreasing the scope of license or increasing the onerousness of supervision requirements could adversely affect our ability to meet patient need and ultimately negatively impact our business and results of operations.

***Regulations related to telehealth are still evolving. To the extent regulations revert to their pre-COVID state, our ability to provide or be reimbursed for certain telehealth services could be impaired.***

Given the uncertain regulatory climate, government regulations regarding the provision of telehealth services have been unpredictable, and sudden changes could be costly to us or have a material effect on our business. Further, some states impose strict standards on using telehealth to prescribe certain classes of controlled substances that can be commonly used to treat mental health disorders. The unpredictability of this regulatory landscape means that sudden changes in policy regarding standards of care and reimbursement are possible. If a successful legal challenge or an adverse change in the relevant laws were to occur, and we were unable to adapt our business model accordingly, our operations in the affected jurisdictions would be disrupted, which could have a material adverse effect on our business, financial condition and results of operations. If we are required to adapt our business model, we may be limited to only in person services, which may have a material adverse effect on our business, financial condition and results of operations.

Recent growth in our telehealth services has been facilitated by significant reduction of regulatory and reimbursement barriers for telehealth services in response to the COVID-19 pandemic, including expansion of reimbursement for telehealth services, and easing of state licensure policies for clinicians, enabling more clinicians to serve patients in more states. During the public health emergency, the Drug Enforcement Agency is permitting providers to prescribe certain control substances through telehealth without requiring those providers to have conducted an in-person medical evaluation. To the extent these regulations revert to their pre-COVID state, our ability to provide certain telehealth services may be impaired, which may have a material adverse effect on our business, financial condition and results of operations.

**Risks Related to Indebtedness**

***Our existing indebtedness could adversely affect our business and growth prospects.***

As of March 31, 2021, we had $399.2 million in principal amount outstanding under our Existing Credit Agreement. Our indebtedness, or any additional indebtedness we may incur, could require us to divert funds identified for other purposes for debt service and impair our liquidity position. If we cannot generate sufficient cash flow from operations to service our debt, we may need to refinance our debt, dispose of assets or issue equity to obtain necessary funds. We do not know whether we will be able to take any of these actions on a timely basis, on terms satisfactory to us or at all.

Our indebtedness and the cash flow needed to satisfy our debt have important consequences, including:

- limiting funds otherwise available for financing our capital expenditures by requiring us to dedicate a portion of our cash flows from operations to the repayment of debt and the interest on this debt;

- making us more vulnerable to rising interest rates; and

- making us more vulnerable in the event of a downturn in our business.

41

Table of Contents

Our level of indebtedness may place us at a competitive disadvantage to our competitors that are not as highly leveraged. Fluctuations in interest rates can increase borrowing costs. Increases in interest rates may directly impact the amount of interest we are required to pay and reduce earnings accordingly. In addition, developments in tax policy, such as the disallowance of tax deductions for interest paid on outstanding indebtedness, could have an adverse effect on our liquidity and our business, financial conditions and results of operations.

In addition, we may need to refinance all or a portion of our indebtedness before maturity. We cannot assure you that we will be able to refinance any of our indebtedness on commercially reasonable terms or at all.

*We may not be able to generate sufficient cash flow to service all of our indebtedness, and may be forced to take other actions to satisfy our obligations under such indebtedness, which may not be successful.*

Our ability to make scheduled payments or to refinance outstanding debt obligations depends on our financial and operating performance, which will be affected by prevailing economic, industry and competitive conditions and by financial, business and other factors beyond our control. We may not be able to maintain a sufficient level of cash flow from operating activities to permit us to pay the principal, premium, if any, and interest on our indebtedness. Any failure to make payments of interest and principal on our outstanding indebtedness on a timely basis would likely result in penalties or defaults, which would also harm our ability to incur additional indebtedness.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay capital expenditures, sell assets, seek additional capital or seek to restructure or refinance our indebtedness. Any refinancing of our indebtedness could be at higher interest rates and may require us to comply with more onerous covenants. These alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations. In the absence of such cash flows and resources, we could face substantial liquidity problems and might be required to sell material assets or operations to attempt to meet our debt service obligations. If we cannot meet our debt service obligations, the holders of our indebtedness may accelerate such indebtedness and, to the extent such indebtedness is secured, foreclose on our assets. In such an event, we may not have sufficient assets to repay all of our indebtedness.

*The terms of the Existing Credit Agreement restrict our current and future operations, particularly our ability to respond to changes or to take certain actions.*

The Existing Credit Agreement contains a number of restrictive covenants that impose significant operating and financial restrictions on us and may limit our ability to engage in acts that may be in our long-term best interests, including restrictions on our ability to:

- incur additional indebtedness or other contingent obligations;

- create liens;

- make investments, acquisitions, loans and advances;

- consolidate, merge, liquidate or dissolve;

- sell, transfer or otherwise dispose of our assets;

- pay dividends on our equity interests or make other payments in respect of capital stock; and

- materially alter the business we conduct.

You should read the discussion under the heading "Description of Indebtedness" for further information about these covenants.

42

The restrictive covenants in the Existing Credit Agreement require us to satisfy certain financial condition tests. Our ability to satisfy those tests can be affected by events beyond our control. In addition, the Existing Credit Agreement contains a financial maintenance covenant requiring compliance with a maximum leverage ratio as of the last day of each fiscal quarter.

