UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

NIZAR S. NAYANI, Individually and on    :    Civil Action No. 1:22-cv-06833-JSR
Behalf of All Others Similarly Situated,    :
   :    <u>CLASS ACTION</u>
                Plaintiff,    :
   :    LEAD PLAINTIFF'S MEMORANDUM OF
   :    LAW IN OPPOSITION TO DEFENDANTS'
       vs.    :    JOINT MOTION TO DISMISS THE
   :    AMENDED COMPLAINT FOR
LIFESTANCE HEALTH GROUP, INC.    :    VIOLATIONS OF THE SECURITIES ACT
MICHAEL K. LESTER, J. MICHAEL    :    OF 1933
BRUFF, ROBERT BESSLER, DARREN    :
BLACK, JEFFREY CRISAN, WILLIAM    :
MILLER, JEFFREY RHODES, ERIC    :
SHUEY, KATHERINE WOOD, MORGAN    :
STANLEY & CO. LLC, GOLDMAN SACHS    :
& CO. LLC, J.P. MORGAN SECURITIES    :
LLC, JEFFERIES LLC, TPG CAPITAL BD,    :
LLC, UBS SECURITIES LLC, and WILLIAM    :
BLAIR & COMPANY, L.L.C.,    :
   :
                Defendants.    :
   :

———————————————————— x

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ....................................................................................................1

II.     STATEMENT OF FACTS ......................................................................................4

      A.      LifeStance's Business ................................................................................4

      B.      The IPO .....................................................................................................5

      C.      Post-IPO Events ........................................................................................6

III.    ARGUMENT ...........................................................................................................8

      A.      Legal Standards.........................................................................................8

      B.      Plaintiff Has Pled Material Misstatements or Omissions Under §11 ......8

            1.      Defendants Failed to Disclose LifeStance's Declining Clinician-
                Retention Rate Despite a Legal Duty to Do So .........................................8

            2.      Plaintiff Has Adequately Pled Materiality.................................................11

      C.      Plaintiff's Claims Do Not "Sound in Fraud" ..........................................12

      D.      None of the Other Asserted Defenses Are Meritorious ..........................16

            1.      "Accurate, Historical Data" Is Not a Defense ..........................................16

            2.      Defendants Had a Duty to Disclose "Interim" Retention Data..................17

            3.      Defendants' Cautionary Language Is Not a Defense.................................21

            4.      Plaintiff Has Pled Actionable Omissions Under Items 303 and 105 .........23

      E.      Plaintiff Has Pled a Control-Person Claim Under §15 ...........................25

IV.     CONCLUSION.......................................................................................................25

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Arfa v. Mecox Lane Ltd.*,
    2012 WL 697155
    (S.D.N.Y. Mar. 5, 2012) ........................................................................................................18

*Asay v. Pinduoduo Inc.*,
    2021 WL 3871269
    (2d Cir. Aug. 31, 2021) .............................................................................................18, 19, 23

*Caiafa v. Sea Containers Ltd.*,
    2008 WL 11516813
    (S.D.N.Y. May 15, 2008) ......................................................................................................15

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
    701 F. Supp. 2d 506 (S.D.N.Y. 2010) ..................................................................................14

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
    477 F. Supp. 3d 123 (S.D.N.Y. 2020) ..................................................................................11

*DeMaria v. Anderson*,
    318 F.3d 170 (2d Cir. 2003) ................................................................................................16

*Dexia SA/NV v. Bear, Stearns & Co.*,
    929 F. Supp. 2d 231 (S.D.N.Y. 2013) ..................................................................................22

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012) ..................................................................................23

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017) ....................................................................................................8

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) ..................................................................................13

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ................................................................................................22

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ................................................................................................................8

*Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entertainment Holdings, Inc.*
    422 F. Supp. 3d 821 (S.D.N.Y. 2019) ..................................................................................25

## TABLE OF AUTHORITIES

**Page**

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)....................................................................................................8, 11

*Hirsch v. 725 Assocs.*,
2014 WL 3950791
(S.D.N.Y. Aug. 13, 2014) .................................................................................................25

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
586 F. Supp. 3d 199 (E.D.N.Y. 2022), *reconsideration denied*,
2022 WL 2872671
(E.D.N.Y. July 21, 2022) ..................................................................................................15

*In re Coty Inc. Sec. Litig.*,
2016 WL 1271065
(S.D.N.Y. Mar. 29, 2016) .................................................................................................17

*In re CPI Card Grp. Inc. Sec. Litig.*,
2017 WL 4941597
(S.D.N.Y. Oct. 30, 2017) ............................................................................................14, 24

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013).............................................................................18, 24

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 524 (S.D.N.Y. 2014)..............................................................................18

*In re Focus Media Holding Ltd. Litig.*,
701 F. Supp. 2d 534 (S.D.N.Y. 2010)..............................................................................17

*In re HEXO Corp. Securities Litigation*,
524 F. Supp. 3d 283 (S.D.N.Y. 2021)..........................................................................14, 21

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005)..............................................................................15

*In re OSG Sec. Litig.*,
971 F. Supp. 2d 387 (S.D.N.Y. 2013).........................................................................13, 14

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)..........................................................................11, 12

**TABLE OF AUTHORITIES**

**Page**

*In re Sanofi Sec. Litig.*,
  2015 WL 365702
  (S.D.N.Y. Jan. 28, 2015), *aff'd sub nom.*
  *Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)..................................................................................................15

*In re Turkcell Iletisim Hizmetler, A.S. Securities Litigation*,
  202 F. Supp. 2d 8 (S.D.N.Y. 2001) .................................................................................17, 19

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
  2008 WL 4449280
  (S.D.N.Y. Sept. 30, 2008)....................................................................................................14

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011)...................................................................................................8

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)..................................................................................................25

*McKenna v. SMART Techs. Inc.*,
  2012 WL 1131935
  (S.D.N.Y. Apr. 3, 2012).......................................................................................................16

*McKenna v. SMART Techs. Inc.*,
  2012 WL 3589655
  (S.D.N.Y. Aug. 21, 2012).....................................................................................................24

*Medina v. Tremor Video, Inc.*,
  640 F. App'x 45 (2d Cir. 2016) .......................................................................................13, 25

*Meyer v. JinkoSolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014).................................................................................................9, 22

*Micholle v. Ophthotech Corp.*,
  2019 WL 4464802
  (S.D.N.Y. Sept. 17, 2019)................................................................................................22, 23

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
  2022 WL 17815767
  (2d Cir. Dec. 20, 2022), *panel rehearing and rehearing en banc denied*,
  No. 21-2524 (2d Cir. Jan. 27, 2023) ................................................................................ *passim*

*Moshell v. Sasol Ltd.*,
  481 F. Supp. 3d 280 (S.D.N.Y. 2020)....................................................................................24

## TABLE OF AUTHORITIES

**Page**

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013)........................................................................................8

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)......................................................................................25

*Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*,
    517 F. Supp. 3d 196 (S.D.N.Y. 2021)..................................................................10, 21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*,
    135 S. Ct. 1318 (2015)........................................................................................16, 17

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012)................................................................................15, 24

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) .........................................................................13, 15, 22

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017)........................................................................................18

*Stone Fam. Tr. v. Credit Suisse AG*,
    2022 WL 954743
    (S.D.N.Y. Mar. 30, 2022) .........................................................................................25

*Wallace v. IntraLinks*,
    2013 WL 1907685
    (S.D.N.Y. May 8, 2013)............................................................................................14

