N3VHNayO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NIZAR S. NAYANI, individually
and on behalf of all others
similarly situated,

                    Plaintiff,

          v.                          22 Civ. 6833 (JSR)

LIFESTANCE HEALTH GROUP, INC.,
et al.,
                                      Oral Argument

               Defendants.

------------------------------x

                                      New York, N.Y.
                                      March 31, 2023
                                      4:35 p.m.

Before:

                    HON. JED S. RAKOFF,

                                      District Judge

                         APPEARANCES

ROBBINS GELLER RUDMAN & DOWD LLP
     Attorneys for Plaintiff
BY:  SAMUEL RUDMAN
     MARK MILLKEY
     BRENT MITCHELL

ROPES & GRAY, LLP
     Attorneys for Defendants Lifestance, et al.
BY:  DANIEL V. McCAUGHEY
     SARA A. BELLIN

DAVIS POLK & WARDWELL
     Attorneys for Defendants Morgan Stanley & Co., et al.
BY:  BRIAN WEINSTEIN

N3VHNayO

(Case called)

MR. RUDMAN:  Good afternoon, your Honor.  Samuel Rudman from Robbins Geller Rudman & Dowd, for plaintiff Nayani.

MR. MILLKEY:  Mark Millkey from Robbins Geller Rudman & Dowd for plaintiff Nayani.

MR. MITCHELL:  Brent Mitchell from Robbins Geller Rudman & Dowd for plaintiff Nayani.

MR. McCAUGHEY:  Good afternoon, your Honor.  Dan McCaughey from Ropes & Gray if LifeStance and the officer and director defendants.

MS. BELLIN:  Sarah Bellin, also from Ropes & Gray, for LifeStance.

MR. WEINSTEIN:  Good afternoon, your Honor.  Brian Weinstein from Davis Polk for the underwriter defendants.

THE COURT:  Good afternoon, all.  We're here for argument on the motion to dismiss, so let me hear first the moving counsel.

MR. McCAUGHEY:  May I use the podium, your Honor?

THE COURT:  Yes, please.

MR. McCAUGHEY:  Thank you.

So I'd like to just start with some -- I'm sorry.  Is there a ring in that?  Is it just me?  It's fine?

I'd like to start with some short background on LifeStance's IPO.  So LifeStance is a nationwide provider of mental healthcare services.

THE COURT:  I've read the papers.

MR. McCAUGHEY:  Sure.  Just wanted to get to the point that at the time it conducted its IPO, it was in the middle of COVID-19 and, more specifically, what has since become known as the great resignation when US workers were quitting their jobs at record numbers.  And LifeStance, like many employers, was not immune from that, as the plaintiffs know.

So when it made its first earnings release as a public company, it announced that it was experiencing an increase in clinician turnover.  This was two months after the IPO in August 2021.  And interestingly enough, the clinician turnover at that time hadn't impacted the Q2 results that LifeStance announced that day, but at the same time, the company announced it did impact its going-forward guidance and lowered that guidance for the remainder of the year.

Now, the plaintiffs -- according to the plaintiffs, that announcement prompted the significant decline in the price of the stock that's brought us all here together in this lawsuit, and the plaintiff alleges that LifeStance's decline in clinician retention began in May 2021.  So that's right around the time that the company filed its registration statement and just weeks before the IPO.  Any claims that the registration statement --

THE COURT:  Wait a minute.

MR. McCAUGHEY:  Sure.

THE COURT:  I understand what subsequently happened is that LifeStance went public on June 10, 2021.  On August 11, LifeStance disclosed its financial results for the second quarter and revised its financial projection for the second half, and in particular, LifeStance revised its expressive -- its expected profit margin downwards by significant amounts. And LifeStance attributed this decline to its struggles with clinician retention, and the stock then declined by 46 percent.

Is that all correct?

MR. McCAUGHEY:  That's all correct, your Honor.

THE COURT:  So, clearly, it would seem that the retention rate is material, yes?

MR. McCAUGHEY:  I think we would not dispute that at a certain point in time, once it has become a known trend and once the data has been sufficiently compiled, aggregated, there surely could be an assessment that it was material.  I think the key question for the Court in this case is whether there were facts known or knowable to management at the time of the IPO, as opposed to in August or the subsequent announcement in November, whether there were facts known at that time that rendered the clinician retention issue material for purposes of the disclosure and the registration statement.

