# Exhibit B

[**EXECUTION VERSION**]

**LOCK-UP AGREEMENT**

June 1, 2021

Morgan Stanley & Co. LLC
Goldman Sachs & Co. LLC
J.P. Morgan Securities LLC
Jefferies LLC

c/o Morgan Stanley & Co. LLC
1585 Broadway
New York, NY 10036

c/o Goldman Sachs & Co. LLC
200 West Street
New York, NY 10282

c/o J.P. Morgan Securities LLC
383 Madison Avenue
New York, NY 10179

c/o Jefferies LLC
520 Madison Avenue
New York, NY 10022

Ladies and Gentlemen:

The undersigned understands that Morgan Stanley & Co. LLC ("**Morgan Stanley**"), Goldman Sachs & Co. LLC ("**Goldman Sachs**"), J.P. Morgan Securities LLC and Jefferies LLC (collectively, the "**Representatives**") propose to enter into an Underwriting Agreement (the "**Underwriting Agreement**") with LifeStance Health Group, Inc., a Delaware corporation (the "**Company**"), and LifeStance TopCo, L.P., providing for the public offering (the "**Public Offering**") by the several Underwriters, including the Representatives (collectively, the "**Underwriters**"), of shares (the "**Shares**") of common stock, par value $0.01 per share, of the Company (the "**Common Stock**").

To induce the Underwriters that may participate in the Public Offering to continue their efforts in connection with the Public Offering, the undersigned hereby agrees that, without the prior written consent of Morgan Stanley and Goldman Sachs on behalf of the Underwriters, it will not, will not cause any direct or indirect affiliate to, and will not publicly disclose an intention to, during the period commencing on the date hereof and ending 180 days after the date of the final prospectus (the "**Restricted Period**") relating to the Public Offering (the "**Prospectus**"), (1) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock beneficially owned (as such term is used in Rule 13d-3 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")), by the undersigned or any Class A partnership units or Class B partnership units of LifeStance TopCo,

1

L.P. (the "**Partnership Units**" and, together with the Common Stock, the "**Securities**") or any other securities so owned convertible into or exercisable or exchangeable for any Securities or (2) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Securities or any security convertible into or exercisable or exchangeable for Securities, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common Stock, Partnership Units or such other securities, in cash or otherwise.   Without limiting any exclusion provided herein, the undersigned acknowledges and agrees that the foregoing precludes the undersigned from engaging in any hedging or other transaction designed or intended, or which could reasonably be expected to lead to or result in, a sale or disposition of any Securities, or any securities convertible into or exercisable or exchangeable for Securities, even if any such sale or disposition transaction or transactions would be made or executed by or on behalf of someone other than the undersigned.

The restrictions described in the foregoing paragraph shall not apply to:

(a) transactions relating to Securities acquired in open market transactions after the completion of the Public Offering;

(b) transfers of Securities as a bona fide gift or to a charitable organization or non-profit educational institution in a transaction not involving a disposition for value;

(c) transfers of Securities (i) as a result of the operation of law through estate, other testamentary document or intestate succession, (ii) to any immediate family member of the undersigned or any trust for the direct or indirect benefit of the undersigned or any immediate family member of the undersigned (for purposes of this agreement, "immediate family" shall mean any relationship by blood, marriage or adoption, not more remote than first cousin), (iii) pursuant to a court order, qualified domestic order or in connection with a divorce settlement; *provided* that such shares remain subject to the terms of this agreement, and, in the case of clause (c)(iii) only, if the undersigned is required to file a report under Section 16(a) of the Exchange Act reporting a reduction in beneficial ownership of shares of Common Stock during the Restricted Period, the undersigned shall include a statement in such report to the effect that such transfer occurred by operation of law or pursuant to a court order, qualified domestic order or in connection with a divorce settlement, as applicable; *provided further*, that no other public announcement or filing related to such transfer shall be required or shall be voluntarily made during the Restricted Period;

(d) distributions of Securities to limited partners, members, nominees, stockholders or holders of similar equity interests in the undersigned not involving a disposition for value;

