N8o2NayA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

NIZAR S. NAYANI, individually
and on behalf of all others
similarly situated,

              Plaintiffs,          New York, N.Y.

        v.                22 Civ. 6833 (JSR)

LIFESTANCE HEALTH GROUP, INC.,
*et al.*,

              Defendants.

------------------------------x     Argument

                              August 24, 2023
                              4:00 p.m.

Before:

                   HON. JED S. RAKOFF,

                              District Judge

APPEARANCES

ROBBINS GELLER RUDMAN & DOWD, LLP
    Attorneys for Plaintiff
BY:  SAMUEL H. RUDMAN
    MICHAEL G. CAPECI

ROPES & GRAY, LLP
    Attorneys for Defendant LifeStance
BY:  DANIEL V. McCAUGHEY
    COLE A. GOODMAN

DAVIS POLK & WARDWELL, LLP
    Attorneys for Defendant Morgan Stanley & Co., LLC
BY:  ESTHER C. TOWNES

(Case called)

THE CLERK:  Will the parties please identify themselves for the record.

MR. RUDMAN:  Good afternoon, your Honor.  Samuel Rudman, from Robbins Geller Rudman & Dowd, for the plaintiffs.

MR. CAPECI:  Michael Capeci, from Robbins Geller, also on behalf of the plaintiffs.

THE COURT:  Good afternoon.

MR. McCAUGHEY:  Good afternoon, your Honor.  Dan McCaughey, from Ropes & Gray, here on behalf of the LifeStance defendants.

MR. GOODMAN:  Cole Goodman, Ropes & Gray, on behalf of the LifeStance defendants.

MS. TOWNES:  Good afternoon.  And Esther Townes, from Davis Polk, on behalf of the underwriters, your Honor.

THE COURT:  Good afternoon.

So we are here for argument on the plaintiffs' motion for class certification.  I read the papers.  As I read the papers—correct me if I am wrong—the parties are in agreement as to most of the requirements for class certification which, of course, isn't going to determine the issues of the merits but just whether the case qualifies for class certification.

But the main dispute is over, if you will, how long the class period.  So let me ask plaintiffs' counsel first, you say that you want to certify, quote, a class of all persons

N8o2NayA

other than defendants and their affiliates who purchased LifeStance common stock in and/or traceable to the company's initial public offering on or about June 10, 2021.

So, if taken on its face, that would mean if someone purchased those shares yesterday, notwithstanding that there has been full disclosure now of all of the alleged misrepresentations, but could show that it was traceable, that the stock that they purchased was ultimately traceable to the IPO, they would be included.  That can't be right.

MR. RUDMAN:  Correct, your Honor.  And in getting prepared for this argument -- first, let me tell you, obviously, I agree, the parties agree that a class should be certified.  The dispute is should there be an end date to the class period?

In getting prepared for the argument and considering things, we took a look at your decision in the *Petrobras* case for the bonds and would suggest that an appropriate end date here is the first financial statement that LifeStance issued that contained 12 months of audited financial results.  That's how you qualified --

THE COURT:  Okay.  And what's the date on that?

MR. RUDMAN:  It actually turns out to be around the day the complaint was filed, August 10, 2022.  It is a 10-Q for that second quarter of 2022.  I believe section 11 says 12 months following -- the 12 months following the effective date

of the registration statement, and that would put you 12 --
because the registration stock offering was in June of 2021,
that will give you the 12 months, and that would give you an
end date similar to what your Honor utilized in the *Petrobras*
case.

THE COURT:  Okay.  So we want to talk about
traceability in a minute, but let me go to defense counsel.
Putting aside for the moment——I know for the moment only——the
traceability issue, do you disagree that I should adopt the
date of August 10, 2022.  Even though you contend that
ultimately you will be able to show that there was full
disclosure before then, that seems to me to be a summary
judgment issue.  Then we can always cut back the scope of the
class.  But I'm not sure why I should reach that now.

MR. McCAUGHEY:  Sure.

Well, your Honor, we first do agree with the way that
you and Mr. Rudman framed the broader issue as to the existence
of a class.  But we do disagree with that date, and it is
because of the full disclosure issue.  On that point, I guess a
couple of things really quickly.  As we read the complaint,
there are three omissions that Mr. Nayani faults the company
for not including at the time of the IPO——it's the increase in
clinician retention, the impact on financial performance, and
then the fact that COVID was a cause of the increase -- or,
sorry, the decrease in retention.

