UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NIZAR S. NAYANI, Individually and on Behalf of All Others Similarly Situated,

    Plaintiff,

-v-

LIFESTANCE HEALTH GROUP, INC., MICHAEL K. LESTER, J. MICHAEL BRUFF, ROBERT BESSLER, DARREN BLACK, JEFFREY CRISAN, WILLIAM MILLER, JEFFREY RHODES, ERIC SHUEY, KATHERINE WOOD, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, JEFFERIES LLC, TPG CAPITAL BD, LLC, UBS SECURITIES LLC, and WILLIAM BLAIR & COMPANY, L.L.C.,

    Defendants.

22-cv-6833 (JSR)

OPINION AND ORDER

---

JED S. RAKOFF, U.S.D.J.:

    Lead Plaintiff Nizar Nayani filed this putative class action against defendants LifeStance Health Group, Inc. ("LifeStance"), a firm that provides mental health services; nine of LifeStance's officers and directors (the "Individual Defendants"); and seven underwriters of LifeStance's initial public offering ("IPO"). The First Amended Complaint ("FAC") alleges that LifeStance filed a materially inaccurate registration statement (the "Registration Statement") in preparation for its IPO and seeks damages under Sections 11 and 15 of the Securities Act. The Court denied defendants' motion to dismiss the FAC by "bottom-line order" on

1

April 10, 2023, ECF No. 52, and issued an opinion reconfirming and explaining the reasoning for that ruling on May 4, 2023, ECF No. 60.

On June 2, 2023, Nayani moved to certify "a class of all persons, other than Defendants and their affiliates, who purchased LifeStance common stock in and/or traceable to the Company's initial public offering ('IPO') on or about June 10, 2021," to appoint Nayani as class representative, and to appoint his chosen counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), as class counsel. ECF No. 63 ("Mot."), at 1. Defendants did not challenge the propriety of certifying a class or appointing Nayani and Robbins Geller as, respectively, class representative and class counsel. Rather, defendants argued only that the class period should end on August 11, 2021, the date on which they argue that LifeStance issued a completely corrective disclosure of the allegedly misleading statements, or, in the alternative, before December 21, 2021, when over 200,000 non-IPO shares entered the market. See ECF No. 67 ("Opp."), at 2-3.

After considering the parties' full briefing and oral argument, the Court, on September 7, 2023, issued a "bottom-line order" granting the motion, but limiting the class to those who purchased LifeStance common stock no later than November 8, 2021. ECF No. 80. The Court now reconfirms and explains the reasoning for that ruling.

2

I.  Factual Background

LifeStance provides clinical mental health services throughout the United States. FAC ¶ 21. In 2021, LifeStance's then-owners decided to take it public. On May 17, 2021, in preparation for LifeStance's IPO, LifeStance filed a Registration Statement on S.E.C. Form S-1, which became effective on June 9, 2021. Id. ¶¶ 25-26.

As the Registration Statement itself noted, LifeStance's retention of its clinicians was central to its success. Id. ¶ 28. The Registration Statement claimed that LifeStance had performed remarkably well on this metric, indicating that LifeStance retained physicians at a rate of 87% between March 2017 and December 31, 2020, significantly above the industry average of 77%. Id. ¶ 68.

By May 2021, however, LifeStance began to experience -- and recognize -- a meaningful decrease in clinician retention. Id. ¶ 57. Although LifeStance's high-level management allegedly discussed the downward shift in clinician retention, the company failed to disclose that shift in the Registration Statement. Id. ¶ 69.

LifeStance went public on June 10, 2021, at an initial price of $18.00 per share. Id. ¶ 27. On August 11, 2021, LifeStance disclosed its financial results for the second quarter of 2021 and revised its financial projections for the second half of 2021. Id.

¶¶ 97-111. Specifically, LifeStance revised its expected profit margin for the second half of 2021 downwards by between 7.4% and 9.5% and its EBITDA by between 25.9% and 33.2%, attributing these declines to its struggles with clinician retention. Id. ¶ 107. On this news, LifeStance's stock declined by 46%, eliminating more than $2.5 billion of market value. Id. ¶ 109.

On November 8, 2021, LifeStance reported its financial results for the third quarter of 2021 and further refined its financial projections for the remainder of the year. Id. ¶¶ 114-115. LifeStance's press release on that date stated that, as it had expected, its clinician retention rate had stabilized to roughly 80%, rather than the 87.5% rate it had touted in the Registration Statement. Id. ¶¶ 114, 117. The share price again declined sharply, though not as dramatically as it did on August 11. Id. ¶ 109.