A breach of the covenants or restrictions under the Existing Credit Agreement could result in an event of default. Such a default may allow the creditors to accelerate the related debt, which may result in the acceleration of any other debt we may incur to which a cross-acceleration or cross-default provision applies. In the event the holders of our indebtedness accelerate the repayment, we may not have sufficient assets to repay that indebtedness or be able to borrow sufficient funds to refinance it. Even if we are able to obtain new financing, it may not be on commercially reasonable terms or on terms acceptable to us. As a result of these restrictions, we may be:

- limited in how we conduct our business;

- unable to raise additional debt or equity financing to operate during general economic or business downturns; or

- unable to compete effectively or to take advantage of new business opportunities.

These restrictions, along with restrictions that may be contained in agreements evidencing or governing other future indebtedness, may affect our ability to grow in accordance with our growth strategy.

### *The transition away from LIBOR may adversely affect our cost to obtain financing.*

On July 27, 2017, the U.K. Financial Conduct Authority announced that it intends to stop persuading or compelling banks to submit London Interbank Offered Rate ("LIBOR") rates after 2021. On March 5, 2021, the U.K. Financial Conduct Authority and the ICE Benchmark Administration (the "IBA") announced that the IBA will cease publication in their current form for (i) 1-week and 2-month U.S. Dollar LIBOR rates immediately following the publication on December 31, 2021 and (ii) overnight, 1-month, 3-month, 6-month and 12-month LIBOR rates immediately following the publication on June 30, 2023. While there is still no consensus on what rate or rates may become accepted alternatives to LIBOR, the Alternative Reference Rates Committee, a steering committee comprised of U.S. financial market participants, selected and the Federal Reserve Bank of New York started in May 2018 to publish the Secured Overnight Finance Rate ("SOFR"), as an alternative to LIBOR. SOFR is a broad measure of the cost of borrowing cash in the overnight U.S. treasury repo market. At this time, it is impossible to predict whether the SOFR or another reference rate will become an accepted alternative to LIBOR. The manner and impact of this transition may materially adversely affect the trading market for LIBOR-based securities, which may result in an increase in borrowing costs under our Existing Credit Agreement. Any replacement for LIBOR may result in an effective increase in the applicable interest rate on our current or future debt obligations, including our Existing Credit Agreement.

### Risks Related to Our Common Stock and This Offering

### *Our Principal Stockholders control us, and their interests may conflict with ours or yours.*

Immediately following this offering, investment entities affiliated with our Principal Stockholders will, collectively, beneficially own approximately 66.0% of our common stock, or 64.4% if the underwriters exercise in full their option to purchase additional shares from the selling stockholders, which means that, based on their combined percentage voting power held after this offering, the Principal Stockholders together will control the vote of all matters submitted to a vote of our stockholders, which will enable them to control the election of the members of the Board of Directors and other corporate decisions. Even when the Principal Stockholders cease to own shares of our stock representing a majority of the total voting power, for so long as the Principal Stockholders continue to own a significant percentage of our stock, the Principal Stockholders will still be able to significantly influence the composition of our Board of Directors and the approval of actions requiring stockholder approval. Accordingly, for

43

**Table of Contents**

such period of time, the Principal Stockholders will have significant influence with respect to our management, business plans and policies, including the appointment and removal of our officers, decisions on whether to raise future capital and amending our charter and bylaws, which govern the rights attached to our common stock. In particular, for so long as the Principal Stockholders continue to own a significant percentage of our stock, the Principal Stockholders will be able to cause or prevent a change of control of us or a change in the composition of our Board of Directors and could preclude any unsolicited acquisition of us. The concentration of ownership could deprive you of an opportunity to receive a premium for your shares of common stock as part of a sale of us and ultimately might affect the market price of our common stock.

In addition, in connection with this offering, we will enter into a Stockholders Agreement that will provide each Principal Stockholder the right to designate nominees for election to our Board of Directors. See "Certain Relationships and Related Party Transactions—Stockholders Agreement."

The Principal Stockholders and their affiliates engage in a broad spectrum of activities, including investments in the healthcare industry generally. In the ordinary course of their business activities, the Principal Stockholders and their affiliates may engage in activities where their interests conflict with our interests or those of our other stockholders, such as investing in or advising businesses that directly or indirectly compete with certain portions of our business or are suppliers or customers of ours. Our amended and restated certificate of incorporation to be effective in connection with the closing of this offering will provide that none of the Principal Stockholders, any of their affiliates or any director who is not employed by us (including any non-employee director who serves as one of our officers in both his director and officer capacities) or its affiliates will have any duty to refrain from engaging, directly or indirectly, in the same business activities or similar business activities or lines of business in which we operate. The Principal Stockholders also may pursue acquisition opportunities that may be complementary to our business, and, as a result, those acquisition opportunities may not be available to us. In addition, each of the Principal Stockholders may have an interest in pursuing acquisitions, divestitures and other transactions that, in its judgment, could enhance its investment, even though such transactions might involve risks to you.

***Upon listing of our shares on Nasdaq, we will be a "controlled company" within the meaning of the rules of Nasdaq and, as a result, we will qualify for exemptions from certain corporate governance requirements. You will not have the same protections as those afforded to stockholders of companies that are subject to such governance requirements.***

After completion of this offering, the Principal Stockholders together will continue to control a majority of the voting power of our outstanding common stock. As a result, we will be a "controlled company" within the meaning of the corporate governance standards of Nasdaq. Under these rules, a company of which more than 50% of the voting power for the election of directors is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain corporate governance requirements, including:

- the requirement that a majority of our Board of Directors consist of independent directors;

- the requirement that we have a nominating and corporate governance committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities;

- the requirement that we have a compensation committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and

- the requirement for an annual performance evaluation of the nominating and corporate governance and compensation committees.