*Willard v. UP Fintech Holding Ltd.*,
    527 F. Supp. 3d 609 (S.D.N.Y. 2021)......................................................................21

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §77k(a) ............................................................................................................. *passim*
    §77l(a)(2) .............................................................................................................14, 15
    §77o........................................................................................................................25
    §77z-1 ......................................................................................................................15
    §78u-4(b)(2).............................................................................................................15
    §78u-4(b)(2)(A) .......................................................................................................15

## TABLE OF AUTHORITIES

**Page**

28 U.S.C.
  §2072(b) ................................................................................................................16

Federal Rules of Civil Procedure
  Rule 8 ................................................................................................................8, 25
  Rule 9(b) .......................................................................................................... *passim*

17 C.F.R.
  §229.105(a) ..........................................................................................................10
  §229.303 ......................................................................................................... *passim*

## OTHER AUTHORITY

SEC Staff Accounting Bulletin No. 99,
  64 FR 45150-01, 1999 WL 625156 (Aug. 19, 1999) ............................................12

Lead Plaintiff Nizar Nayani ("Plaintiff") respectfully submits this memorandum opposing Defendants' joint motion to dismiss the Amended Complaint (ECF No. 45; "AC," cited as "¶__").[1]

## I.    INTRODUCTION

LifeStance is one of the nation's largest providers of virtual and in-person outpatient mental and behavioral health services, with operations in 27 states as of March 31, 2021 (¶21), and 3,100 licensed mental health clinicians as of December 31, 2020.  ¶23.  This case arises from Defendants' failure to apprise investors in the Company's June 10, 2021 IPO of a known, pre-IPO increase in turnover of the Company's most valuable asset—its clinicians.

Because LifeStance generates revenue on a per-visit basis when a patient receives care from one of its clinicians, Defendants have, time and again, underscored the importance of clinician headcount to the Company's growth.  As defendant Michael Lester—LifeStance's President, CEO, and Board chair at the time of the IPO (¶7)—stated during an investor conference call on November 12, 2021: "[our] growth driver is super simple, *number of clinicians* … that's *our unit economic*."  ¶100.  He continued: "*it's all about the number of clinicians.  That's the key driver for us.*"  *Id.*

But as Defendants have acknowledged, that "key driver" is about much more than hiring new clinicians; it's also about retaining *existing* ones.  As the Registration Statement for the IPO states: "Recruiting new clinicians *and retaining existing clinicians* in our existing centers enables us to see more patients per center by expanding our patient visit capacity."  ¶28.  Indeed, because new clinicians have few if any patients and must, in any event, wait at least 4 to 6 months to be enrolled

---

[1]    "Defendants" refers to LifeStance Health Group, Inc. ("LifeStance" or "the Company") (¶6), as well as the "Individual Defendants," Michael K. Lester (¶7), J. Michael Bruff (¶8), Robert Bessler (¶9), Daren Black (*id.*), Jeffrey Crisan (*id.*), William Miller (*id.*), Jeffrey Rhodes (*id.*), Eric Shuey (*id.*), Katherine Wood (*id.*), and the "Underwriter Defendants," Morgan Stanley & Co., LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Jefferies LLC, TPG Capital BD, LLC, UBS Securities LLC, and William Blair & Company, LLC (¶¶11-13).  "MTD" refers to Defendants' memorandum of law in support of their motion to dismiss, dated January 18, 2023 (ECF No. 47). Unless otherwise noted, emphasis is added and internal citations and quotation marks are omitted.

in insurance-provider networks (¶¶38, 60-62, 65), they generate very little revenue. As CFO-defendant J. Michael Bruff has admitted: "[new] clinicians ramp to maturity over a 12-month period." ¶61. Established clinicians, by contrast, who are already enrolled in insurance networks and have a reliable stable of patients, provide LifeStance with its bread-and-butter stream of revenue.

So when LifeStance *loses* clinicians, it's a double whammy. First, the Company loses the revenue they were generating. As Bruff has conceded, "when a clinician leaves the company, it has … *an immediate impact, downward impact, on the [Company's] financial performance as leaving clinicians are typically at full capacity*." ¶59; *see also* ¶76. And second, LifeStance has to incur substantial costs to replace them. Those costs include: (i) recruitment costs, such as recruiting fees, advertising, interviewing, and screening; (ii) onboarding costs, such as training and management time; (iii) costs associated with getting new clinicians enrolled in health insurance networks; and (iv) the lack of productivity during a clinician's first year of employment. ¶58.

That is why, in promoting the IPO, the Registration Statement emphasized a "clinician retention rate of *over 87% compared to the industry average of 77%*," through December 31, 2020. ¶68. Retention is a critical metric for investors, with a direct, immediate impact on the Company's financial performance (¶59), and a subject on which Defendants chose to speak. *See* ¶68.

At least weeks before the IPO, however, that 87% figure was no longer true, as Defendants have admitted. During an earnings conference call on August 11, 2021 (¶49), for second-quarter 2021 ("Q2 2021"), LifeStance's Chief Growth Officer ("CGO"), Danish Qureshi, stated that the Company had lost clinicians as a result of the COVID-19 pandemic, as well as "for personal reasons." ¶¶50-51. Significantly, Bruff stated that Defendants "saw" the increase in clinician turnover "midway through the second quarter"—*i.e.*, mid-May 2021—almost a *month* before the June IPO. ¶57. And Qureshi explained that LifeStance knew about the increased turnover before

the IPO because the Company had "early warning" procedures in place, both "data-driven" and "personal," to allow it to monitor clinician movement.  ¶52.  In particular, Qureshi stated that the Company has "*monthly touch points with all clinicians*," and does "exit interviews with *every single clinician* before they leave to be able to understand really what's going on …."  *Id.*; *see also* ¶53.

And, given the importance of clinician retention to LifeStance's growth and financial performance, this increased turnover was the subject of pre-IPO meetings at the highest reaches of the Company, including with its Regional Presidents, Regional Clinical and Medical Directors, and Senior Clinical and Medical Directors, as well as with the Company's Chief Medical Officer ("CMO"), CGO Qureshi, and Senior Clinical and Medical Directors.  ¶¶34, 54.

For example, in May 2021 Qureshi participated in a virtual meeting with other high-ranking LifeStance executives, including the CMO, specifically to discuss clinician turnover.  During the meeting—the occurrence of which corroborates Bruff's later admission that Defendants "saw" increased turnover "midway through the second quarter" (¶57)—data about the reasons for the ongoing increase in clinician resignations, gathered from across half of the Company's national footprint since early 2021, was presented and discussed.  ¶55.  Although pandemic-related burnout was one reason cited, Plaintiff also alleges two others: compensation discontentment and credentialing delays.  *See* ¶33; ¶¶35-41 (compensation discontentment); ¶¶42-43 (credentialing delays); ¶¶44-48 (COVID-19 fatigue).

Yet despite this known decline in clinician retention—which occurred well before an IPO that generated *hundreds of millions of dollars* in proceeds (¶26)—Defendants failed to apprise investors of the changed circumstances about which they were aware, and which a reasonable person would have considered important in deciding whether to participate in the IPO.

In short, Plaintiff has pled a strict-liability/negligence claim under §11 of the Securities Act:

he has pled an omission "to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. §77k(a).

## II.    STATEMENT OF FACTS

### A.    LifeStance's Business

Because LifeStance generates revenue on a per-visit basis (¶28), LifeStance has repeatedly underscored the importance of its clinician workforce.  *See, e.g.*, ¶¶98-100.