THE COURT:  That sounds right.  So what was known?

MR. McCAUGHEY:  Well, I think what I'd point the Court to is that the plaintiffs have identified -- they've made

allegations about certain conversations that were happening, including exit interviews, conversations among senior executives regarding the reasons that people were resigning. So I think the plaintiff has pled that some clinicians were resigning and that the company was discussing the reasons for the resignation.

But what we would submit they have not alleged are a number of things that would be needed to make the determination that it was material -- that the retention issue was material at the time of the IPO. That includes the actual number of clinicians that had resigned, how the number that had resigned at the time of the IPO impacted the aggregate retention rate, as well as the impact that those resignations, that is, those that occurred at the time of the IPO, how those would impact the company's financial performance. We suggest that those allegations are lacking and that anecdotal evidence about the fact that some clinicians were resigning and some of the reasons that they were resigning, those things are not sufficient to establish materiality or a disclosure obligation at the time of the IPO.

THE COURT: All right. Why doesn't that at least create an uncertainty, using the term from 303?

MR. McCAUGHEY: Sure. I think we would submit that for purposes of item 303, this might be a slightly imprecise way of describing it, but the company has to at least know that

the thing is happening, right, that an event or trend or uncertainty -- that some factual development has occurred.  We would acknowledge that if there is some -- if there are facts showing that an event or a trend or an uncertainty has occurred and --

THE COURT:  Well, what do you think is the difference?  Since item 303 talks of "trends" or "uncertainties," that suggests that they had different meanings.

MR. McCAUGHEY:  Well, we would submit that we have tried very hard, reading the cases, to come up with a distinction between "trend" and "uncertainty," and our take in reviewing the cases is that those two terms are used rather interchangeably.

THE COURT:  I hadn't done this before, but I happen to have here Webster's dictionary.  Let me just see what it says.

So "trend" as a noun is underlying or prevailing tendency or inclination, as modern trends in poetry.  Perhaps that example is perhaps not directly on point in this case.  But underlying or prevailing tendency or inclination.

OK.  Let's see what Mr. Webster says for "uncertain."

Well, the actual definitions are lack of certainty, doubt; or, second, that which is uncertain.  There is a note: uncertainty, doubt, dubiety, dubiosity, skepticism, suspicion, mistrust, the lack of sureness about someone or something.  Uncertainty may imply a falling short of certainty or so far

removed from it that one can only guess or surmise.  And then it goes on to give the nuances between that and doubt, dubiety, dubiosity.  And I won't bother trying to sort out the difference between dubiety and dubiosity.

So doesn't that suggest that uncertainty is something less than a trend, or at least a trend, you know which way it's going.  Uncertainty, you're not sure whether -- which way it's going, but that uncertainty may or may not be material.

MR. McCAUGHEY:  I think the last point that your Honor made is actually consistent with our view of the cases, which is that the issuer has to know that there is some factual development to potentially disclose in the first place that has the potential to be material.  Now, if it may or may not be material and -- but the facts have been developed as to what's going on at the company, perhaps uncertainty suggests, if you're uncertain as to materiality, the better course is to disclose it.

But our point is if the facts are not sufficiently developed in the first place, which is what we would suggest is the case here, right, their allegations of what we would view as anecdotal evidence of some clinicians resigning -- again, at a company with 3,000 clinician, right, if there were one clinician resigning, ten clinicians, even 100 clinicians resigning, we suggest that's not necessarily a development that has the potential to be a material fact that ought to be

N3VHNayO

disclosed.  That's our view on where the uncertainty comes in.

THE COURT:  All right.  OK.

MR. McCAUGHEY:  So the point there is that there are not -- the allegations -- while there is, again, anecdotal evidence that some clinicians were resigning, the company was making efforts to understand the reasons they were resigning, there was no allegation about the aggregate number that were resigning, how they would impact the overall retention rate, and how that in turn—again, at the time of the IPO—would impact the company's financial performance.

THE COURT:  Go ahead.