(e) transfers of Securities to a corporation, partnership, limited liability company, investment fund or other entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the undersigned, or is wholly owned by the undersigned and/or by members of the immediate family of the undersigned, or, in the case of an investment fund, that is managed by, or is under common management with, the undersigned (including, for the avoidance of doubt, a fund managed by the same manager or managing member or general partner or management company or by an entity

2

controlling, controlled by, or under common control with such manager or managing member or general partner or management company as the undersigned or who shares a common investment advisor with the undersigned); *provided* that if the undersigned is required to file a report under Section 16(a) of the Exchange Act during the Restricted Period, the undersigned shall include a statement in any such report regarding the circumstances of the transfer;

(f) transfers to the Company in connection with the exercise or settlement of stock options, restricted stock units or other equity awards pursuant to any plan or agreement granting such an award to an employee or other service provider of the Company or its affiliates, which plan or agreement is described in the registration statement and the Prospectus related to the Public Offering; *provided* that any remaining Common Stock received upon such exercise or settlement will be subject to the restrictions set forth in this agreement; and *provided further* if the undersigned is required to file a report under Section 16(a) of the Exchange Act during the Restricted Period, the undersigned shall include a statement in any such report to the effect that (i) such transfer is in connection with the vesting or settlement of restricted stock units or incentive units, or the "net" or "cashless" exercise of options or other rights to purchase shares of Common Stock, as applicable, and (ii) the transaction was only with the Company;

(g) dispositions to the Company upon exercise of the Company's right to repurchase or reacquire the undersigned's Securities in the event the undersigned ceases to provide services to the Company pursuant to agreements in effect on the date hereof, including without limitation the Company's Class B unit award agreements, which agreements are described in the registration statement and the Prospectus related to the Public Offering, that permit the Company to repurchase or reacquire, at cost, such securities upon termination of the undersigned's services to the Company or its affiliates; provided that any filing under Section 16(a) of the Exchange Act relating to such disposition shall clearly indicate in the footnotes thereto that the shares were repurchased or reacquired by the Company;

(h) transfers of shares of Common Stock pursuant to a bona fide third party tender offer, merger, consolidation or other similar transaction made to all holders of Common Stock involving a "change of control" (as defined below) of the Company that occurs after the consummation of the Public Offering, is open to all holders of the Company's capital stock and has been approved by the board of directors of the Company; *provided*, that if such change of control is not consummated, such shares shall remain subject to all of the restrictions set forth in this agreement (for the purposes of this clause (h), a "change of control" is defined as any bona fide third party tender offer, merger, consolidation or other similar transaction the result of which is that any "person" (as defined in Section 13(d)(3) of the Exchange Act), or group of persons, other than the Company, becomes or would become the beneficial owner (as defined in Rules 13d-3 and 13d-5 of the Exchange Act) of 50% or more of the total voting power of the voting stock of the Company) (or the surviving entity);

(i) if permitted by the Company's bylaws and any applicable laws, establishing a trading plan on behalf of a shareholder, officer or director of the Company pursuant to Rule 10b5-1

3

under the Exchange Act for the transfer of shares of Common Stock, *provided* that (i) such plan does not provide for the transfer of shares of Common Stock during the Restricted Period and (ii) to the extent a public announcement or filing under the Exchange Act, if any, is required of or voluntarily made by or on behalf of the undersigned or the Company regarding the establishment of such plan, such announcement or filing shall include a statement to the effect that no transfer of shares of Common Stock may be made under such plan during the Restricted Period;

(j) the transfer, conversion, reclassification, contribution, redemption or exchange of any Partnership Units or other securities of the Company pursuant to the organizational transactions (the "**Organizational Transactions**") described in the registration statement and the Prospectus related to the Public Offering; *provided* that any Securities and any securities convertible into or exercisable or exchangeable for Securities received in the organizational transactions remain subject to all the terms of this agreement; *provided further* that, to the extent a public announcement or filing under the Exchange Act, if any, is required of or voluntarily made by or on behalf of the undersigned or the Company regarding the transfer, conversion, reclassification, redemption or exchange, as applicable, such announcement or filing shall include a statement to the effect that such transfer, conversion, reclassification, contribution, redemption or exchange, as applicable, occurred pursuant to the Organizational Transactions and no transfer of shares of Common Stock or other securities received upon exchange may be made during the Restricted Period;