THE COURT:  Right.  According to the plaintiffs, that was portrayed as the sole cause when, according to them, there were other causes as well.

MR. McCAUGHEY:  Well, I guess I would say a couple things.

I think, according to the plaintiffs—and I don't want to put words in Mr. Rudman's mouth—the company had actually made a disclosure that its business was having some success. Despite COVID, it was able to continue -- right, able to continue seeing patients remotely.  And I think the allegation is that it did not disclose that COVID was separately having a negative impact on clinician retention as I understand the allegation there.

THE COURT:  I thought -- hold on just a minute.  Let me take a look in my notes here.

MR. McCAUGHEY:  You might be going to the compensation issue, and that's --

THE COURT:  As I understand it, there was an analyst call or an earnings call on August 11, 2021 at which, according to the plaintiffs, a high-level officer of LifeStance disclaimed that the retention problems were company specific, saying instead they were, rather, a product of industry-wide dynamics arising from COVID.  And the argument is that there were additional problems, material problems that weren't related to COVID.  Compensation was one of them.  Compensation

N8o2NayA

discontent, if you will.  A second was something called credentialing delays.  Third was COVID.  And then also operational constraints specific to LifeStance resulting from the company's previous rapid expansion.

So they say they are all of those factors, and what do you say?  Are you saying that it's undisputed that all of those were addressed by disclosures subsequent to that earnings call?

MR. McCAUGHEY:  No, your Honor.  I guess we would say a couple of things.

One is, as we read the complaint, the nondisclosure of those underlying causes is not part of what the plaintiff faults the company for not disclosing.

He faults the company for not disclosing that there had been a material decline in retention, and that point was disclosed on the August earnings call.

He faults the company for not disclosing the impact that it was having on operational or financial performance. That was disclosed on the August earnings call.

And, again, he faults them for COVID being a reason that people were leaving, which they disclosed on the August earnings call.

So our position is the omissions that are described as omissions in the complaint were all addressed on the August earnings call.

N8o2NayA

THE COURT:  Okay.  So you say even if they fail to mention other causes, that is not what the plaintiffs are alleging was the material misstatements here.

MR. McCAUGHEY:  That's right, your Honor.  And to be sure, those are things that the plaintiffs have pointed to in their reply brief.  Those facts are referenced in the complaint as reasons for the increase in retention rate.  But as we read it, there is not an allegation that the company had an obligation to disclose the underlying reasons, only that it had to disclose the material decline in the retention --

THE COURT:  Let me go to plaintiffs.  Just on that point—then we are going to deal with traceability later—what about that?

MR. RUDMAN:  Your Honor asked is it undisputed.  It is not undisputed.  Obviously we dispute it.  There are no corrective disclosures, as that phrase is known in securities litigation, pled in the complaint.  So we don't have anything saying the truth was revealed, they disclosed, they have now finally said what happened.  They are simply statements that the company made about their business which are used to show what their knowledge was at the time of the IPO and when the market was made aware of certain facts.

THE COURT:  Let me pull out the complaint, the amended complaint.  Hold on.

So point me to where in the complaint you say that on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

or after August 11, though they made some disclosures, they still did not disclose what had to be disclosed or something along those lines.

MR. RUDMAN:  So first let's talk about the -- I can point your Honor to the paragraphs in the complaint, but I think this part will be undisputed.

With August 11, what the complaint alleges is that they disclosed that sometimes in May they saw an uptick in people leaving——in departures——and a decline in the retention rate.  And they were unable at that point in time to gauge the financial impact.  However, they were putting out guidance for 2021 that was lower than what people had anticipated.  But they couldn't tell what it was.  It was a conference call following that earnings release——we discussed it at the motion to dismiss hearing——where there were eight or nine questions asked.  Seven of them were about that.  Okay?  So there is no real definitive explanation as to why people were leaving and there is also no explanation as to what's the financial impact.

Then in November, if you go to paragraph 71, on November --

THE COURT:  Hang on just one second.