> The FAC asserts two claims:
> (1) That all defendants violated section 11 of the Securities Act by filing a registration statement that was materially inaccurate;
> (2) That the Individual Defendants violated section 15 of the Securities Act because (a) they were directly responsible for LifeStance as its controlling persons and (b) LifeStance violated section 11.

II. <u>Legal Standard</u>

4

"[A] party seeking to maintain a class action must affirmatively demonstrate his compliance with [Federal] Rule [of Civil Procedure] 23."[1] Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013). The lead plaintiff in a putative class action must thus "prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)." Id. (emphasis omitted). In addition, the lead plaintiff must show that at least one of the subparagraphs of Rule 23(b) is satisfied. In this case, Nayani seeks to proceed under Rule 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Rule 23 also "contains an implicit threshold requirement that the members of a proposed class be readily identifiable, often characterized as an ascertainability requirement."[2] In re Petrobras

---

[1] Here and elsewhere, internal citations and quotation marks are omitted unless otherwise indicated.

[2] The precise source of that "implicit threshold requirement" continues to be the subject of debate. In re Petrobras, 862 F.3d at 264; see 1 Newberg and Rubenstein on Class Actions § 3:2 (6th ed 2023). The Second Circuit has explained that "the ascertainability requirement merely gives name to a particularly vexing type of class defect that would cause a proposed class to founder on the shoals of predominance, superiority, or both." Id.

5

Sec. Litig., 862 F.3d 250, 264 (2d Cir. 2017). Ascertainability "requires only that a class be defined using objective criteria that establish a membership with definite boundaries." Id.

"[A] court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). "In appointing class counsel, the court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Rule 23(g)(1)(A). "Class counsel must fairly and adequately represent the interests of the class." Rule 23(g)(4).

III. Discussion

Defendants do not dispute that the Court should certify a class of those who purchased LifeStance common stock traceable to the company's IPO. See Opp. at 1-3. Indeed, Nayani has shown that the proposed class "meets the numerosity threshold because it consists of likely thousands of geographically dispersed investors"; each of the class members' claims raise "common

---

at 269 n.20. Understood in that light, "[a]scertainability provides a guiding principle for the otherwise murky analysis of classes that, though ostensibly defined by objective criteria, nonetheless present fatal challenges of determinability." Id.

questions of law and fact -- most notably, whether the Registration Statement contained materially untrue or misleading statements or omissions"; "Nayani's claims are typical of those of the Class, as he acquired his LifeStance common stock pursuant or traceable to the IPO, and brings claims based on the same facts and legal theories arising from the Registration Statement's [allegedly] untrue and misleading statements and omissions"; and "Nayani is adequate to serve as the Class Representative because his interests in maximizing any recovery are firmly aligned with those of the proposed Class." Mot. at 2-3. Nayani thus satisfies the requirements of Rule 23(a).

Setting aside for the moment any issues stemming from the length of the class period, Nayani has also met the predominance and superiority requirements of Rule 23(b)(3). The common class-wide issues of whether the Registration Statement contained any misleading misstatements or omissions, and whether any such misstatements or omissions were material, "are central to claims under sections 11 and [15]" of the Securities Act and "predominate over any individual questions." In re Deutsche Bank AG Sec. Litig., 328 F.R.D. 71, 86 (S.D.N.Y. 2018). A class action is superior because "the alleged securities violations implicate[] economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible." Id. A class action will thus "achieve

significant economies of time, effort and expense, and promote uniformity of decision." In re Foodservice Inc. Pricing Litig., 729 F.3d 108, 130 (2d Cir. 2013).

The sole disputed issue is when the class period should end. Nayani's motion for class certification specified no date at all. At oral argument, however, Nayani proposed an end date of August 10, 2022, which is the date of "the first financial statement that LifeStance issued that contained 12 months of audited financial results." ECF No. 78 ("Transcript"), at 3.[3]

Defendants primarily argue for an end date of August 11, 2021, when LifeStance first disclosed its downward shift in clinician retention and attributed the decline to COVID-19. In defendants' telling, "the August 11 Disclosures revealed all material facts underlying Plaintiff's claims." Opp. at 10. If so, any investors who purchased after that date had actual knowledge of the data that Nayani alleges should have been included in the Registration Statement. As a result, those investors would be subject to the statutory affirmative defense "that at the time of such acquisition

---

[3] Section 11 provides that if a plaintiff "acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery . . . shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission." 15 U.S.C. § 77k(a).