Following this offering, we may elect to utilize one or more of these exemptions. Accordingly, you will not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of Nasdaq.

44

Table of Contents

*We are an emerging growth company and our compliance with the reduced reporting and disclosure requirements applicable to emerging growth companies could make our common stock less attractive to investors.*

We are an "emerging growth company," as defined in the Jumpstart Our Business Acts of 2012 (the "JOBS Act"), and may remain an emerging growth company for up to five years. For as long as we are an emerging growth company, we will not be required to comply with certain requirements that are applicable to other public companies that are not emerging growth companies, including the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), and may also take advantage of the reduced disclosure obligations regarding executive compensation in our periodic reports, proxy statements and registration statements and the exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and obtaining stockholder approval of any golden parachute payments not previously approved. As a result, the information we provide stockholders will be different than the information that is available with respect to other public companies. In this prospectus, we have not included all of the executive compensation related information that would be required if we were not an emerging growth company and we have provided only two years of audited financial statements and only two years of related "Management's Discussion and Analysis of Financial Condition and Results of Operations." If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock, and our stock price may be more volatile.

In addition, under the JOBS Act, emerging growth companies can delay adopting new or revised accounting standards issued subsequent to the enactment of the JOBS Act until such time as those standards apply to private companies. We have elected to use this extended transition period.

*We will incur increased costs as a result of operating as a public company, and our management will be required to devote substantial time to compliance with our public company responsibilities and corporate governance practices.*

As a public company, and particularly after we are no longer an "emerging growth company," we will incur significant legal, accounting, and other expenses that we did not incur as a private company. The Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the listing requirements of Nasdaq, and other applicable securities rules and regulations impose various requirements on public companies, including establishment and maintenance of effective disclosure and financial controls and corporate governance practices. We expect that we will need to hire additional accounting, finance, and other personnel in connection with our becoming, and our efforts to comply with the requirements of being, a public company, and our management and other personnel will need to devote a substantial amount of time towards maintaining compliance with these requirements. Our management and other personnel will also need to devote a substantial amount of time towards compliance with the additional reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These requirements will increase our legal and financial compliance costs and will make some activities more time-consuming and costly. For example, we expect that the rules and regulations applicable to us as a public company may make it more difficult and more expensive for us to obtain director and officer liability insurance. We are currently evaluating these rules and regulations and cannot predict or estimate the amount of additional costs we may incur or the timing of such costs. These rules and regulations are often subject to varying interpretations, in many cases due to their lack of specificity, and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices.

45

Table of Contents

*We have identified material weaknesses in our internal control over financial reporting and may identify additional material weaknesses in the future or fail to maintain an effective system of internal control over financial reporting. If our remediation of the material weaknesses is not effective, or we fail to develop and maintain effective internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired, which could harm our business and negatively impact the value of our common stock.*

In connection with the preparation of our consolidated financial statements as of and for the year ended December 31, 2019, we identified material weaknesses in our internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

We did not design and maintain an effective control environment commensurate with our financial reporting requirements due to an insufficient complement of resources in the accounting/finance and IT functions, with an appropriate level of knowledge, experience and training. This material weakness contributed to the following additional material weaknesses:

- We did not maintain formal accounting policies and procedures, and did not design and maintain controls related to significant accounts and disclosures to achieve complete, accurate and timely financial accounting, reporting and disclosures, including controls over account reconciliations, segregation of duties and the preparation and review of journal entries.

  These material weaknesses resulted in material misstatements related to the identification and valuation of intangible assets acquired in business combinations that impacted the classification of intangible assets and goodwill, related impacts to amortization and income tax expense, and the restatement of our previously issued annual consolidated financial statements as of and for the years ended December 31, 2019 and 2018 with respect to such intangibles assets acquired in business combinations. The consolidated financial statements and the related notes included elsewhere in this prospectus give effect to such restatement. Additionally, these material weaknesses could result in a misstatement of substantially all of the financial statement accounts and disclosures that would result in a material misstatement to our annual or interim consolidated financial statements that would not be prevented or detected.

- We did not design and maintain effective controls over IT general controls for information systems that are relevant to the preparation of our consolidated financial statements. Specifically, we did not design and maintain: (i) program change management controls for financial systems to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately; (ii) user access controls to ensure appropriate segregation of duties and that adequately restrict user and privileged access to financial applications, programs, and data to appropriate Company personnel; (iii) computer operations controls to ensure that critical batch jobs are monitored and data backups are authorized and monitored; and (iv) testing and approval controls for program development to ensure that new software development is aligned with business and IT requirements.

These IT deficiencies did not result in a material misstatement to our consolidated financial statements; however, the deficiencies, when aggregated, could impact maintaining effective segregation of duties, as well as the effectiveness of IT-dependent controls (such as automated controls that address the risk of material misstatement to one or more assertions, along with the IT controls and underlying data that support the effectiveness of system-generated data and reports) that could result in misstatements potentially impacting all financial statement accounts and disclosures that would not be prevented or detected. Accordingly, we have determined these deficiencies in the aggregate constitute a material weakness.

46

Table of Contents

We have begun implementation of a plan to remediate these material weaknesses. These remediation measures are ongoing as of the date of this prospectus and include: hiring additional personnel, such as finance and accounting, compliance, IT, human resources and other professionals with appropriate levels of knowledge and experience, and establishing an internal audit function; implementing additional procedures and controls consistent with the Committee of Sponsoring Organizations of the Treadway Commission (COSO) framework to address the risk of material misstatement; and enhancing IT governance processes.