As the Company has explained, established clinicians typically see a higher volume of patients than new clinicians, and consequently bring in more revenue, as new clinicians take time to obtain insurance credentials, complete training, and build a patient base.  *See* ¶¶58-62.  As defendant Bruff explained during a conference call with investors discussing the Company's Q2 2021 financial results (the "Q2 Conference Call"), "clinicians ramp to maturity over a 12-month period."  ¶61.  A 4-to-6 month ramp period is considered a best-case scenario for new clinicians.  ¶62.  Not only do new clinicians render fewer services than established clinicians, but they come at an operational cost to the Company, as LifeStance must expend money onboarding and training them.  ¶58.  For this reason, when a clinician leaves, it has "an immediate [] downward impact, on the [Company's] financial performance *as leaving clinicians are typically at full capacity*."  ¶59.

Clinician retention impacts not only LifeStance's revenue, but also its critical earnings margin, which the Company refers to as the "Center Margin."  ¶31.  The Registration Statement explains that Center Margin is a key metric that "best reflects the economics of [LifeStance's] model as it includes all direct expenses associated with our patients' care."  ¶99.  LifeStance seeks to grow its Center Margin in part "through clinician hiring and retention."  *Id.*  Clinician retention drives Center Margin, as retained clinicians bring in more revenue with less operational cost, while new hires take time to build a patient base and require onboarding and training.  Clinician retention is therefore an essential element of LifeStance's financial performance.

### B.    The IPO

LifeStance filed its Form S-1 Registration Statement, which incorporated a prospectus, on May 17, 2021. ¶25. The SEC declared the Registration Statement, as amended, effective on June 9, 2021 (¶26), and the IPO was completed on June 14, 2021, with the Company selling 32,800,000 shares of LifeStance common stock to the public at a price of $18.00 per share. ¶27. Controlling shareholders TPG VII Lynnwood, Summit Partners and its affiliates, and Silversmith and its affiliates sold an additional 13,200,000 shares at the same price, including 6 million shares sold to the Company's underwriters pursuant to an overallotment option. ¶26.

The Registration Statement repeatedly represented "a clinician retention rate of over 87% compared to the industry average of 77%" (¶68), and stated Defendants' "belie[f] [that] the COVID-19 pandemic did not have a material impact on our results of operations, cash flows and financial position as of or for the three months ended March 31, 2021." ¶73.

Having chosen to speak on these subjects, Defendants had a duty to disclose that clinician retention rates had in fact been falling since no later than mid-May 2021—the month before the IPO—for three primary reasons (¶33), including, first, COVID-19-related fatigue and burnout. ¶¶45-48. Second, clinicians were leaving due to discontentment with LifeStance's compensation arrangements. ¶35. Specifically, when recruiting physicians, LifeStance advertised a "base salary" that clinicians would purportedly receive during their first year of employment. ¶36. In reality, the salary was an advance on compensation paid in equal installments over the initial twelve-month employment period, which clinicians paid back by earning gross fees on patient services that were offset against the salary advance. *Id.* As many clinicians failed to see sufficient patient volume to offset their advances—due either to the initial ramp-up period for new clinicians (¶38) or to operational inefficiencies at LifeStance's clinics (¶39)—they accumulated overwhelming amounts of debt owed to the Company, and many newly-hired clinicians resigned as a result. ¶41. Some even

referred to the compensation arrangement as "indentured servitude."  ¶38.

And third, many clinicians left LifeStance due to problems obtaining insurance credentials, which are necessary for enrollment in an insurance company's provider networks.  ¶42.  As operational inefficiencies delayed the credentialing process, new clinicians were left out of insurance networks, and thus could not see patients in those networks, exacerbating difficulties in paying off the debt owed via LifeStance's salary advances.  ¶43.

This occurrence of heightened clinician turnover was widespread across the Company, and was a frequent topic of discussion among senior managers at LifeStance. ¶34.  Regional Presidents and Clinical and Medical Directors would report retention issues to Senior Clinical and Medical Directors, who brought them to the attention of C-Suite executives at LifeStance, including the CMO and Qureshi, the CGO.  ¶54.  So Defendants were aware of the rise in clinician turnover before the Registration Statement became effective, but failed to disclose it to investors.

For example, in May 2021, weeks before the IPO, C-suite executives at LifeStance— including Senior Clinical and Medical Directors, LifeStance's CMO, and CGO Qureshi— participated in a meeting with other high-ranking executive managers to discuss the Company's difficulties with clinician retention.  ¶¶54-55.  During the meeting, data concerning the reasons for an ongoing increase in clinician resignations—spanning half of the Company's national footprint since early 2021—was presented and discussed among the senior managers present.  *Id.*  Yet Defendants failed to disclose these known events and uncertainties in the Registration Statement.

### C.    Post-IPO Events

On August 11, 2021, LifeStance announced its Q2 2021 financial results for the period ending June 30, 2021, only weeks after the completion of the IPO.  ¶111.  The press release accompanying the announcement acknowledged a "recent change in clinician retention levels" during Q2 2021.  *Id.*  On the Q2 Conference Call discussing these financial results, defendant Bruff

spoke specifically about an "increase in turnover that we saw midway through the second quarter." ¶57. In other words, though the IPO was completed near the end of Q2 2021, with the Registration Statement declared effective on June 9, 2021, Defendants admitted that they saw the increase in clinician turnover midway through the quarter, in mid-May.

Bruff also explained the impact of this increase, given the months-long ramp-up for new clinicians, stating that the Company expected this dynamic "to negatively impact Center Margin and adjusted EBITDA by approximately $7 million to $9 million." ¶¶65, 106. Because the Company's Center Margin and adjusted EBITDA for the first six months of 2021 totaled $95.2 million and $27.1 million, respectively (¶106), LifeStance was effectively communicating an expectation that clinician turnover would cause its reported Center Margin for the second half of 2021 to be between 7.4% and 9.5% less than what it reported during the first half, and that its reported adjusted EBITDA for the second half of 2021 would be between 25.9% and 33.2% less than what it reported during the first half (¶107)—amounts that were quantitatively material.

On the same call, CGO Qureshi explained that "this increased level of turnover is very clearly tied to COVID." ¶51. Qureshi also outlined the "early warning signs" or "triggers" that LifeStance had in place "to monitor what's going on in [the Company's] clinician base." ¶52. He explained that LifeStance had both a "data-driven" and "personal" approach to monitoring turnover, and that the Company conducted "exit interviews with every single clinician before they leave to be able to understand" what motivated their departure. *Id.* In other words, LifeStance executives were constantly monitoring clinician turnover throughout Q2 2021, and were thus well aware of the increase in clinician turnover and its causes at least weeks before the IPO. Then on November 8, 2021, the Company announced its third quarter 2021 financial results, explaining that clinician retention had "stabilized to approximately 80%" and both Center Margin and revenue declined "as

new clinicians ramp to maturity." ¶114.

On August 10, 2022, the day the initial complaint was filed, LifeStance's common stock traded in a range of $5.85-$7.86, representing a decline of *at least* 56% from the $18.00 price at which it had been sold to the investing public in the IPO. ¶119.