MR. McCAUGHEY:  While we're on item 303, I think there's another important element to it that also is not pled here, which is facts regarding management's knowledge of the event, trend, or uncertainty.  Now, to be sure, it's kind of the same answer, right?  There are allegations that management was assessing the reasons that people were leaving, but no allegation that they knew the number that had left, had compiled the data -- really all the same points -- had compiled the data to determine how that would impact the aggregate retention rate and how that in turn would impact the company's financial metrics.  So I think it's both of those elements outside of 303 that we would argue have not been adequately pled.

THE COURT:  Why don't we put you on pause for a minute

N3VHNayO

and let me hear from your adversary, and we'll come back to you.

MR. McCAUGHEY:  Sure.  Thank you, your Honor.

MR. RUDMAN:  You want me to go to the podium, your Honor?

THE COURT:  Yes, please.

MR. RUDMAN:  Good afternoon, your Honor.

Let's go right to the crux of it here.  The case is essentially admitted.  In August -- the company goes public in June and has the conference call in August on the second quarter results.  During that conference call, as alleged in our complaint, the defendants admit that they track clinician retention very closely, that they conduct exit interviews with all the doctors that are leaving, and that they saw a rise in turnover midway through the second quarter.  So it's admitted here that there was a rise in turnover and that the clinician retention rate was declining in the middle of the second quarter.

None of that --

THE COURT:  I don't recall any indication of how much they said that rise in termination -- or whatever it is, reduction in retention was during the period prior to the IPO.

MR. RUDMAN:  Oh.  It was for the period up to June 30, the end of the second quarter, because in August they're reporting the numbers for the second quarter.

THE COURT:  I'm asking what are the numbers?

MR. RUDMAN:  Your Honor, we don't have the numbers, but we don't have to plead the exact numbers here because we're under notice pleading.

So it's obvious what took place was a material event for the company because, as the defendants have pointed out in their briefing, the company made their second quarter numbers, and they reported them in August.  But if you look at the stock chart, which is in our complaint, the stock collapsed on the announcement of these results.  There was a conference.  During that August conference call, there were nine questions asked by analysts about what happened with the company's results.  Six of them were directly related towards questions about the turnover, the churn, and the retention rates.

So it's clear that this was material information and that it was important information that investors needed to know about in the prospectus.  We don't have the exact number, nor are we required to have it at this point in time.  It's not pleading fraud with particularity; it's notice pleading.

THE COURT:  But even for notice pleading, to meet the basics of pleading, for example, if the chain -- this is clearly not the case -- but supposing the decline in retention was .001 percent.  How could that possibly be --

MR. RUDMAN:  Well, it wouldn't have been, but that's not what happened here.  They said it was significant and it

N3VHNayO

was going to negatively impact, and they revised their projections going forward.  So we're entitled to an inference based on the -- based on that admission, that that was essentially what was taking place during the -- midway through the second quarter.  You can't ignore what they ultimately disclosed, your Honor.

THE COURT:  Well, the registration did warn investors that the company might retain physicians at a different rate after December 31, 2020, right?

MR. RUDMAN:  Yes.  It gave a boilerplate warning that, in our view, was insufficient, misleading in and of itself in that at the time that the warning was given, the company knew it was losing clinicians at a higher rate than it had in the past.  And we've alleged a whole series of reasons why that was the case, simply not going off the company's admission that they lost clinicians due to COVID-19 burnout, but also the other reasons that we allege why people were leaving—compensation issues and credentialing issues.

But, again, to get to your other point, your Honor, we can't, without discovery, know exactly what the number is, but we don't need to in a Section 11 case.  This is notice pleading here.  And I'm not even going to argue about the defendants' argument that 9(b) should apply.  We're clearly, in our view, within notice pleading, and I think your Honor's decisions in this regard have been consistent with that.  This is a

Section 11 case.  We just have to make plausible allegations.

THE COURT:  No, I'll hear whatever your adversary wants to say beyond what he put in his brief on this issue, but I agree, I don't think they have to comply with 9(b), but they do still have to comply with plausibility.

MR. RUDMAN:  Right.  And so here's why my allegations are plausible.  Because we allege that when the IPO took place, we allege defendants' admissions, which you can't ignore here, that they track these things on a daily basis, that they saw the uptick in the middle of the second quarter, and we also plead directly that there was a meeting in May between the chief growth officer and other executives where they recognized the retention issues.  We plead specific reasons why clinicians were leaving, and importantly, again, the company admitted it.