(k) pledges to any third-party pledgee in a *bona fide*, arm's length transaction, to the extent necessary for bona fide business purposes, as collateral to secure obligations pursuant to lending or other arrangements between such third parties (or their affiliates or designees) and the undersigned and/or its affiliates or any similar arrangement relating to a financing agreement for the benefit of the undersigned and/or its affiliates, *provided* that the terms of such pledge shall provide that the underlying Securities may not be transferred to the pledgee until the expiration of the Restricted Period; and

(l) to the extent the undersigned is named as a Selling Stockholder in the Underwriting Agreement, the transfer of the undersigned's Securities pursuant to the terms of the Underwriting Agreement to the Underwriters in connection with the public offering contemplated by the Underwriting Agreement.

*provided* that in the case of any gift, transfer, distribution or pledge pursuant to clause (b), (c), (d), (e) or (k), each donee, transferee, distributee or pledgee, as applicable, shall sign and deliver a lock up letter substantially in the form of this agreement; and provided, further, that in the case of any gift, transfer or distribution pursuant to clause (a), (b), (c)(i)-(ii), (d) or (k), no filing under Section 16(a) of the Exchange Act, reporting a reduction in beneficial ownership of shares of Common Stock or other Securities, shall be required or shall be voluntarily made during the Restricted Period, other than a filing on Form 5 made after the expiration of the Restricted Period.

In addition, the undersigned agrees that, without the prior written consent of Morgan Stanley and Goldman Sachs on behalf of the Underwriters, it will not, during the Restricted Period, make any demand for or exercise any right with respect to, the registration of any Securities or any security convertible into or exercisable or exchangeable for Securities. The undersigned also

4

agrees and consents to the entry of stop transfer instructions with the Company's transfer agent and registrar against the transfer of the undersigned's Securities except in compliance with the foregoing restrictions.

If the undersigned is an officer or director of the Company, the undersigned further agrees that the foregoing provisions shall be equally applicable to any issuer-directed Shares the undersigned may purchase in the Public Offering.

If the undersigned is an officer or director of the Company, (i) Morgan Stanley and Goldman Sachs agree that, at least three business days before the effective date of any release or waiver of the foregoing restrictions in connection with a transfer of shares of Common Stock, Morgan Stanley and Goldman Sachs will notify the Company of the impending release or waiver, and (ii) the Company will agree in the Underwriting Agreement to announce the impending release or waiver by press release through a major news service at least two business days before the effective date of the release or waiver.  Any release or waiver granted by Morgan Stanley and Goldman Sachs hereunder to any such officer or director of the Company shall only be effective two business days after the publication date of such press release.  The provisions of this paragraph will not apply if (a) the release or waiver is effected solely to permit a transfer not for consideration and (b) the transferee has agreed in writing to be bound by the same terms described in this agreement to the extent and for the duration that such terms remain in effect at the time of the transfer.

If, prior to the expiration of the Restricted Period, Morgan Stanley and Goldman Sachs consent at their discretion, on behalf of the Underwriters, to release any Securities held by any directors, officers, shareholders of 1.0% or more of the Securities of the Company from the restrictions of any lock-up arrangement similar to that set forth in this agreement and/or entered into in connection with the Public Offering (any such release being a "**Triggering Release**" and such party receiving such release being a "**Triggering Release Party**"), then a number of the undersigned's Securities subject to this agreement shall also be released from the restrictions set forth herein on a *pro rata* basis, such number of Securities being the total number of Securities held by the undersigned on the date of the Triggering Release that are subject to this agreement multiplied by a fraction, the numerator of which shall be the number of Securities released pursuant to the Triggering Release and the denominator of which shall be the total number of Securities held by the Triggering Release Party on such date.  Notwithstanding the foregoing, such Triggering Release shall not be applied (a) if the aggregate number of shares of  Common Stock affected by such discretionary release, waiver, or termination, in whole or in part, excluding any release pursuant to clause (b) below, is less than or equal to 1.0% of the fully-diluted capitalization of the Company as measured immediately prior to the consummation of the Public Offering; (b) with respect to any release granted to a director or officer of the Company due to financial hardship, in any amount and subject to such terms as may be determined by the Morgan Stanley and Goldman Sachs in their sole discretion; or (c) in the event of any primary or secondary public offering or sale of Common Stock that is underwritten (the "**Underwritten Sale**") during the Restricted Period in a transaction that complies with the terms of the Underwriting Agreement; *provided* that if the undersigned has a contractual right to demand or require the registration of the undersigned's Securities or otherwise "piggyback" on a registration statement filed by the Company for the offer and sale of its Securities, the undersigned is offered the opportunity to participate on a *pro rata* basis in the Underwritten Sale consistent with such contractual rights and the undersigned is