Okay.  "On November 8, 2021," I'm reading now from paragraph 71, "LifeStance held a conference call with security analysts and investors to discuss its quarterly financial results and operations for the period ending September 30, 2021

('the Q3 conference call').  During the Q3 conference call, defendant Lester admitted that the company had expected its clinician retention rate to decline by approximately 10 percent from the 87 percent retention rate represented in the registration statement and then stabilize at an 80 percent analyzed rate during the second half of 2021.  As far as retention rates, so as we said in our roadshow in 2020, we saw an 87 percent retention rate, and due to COVID we had indicated that we saw we had more clinicians leaving than we had seen historically in 2020, and so we felt like that was going to shake out around 80 percent.  We in fact have stabilized at around 80 percent.  During the quarter we had 400 technicians, stabilized clinician retention to 80 percent annualized aligned with our expectations, opened 29 *de novo* centers, and completed six acquisitions."

So then, this is paragraph 72, "Accordingly, the registration statement contained inaccurate statements of material fact and omitted known material facts necessary to make the statements contained therein not misleading as of the date it was declared effective by the SEC.  Once the defendants chose to use the registration statement to speak about clinician retention, they had a duty to ensure that registration spoke completely and truthfully, including about the increase in clinician resignations after March 31, 2021 and the adverse effects of the turnover on LifeStance's operations

so that the representations and the registration were not misleading as of the date it was declared effective by the SEC."

So I don't see where there you are saying --

MR. RUDMAN: Well --

THE COURT: -- anything about the issue we were just discussing here.

MR. RUDMAN: Well, no. They put more color on what happened with people leaving. They actually said how much -- remember, in August they didn't tell how much it had declined. Here they told you how much it had declined.

Also, if you look in paragraphs 114 to 1 --

THE COURT: But the point your adversary is making is, assuming for the sake of argument that they should have disclosed earlier that they expected a decline to 80 percent, now it is being disclosed.

MR. RUDMAN: Well, that's in November.

THE COURT: Yes.

MR. RUDMAN: Correct, correct.

THE COURT: So he is saying he wants to put the cutoff date in August, but let's just take November.

MR. RUDMAN: Well, your Honor, I don't think any of this, I think you mentioned it earlier in the argument, is actually appropriate on a motion for class certification.

THE COURT: Why not?

N8o2NayA

MR. RUDMAN:  Well, because we are getting into the merits.

THE COURT:  Yes.  Last I heard, the Supreme Court decided about 20 years ago that you could look at the merits in deciding class certification.

MR. RUDMAN:  Okay.  But we are not -- we don't have experts here telling us what these disclosures did to the price of the stock or whether they are complete and full, and I don't have a disclosure expert here telling you that this would have been additional material information.  We are kind of looking at things that are in a complaint and then drawing from that a conclusion that was a full disclosure, when the market might tell you something different.

THE COURT:  No, no.  The argument of your adversary is, according to him, the complaint says that what you failed to disclose was X and he says the cutoff should be, therefore, when X was disclosed.  And what he says the complaint says was X is the decline in the retention rate without reference to whether it was caused by A, B, or C.

MR. RUDMAN:  Right.  Well, we do argue in the complaint there were other reasons and they were lying about the reasons why they were losing clinicians and it wasn't company specific.

THE COURT:  That's where I wanted you to point me.

MR. RUDMAN:  That it wasn't company specific.  You

N8o2NayA

want the actual part of the registration statement that was false because of that?

THE COURT:  No, I want the place in the complaint where you say "and here's something they should have disclosed that they didn't."

MR. RUDMAN:  Okay.  Well, the complaint -- the central allegation in the complaint is that they were having problems with their clinicians because of three reasons; and, as a result, they were experiencing higher clinician leaving.

THE COURT:  I'm going to come back again.  It's a lengthy complaint, and I appreciate that I need to reread it again.  I have already read it in connection with the motion to dismiss.  But what I have specifically -- there is no doubt that the complaint alleges that there was a failure to disclose the actual decline in the retention rate.

MR. RUDMAN:  Correct.

THE COURT:  But what I am not seeing until you maybe point me to it, is where it says "and the reasons for that should have been disclosed and were not because all they said was that it was COVID and really there were other reasons."

MR. RUDMAN:  We don't allege that, your Honor.

THE COURT:  Okay.

MR. RUDMAN:  What we do allege is that the financial impact of it wasn't properly disclosed or stated.

THE COURT:  What do you mean by that?

N8o2NayA

MR. RUDMAN:  Well, what the financial impact was going to be to the company at the time of the IPO.

THE COURT:  As a result of the decline in the retention.