8

[they] knew of such untruth or omission." 15 U.S.C. § 77k(a); see In re Initial Pub. Offering Sec. Litig., 483 F.3d 70, 73 n.1 (2d Cir. 2007).

If defendants' premise -- that the August 11, 2021 disclosures fully revealed the material misstatements or omissions from the Registration Statement -- were correct, defendants would be right that the class period should end on that date. In a class action under the federal securities laws involving a misstatement or omission, "courts are required to cut off the class period on the date of a statement or event that cures the market." Pirnik v. Fiat Chrysler Auto., N.V., 327 F.R.D. 38, 48 (S.D.N.Y. 2018). "That is, the class period ends on the date when the full truth has been disclosed to the market." Id.

Nayani does not contest as much. Instead, Nayani argues that the August 11 disclosures did not reveal "the full truth," id., because they contained an incomplete and itself misleading account of the reasons for LifeStance's faltering clinician retention. Nayani's reply brief points to the FAC's allegation that the "increase in clinician resignation in the weeks before the IPO was primarily attributable to three factors: (1) compensation discontentment; (2) credentialing delays; and (3) COVID-19 fatigue." FAC ¶ 33. Because the August 11 disclosures attributed LifeStance's developing clinician retention problems only to COVID-19, Nayani contends that those who invested after that date

still "would have no idea that the Company's compensation system was contributing to and perpetuating the problem of turnover." ECF No. 73 ("Reply"), at 6.

The Court agrees with Nayani that because the August 11 statements served as "merely a partial disclosure," defendants' "alleged misrepresentations and/or omissions continued to injure investors after this date." Shapiro v. TG Therapeutics, Inc., 2022 WL 16555585, at *4 (S.D.N.Y. Oct. 31, 2022). But the Court disagrees with Nayani's explanation, in his reply brief, of why that is so. Although the FAC mentions "compensation discontentment" and "credentialing delays" as additional factors that contributed to the drop in clinician retention, FAC ¶ 33, nowhere does it allege that a discussion of those factors was a material omission from the Registration Statement.

Rather, what the FAC repeatedly emphasizes as the material misstatements and omissions are 1) LifeStance's drop in clinician retention, 2) the resulting financial impact, and 3) the role of COVID-19. See id. ¶¶ 49 (heading states "LifeStance Knew About the Increase[d] Clinician Turnover Before the IPO and that It Was Reasonably Likely to Have a Material Adverse Effect on Its Financial Performance"), 56, 58-59, 63, 65-66, 68-74, 79, 90, 92, 98-100, 108. Indeed, at oral argument, Nayani's counsel specifically disclaimed any allegation that the Registration Statement needed to disclose the reasons, other than COVID-19, for

10

LifeStance's clinician retention problems. Transcript at 12 ("We don't allege that."). The failure of the August 11 disclosures to mention those other reasons is thus not why they were "merely . . . partial disclosure[s]." Shapiro, 2022 WL 16555585, at *4.

Nevertheless, defendants cannot rely on the FAC's allegations to argue that the August 11 disclosures completely corrected the Registration Statement's material misstatements or omissions. The FAC alleges that the August 11 disclosures described a "recent uptick in clinician turnover at LifeStance" that was "very clearly tied to" COVID-19, and that the disclosures provided revised estimates for "two key financial performance measures" in light of that uptick. FAC ¶¶ 50-51. But it does not allege that LifeStance disclosed the specific decrease in clinician retention rate, or that LifeStance provided an expected rate at which clinician retention would eventually stabilize, on August 11. See id. ¶¶ 49-66.

This matters because the FAC clearly alleges that LifeStance's clinician retention rate was material. Indeed, the Registration Statement itself touted that, between March 17 and the end of 2020, LifeStance had "a clinician retention rate of over 87% compared to the industry average of 77%." Id. ¶ 68; see id. ¶ 69 ("[S]uch statements repeatedly highlighted a better-than-average clinician turnover rate at LifeStance by distinguishing the Company's 87% physician retention rate from the 77% industry

11

average."). The Registration Statement also proclaimed that LifeStance's "ability to attract and retain quality clinicians" was a "principal competitive factor" for it. Id. ¶ 99. Moreover, LifeStance's CEO at the time of its IPO described its "number of clinicians" as its "unit economic." Id. ¶ 100.