We intend to evaluate current and projected resource needs on a regular basis and hire additional qualified resources as needed. Our ability to maintain qualified and adequate resources to support the Company and our projected growth will be a critical component of our internal control environment.

We cannot assure you that the measures we have taken to date, and actions we may take in the future, will be sufficient to remediate the material weaknesses in our internal control over financial reporting or that they will prevent or avoid potential future material weaknesses. If we are unable to successfully remediate our existing or any future material weaknesses in our internal control over financial reporting, or identify any additional material weaknesses, the accuracy and timing of our financial reporting may be negatively impacted, we may be unable to maintain compliance with securities law requirements in addition to applicable stock exchange listing requirements, investors may lose confidence in our financial reporting, and our stock price may decline as a result.

We have not performed a formal evaluation of our internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, nor have we engaged an independent registered public accounting firm to perform an audit of our internal control over financial reporting as of any balance sheet date or for any period reported in our consolidated financial statements. Presently, we are not an accelerated filer, as such term is defined by Rule 12b-2 of the Exchange Act, and therefore, our management is not presently required to perform an annual assessment of the effectiveness of our internal control over financial reporting. Our independent registered public accounting firm will first be required to audit the effectiveness of our internal control over financial reporting for our Annual Report on Form 10-K for the first year we are no longer an "emerging growth company" and may identify additional material weakness. We will also be required to disclose changes made in our internal controls over financial reporting on a quarterly basis. Any failure to maintain effective disclosure controls and internal control over financial reporting could have a material and adverse effect on our business, results of operations and financial condition and could cause a decline in the trading price of our common stock.

***Provisions of our corporate governance documents could make an acquisition of our Company more difficult and may prevent attempts by our stockholders to replace or remove our current management, even if beneficial to our stockholders.***

In addition to beneficial ownership by our Principal Stockholders of a controlling percentage of our common stock, our certificate of incorporation and bylaws, and the Delaware General Corporate Law (the "DGCL"), contain provisions that could make it more difficult for a third party to acquire us, even if doing so might be beneficial to our stockholders. These provisions include a classified Board of Directors and the ability of our Board of Directors to issue preferred stock without stockholder approval that could be used to dilute a potential acquirer. In addition, these provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our Board of Directors. Because our Board of Directors is responsible for appointing the members of our management team, these provisions could in turn affect any attempt to replace current members of our management team. As a result, you may lose your ability to sell your stock for a price in excess of the prevailing market price due to these protective measures, and efforts by stockholders to change the direction or management of the Company may be unsuccessful. See "Description of Capital Stock."

47

*Our amended and restated certificate of incorporation after this offering will designate courts in the State of Delaware as the sole and exclusive forum for certain types of actions and proceedings that may be initiated by our stockholders, and also provide that the federal district courts will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act of 1933, as amended (the "Securities Act"), each of which could limit our stockholders' ability to choose the judicial forum for disputes with us or our directors, officers, stockholders, or employees.*

Our amended and restated certificate of incorporation will provide that, subject to limited exceptions, the Court of Chancery of the State of Delaware will be the sole and exclusive forum for:

- any derivative action or proceeding brought on our behalf;

- any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers or other employees to us or our stockholders;

- any action asserting a claim against us arising pursuant to any provision of the DGCL, our certificate of incorporation or our bylaws;

- any action to interpret, apply, enforce or determine the validity of our certificate of incorporation or bylaws; and

- any other action asserting a claim against us that is governed by the internal affairs doctrine (each, a "Covered Proceeding").

Our certificate of incorporation will also provide that the federal district courts of the United States of America will be the exclusive forum for the resolution of any complaint asserting a cause of action against us or any of our directors, officers, employees or agents and arising under the Securities Act. However, Section 22 of the Securities Act provides that federal and state courts have concurrent jurisdiction over lawsuits brought the Securities Act or the rules and regulations thereunder. To the extent the exclusive forum provision restricts the courts in which claims arising under the Securities Act may be brought, there is uncertainty as to whether a court would enforce such a provision. We note that investors cannot waive compliance with the federal securities laws and the rules and regulations thereunder. This provision does not apply to claims brought under the Exchange Act.

Any person or entity purchasing or otherwise acquiring any interest in shares of our capital stock shall be deemed to have notice of and to have consented to these provisions. These provisions may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers or other employees, which may discourage such lawsuits against us and our directors, officers and employees. Alternatively, if a court were to find these provisions of our certificate of incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect our business and financial condition.

*Our amended and restated certificate of incorporation after this offering will contain a provision renouncing our interest and expectancy in certain corporate opportunities, which could adversely impact our business.*

Each of our Principal Stockholders and the members of our Board of Directors who are affiliated with them, by the terms of our certificate of incorporation, will not be required to offer us any corporate opportunity of which they become aware and can take any such corporate opportunity for themselves or offer it to other companies in which they have an investment. We, by the terms of our certificate of incorporation, will expressly renounce any interest or expectancy in any such corporate opportunity to the extent permitted under applicable law, even if the opportunity is one that we or our subsidiaries might reasonably have pursued or had the ability or desire to pursue if granted the opportunity to do so. Our certificate of incorporation will not be able to be amended to eliminate our renunciation of any such corporate opportunity arising prior to the date of any such amendment.

48

Table of Contents

Our Principal Stockholders are in the business of making investments in companies and any of our Principal Stockholders may from time to time acquire and hold interests in businesses that compete directly or indirectly with us. These potential conflicts of interest could have a material adverse effect on our business, financial condition, results of operations or prospects if our Principal Stockholders allocate attractive corporate opportunities to themselves or their affiliates instead of to us.