## III.    ARGUMENT

### A.    Legal Standards

Section 11 of the Securities Act "imposes strict liability on issuers and signatories, and negligence liability on underwriters, for material misstatements or omissions in a registration statement." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 99 (2d Cir. 2017). "[S]ection [11] was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983) ("*Huddleston*"; footnote omitted). Accordingly, a plaintiff "need only show a material misstatement or omission to establish [its] *prima facie* case." *Id*. at 382. Upon such a showing, "an issuer's liability ... is absolute," *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011), "even for innocent misstatements." *Huddleston*, 459 U.S. at 382.

Unless a §11 claim sounds in fraud, which here it does not, only "notice pleading" is required, *i.e.*, "the 'short and plain statement' requirements" of Rule 8. *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013).

### B.    Plaintiff Has Pled Material Misstatements or Omissions Under §11

#### 1.    Defendants Failed to Disclose LifeStance's Declining Clinician-Retention Rate Despite a Legal Duty to Do So

In keeping with their "particularly heavy" "moral responsibility to the [investing] public" under the Securities Act, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 581 (1995), Defendants had a

- 8 -

burden of full disclosure before the IPO, with three independent bases requiring disclosure of LifeStance's decline in clinician retention.

*First*, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 & n.3 (2d Cir. 2014) ("*JinkoSolar*"). "Having chosen to speak ..., Defendants had a duty to speak accurately, *giving all material facts ... to permit investors to evaluate the potential risks*." *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, 2022 WL 17815767, at *4 (2d Cir. Dec. 20, 2022), *panel rehearing and rehearing en banc denied*, No. 21-2524 (2d Cir. Jan. 27, 2023). Thus, when Defendants represented the Company's 87% clinician retention rate in the Registration Statement—indeed, repeatedly *highlighted* that rate (¶68)—they were required to speak fully and completely on the subject, disclosing the admitted fact that clinician retention was shrinking by no later than May 2021, weeks before the IPO (*see* ¶¶70, 113), and that the Company would necessarily incur substantial costs to replace those clinicians. *See* ¶¶58, 61-62. Similarly, having opined on the purported lack of any material impact of the COVID-19 pandemic on the Company's "results of operations, cash flows and financial position" (¶73), Defendants were required to disclose that the pandemic was understood to be one of the three principal causes of the pre-IPO decline in clinician retention (¶¶33, 74-79), which was having an "immediate impact, downward impact, on the [Company's] financial performance." ¶59.

*Second*, Defendants had an independent legal duty of disclosure under Item 303 of Regulation S-K, 17 C.F.R. 229.303, which requires disclosure when, as Plaintiff alleges, an "'event or uncertainty is both presently known to management and *reasonably likely to have material effects* on the registrant's financial condition or results of operation.'" ¶82 (quoting 1989 SEC Interpretive Release regarding Item 303); *see generally Moab Partners*, 2022 WL 17815767, at *2-3 (explaining operation of Item 303); ¶¶80-85 (same). Here, the Company's undisputed pre-IPO decline in

clinician retention constituted an event or uncertainty "known" at the highest levels of the Company—through the "early warning" procedures LifeStance had in place to monitor clinician turnover, including "'monthly touch points with all clinicians'" and "'exit interviews with every single clinician before they leave to be able to understand really what's going on'" (¶¶52-53; quoting CGO Qureshi), and as reflected in pre-IPO meetings held specifically to address turnover, including a C-suite-level meeting convened in May 2021.  *See* ¶¶34, 54-55.

In these circumstances, as the Second Circuit has recognized, "'Disclosure is … required unless management *determines* that a material effect on the [Company's] financial condition or results of operations is <u>*not reasonably likely to occur*</u>.'"  *Moab Partners*, 2022 WL 17815767, at *2 (quoting 1989 SEC Interpretive Release); *see also* ¶85.  Because Defendants have effectively *admitted* their inability to rule out a reasonable likelihood of a "material effect" of those resignations—stating "it was unclear at the time" what impact the increase would have on the Company's financials, MTD at 21—they had no choice, under Item 303 and *Moab Partners*, but to disclose the increase.  Yet they did not.

And *third*, Defendants had an independent disclosure obligation under Item 105 of Regulation S-K, requiring a "'discussion of the material factors that make an investment in the registrant or offering speculative or risky.'"  ¶94 (quoting 17 C.F.R. §229.105(a)).  Because none of the risk disclosures in the Registration Statement advised potential investors of an *already-occurring* increase in clinician turnover—impacting the Company's "key" "growth driver" (¶100)— Defendants violated that duty.  *See, e.g.*, *Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 517 F. Supp. 3d 196, 210 (S.D.N.Y. 2021) ("*Papa John's*"; "Under [Item 105], risk disclosures are actionable 'half-truths' when a company discloses a risk that could have an impact on its business when, in fact, that risk has already materialized.").

### 2. Plaintiff Has Adequately Pled Materiality

Having pled Defendants' misleading failure to disclose declining clinician retention and the reasons therefor, Plaintiff need only plead the materiality of those omissions to make his *prima facie* case. *Huddleston*, 459 U.S. at 382. "A statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.'" *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 378 (S.D.N.Y. 2015) (Rakoff, J.). "Materiality is a mixed question of law and fact and is rarely a basis for dismissal on the pleadings." *Id.*

We know that clinician headcount, retention, and turnover are material information for LifeStance because Defendants have told us so. The Registration Statement states that the "ability to attract *and retain* quality clinicians" is a "principal competitive factor." ¶99. CGO Qureshi has stated that "clinicians are a critical part of our growth." ¶100. CEO Lester has said that LifeStance's "growth driver is super simple, *number of clinicians* … that's our *unit economic*," and that the number of clinicians is "the *key driver* for us." *Id.* And CFO Bruff has admitted that clinician departures have an "immediate," "downward impact" on LifeStance's financial performance (¶59), in the form of both lost revenue, as "*leaving clinicians are typically at full capacity*" (¶¶59-61), and increased operational expenses, as replacements entail significant onboarding costs for up to a year. ¶¶58, 61-62. Moreover, Plaintiff alleges that, during the lead up to the IPO, approximately *one third* of LifeStance's newly-hired clinicians resigned within the first three months of their employment, based on data collected at the Company beginning in early 2021. ¶41.

These allegations are, by themselves, more than sufficient to plead materiality. "Given the complaint's repeated and particularized allegations of the importance of [clinician retention] to [LifeStance's] financial outlook," the increase in clinician turnover "is not so 'obviously unimportant' as to justify dismissal on grounds of lack of materiality." *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 131 (S.D.N.Y. 2020) (Rakoff, J.).

But Plaintiff has also alleged quantitative and qualitative materiality under SEC Staff Accounting Bulletin No. 99 ("SAB No. 99"). *See* 64 FR 45150-01, 1999 WL 625156 (Aug. 19, 1999); ¶¶102-104. After the IPO, for example, Defendants disclosed their expectation that the increased turnover that began in the first half of 2021 would reduce Center Margin and adjusted EBITDA in the second half by up to 9.5% and 33.23% (¶¶106-107), respectively, *well* above SAB No. 99's presumptive materiality threshold of 5%. *See* 1999 WL 625156, at *45151. And the 46% stock-price drop accompanying the disclosure of clinician turnover in August 2021 (¶109), as well as intense analyst interest in "lower retention" and "costly attrition" (¶¶51, 110), further support Plaintiff's allegations of materiality. *See* 1999 WL 625156, at *45152 (including stock-price "volatility" and "market reaction" among factors tending to show materiality). Thus, Plaintiff has satisfied his burden of pleading materiality and made his *prima facie* case for liability under §11.[2]

## C.    Plaintiff's Claims Do Not "Sound in Fraud"

Citing the AC's purported "'wording and imputations' that 'are classically associated with fraud,'" and despite Plaintiff's express disavowals to the contrary (¶¶121, 129), Defendants contend the AC "sounds in fraud," not only triggering Rule 9(b)'s particularity requirement, but—somehow—grafting a scienter requirement onto §11 where none exists in the statute. MTD at 10-11.