You're at June 10.  You're two weeks away from the end of the quarter, your Honor.  You cannot tell me this is not information every single investor in this company would want to know, yet the prospectus talks about an 87 percent retention rate and doesn't mention that at the very time that people are buying stock in this company, the people running the company know that they're losing clinicians at a higher rate than they were in the past.  They present themselves as an expert at retaining clinicians.  This is their shrink, this is their core specialty, and they're losing people.

And this is a pleading motion.  And based on these

N3VHNayO

facts, when you look at the -- take a look at the stock chart, Judge.  It's in our complaint.  When you see the drop, they made their numbers.  The stock is off a cliff.  So this is highly material information that anyone that was investing in this company would have wanted to know.

THE COURT:  Let me go back to defense counsel.

MR. McCAUGHEY:  Thank you, your Honor.

THE COURT:  Isn't plaintiff's counsel right in saying that in your very IPO you emphasize that retention is one of your real strengths and that, in that context, the failure to disclose the decline in retention becomes even more significant?

MR. McCAUGHEY:  I think an important point to bear in context there, I agree that those statements are made in the registration statement.  The company acknowledged the historically accurate fact, right, that as of the end of the prior year, this was its retention rate, 87 percent.  We submit that those recitations -- I think there's plenty of case law to support recitation of a historically accurate fact is not itself misleading.

Then as to what it knew at the time of the IPO, I think another critical point here is the timing, right?  By the plaintiff's own allegation, this began at some point in May, the very same time the registration statement was filed and just a week before the IPO happened.  So in a matter of weeks,

N3VHNayO

I don't think it's plausible that an unidentified number of resignations -- I don't think that's adequate pleading under any standard that an unidentified number of resignations all of a sudden make that statement materially misleading because it didn't disclose more facts necessary to make it accurate or as a standalone materiality obligation, because there simply are no obligations about the numbers at the time, as the Court mentioned, and how those impacted the aggregate rate.  The timing is a critical component of that.  I think there are a number of cases --

THE COURT:  No, I understand that argument.  I'm just wondering, so you tell investors:  Please buy our stock because, among other things, this company is unusually strong in its retention rate.  And at the time you're making that statement, you know that over the past few weeks there has been a decline in the retention rate.  And while you may not know yet why that is, could be COVID or whatever, certainly it casts some uncertainty on what you're saying is one of your company's greatest strengths, at least that's the argument.

MR. McCAUGHEY:  Sure.  I think, your Honor, that is highly dependent on both the timing, as I mentioned, and what's known about the numbers, right?  As the Court pointed out, you could read these pleadings, and it could have been that 20 or 25 clinicians had resigned, and the company wanted to understand the reasons for those resignations.  Those are the

things that it was talking about in the senior executive meetings. But that anecdotal evidence by itself is not enough to suggest that the historical retention rate is inaccurate or that there's -- or that resignations had even developed into some kind of pattern or trend that warranted disclosure.

I think that's especially true here for a few reasons: One, as Mr. Rudman mentioned, the plaintiffs allege three different reasons that people had resigned. That underscores that this is a highly personalized decision, as anybody's career is, right, for each clinician. Some of them might have quit because they were unhappy with their compensation, as plaintiff alleges; some of them might have quit because it took too long to be credentialed with insureds; some may have quit because of COVID-19 burnout. Those are all three factors that they cite.

THE COURT: So in the most recent issue of the National Lawyer, I think is the name of the magazine, there's an article about the fact that an unusual number, namely, six, federal judges have resigned in the last few months, but I attribute that entirely to boredom.

Go ahead.

MR. McCAUGHEY: No doubt each of them had their very individualized reasons, and I would suggest that that does not mean that the federal judiciary has a material attrition problem. I think the individualized nature of these decisions

really underscores why it does not rise to the pattern of a trend or some material development that in a matter of weeks the company had the ability to meaningfully assess, quantify, and make an updated disclosure on, which, by the way, obviously it did do later in the year.

Touching quickly on the stock drop that Mr. Rudman mentioned a few times, I'm not sure that's the centerpiece -- we haven't sort of briefed causation or anything here, but it's equally, if not more, plausible the reason the stock dropped is that the company reduced its guidance going forward, right?  It gave a disclosure once it had the ability to assess with the benefit of time and the actual closing of the quarter.  It gave an assessment.  It said that resignations had increased.  This is, again, two months post-IPO.  It appropriately lowered its guidance.  And while I know big stock drops attract lawsuits like these, the fact that -- it's equally, if not more, plausible that the reduction was due to the reduction in guidance because, critically, the company actually met its numbers for the quarter in which this was an issue.