5

released from its lockup restrictions set forth herein to the extent of the undersigned's participation in such Underwritten Sale or such contractual rights are waived pursuant to the terms thereof.  In the event of a Triggering Release, the Company shall use commercially reasonable efforts to notify the undersigned within five business days of the occurrence of such Triggering Release, which notification obligation may be satisfied by the issuance of a press release through a major news service, or on a Form 8-K, announcing such Triggering Release; *provided* that the failure by the Company to give such notice shall not give rise to any claim or liability against the Company or Morgan Stanley and Goldman Sachs except, in respect of the Company, in the case of bad faith on the part of the Company.

The undersigned understands that the Company and the Underwriters are relying upon this agreement in proceeding toward consummation of the Public Offering.  The undersigned further understands that this agreement is irrevocable and shall be binding upon the undersigned's heirs, legal representatives, successors and assigns.

The undersigned acknowledges and agrees that the Underwriters have not provided any recommendation or investment advice nor have the Underwriters solicited any action from the undersigned with respect to the Public Offering of the Shares and the undersigned has consulted their own legal, accounting, financial, regulatory and tax advisors to the extent deemed appropriate. The undersigned further acknowledges and agrees that, although the Underwriters may provide certain Regulation Best Interest and Form CRS disclosures or other related documentation to the undersigned in connection with the Public Offering, the Underwriters are not making a recommendation to the undersigned to participate in the Public Offering or sell any Shares at the price determined in the Public Offering, and nothing set forth in such disclosures or documentation is intended to suggest that any Underwriter is making such a recommendation.

Whether or not the Public Offering actually occurs depends on a number of factors, including market conditions.  Any Public Offering will only be made pursuant to an Underwriting Agreement, the terms of which are subject to negotiation between the Company and the Underwriters.

Notwithstanding anything to the contrary contained herein, this agreement will automatically terminate and the undersigned will be released from all of his, her or its obligations hereunder upon the earliest to occur, if any, of (i) prior to the execution of the Underwriting Agreement, either the Company on the one hand, or Morgan Stanley and Goldman Sachs, together, on the other hand, advises the other in writing that it has determined not to proceed with the Public Offering, (ii) the withdrawal of the Registration Statement on Form S-1 related to the Public Offering, (iii) the Underwriting Agreement is executed but is terminated (other than the provisions thereof which survive termination) prior to payment for and delivery of the Common Stock to be sold thereunder, or (iv) August 1, 2021, in the event that the Underwriting Agreement has not been executed by such date; provided, however, that the Company may, by written notice to the undersigned prior to such date, extend such date for a period of up to three additional months.

This agreement may be executed and delivered via facsimile, electronic mail (including .pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com or www.echosign.com) or other transmission method and any counterpart so

delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

This agreement shall be governed by and construed in accordance with the laws of the State of New York.

Very truly yours,

**IF A NATURAL PERSON:**                          **IF AN ENTITY OR TRUST:**

Evan

_____                        _____
(please print full name)                          (please print complete name of entity)

_____                        _____
(duly authorized signature)

                                                _____
                                                (please print full name)

                                                _____
                                                (please print full title)

                                                Address:
                                                _____
                                                _____

_Signature Page to Lock-up Agreement_