MR. RUDMAN:  Correct.  Now, the defendants say all of that was obvious in August because of the announcement.  And my response to that is, no, that was not obvious in August because in August -- putting aside whether I even need to plead any of this, but the August statement simply says we experienced an uptick.  It does not quantify it.  It puts out guidance for the end of 2021.  And then in the November announcement, they quantify it and they say what the percentage was, 87, and they expect it to go down 10 percent and then stabilize around 80.  They say, then, they were going to hit the lower end of the guidance they put out in August, and they put out reduced guidance for 2022 based on this problem, and they also put more information into the market in terms of the costs to dig themselves out of this hole.  So our argument is that the information about what was misrepresented or disclosed in the prospectus came out over time.

But I do want to urge the Court that we are getting into essentially what is a loss causation argument, and that is an affirmative defense that the defendants have.  When you came out on the bench, your Honor, you said, Why can't I just make the class period from the time of the IPO and then after we

discussed it to the 12 months, and deal with this in summary judgment?  And I would say that's the appropriate time to do this.  We have a complete factual record.  The defendants are free to come in here and say, listen, Judge, you need to cut this off in August, you need to cut this off in November. Here's my study showing people knew.  Here's the evidence that shows there was nothing more to be disclosed.

THE COURT:  But what they are saying is you still are cabined by your complaint, and it's an amended complaint at that.  And if you are saying now everything that needed to be disclosed to correct the misstatements that you alleged in the complaint were false or misleading, we, the defendants, they say, disclosed all that stuff by, and then there is a debate about when.

So on your view, when did they ultimately disclose everything that you say in your complaint was false or misleading, disclose the --

MR. RUDMAN:  I'm not sure yet because we haven't gone through discovery, and I don't know what the ultimate facts are.

THE COURT:  I'm just talking about -- all right.  So let's say --

MR. RUDMAN:  I mean, I --

THE COURT:  By the way, when you say you haven't gone through, there has been some discovery, has there not?

MR. RUDMAN:  Yes, your Honor.  There has been discovery, and I think some of that is in some of the papers that you have seen.

I don't want to misspeak.  I don't want to be misunderstood.  We didn't have to have any of this in the complaint.  The complaint simply could have said there was a registration statement, it failed to disclose the decline in clinician retention, and that's it.  We didn't have to have the August statement, the November statement.  None of that had to be in the complaint for you to sustain it, in my view.

THE COURT:  Well, but, no, what you have to have in the complaint is what were the statements that either were false or the statements that were misleading because they failed to disclose what needed to be disclosed to make them true.  And there you are bound by your complaint.

MR. RUDMAN:  That's correct.  But that's what I have said.  That's what's in the complaint.

But you are looking at these two dates.  There are 20 other dates or 30 other dates between August and the end of that 12 months that the stock goes down that could very well -- an expert could tell me are very well attributable to more information coming out about this problem or about problems, this clinician retention problem, and therefore are ascertainable or collectible under Section 11.  The damages are the price of the stock on the date the complaint was filed

against the offering price.  It's their burden, the defendant's burden, to say I think here that's $18 offering price, $7 in change on the date the first complaint was filed.  How much of that $11 is attributable to what we allege was misrepresented or omitted in the complaint.  That will be their burden --

THE COURT:  Okay.  I understand your argument.  Let me hear from defense counsel.

MR. McCAUGHEY:  Sure.

And, your Honor, briefly on the burden and the merits points, we obviously agree it is appropriate for the Court to look at the merits, and I would also mention in our view the plaintiffs are conflating to some extent our burden to make right on the evidence at trial to establish the affirmative defense that somebody knew about something about they don't have a claim.  But this is class certification, where it is the plaintiffs' burden to show by a preponderance of the evidence that this class is appropriate and meets the Rule 23 factors. We don't object to them resting on their complaint to do that, but we think it is essential for the Court to, as we have been discussing, look at the omissions they allege should have been included in the registration statement and look at when they are disclosed, and there are a number of courts that, when it is clear there is a single corrective disclosure, where all of the alleged omissions have later been revealed in the market, that it is appropriate, whether you call it ascertainability or

typicality, it is appropriate to cut the class off there because in the words of one of the courts, the claims of the plaintiff -- the claims of a shareholder who bought stock after they knew those three things are incongruous -- that's the word from the *Smart Technologies* case, they are incongruous with the lead plaintiff who claims that he needed to know all those things before he purchased the stock and that is essentially our position and then --

THE COURT:  Putting aside my view as a former English major that the word "incongruous" is probably not the right word, but I get the point.