According to the FAC, it was not until November 8, 2021 that LifeStance quantified its decline in clinician retention and stated the expected rate at which clinician retention would stabilize. On that date, LifeStance "admitted that the Company had expected its clinician retention rate to decline by approximately 10% from the 87% retention rate represented in the Registration Statement, and then stabilize at an 80% annualized rate during the second half of 2021." Id. ¶ 71 (emphasis omitted). Moreover, LifeStance reported that its clinician retention rate had in fact "stabilized to approximately 80% annualized in the third quarter." Id. ¶ 114. Defendants were then "peppered with questions regarding . . . the 80% annualized retention figure." Id. ¶ 117.

Defendants acknowledged at oral argument that LifeStance provided such disclosures on November 8, but not August 11.[4]

---

[4] Defendants contest that LifeStance's specific clinician retention rate is material. But as the Court explained in its opinion denying defendants' motion to dismiss, "materiality is rarely a basis for dismissal on the pleadings." ECF No. 60, at 8 (quoting In re Petrobras Sec. Litig., 116 F. Supp. 3d 368, 378 (S.D.N.Y. 2015)). By the same token, there is no requirement to prove materiality "before class certification." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 276 (2014).

Transcript at 19 (defense counsel stated, "[T]he specific retention rate at that point had stabilized at 80 percent. The company disclosed that on November 8. And to be sure, that was not part of the August 11 disclosure.").

The Court thus selects November 8, 2021 as the end date for the class period. By that date, LifeStance had made complete disclosures of each of the Registration Statement's misstatements or omissions that the FAC alleges were material. Nayani asserts that "[t]here are 20 other dates or 30 other dates between August [2021 and August 2022]" that an expert could determine are "attributable to more information coming out about . . . this clinician retention problem." Transcript at 15. But that hypothetical assertion does not satisfy Nayani's burden to demonstrate "by at least a preponderance of the evidence" that his proposed class, including the class period, meets the requirements of Rule 23. Brown v. Kelly, 609 F.3d 467, 476 (2d Cir. 2010). Given the timeline of LifeStance's disclosures, Nayani has not met that burden for investors who purchased LifeStance common stock after November 8, 2021.[5]

---

[5] The Court's decision is based on the current, still developing, record. "[W]hen the record warrants, it is appropriate for a district court to modify a proposed class period based on clear, unambiguous disclosures." In re SunEdison, Inc. Sec. Litig., 329 F.R.D. 124, 135 (S.D.N.Y. 2019). Indeed, "even after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation." M.G. v. N.Y.C. Dep't of Educ., 162 F. Supp. 3d 216, 231-32 (S.D.N.Y. 2016).

Defendants argue that, in the alternative, the class period should end on December 21, 2021, when more than 200,000 non-IPO shares entered the market. "To bring a claim under [sections 11 and 15 of the Securities Act], the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading." Slack Techs., LLC v. Pirani, 598 U.S. 759, 768 (2023). That requirement is not satisfied if a plaintiff instead "purchased unregistered shares unconnected to the registration statement and its representations about the firm's business and financial health." Id. at 765.

Defendants contend that there are no "objective criteria that establish" whether a share purchased after December 21, 2021 is traceable to the Registration Statement. In re Petrobras, 862 F.3d at 264. As a result, including potential plaintiffs who invested after that date "in the proposed class would cause individual issues to predominate over class-wide issues." Opp. at 3. Put differently, a class extending beyond December 21, 2021 may not be ascertainable. Such a question raises an interesting legal issue that is worthy of further analysis when it is squarely presented. That said, the Court need not reach it here. The class period ends on November 8, 2021, which is of course before December 21, 2021.

Finally, defendants raise no challenge to appointing Nayani as class representative and appointing Nayani's chosen counsel, Robbins Geller, as class counsel. The Court agrees that Nayani and

Robbins Geller have "actively and diligently prosecuted this action on behalf of the proposed Class." Mot. at 3. As the Court stated in its opinion appointing Nayani as Lead Plaintiff, "Nayani has demonstrated a willingness and ability to supervise counsel on behalf of the class" and Robbins Geller is a "well-known player in securities class actions." ECF No. 40, at 12-13. The Court thus appoints Nayani as class representative and appoints Robbins Geller as class counsel.

IV. Conclusion

The Court certifies a class of all persons, other than defendants and their affiliates, who purchased LifeStance common stock in and/or traceable to LifeStance's IPO, which took place on or about June 10, 2021, provided that such persons purchased LifeStance common stock no later than November 8, 2021. The Court appoints Lead Plaintiff Nizar Nayani as class representative and appoints Robbins Geller as class counsel.

SO ORDERED.

New York, NY
September 28, 2023

_____
JED S. RAKOFF, U.S.D.J