**You will experience immediate and substantial dilution in the net tangible book value of the shares of common stock you purchase in this offering.**

The initial public offering price of our common stock is substantially higher than the as adjusted net tangible book deficit per share of our common stock. Therefore, if you purchase shares of our common stock in this offering, you will pay a price per share that substantially exceeds our as further adjusted net tangible book deficit per share after this offering. You will experience immediate dilution of $17.64 per share, representing the difference between our as further adjusted net tangible book value per share after giving effect to this offering and the initial public offering price. In addition, purchasers of common stock in this offering will have contributed approximately 51.4% of the aggregate price paid by all purchasers of our stock but will own only approximately 10.7% of our common stock outstanding after this offering assuming no exercise of the underwriters' option to purchase additional shares from the selling stockholders. See "Dilution."

**An active, liquid trading market for our common stock may not develop, which may limit your ability to sell your shares.**

Prior to this offering, there was no public market for our common stock. Although our common stock has been approved for listing on Nasdaq under the symbol "LFST," an active trading market for our shares may never develop or be sustained following this offering. The initial public offering price has been determined by negotiations among us, the selling stockholders and the representatives of the underwriters and may not be indicative of market prices of our common stock that will prevail in the open market after the offering. A public trading market having the desirable characteristics of depth, liquidity and orderliness depends upon the existence of willing buyers and sellers at any given time, such existence being dependent upon the individual decisions of buyers and sellers over which neither we nor any market maker has control. The failure of an active and liquid trading market to develop and continue would likely have a material adverse effect on the value of our common stock. The market price of our common stock may decline below the initial public offering price, and you may not be able to sell your shares of our common stock at or above the price you paid in this offering, or at all. An inactive market may also impair our ability to raise capital to continue to fund operations by selling shares and may impair our ability to acquire other companies or technologies related to our platform by using our shares as consideration.

**Our stock price may be volatile, and the value of our common stock may decline.**

The market price of our common stock may be highly volatile and may fluctuate or decline substantially as a result of a variety of factors. In addition, securities markets worldwide have experienced, and are likely to continue to experience, significant price and volume fluctuations. This market volatility, as well as general economic, market or political conditions, could subject the market price of our shares to wide price fluctuations regardless of our operating performance. We, the selling stockholders and the underwriters have negotiated the initial public offering price. You may not be able to resell your shares at or above the initial public offering price or at all. Our results of operations and the trading price of our shares may fluctuate in response to various factors, including:

- actual or anticipated changes or fluctuations in our results of operations and whether our results of operations meet the expectations of securities analysts or investors;

- actual or anticipated changes in securities analysts' estimates and expectations of our financial performance;

- announcements of new technology platform capabilities, commercial or payor relationships, acquisitions, or other events by us or our competitors;

49

- general market conditions, including volatility in the market price and trading volume of technology companies in general and of companies in the mental healthcare industry and the general healthcare in particular;

- investors' perceptions of our prospects and the prospects of the businesses in which we participate;

- sales of large blocks of our common stock, including sales by our executive officers, directors, and significant stockholders;

- announced departures of any of our key personnel;

- lawsuits threatened or filed against us or involving our industry, or both;

- changing legal or regulatory developments in the United States and other countries;

- any default or anticipated default under agreements governing our indebtedness;

- effects of public health crises, such as the COVID-19 pandemic; and

- general economic conditions and trends.

These and other factors, many of which are beyond our control, may cause our results of operations and the market price and demand for our shares to fluctuate substantially. While we believe that results of operations for any particular quarter are not necessarily a meaningful indication of future results, fluctuations in our quarterly results of operations could limit or prevent investors from readily selling their shares and may otherwise negatively affect the market price and liquidity of our shares. In addition, in the past, when the market price of a stock has been volatile, holders of that stock have sometimes instituted securities class action litigation against the company that issued the stock. If any of our stockholders brought a lawsuit against us, we could incur substantial costs defending the lawsuit. Such a lawsuit could also divert the time and attention of our management from our business, which could significantly harm our profitability and reputation.

*We do not expect to pay any dividends for the foreseeable future. Investors in this offering may never obtain a return on their investment.*

We do not currently pay dividends and do not currently anticipate paying dividends on our common stock in the future. The declaration, amount and payment of any future dividends on shares of our common stock will be at the sole discretion of our Board of Directors, which may take into account general and economic conditions, our financial condition and results of operations, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions, the implications of the payment of dividends by us to our stockholders or by our subsidiaries to us, and any other factors that our Board of Directors may deem relevant. In addition, our ability to pay dividends is, and may be, limited by covenants of any future outstanding indebtedness we or our subsidiaries incur. Therefore, any return on investment in our common stock is solely dependent upon the appreciation of the price of our common stock on the open market, which may not occur. See "Dividend Policy."

*If securities or industry analysts do not publish research or publish unfavorable or inaccurate research about our business, our common stock price and trading volume could decline.*

The trading market for our shares will be influenced, in part, by the research and reports that industry or securities analysts publish about us or our business. We do not have any control over these analysts. Securities and industry analysts do not currently, and may never, publish research on our Company. If no securities or industry analysts commence coverage of our Company, the trading price of our shares would likely be negatively impacted. In the event securities or industry analysts initiated coverage, and one or more of these analysts cease coverage of our Company or fail to publish reports on us regularly, we could lose visibility in the financial markets, which in turn could cause our share price or trading volume to decline. Moreover, if one or more of the analysts who cover us downgrade our stock, or if our results of operations do not meet their expectations, our share price could decline.