In fact, the language Defendants quote from the AC is not "associated with" fraud, but

---

[2]    Unable to contest Bruff's acknowledgment of the "immediate," "downward" impact of clinician turnover on the Company's "financial performance" (¶59), and the undisputed material impact of that turnover during the second half of 2021, Defendants contend Plaintiff has failed to plead a "material negative impact on LifeStance's financial performance in Q2 2021," citing no authority that this is required. MTD at 15-16. But the "immediate," "downward" impact Bruff conceded need not be immediately *material*. Indeed, Item 303 specifically contemplates a material *future* impact. *See, e.g.*, ¶82 (disclosure duty arises when "event or uncertainty" was "reasonably likely to have material effects on the registrant's financial condition or results of operation"—in the *future*); *see also Moab Partners*, 2022 WL 17815767, at *2. In any event, the materiality of the impact on LifeStance's Q2 2021 financial performance presents a question of fact inappropriate for resolution on a motion to dismiss. *See Petrobras*, 116 F. Supp. 3d at 378.

"simply track[s] the language of Section 11." *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 559 (S.D.N.Y. 2017); *see also In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 405 (S.D.N.Y. 2013). Compare the language Defendants quote in footnote 5 of their MTD—concerning "inaccurate statements of material fact that created a materially false impression," and "inaccurate statements of material fact and [omissions of] known material facts necessary to make the statements contained therein not misleading"—with the substantially similar language from §11 itself, referring to "an untrue statement of a material fact or [omission] to state a material fact required to be stated therein or necessary to make the statements therein not misleading …." 15 U.S.C. §77k(a).

As Judge Koeltl has written, siding with "[t]he majority of well-reasoned cases," to "hold that bare recitations of the elements of the causes of action triggered Rule 9(b) would be contrary to the holding of the Court of Appeals in *Rombach [v. Chang]*, 355 F.3d [164, 178 (2d Cir. 2004)], that claims under Section 11 need not sound in fraud …." *comScore*, 268 F. Supp. 3d at 559. Or as Judge Scheindlin put it: "it is clear that the Second Circuit did not intend *Rombach* as an instruction that all § 11 pleadings should be subjected to the Rule 9(b) standard." *OSG*, 971 F. Supp. 2d at 405.

Plaintiff's allegations of "knowledge," MTD at 10, do not change the analysis. Plaintiff asserts multiple bases for a legal duty to disclose the omitted clinician-retention information, including Item 303, which requires pleading a "known" "event or uncertainty," *inter alia. See* ¶¶80-84; *Moab Partners*, 2022 WL 17815767, at *2 ("[t]he failure to make a material disclosure required by Item 303 can serve as the basis for claims under Section[] 11"). But that required allegation of knowledge—or at least of a "plausible inference" of knowledge[3]—does not necessarily imply fraud: "[T]he allegations that [the defendant] failed to disclose a known uncertainty supports the claim of

---

[3]   *See Medina v. Tremor Video, Inc.*, 640 F. App'x 45, 48 (2d Cir. 2016) (in a §11 action, requiring "allegations of specific facts from which we could draw the 'plausible inference' that defendants had actual knowledge of the trends or uncertainties at the time the registration statement was issued").

Section 11 and 12(a)(2) liability pursuant to Regulation S–K, *which plaintiffs are able to allege without requiring the application of Rule 9(b)*." *Wallace v. IntraLinks*, 2013 WL 1907685, at \*12 (S.D.N.Y. May 8, 2013) (citing *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 513 (S.D.N.Y. 2010) ("[T]hat a fact was known and not disclosed *does not mean, as a matter of law, that the circumstances of the resulting omission sound in fraud*.")).

Indeed, because Plaintiff's allegations of knowledge are as consistent with negligence—which he *does* plead (¶¶13, 67, 69, 96)—as with fraud—which he expressly disavows (¶¶121, 129)—that is how they should be understood. *See, e.g., Citiline*, 701 F. Supp. 2d at 513 ("allegations against the underwriters sound in negligence" when "the underwriters are alleged only to have failed to disclose facts that they *knew*"); *OSG*, 971 F. Supp. 406 ("Plaintiffs' assertion that ... Defendants knew or should have known … does not constitute an allegation of fraud, but rather of negligence."); *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at \*3 (S.D.N.Y. Oct. 30, 2017) (Kaplan, J.; plaintiff asserting Item 303 may "proceed[] under strict liability and negligence theories").[4]

But even if the Court disagrees, Plaintiff has satisfied Rule 9(b). The AC sufficiently "(1) specif[ies] the statements that [he] contends were" false (¶¶68,73); "(2) identif[ies] the speaker" (*id.*); "(3) state[s] where and when the statements were made" (*id.*; ¶¶25-27); and "(4) explain[s] why the statements were" false (¶¶69-72; 74-79; 28-66). *See* MTD at 11 (citing *Ladmen Partners, Inc. v. Globalstar, Inc.*, 2008 WL 4449280, at \*11 (S.D.N.Y. Sept. 30, 2008)).

Rule 9(b) does *not* require, in addition, that Plaintiff plead scienter, as Defendants contend. *See* MTD at 11. As this Court has explained: "When [*Rombach* says] you have to plead fraud with particularity, it doesn't mean you have to plead with particularity an element that is not an element

---

4   In *In re HEXO Corp. Securities Litigation*, 524 F. Supp. 3d 283, 299 n.17 (S.D.N.Y. 2021), which Defendants cite, *see* MTD at 10, the Court found that the plaintiffs' §11 "claims rest[ed] on the same theory" as their fraud claims, "such that they [were] 'almost a mirror image' of one another."

- 14 -

of the complaint. It just means, for example, the misrepresentations would have to be spelled out in 9(b) detail as opposed to the more general detail that [R]ule 8 would require." *La. Mun. Police Emps. Ret. Sys. v. Merrill Lynch & Co.*, No. 1:08-cv-9063 (JSR) (S.D.N.Y. Feb. 19, 2009), Excerpted Transcript of Oral Argument at 63:24-64:5, attached as Exhibit A to the Declaration of Mark T. Millkey, submitted herewith. *See also In re Sanofi Sec. Litig.*, 2015 WL 365702, at \*13 n.8 (S.D.N.Y. Jan. 28, 2015) (While "[c]laims that sound in fraud must satisfy the heightened pleading requirements of Rule 9(b), ... that Rule does not add substantive elements such as scienter to any claim."), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

In arguing for a scienter requirement, Defendants misread *Rombach*, which merely applies the particularity requirement of Rule 9(b)—not the heightened pleading standards of the PSLRA—to 1933 Act claims that sound in fraud.[5] *Rombach*, 355 F.3d at 171.[6] But even if those standards did apply, the PSLRA requires only that the AC "state with particularity facts giving rise to a strong inference that the defendant acted *with the required state of mind*." 15 U.S.C. §78u-4(b)(2)(A).

---

[5] The Second Circuit has repeatedly and explicitly held that "the heightened pleading standards" of the PSLRA do not apply to "non-fraud claims" under §§11 or 12(a)(2). *See, e.g.*, *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012). Indeed, there is no provision equivalent to 15 U.S.C. §78u-4(b)(2) in 15 U.S.C. §77z-1, the portion of the PSLRA applicable to 1933 Act claims.