THE COURT:  All right.  Sorry, there was something else you wanted to say?

MR. McCAUGHEY:  One other -- just one point I wanted to mention is the comment by the CFO Mr. Rudman alluded to which is made in August.  It's a central part of their pleading, and I'll just actually read it briefly.  He says:

"The first quarter we were in line" -- this is from paragraph 57 of the complaint -- "In the first quarter we were in line with our growth expectations from a clinician and revenue perspective.  In the second quarter" -- and I think this is the line Mr. Rudman was referring to -- "the second quarter is when we saw an uptick in the clinician growth momentum, and it's also where we saw the increase in turnover."

So a couple of points there:  First, I think read in context is the statement made in August, after the quarter had closed, when the company's going back and looking with the benefit of hindsight at the numbers from the prior quarter, it's got to be viewed as when we went and did that assessment with the benefit of hindsight, this is where we see the trends beginning, now that we have all the numbers in front of us.

But even taken at face value, right, even if, as the plaintiff suggests, you should read that to say a light bulb went on at some point in the second quarter, even that statement does not say how many clinicians had resigned at that point, does not say there was some uniform reason for them resigning, doesn't say how it impacted the aggregate growth rate, and all the points I made earlier.  So I just wanted to address that statement.

THE COURT:  Thank you very much.  I'll give plaintiff's counsel a final opportunity to be heard.

MR. McCAUGHEY:  Thank you.

MR. RUDMAN:  You want me to go back there?  Could I stand here?

THE COURT:  No, go back there.  The exercise will do you good.

MR. RUDMAN:  I only have a couple of seconds.

So, Judge, you made my point during that last colloquy.  It's the uncertainty that item 303 requires disclosure.  If they know there's an uptick in resignations and that prior financial results may not be indicative of future results—that's the language from 303—and they know of an uncertainty, they have to disclose it.

What was so hard here about disclosing an uptick in clinician resignations?  We're not sure how it's going to impact us.  It could impact us negatively, or maybe we could work things out.  But that disclosure wasn't in the document for one reason.  They didn't want to put it in there because it would have been bad for them.  OK?  Because when the numbers came out, the stock went down, and it's been down ever since. That makes my point.  It's the uncertainty of the clinicians. I don't need to quantify it.  We know there was a problem. They've admitted it.  They've admitted they recognized it prior to the IPO.  It had to be disclosed.

We haven't really talked about cases today, and I didn't want to -- I wanted to try to do the argument without talking about any cases because I think it's a straightforward

argument, and I know your Honor is able to do it without any cases. But in the *Macquarie* case in the Second Circuit, the Second Circuit upheld a 303 claim on a change in the law. The law hadn't even changed. The Macquarie was warehousing oil and had internally analyzed that if the law changed for this one particular type of oil, it would cost them a lot of money. It didn't disclose anything about that in the registration statement. The law hadn't even changed at the time of the IPO, but they had quantified what the expense would be or what the uncertainty would be. They knew it was going to be bad for them. And that was dismissed by the district court and reversed by the Second Circuit, saying once you've identified an uncertainty and you can tell that it may have an impact, you've got to disclose it.

There isn't any doubt here that they knew when they were losing doctors that they knew it was going to have an impact. They might not have been able to tell you exactly how much, but they knew there was going to be one.

THE COURT: All right. I will take -- I haven't read that case. I read your papers, but I will take a look at that case. And I am aware that occasionally the Second Circuit does get it right, so I'll take a look at it.

MR. RUDMAN: I have nothing further, your Honor.

THE COURT: Thank you. Very good.

So, first of all, thanks to both sides for an

N3VHNayO

excellent argument.  My practice increasingly is to move cases along by giving you a bottom-line ruling with opinion to follow.  So I will reflect on this but get you a bottom line by sometime in the middle of April, and then pending where I come out, we'll see where we go or don't go from there.  But an opinion will follow either way.

So I thank counsel again, and that concludes this proceeding.

(Adjourned)