Let's shift -- I'm sorry.

MR. McCAUGHEY:  There are just a couple of other specific points I would like to make.

One is I thought I heard Mr. Rudman say that on August 11 there was no explanation of the financial impact of clinician retention.  We very much disagree with that.  We think it is right in the complaint and it is in the public record.  So this is paragraph 106 of the complaint.  At the time of that earnings call, in addition to -- in addition to describing the increase in clinician retention, the company revised its guidance down, its earning guidance for the rest of the year and it specifically lowered its EBITDA projections in that call based on the decline in clinician retention.  So we disagree and, frankly, think it is undisputed that there was a

N8o2NayA

disclosure about the financial impact at the time of the August 11 call, and we don't think there is any allegation that suggests there was anything misleading about that.

THE COURT:  What about the possibility, which I sort of alluded to and plaintiffs have now picked up on, what would be wrong or inappropriate in my certifying a class that begins on the day of the initial public offering, again, putting aside traceability, and ends on, quote, a date to be determined at the time of the decision on summary judgment.

MR. McCAUGHEY:  Our view on that, your Honor, is that the plaintiffs have the burden at class certification to show typicality and to show ascertainability of a class.  Right? That comes from the cases we cited.  And it is appropriate to decide it now.  And it makes -- it's more fair to the defendant to give them notice of who is in the class, which I think isn't an appropriate decision to make at summary judgment, and to the other class members if it's undisputed from the allegations in the complaint that the allegedly omitted information was disclosed to cut the class period off then.

THE COURT:  All right.  Let's turn to traceability.

MR. McCAUGHEY:  Your Honor, I'm sorry to belabor this one.  There is one more point I wanted to make which is --

THE COURT:  Go ahead.

MR. McCAUGHEY:  -- you had alluded to the possibility of November 8, as opposed to August 11, which is the date we

would ask for.  And I think you are correct, the only difference between those is that the specific -- I don't think there is a dispute about this, the specific retention rate at that point had stabilized at 80 percent.  The company disclosed that on November 8.  And to be sure, that was not part of the August 11 disclosure.

Our position on that is that the complaint does not allege that there was an -- that the company had an obligation to disclose the specific retention rate.  It says that the company had an obligation to disclose that there was a material decline in the retention rate, and that was disclosed on August 11.  So on August 11 you have material decline in the retention rate that's disclosed, you have the impact on financials that's disclosed, and you have the fact that COVID was a cause and, again, sorry to belabor it, but we do think that's an important difference between August 11 versus November 8.

THE COURT:  I'm not totally sure I follow that argument.  So supposing on August 11 you know that the retention rate has at least declined materially to X, but all you say is it's materially declined and you don't say X until three months later, four months later, whatever.  You don't think a reasonable investor would want to know what you mean by material decline?  It could be 2 percent?  It could be 10 percent?  It could be 90 percent?  Why wouldn't that be highly material to an investor?

N8o2NayA

MR. McCAUGHEY:  Well, I guess a couple points, your Honor.

One is, if the company says here is what we think the financial impact of the decline in retention is and this is getting -- this next point is getting a little beyond what's in the briefing, but this is a company that was growing.  There are more clinicians every quarter than there had been the prior quarter.  So the company is growing a lot.  They disclose, okay, retention has become a problem, here's how much it's going to impact our revenue and our EBITDA for the remainder of the year.  I think that's what you care about as an investor, and I think that's sort of the critical point.  And --

THE COURT:  That is certainly one of the critical points, but supposing, and again this is not the facts of this case, but just to put it in a hypothetical, supposing the decision had been made in some hypothetical situation that, you know, we are having so much trouble with these darned doctors, we are not going to hire any more, it wouldn't be enough not to disclose that, to just say so far its had -- the fact that there has been a decline in the retention rate has led to such and such a financial impact, right?