Table of Contents

**Cautionary Note Regarding Forward-Looking Statements**

This prospectus contains forward-looking statements. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based on our current beliefs, expectations and assumptions regarding the future of our business, future plans and strategies, and other future conditions. Forward-looking statements can be identified by words such as "anticipate," "believe," "envision," "estimate," "expect," "intend," "may," "plan," "predict," "project," "target," "potential," "will," "would," "could," "should," "continue," "contemplate" and other similar expressions, although not all forward-looking statements contain these identifying words. For example, all statements we make relating to growth rates and financial results, our plans and objectives for future operations, growth or initiatives, strategies or the expected outcome or impact of pending or threatened litigation are forward-looking statements.

We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements we make. We have based these forward-looking statements largely on our current expectations and projections about future events and trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements are subject to a number of risks, uncertainties, factors and assumptions described in "Risk Factors" and elsewhere in this prospectus, including, among other things:

- we may not grow at the rates we historically have achieved or at all, even if our key metrics may imply future growth, including if we are unable to successfully execute on our growth initiatives and business strategies;

- if we fail to manage our growth effectively, our expenses could increase more than expected, our revenue may not increase proportionally or at all, and we may be unable to execute on our business strategy;

- if reimbursement rates paid by third-party payors are reduced or if third-party payors otherwise restrain our ability to obtain or deliver care to patients, our business could be harmed;

- we conduct business in a heavily regulated industry and if we fail to comply with these laws and government regulations, we could incur penalties or be required to make significant changes to our operations or experience adverse publicity, which could have a material adverse effect on our business, results of operations and financial condition;

- we are dependent on our relationships with affiliated practices, which we do not own, to provide health care services, and our business would be harmed if those relationships were disrupted or if our arrangements with these entities became subject to legal challenges;

- we operate in a competitive industry, and if we are not able to compete effectively, our business, results of operations and financial condition would be harmed;

- the impact of health care reform legislation and other changes in the healthcare industry and in health care spending on us is currently unknown, but may harm our business;

- if our or our vendors' security measures fail or are breached and unauthorized access to our employees', patients' or partners' data is obtained, our systems may be perceived as insecure, we may incur significant liabilities, including through private litigation or regulatory action, our reputation may be harmed, and we could lose patients and partners;

- our business depends on our ability to effectively invest in, implement improvements to and properly maintain the uninterrupted operation and data integrity of our information technology and other business systems;

- our existing indebtedness could adversely affect our business and growth prospects;

51

March 31, 2021, our net income (loss) was $2.7 million and $(8.7) million, respectively. Adjusted EBITDA increased from $6.5 million in 2018 to $24.4 million in 2019, was $12.7 million in the Predecessor 2020 Period, was $37.5 million in the Successor 2020 Period, and was $50.1 million in 2020 on a pro forma basis. Adjusted EBITDA increased from $8.2 million for the three months ended March 31, 2020 to $12.6 million for the three months ended March 31, 2021. See "—Key Metrics and Non-GAAP Financial Measures" for more information about how we define and calculate Adjusted EBITDA and for a reconciliation of net income (loss), the most comparable GAAP measure, to Adjusted EBITDA. See "Unaudited Pro Forma Financial Information" for additional information regarding the presentation of our December 31, 2020 pro forma financial information.



**Total Revenue ($ in millions)**

**Key Factors Affecting Our Results**

*Expanding Center Capacity and Visits Within Existing Centers*

We have built a powerful organic growth engine which enables us to drive growth within our existing footprint.

*Our Clinicians*

As of March 31, 2021, we employed over 3,300 psychiatrists, APNs, psychologists and therapists through our subsidiaries and affiliated practices. We generate revenue on a per visit basis as clinical services are rendered by our clinicians. As our existing centers mature, we grow capacity through investments in office expansion to increase our average clinicians per center and enhance overall utilization. Recruiting new clinicians and retaining existing clinicians in our existing centers enables us to see more patients per center by expanding our patient visit capacity. We believe our dedicated employment model offers a superior value proposition compared to independent practice. Our network relationships provide clinicians with ready access to patients. We also enable clinicians to manage their own patient volumes. Our platform promotes a clinically-driven professional culture and streamlines patient access and care delivery, while optimizing practice administration processes through technology. We believe we are an employer of choice in mental health, allowing us to employ highly qualified clinicians. Our success is demonstrated by our track record – in addition to the clinicians we have gained through our acquisitions, we have hired 1,746 clinicians through our subsidiaries and affiliated practices since our inception in March 2017 through December 31, 2020, with a clinician retention rate of over 87% compared to the industry average of 77%.

We believe we have significant opportunity to grow our employed clinician base—we estimate there are approximately 650,000 mental health clinicians in the United States, providing us with a meaningful runway to grow from our current base of more than 3,300 clinicians employed through our subsidiaries and affiliated practices, as of March 31, 2021. To capitalize on this opportunity, we have developed a rigorous and exclusive in-house national clinician recruiting model that works closely with our regional clinical teams to select the best candidates and fulfill capacity in a timely manner. As we grow our clinician base, we can grow our business,

75

Table of Contents

- Provided support to clinicians and administrative employees in the event they were unable to work due to a quarantine.

- Trained all of our clinicians to meet patients virtually.

- Upgraded acquired center websites to allow patients to readily access digital services.

- Proactively communicated with patients about the availability of clinicians and treatment and appointment reminders.