[6] Defendants' cases confuse those two related but distinct requirements, as well. *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (dismissing "Plaintiffs' Section 11 claim" for "fail[ing] to plead with particularity *a strong inference of scienter*" "[i]n contravention of Fed.R.Civ.P. 9(b) *and the PSLRA*"); *see also In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 227 (E.D.N.Y. 2022) (dismissing Exchange Act claims under the "strong inference" standard, and dismissing Securities Act claims "[b]ecause I have already found—*in connection with plaintiffs' Section 10(b) Exchange Act claim*—that based on insufficiently alleged scienter, the statements … do not support a *compelling inference* of fraud"), *reconsideration denied*, 2022 WL 2872671, at \*5 (E.D.N.Y. July 21, 2022) ("I now conclude again, that the Complaint insufficiently pleaded scienter"). In *Caiafa v. Sea Containers Ltd.*, 2008 WL 11516813, at \*5 (S.D.N.Y. May 15, 2008), the plaintiffs incorrectly "acknowledge[d]" a scienter requirement. But the Second Circuit affirmed, in a summary order, because the §11 claim failed to satisfy Rule 9(b)'s "particularity" requirements—and did not mention scienter. 331 F. App'x 14, 16 (2d Cir. 2009).

Section 11, a strict-liability statute, does not require a state of mind at all—beyond, for some defendants, negligence—and the application of Rule 9(b) does not create such a requirement. A contrary rule would run afoul of the Rules Enabling Act, which provides that the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. §2072(b).[7]

### D.  None of the Other Asserted Defenses Are Meritorious

### 1.  "Accurate, Historical Data" Is Not a Defense

Although Defendants contend their citation of an 87% clinician retention rate cannot be misleading because it is historically accurate, *see* MTD at 12-15, they are wrong as a matter of law.

As Defendants concede, the inquiry under §11 "'does not focus on whether particular statements, taken separately, were *literally*'"—or historically—"'*true*, but whether defendants' representations, *taken together and in context*, would have misled a reasonable investor about the nature of the securities.'" MTD at 12 (quoting *DeMaria v. Anderson*, 318 F.3d 170, 180 (2d Cir. 2003)). There can be little doubt that a reasonable investor would be misled by a representation of an 87% retention rate, however historically accurate, represented as 10 points higher than the "industry average" (¶68), when the actual, undisclosed retention rate had declined weeks before the IPO, and was the subject of pre-IPO meetings and concern by C-suite management. *See* ¶¶33-34, 50-57, 70, 113. Put another way, no reasonable investor would infer from Defendants' statement of favorable historical data that clinician retention had already gotten *worse*.

And that is especially true given Congress's goal in adopting §11—"to ensure that issuers 'tell[] the *whole truth*' to investors." *Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*, 135 S. Ct. 1318, 1331 (2015). "*[L]iteral accuracy is not enough*: An issuer must as well

---

[7]    *See McKenna v. SMART Techs. Inc.*, 2012 WL 1131935, at *21 (S.D.N.Y. Apr. 3, 2012) ("[P]rocedural rules cannot eviscerate substantive law …. The Securities Act is a strict liability statute ... and does not ... require … scienter.").

*desist from misleading investors by saying one thing and holding back another*." *Id.* But that is precisely what Plaintiff alleges: that Defendants said one thing—representing an 87% clinician retention rate—and held back another—that the rate had declined just as investors were deciding whether to invest in the IPO. As the Second Circuit wrote in *Moab Partners*, issuers must disclose "<u>all</u> *material facts ... to permit investors to evaluate the potential risks*." 2022 WL 17815767, at *4.

*Second*, Defendants mischaracterize Plaintiff's claim. Plaintiff does not allege, as Defendants suggest, a "promise" or "forward-looking guarantee," MTD at 13, 14, that LifeStance's rate of clinician retention would continue at its historical level "following the IPO." *Id.* at 13. Rather, he alleges an already-reduced but undisclosed level of clinician retention *before* the IPO. So when Defendants argue, quoting *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016), that "'disclosure of accurate historical data does not become misleading even if less favorable results might be *predictable by the company in the future*,'" they are missing the point. MTD at 13. Unlike the metric at issue in *Coty*—for which the plaintiffs alleged "no facts that actually support[ed] their assertions [of a decline] at the time of the IPO," 2016 WL 1271065, at *6—the LifeStance retention rate had, as Defendants *admit*, already fallen before the IPO, with an "immediate" impact on the Company's operating results. *See* ¶¶ 57, 59. Their failure to disclose that known, pre-IPO decline was actionably misleading.

### 2.    Defendants Had a Duty to Disclose "Interim" Retention Data

Relying on cases that do not reflect current law, and that concern "financial data" not at issue here, Defendants argue that courts are "'reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress.'" MTD at 16-17 (quoting *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 540 (S.D.N.Y. 2010)).[8] But even if financial data—as opposed to

---

[8]    Similarly, Defendants rely on other older cases such as *In re Turkcell Iletisim Hizmetler, A.S. Securities Litigation*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (applying an "extreme departure"

clinician-turnover data—*were* at issue, controlling Second Circuit law recognizes that "a duty to disclose [such information] arises if a reasonable investor would view the omission as 'significantly alter[ing] the "total mix" of information made available.'" *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 36 (2d Cir. 2017). Thus, "the test for whether an omission of interim financial data is material, *and therefore violates Section 11* …, is whether there is a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Asay v. Pinduoduo Inc.*, 2021 WL 3871269, at *4 (2d Cir. Aug. 31, 2021). In other words, material intra-period financial data must be disclosed.

Where, as here, Item 303 applies—because Plaintiff pleads a known "event" or "uncertainty" (not an omission of financial data)[9]—disclosure is required "unless management determines that a material effect on the [Company's] financial condition or results of operations is <u>not reasonably</u> *likely to occur.*'" *Moab Partners*, 2022 WL 17815767, at *2; *see also* §III.B.1 above. That requirement includes interim information. *See, e.g.*, *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 513 (S.D.N.Y. 2013) ("under Item 303, Defendants were required to disclose the issues *even though it arose intra-quarter*").

Because, as shown in §III.B.1 and 2 above, Plaintiff has adequately pled both materiality *and* Defendants' inability to rule out a reasonable likelihood of a material effect on LifeStance's operating results, he has done more than enough to establish a duty of intra-period disclosure,

standard for disclosing interim data since rejected in favor of the Second Circuit's materiality test), and *Arfa v. Mecox Lane Ltd.*, 2012 WL 697155, at *9-10 (S.D.N.Y. Mar. 5, 2012) (merely noting that there is no general obligation to disclose the results of a quarter in progress). *See generally* MTD at 16-17.

9    *See, e.g.*, *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 541 (S.D.N.Y. 2014) (distinguishing allegations of omitted "financial data" from omissions under Item 303: "Plaintiffs allege omission of a material trend, not financial data, and the extent of an impact such a trend would have."). Plaintiff here alleges an "event" or "uncertainty" under Item 303, not a "trend," but the point is the same: Plaintiff has not alleged an omission or misstatement of financial data.

*regardless* of the test the Court applies. Defendants' arguments to the contrary are without merit.