MR. McCAUGHEY:  Well, I actually think in that scenario, so if you go back to what they announced on August 11, the results for the past quarter, which, by the way, they had met their numbers, notwithstanding the allegations about

the increases in turnover, and then they announced their going-forward guidance for the rest of the year. So the projected decrease in EBITDA was a going-forward projection. So I think that actually -- that your hypothetical might reinforce my point, because in your hypothetical the decline in EBITDA would be a heck of a lot bigger because it would hit the top line or the bottom line. So it is baked into those numbers and that is, we would suggest, what investors care about.

And just two more things. The point that I'm making really --

THE COURT:  The last point you wanted to make, you told me you were going to make a minute ago, has grown to two? This is an exponential --

MR. McCAUGHEY:  I'm sorry, your Honor. I guess it's a supplement.

THE COURT:  Go ahead.

MR. McCAUGHEY:  What I am getting at really comes from paragraph 69, where they say, "The registration statement negligently failed to disclose that the company's clinician rate had declined materially before the IPO." That was disclosed on August 11, right? It does not say the company failed to disclose the precise retention rate at the time of the IPO or in the August 11 earnings call, and that's why we think that that alleged omission was fully covered and that there is a single corrective disclosure here.

N8o2NayA

Thank you for the patience.  I appreciate it.

THE COURT:  Not at all.  It is good to hear from both sides.

Now let's turn to the traceability issue.  So let me ask plaintiffs' counsel, if we extend the class period to your proposed state of August 10, 2022, how would one determine who purchased shares connected to the IPO and who purchased other shares for those persons who purchased after December 21, 2021?

MR. RUDMAN:  Okay.  Well, there are two things.

The first thing is your question, your Honor, presupposes those shares actually were deposited at the DTC, and all of the materials that the defendants submitted are actually hearsay because they are e-mails between people who aren't here with people who also aren't here, and they are records from the DTC that haven't been authenticated.  I'm not doubting that they are what they claim to be, but they are not actually proper evidence.  It's actually hearsay.

THE COURT:  If you aren't doubting it, though, why can't I consider it?  That sounds like a waiver of the hearsay --

MR. RUDMAN:  Well, I'm not going to waive it.  I think our first argument is you can't -- I think our brief says you can't consider it.

THE COURT:  Okay.

MR. RUDMAN:   Let's say --

N8o2NayA

THE COURT:  There is nothing to stop me, is there, if that were to be important to the determination of the cutoff date, from holding an evidentiary hearing as part of this motion to determine that.

MR. RUDMAN:  That's right.

THE COURT:  Okay.

MR. RUDMAN:  But let's say -- I think I didn't speak clearly, right, and inadvertently waived something I didn't mean to waive, but let's assume --

THE COURT:  Let's assume *arguendo* that because of your hearsay objection I hold an evidentiary hearing and lo and behold it turns out that all this stuff was accurate.  Then how do we know that someone who purchased shares after that date was -- are traceable to the initial public offering?

MR. RUDMAN:  Here's my answer to that question, because I think it's roughly 40,000 shares or 41,000 shares?

(Counsel confer)

MR. RUDMAN:  242,000 shares.  It represented .5 percent --

THE COURT:  It's a small amount.

MR. RUDMAN:  -- of the float.

What's the standard of proof in a civil case, your Honor?  Anyone who bought stock after that, there is a 99.5 percent chance they bought a share registered in the offering. Why does -- what authority is it that says if a single share

N8o2NayA

enters, the bad guys -- and by that I'm not saying -- the defendants get off or the case gets limited?  Isn't it if I can show it?  What the Supreme Court said in *Slack* was you've got to plead tracing and prove it.  Can't I prove it with 51 percent --

THE COURT:  So what you are saying is the purchaser probably has no idea --

MR. RUDMAN:  Correct.

THE COURT:  -- whether the shares came from this group or that group, but statistically it is much more likely than not that it came from the IPO shares.

MR. RUDMAN:  Right.  Well, without getting too technical, your Honor, the shares go in -- as I think you know, the shares go into a big pot at the DTC——some of this is mentioned in the defendant's papers——and they just get labeled when they get traded with different brokerage firms, okay?  So it's very hard to figure out how or what -- we have done some tracing in other cases, and it can be done.  But my point would be if it's only .5 percent, what is the appropriate standard?

THE COURT:  Well, that's a good question.  What do you say the appropriate standard is?