We believe the COVID-19 pandemic did not have a material impact on our results of operations, cash flows and financial position as of or for the three months ended March 31, 2021. While the impact of the COVID-19 pandemic has increased stressors associated with mental health, we believe that a combination of factors contribute to our total patient visits and related revenue, including, among others, long-term trends in reduced stigmatization of mental health. Even before the pandemic, we saw the need to have a platform supported by leading technology to give us the ability to treat patients virtually or in-person. Our prior investment in our technology platform, most notably in our digital capabilities, became an essential component for continuing to deliver care to our patients during the pandemic. We observed an impact on appointments in mid-March 2020 as patients moved to shelter-at-home and increased cancellations. By the end of March 2020, appointments and visits had returned to normal levels. Our clinician recruitment opportunities have also increased as a result of the pandemic, driven by an increase in clinician supply from those seeking more stable employment models. With independent clinicians facing higher technology costs, shifting consumer behavior and challenges from the uncertain economic environment, our pipeline of acquisition targets grew and assisted in our 2020 footprint expansion.

Even prior to the COVID-19 pandemic, our payor contracts or payor policies typically provided for rate parity for our care services regardless of whether visits are conducted in-person or virtually. As a result, even if temporary rate parity provisions that were enacted in response to the COVID-19 pandemic are not permanently extended, we do not expect such actions to have a meaningful impact on our business.

We believe COVID-19 will represent a paradigm shift in the importance of and focus on mental health care. We have seen significant increase in patient demand as well as payor and employer adoption of mental health coverage options during the pandemic and it is now integrated into health care offerings more than ever before. We feel the spotlight the pandemic has put on the need for mental health care will have a positive impact on our industry and business for years to come.

## Key Metrics and Non-GAAP Financial Measures

We evaluate the growth of our footprint through a variety of metrics and indicators. The following table sets forth a summary of the key financial metrics we review to evaluate our business, measure our performance, identify trends affecting our business, formulate our business plan and make strategic decisions:

| | Successor Three months ended March 31, 2021 | Predecessor Three months ended March 31, 2020 | Pro Forma Year ended December 31, 2020 | Successor April 13 to December 31, 2020 | Predecessor January 1 to May 14, 2020 | Predecessor Year ended December 31, 2019 |
|---|---|---|---|---|---|---|
| *(in thousands)* | | | | | | |
| Total revenue | $ 143,132 | $ 73,106 | $ 377,217 | $265,556 | $ 111,661 | $212,518 |
| Revenue growth | 96% | 81% | 77% | * | * | 112% |
| Organic revenue growth | | | 41% | * | * | 35% |
| Income (loss) from operations | $ (881) | $ 5,635 | $ (354,247) | $ 6,741 | $ 8,695 | $ 15,241 |
| Center Margin | $ 43,998 | $ 21,472 | $ 119,176 | $ 86,292 | $ 32,884 | $ 62,396 |
| Net income (loss) | $ (8,682) | $ 2,653 | $ (299,038) | $ (13,125) | $ (24,945) | $ 5,669 |
| Adjusted EBITDA | $ 12,584 | $ 8,217 | $ 50,135 | $ 37,470 | $ 12,665 | $ 24,400 |

81

Table of Contents

\*    Denotes not meaningful due to lack of comparability between annual and partial periods. In addition, organic revenue growth is measured on a twelve-month basis and is therefore not reported for interim periods.

Organic revenue growth, Center Margin and Adjusted EBITDA are not measures of financial performance under GAAP and are not intended to be substitutes for any GAAP financial measures, including revenue, income from operations or net income (loss), and, as calculated, may not be comparable to companies in other industries or within the same industry with similarly titled measures of performance. Therefore, non-GAAP measures should be considered in addition to, not as a substitute for, or in isolation from, measures prepared in accordance with GAAP.

### *Organic Revenue Growth*

We define organic revenue growth as the change in total revenue, excluding revenue from acquisitions for the first twelve months following the date of acquisition of new centers. Therefore, organic revenue is computed by removing from total revenue the amount of revenue from centers acquired within twelve months from the end of the period presented. We use organic revenue growth as one of the measures to assess our results of operations. We believe that organic revenue growth is an appropriate measure of operating performance as it allows investors to measure, analyze and compare our growth in a meaningful and consistent manner without the impact of what may be non-comparable acquisition activity from period to period. Organic revenue growth metrics vary across the healthcare industry. As a result, our organic revenue growth calculation is not necessarily comparable to similarly titled metrics reported by other companies.

### *Center Margin*

We define Center Margin as income (loss) from operations excluding depreciation and amortization and general and administrative expenses. Therefore, Center Margin is computed by removing from income (loss) from operations the costs that do not directly relate to the delivery of care and only including center costs, exclusive of depreciation and amortization. We consider Center Margin to be an important measure to monitor our performance relative to the direct costs of delivering care. We believe Center Margin will be useful to investors to measure whether we are sufficiently controlling the direct costs of delivering care.

Center Margin is not a financial measure of, nor does it imply, profitability. The relationship of income (loss) from operations to center costs, excluding depreciation and amortization is not necessarily indicative of future profitability from operations. Center Margin excludes certain expenses, such as general and administrative expenses, and depreciation and amortization, which are considered normal, recurring operating expenses and are essential to support the operation and development of our centers. Therefore, this measure may not provide a complete understanding of the operating results of our Company as a whole, and Center Margin should be reviewed in conjunction with our GAAP financial results. Other companies that present Center Margin may calculate it differently and, therefore, similarly titled measures presented by other companies may not be directly comparable to ours. In addition, Center Margin has limitations as an analytical tool, including that it does not reflect depreciation and amortization or other overhead allocations.