For example, Defendants suggest that requiring the "'instantaneous disclosure' of intra-quarter data in an IPO," "'without the benefit of reflection or certainty provided by the traditionally recognized reporting periods,'" would be "'unworkable and potentially misleading.'" MTD at 16 (quoting *Turkcell*, 202 F. Supp. 2d at 13). That argument might have some appeal if Plaintiff had alleged the omission of a complex financial metric, requiring data analysis or the nuanced application of intricate accounting principles. But Plaintiff has alleged Defendants' failure to disclose increased clinician turnover—not some arcane financial metric resulting from that failure. Because clinician turnover (1) is information critical to LifeStance's business that Defendants track in real time, through "'exit interviews with every single clinician before they leave to be able to understand really what's going on'" (¶52), and (2) requires no expertise or subjectivity to determine, but only the ability to *count*, there was no legitimate reason for Defendants to withhold that material information they had at their fingertips.

*Second*, Defendants rely on *Asay*, where the district court found that the "omission of Q2 2018 interim expense data from IPO registration statement that was filed one month after the close of Q2 was not actionable." MTD at 17. But as the Second Circuit later observed, "the Offering Documents *clearly disclosed substantial increases in marketing expenses*, and further cautioned investors that such increases *could continue* …." 2021 WL 3871269, at *4. Here, by contrast, Defendants failed to disclose, pre-IPO, the admitted fact of *already-occurring* clinician turnover.

*Third*, Defendants mischaracterize the AC, stating that it alleges clinician turnover beginning in May 2021 "at the earliest." MTD at 17. In fact, the AC alleges, based on data collected at LifeStance starting in "early 2021" (¶¶41, 55), that turnover began "no later than May 2021." ¶56. Although Plaintiff cannot know or allege, without discovery, precisely when the increase in clinician

turnover began, he can, with certainty, plead mid-May as the *latest* time when the Company's most senior management, including the CMO and CGO, became aware of that increase.  *See, e.g.*, ¶¶34, 54-55, 77, 57, 113.  Moreover, Defendants' larger argument—that a known but "very recent increase in clinician resignations" made it "nearly impossible for LifeStance to [] predict[] the impact … on [its] future financial growth," MTD at 18—both misses the point, because Defendants' failure to disclose an already-existing increase in turnover entails no prediction, and concedes the necessity of disclosure under Item 303.  *See, e.g., Moab Partners*, 2022 WL 17815767, at *2 (requiring disclosure "'unless management *determines* that a material effect on the [Company's] financial condition or results of operations is <u>not</u> *reasonably likely to occur*'").

*Fourth*, Defendants try to turn one of Plaintiff's most damning allegations—that "during the period leading up to the IPO, approximately one third of newly-hired LifeStance clinicians resigned within the first three months of their employment" (¶41)—to their advantage, arguing that those "resignations would have a substantially different impact on LifeStance's financial outlook than the resignations of high-performing, long-standing clinicians." MTD at 18.  But those resignations by newly hired clinicians were *in addition* to the resignation of experienced clinicians, about whom defendant Bruff admitted: "leaving clinicians *are typically at full capacity*."  ¶59.

*Fifth*, citing Q2 2021 Center Margin growth attributable to increased clinician hiring, Defendants argue that "Plaintiff does not allege that LifeStance knew in advance of its standard quarter close process" that Center Margin growth would be partially offset by a change in clinician retention levels.  MTD at 18.  Because, however, Plaintiff does not allege misreported Center Margin—or any other financial data—but rather Defendants' failure to disclose known increases in pre-IPO clinician turnover—a critical non-financial matter—this argument is a red herring.

*Finally*, Defendants argue that they could not predict—and therefore had no duty to

- 20 -

disclose—the impact of the pandemic on the Company's future financial growth. MTD at 19. But because the Company has admitted that (1) the "increased level of turnover [in Q2 2021 was] very clearly tied to COVID" (¶51); (2) clinician departures have an "immediate," "downward impact" on the Company's financial performance (¶59); and (3) LifeStance had "early warning" procedures, including "exit interviews with every single clinician before they leave," to be able to understand the reasons for those departures (¶52), Defendants were required to disclose the known impact COVID-19 was having on clinician retention before the IPO. Furthermore, Defendants simply ignore the other two bases for increased turnover Plaintiff alleges—compensation discontentment and credentialing delays—which were within Defendants' control and about which they were aware. *See* ¶¶33-43, 54-55. Thus, they cannot avoid the disclosure of this material, intra-quarter information.[10]

### 3. Defendants' Cautionary Language Is Not a Defense

For all the reasons given in §III.B.2 above, Plaintiff has adequately alleged the materiality of the omissions asserted, and Defendants' citation to the Registration Statement's cautionary language does not change that fact. *See* MTD at 20-22, 24-25. Indeed, *because Defendants cannot point to a single disclosure that clinician turnover was already increasing in Q2 2021*, before the effective date of the Registration Statement, much less the reasons for that increase, their disclosures were not only ineffective, but themselves misleading. *See, e.g.*, *Papa John's*, 517 F. Supp. 3d at 210 ("Under

---

[10] Because Plaintiff has alleged Defendants' contemporaneous awareness of Q2 2021 clinician turnover and the reasons therefor, Defendants' case law is distinguishable. *See* MTD at 19; *In re HEXO*, 524 F. Supp. 3d at 301 ("Plaintiffs do not allege that the Securities Act Defendants knew any information in January 2019, when they issued the Prospectus, upon which to conclude that HEXO would not sell the Purchase Obligation to the SQDC by October 2019."); *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 620 (S.D.N.Y. 2021) (rejecting plaintiffs' allegation of Item 303 "trend," which Plaintiff does not allege, and holding that—unlike Plaintiff—plaintiffs "conspicuously fail to allege the existence of any causal event or moment in time that the declines [in trading volume] allegedly began." Here, by contrast, Plaintiff alleges three pre-IPO causes of the "uncertainty" alleged—the decline in clinician retention: (1) compensation discontentment; (2) credentialing delays; and (3) pandemic fatigue. ¶33. In addition, the court in *Willard* found that the plaintiffs had failed to plead materiality. 527 F. Supp. 3d at 621.).

[Item 105], risk disclosures are actionable 'half-truths' when a company discloses a risk that could have an impact on its business when, in fact, that risk has already materialized.").

For example, Defendants point to certain generic warnings—such as that LifeStance's historical growth may not be "indicative of results to be expected"; that LifeStance "may not grow at the rates we have historically achieved"; and that LifeStance's estimates and forecasts "may prove to be inaccurate," MTD at 20 (bullets 1 & 2)—but generic warnings cannot excuse Defendants' omissions. *JinkoSolar*, 761 F.3d at 251 ("generic warning of a risk will not suffice when undisclosed facts … would substantially affect a reasonable investor's calculations of probability").

Even those warnings that specifically refer to the Company's "ability to attract and retain" clinicians fail to disclose the turnover that was already occurring. MTD at 20 (bullet 3). *See Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). And while *none* of the risk disclosures even mention compensation discontentment, those that refer to "credentialing" fail to acknowledge it as a reason for the undisclosed clinician turnover. *See* MTD at 20 (bullet 4); *Dexia SA/NV v. Bear, Stearns & Co.*, 929 F. Supp. 2d 231, 240 (S.D.N.Y. 2013) (Rakoff, J.; "[T]he cautionary language must 'warn [ ] of the specific contingency that lies at the heart of the alleged misrepresentation.'").