MR. RUDMAN:  I say 51 percent because that's what I need in a civil case to win.  Well, maybe.  I don't know.  If I was to come in here, a single plaintiff to come in and say I bought stock in February and all we had was that 241,000

shares, he put a statistician up there to tell the jury there is a 99.5 percent Mr. so-and-so bought stock that was registered in the offering, that would be sufficient for them to rule he bought stock traceable to the IPO, wouldn't it?

THE COURT: All right. So you make two arguments. I don't think that it's obvious to me that 51 percent would be the amount, but we were saying I don't have to reach that question because --

MR. RUDMAN: No. You can just say 99 1/2 percent is probably good enough.

THE COURT: Let me go to defense counsel.

MR. McCAUGHEY: Thank you, your Honor.

With respect to the point Mr. Rudman was just making about the ability for there to be an individualized hearing as to every single member of the class, to be sure, he has litigated more class actions than I have, but I kind of thought the point of the class action was that you did not have to do that. And the point of the typicality requirement is you have to be able to tell that the people who were included in the class definition that their shares -- I'm sorry, the traceability requirements, that their shares are traceable to the registration statement. So I'm not sure the percent necessarily matters. I don't think there is a percent that's established in the cases.

THE COURT: What about doesn't that lead to the result

N8o2NayA

the plaintiff just said that if even one share was added to the pile so to speak at a later date, the whole class certification falls apart?  That can't be right.

MR. McCAUGHEY:  Well --

THE COURT:  Ascertainability isn't even in the statute.  It is a judicially created gloss on the statute.  It is Second Circuit law.  Not, by the way, the law in every circuit.  I am hoping one day the Supreme Court will resolve that split.  But in any event, I'm bound by Second Circuit law.

But why shouldn't the standard not be, for example, ascertainability as a practical matter and, therefore, as a practical matter, the odds are overwhelming that you purchased shares that were traceable to the IPO.  The fact that theoretically a few people might not have purchased shares that were traceable to the IPO is not a matter to derail a class action.

MR. McCAUGHEY:  Well, I guess a couple things.

I don't think it would derail a class action because there would still be a class that consisted of individuals that purchased over, in this case—doing the math in my head—June to December, a 12-month period, so I don't think it would derail the class action.  And actually the way that the lockup works means for a set period of time none of those shares can come into the market.  This is an aside and not related to this question, but obviously it becomes a secondary issue if the

N8o2NayA

Court were to cut off the class when the --

THE COURT:  Well, but under your theory, then, that's the only cutoff would be the one-year cutoff.  If any shares were added after that time, even if there were ten shares or two shares --

MR. McCAUGHEY:  I agree with you that the one share example would be an extreme result, but I'm not sure that there is a standard as to the threshold of the -- you know, the percentage threshold.  I would note in the *Honest Company* case that we cite in our briefs, it was only 6,000 shares that entered the market, and the Court held that that defeated -- it raised issues of I believe it was under the elements of predominance and commonality, because then you would have to go litigate.  And by the way, the defendants would be entitled to litigate whether those people's shares were traceable to the IPO.  And that would create a massive inefficiency that's at odds with the purposes of the class action.

THE COURT:  All right.  So it's a very interesting issue and one I think is not totally resolved by existing case law, which are my favorite kinds of issues.  But I will undertake to resolve that and all the other issues we discussed.

Remind me, because I didn't bring the case management plan with me, what's the schedule for summary judgment

MR. CAPECI:  Your Honor, the defendants -- or the

N8o2NayA

parties can move on October 12, oppositions are October 26, replies November 9.

THE COURT: All right. So I will resolve this motion at least by bottom line order——I may not be able to give you a full opinion——by no later than -- let's see. My law clerk's only been working 23 hours a day, so he is really sluffing off. But let's see. What day of the week, Linda, is September 15?

THE DEPUTY CLERK: September 15 is a Friday.

THE COURT: Okay. So we will get you at least a bottom line order.

Now, I'm reserving the possibility that the bottom line order may say that the cutoff date will be determined after summary judgment. So that's still on the table. But, in any event, you will know where you stand so you can go forward with your summary judgment papers.

THE CLERK: It doesn't matter that you are in Bangladesh?

THE COURT: It doesn't matter that I am in Bangladesh. Last time I checked, the e-mails run from here to there.

Very good. Anything else we need to take up today?

MR. RUDMAN: Nothing from the plaintiffs, your Honor.

MR. McCAUGHEY: Nothing from us, your Honor. Thank you for the time.

THE COURT: Thank you.

oOo