Table of Contents

and specialist physicians can more easily and consistently connect patients to our clinicians throughout the course of their care.

- *Improved outcomes:* Through the integration of mental and physical health care, we believe physicians can achieve better outcomes and lower total health care costs to their patients with co-morbidities. Our proven outcomes also provide our primary care and specialist physician partners with data to assess treatment of our mutual patients.

- *Enable more integrated care and lower costs:* We believe mental and physical health care integration will help lower costs to our primary care physician partners under reimbursement models where reimbursement rates are tied to quality and value-based outcomes. Our collaborative care model, through our partnerships with primary care physicians, other specialists and payor partners, aims to improve early diagnosis of mental health conditions to drive identification and better treatment, which may lead to improved quality outcomes and lower costs.

**How We Strengthen the Healthcare Ecosystem**

We are a market leader with significant scale in terms of both multi-disciplinary clinician base and geographic reach. We believe our value proposition drives a powerful network effect that further reinforces our competitive strengths.

*Extensive Scale, Breadth and Access*

We are reimagining access to mental health care in the United States. We are one of the nation's largest providers of outpatient mental health care in the country based on the number of clinicians we employ through our subsidiaries and our affiliated practices and our geographic scale, employing over 3,300 dedicated clinicians across 73 MSAs in 27 states, as of March 31, 2021. In 2020, our clinicians treated more than 357,000 patients through 2.3 million visits. We serve all patient demographics through a comprehensive suite of mental health services to treat the most common mental health conditions. Our care delivery model enables patient access via virtual or in-person visits, at their convenience. During the twelve months ended December 31, 2020, 93% of our patients were commercially insured as of their latest visit, which allowed them to access care through their insurance coverage, increasing access and affordability. We believe the scale, breadth and depth of our offering is unmatched in our industry.

*Differentiated Platform Delivering Seamless Patient Experience*

We believe we deliver a superior patient experience through a pioneering, modern care model. We believe that, while advanced digital capabilities are an essential part of the future of mental health care delivery, it is difficult to replicate and replace the in-person, human aspect of care. As a result, we have built a holistic, people-driven, digitally enabled care experience. Our patients access and receive care through an integrated virtual and in-person offering. Patients are more engaged, making them more likely to seek care more frequently and less likely to cancel or miss appointments. We believe our hybrid delivery model is also critical to achieving improved outcomes in mental health, where many patients and conditions require regular in-person treatment. This hybrid approach allows patients and clinicians to focus on their personal needs and preferences, to develop a personalized treatment plan that can enhance patient engagement and incorporate their treatment into their lives. Our digital tools not only improve patient access but also better match patients and our clinicians, streamline internal referrals and inform our clinicians' decision-making through evidenced-based resources. We believe the model we built is critical to delivering best-in-class mental health care outcomes and differentiates our platform.

*Comprehensive Clinical Capabilities with Improved Outcomes*

Our comprehensive suite of mental health care services is built to meet the breadth of our patients' needs and deliver improved outcomes. Our patients have access to our team of licensed mental health clinicians, including psychiatrists, APNs, psychologists and therapists. We treat a broad range of mental health conditions,

111

**Table of Contents**

**Competition**

The market for mental health services is competitive. We compete in a highly fragmented market with direct and indirect competitors that offer varying levels of impact to key stakeholders such as patients, clinicians, payor partners and physician partners. Our competitors primarily include other mental health providers that deliver services virtually or in-person. Our indirect competitors also include episodic consumer-driven point solutions, such as in-person and virtual life coaching, digital therapy and support tools and other technologies related to mental health care. As the demand and market for mental health services continue to grow, we may also face competition from new market entrants, including major retailers that have recently begun to offer in-person and virtual mental health care in certain markets. However, as our market grows, new stakeholders in the healthcare ecosystem could provide increased partnership opportunities for us. Each of the individual geographic areas in which we operate has a different competitive landscape. In each of our markets we compete with other mental health providers for patients and in contracting with commercial payors. In addition, we face intense competition from other clinical practices, hospitals, health systems and other outpatient mental health providers in recruiting psychiatrists, APNs, psychologists, therapists, and other health care professionals.

The principal competitive factors in our industry include:

- patient engagement and satisfaction;

- quality outcomes for patients;

- comprehensive digital tools;

- ability to negotiate favorable reimbursement rates;

- convenience, accessibility and availability;

- brand awareness and reputation;

- technology capabilities;

- ability to attract and retain quality clinicians;

- employment models;

- geographic footprint;

- level of participation in insurance plans;

- scalability of models; and

- financial resources and stability.

We believe that we compete favorably with our competitors on the basis of these factors and we believe the offerings of competitors inadequately simultaneously address the needs of key stakeholders or fail to do so at scale. See "Risk Factors—Risks Related to Our Business—We operate in a competitive industry, and if we are not able to compete effectively our business, results of operations and financial condition would be harmed."

**Government Regulation**

The healthcare industry and the practice of medicine are governed by an extensive and complex framework of federal and state laws, which continue to evolve and change over time. The costs and resources necessary to comply with these laws are high. Our profitability depends in part upon our ability to operate in compliance with applicable laws and to maintain all applicable licenses. As the applicable laws and rules change, we are likely to make conforming modifications in our business processes from time to time. In some jurisdictions where we operate, neither our current nor our anticipated business model has been the subject of formal judicial or administrative interpretation. We cannot be assured that a review of our business by courts or regulatory authorities will not result in determinations that could adversely affect our operations or that the health care regulatory environment will not change in a way that impacts our operations.

121