Similarly, those disclosures referring to COVID-19 fail to acknowledge it as a reason for the Q2 2021 clinician turnover, an omission especially misleading in light of Defendants' opinion, stated in the Registration Statement, that the pandemic "did not have a material impact on our results of operations, cash flows and financial position as of or for the three months ended March 31, 2021." ¶73. *See, e.g.*, *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (disclosure must be "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements"); *Micholle v.*

*Ophthotech Corp.*, 2019 WL 4464802, at \*13 (S.D.N.Y. Sept. 17, 2019) (defendants' affirmative statements "diminish[ed] the impact of" their risk disclosures); *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 647-48 (S.D.N.Y. 2012) (risk disclosures that were "somewhat undermined, or at least downplayed," by other statements were "misleading").

Finally, Defendants' citation to the Second Circuit's opinion in *Asay* is not to the contrary because, as Defendants fail to acknowledge, the Second Circuit recognized that "the Offering Documents *clearly disclosed substantial increases in marketing expenses ….*" 2021 WL 3871269, at \*4.  Defendants made no analogous disclosure about declining clinician retention.

### 4. Plaintiff Has Pled Actionable Omissions Under Items 303 and 105

Plaintiff has already explained that Defendants had an independent duty to disclose known "events and uncertainties" under Item 303, *see* §III.B.1, above, and already-occurring risks under Item 105.  *See* §III.B.1 & D.3, above.  In this case, the event, uncertainty, and risk are all the same— the increase in clinician turnover LifeStance was experiencing before the IPO.

Rather than confront Plaintiff's actual allegation about a known "event" or "uncertainty," Defendants choose to mischaracterize it, pretending he has pled an Item 303 "trend" instead.  But Defendants cannot change Plaintiff's actual allegation simply by repeating the word "trend" over and over.  *See* MTD at 1, 3, 17, 22-24 (14 references).  Plaintiff himself uses the word "trend" only when discussing Item 303 generally or quoting SEC guidance, and repeatedly and unambiguously alleges an event or uncertainty instead.  *See* ¶¶80-86, 89-90, 93.

Nonetheless, Defendants prefer the term "trend" because it permits them to argue that the time frame of the clinician turnover in Q2 2021 was too short to be a trend.  *See* MTD at 22.  Putting aside that the start date for the increased turnover is an open question (*see* ¶55 (referring to data gathered since "early 2021")), there is no doubt that the alternative terms used in Item 303 and the

SEC guidance ("trend, demand, commitment, event or uncertainty" (¶82)) are independent bases for a duty to disclose. *See, e.g.*, *Panther Partners*, 681 F.3d at 120 (recognizing Item 303 "uncertainty surrounding [a] defect rate"); *McKenna v. SMART Techs. Inc.*, 2012 WL 3589655, at *4 (S.D.N.Y. Aug. 21, 2012) (recognizing an Item 303 claim for "'uncertainty' over the demand for SMART's interactive whiteboards"). Plaintiff thus submits that the Court should reject Defendants' effort to knock down a straw man of their own creation.[11]

Defendants also argue that Plaintiff has failed to allege a "known" uncertainty, despite Bruff's clear admission that "the second quarter is *when we saw* an uptick in the clinician growth momentum, and it's also *where we saw* the increase in turnover." ¶57. At best raising a question of fact, which must be resolved in Plaintiff's favor,[12] Defendants contend Bruff didn't mean what he said, and was speaking "with the benefit of hindsight," after "thorough post-IPO review and analysis." MTD at 24. But clinician headcount (including retention) is LifeStance's "growth driver" and "unit economic" (¶100)—critical information Defendants track in real time (¶52)—so there is every reason to believe Bruff was acknowledging the Company's contemporaneous awareness of increased turnover. Moreover, Plaintiff pleads the corroborating allegation of a virtual meeting occurring in May 2021, attended by the Company's CMO, CGO, and other Company leadership, specifically to discuss "data about *the reasons for the ongoing increase in clinician resignations*." ¶55. Although Defendants attempt to dismiss this allegation as one about mere "raw, unanalyzed"

---

[11]   In any event, "whether a pattern or occurrence is sufficiently lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage." *CPI*, 2017 WL 4941597, at *3; *see also Facebook*, 986 F. Supp. 2d at 513 (finding a duty to disclose even though "Facebook was aware of the material negative impact … of increasing mobile usage and the Company's product decisions *ten days before the IPO*").

[12]   *See Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 287 (S.D.N.Y. 2020) (Rakoff, J.; "After discarding … allegations that amount to nothing more than legal conclusions, … the court should 'accept as true' what remains and 'draw all reasonable inferences in plaintiff's favor.'").

data, MTD at 23, the very purpose of the meeting was to discuss the increase in clinician resignations known to senior management, including the CGO and CMO, before the IPO. So Plaintiff has, at a *minimum*, alleged a "plausible inference" of "actual knowledge," which is all that is required. *See Medina*, 640 F. App'x at 48.[13]

### E.    Plaintiff Has Pled a Control-Person Claim Under §15

Because Plaintiff has pled a primary violation under §11, and "the majority of courts in this district have concluded that culpable participation is not required to state a [§15] claim," *Stone Fam. Tr. v. Credit Suisse AG*, 2022 WL 954743, at *8 (S.D.N.Y. Mar. 30, 2022), Plaintiff has pled a §15 claim on that basis alone. In any event, Plaintiff has also alleged a plausible inference of Defendants' actual knowledge of increasing, pre-IPO clinician turnover, as discussed above, pleading culpable participation, as well.

### IV.    CONCLUSION

Plaintiff respectfully requests that the Court deny the motion to dismiss in its entirety.[14]

---

[13] Defendants also complain that Plaintiff's allegations about the May 2021 meeting are "presumably sourced from an unnamed confidential witness." MTD at 17 n.10. But Rule 8, which governs this case (*see* §III.C above), does not require Plaintiff to allege with particularity the sources of the factual allegations contained in the AC, but only "factual allegations that are sufficient to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Hirsch v. 725 Assocs.*, 2014 WL 3950791, at *1 (S.D.N.Y. Aug. 13, 2014). "'[D]etailed factual allegations' are not necessary." *Id. Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entertainment Holdings, Inc.*, on which Defendants rely, merely explains, in the context of applying Rule 9(b)'s particularity requirement to 10b-5 claims under the Exchange Act, that confidential witnesses must be described "with sufficient particularity …." 422 F. Supp. 3d 821, 851 (S.D.N.Y. 2019) (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (outlining requirements for confidential witnesses under Rule 9(b))). Here, however, Plaintiff has more than sufficiently put Defendants on notice of the claims against them, and nothing else is required. And, as just discussed, Bruff admitted Defendants' contemporaneous knowledge anyway, both corroborating and rendering unnecessary the May meeting allegation. ¶57.

[14] If the Court grants Defendants' motion in whole or in part, Plaintiff respectfully requests leave to amend, which is typically freely given. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

DATED:  February 17, 2023   Respectfully submitted,

        ROBBINS GELLER RUDMAN
          & DOWD LLP
        SAMUEL H. RUDMAN
        MARK T. MILLKEY
        MARY K. BLASY
        BRENT E. MITCHELL


           */s/ Samuel H. Rudman*
          SAMUEL H. RUDMAN

        58 South Service Road, Suite 200
        Melville, NY  11747
        Telephone:  631/367-7100
        631/367-1173 (fax)
        srudman@rgrdlaw.com
        mmillkey@rgrdlaw.com
        mblasy@rgrdlaw.com
        bmitchell@rgrdlaw.com

        *Lead Counsel for Lead Plaintiff*