UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

NIZAR S. NAYANI, Individually and on
Behalf of All Others Similarly Situated,

                      Plaintiff,

    vs.

LIFESTANCE HEALTH GROUP, INC.,
MICHAEL K. LESTER, J. MICHAEL
BRUFF, ROBERT BESSLER, DARREN
BLACK, JEFFREY CRISAN, WILLIAM
MILLER, JEFFREY RHODES, ERIC
SHUEY, KATHERINE WOOD, MORGAN
STANLEY & CO. LLC, GOLDMAN SACHS
& CO. LLC, J.P. MORGAN SECURITIES
LLC, JEFFERIES LLC, TPG CAPITAL BD,
LLC, UBS SECURITIES LLC, and WILLIAM
BLAIR & COMPANY, L.L.C.,

                      Defendants.

———————————————————————— x

:  Civil Action No. 1:22-cv-06833-JSR

:  CLASS ACTION

:  DECLARATION OF MICHAEL G. CAPECI
   IN SUPPORT OF: (1) LEAD PLAINTIFF'S
   MOTION FOR FINAL APPROVAL OF
   CLASS ACTION SETTLEMENT AND
   APPROVAL OF PLAN OF ALLOCATION;
   AND (2) LEAD COUNSEL'S MOTION FOR
   AN AWARD OF ATTORNEYS' FEES AND
   EXPENSES AND AN AWARD TO LEAD
   PLAINTIFF PURSUANT TO 15 U.S.C. §77z-
   1(a)(4)

I, MICHAEL G. CAPECI, am an attorney duly licensed to practice law in the State of New York and am admitted to practice in this Court and declare as follows:

1.      I am a partner of Robbins Geller Rudman & Dowd LLP ("Robbins Geller or "Lead Counsel"), counsel for Lead Plaintiff Nizar S. Nayani ("Lead Plaintiff" or "Nayani") and the Class in the above-captioned action (the "Action").[1]  I have been actively involved in all material aspects of the prosecution and resolution of this Action, and have personal knowledge of the matters set forth herein.

2.      I respectfully submit this declaration in support of Lead Plaintiff's motion for final approval of the all-cash settlement of $50,000,000 (the "Settlement Amount") and the proposed Plan of Allocation and Lead Counsel's application for an award of attorneys' fees and expenses and an award to Lead Plaintiff pursuant to 15 U.S.C. §77z-1(a)(4) in connection with Nayani's representation of the Class.

## I.      PRELIMINARY STATEMENT

3.      This Settlement is the product of an efficient litigation strategy executed from the commencement of this Action on August 10, 2022 until October 13, 2023, when the Settlement was reached.   The Settlement was achieved after an all-day mediation session and subsequent negotiations, and only after Lead Counsel, *inter alia*, (i) successfully opposed Defendants' motion to dismiss; (ii) completed class certification discovery, including a deposition of Nayani; (iii) successfully moved for certification of the Class; (iv) engaged in extensive document discovery that involved the production of over 145,000 documents (comprising approximately 796,000 pages)

---

[1]      Capitalized terms not defined herein have the meaning ascribed to them in the Stipulation of Settlement, dated October 13, 2023 (ECF 84-1) (the "Stipulation").

4892-4333-7110.v1

by Defendants and third parties; (v) took four depositions of current LifeStance employees; and (vi) retained, consulted with, and served reports on behalf of three experts.

4.      The Settlement takes into consideration the significant risks specific to this Action, including, for example, the risk that the Court would render an adverse decision on Defendants' likely motion for summary judgment.  Furthermore, the Settlement is the result of arm's-length negotiations between the parties facilitated by mediator Hon. Layn R. Phillips (Ret.) of Phillips ADR.  These negotiations were conducted by experienced counsel with an understanding of the strengths and potential weaknesses of the claims and defenses, and the Settlement was reached after each side had an opportunity to reflect on the negotiations at the mediation and deliberate further.

5.      The Settlement provides a significant recovery to the Class, given the nature of the allegations and the size of investors' estimated losses.  As set forth below, despite the fact that many of these allegations were independently supported, numerous uncertainties remained in the case, especially given that at the time the parties reached a settlement in principle, fact discovery had not yet been completed.

6.      The operative complaint is the Amended Complaint for Violations of Federal Securities Laws, dated December 19, 2022 (ECF 45) ("Amended Complaint").  The gravamen of the Amended Complaint is that, in connection with LifeStance's initial public offering ("IPO") on or about June 10, 2021, Defendants allegedly made several false and misleading statements and/or omissions in the IPO Registration Statement in violation of §§11 and 15 of the Securities Act of 1933 ("Securities Act").

7.      Specifically, the Amended Complaint alleges that Defendants made materially false and misleading statements and/or omitted material facts about the Company's clinician retention rate.  Despite the Registration Statement claiming "a clinician retention rate of over 87% compared

- 2 -

to the industry average of 77%[,]" the Amended Complaint alleged, based in part on Defendants' own admissions, that the retention rate had materially declined in the months leading up to the IPO.

8.      In opting to settle the Action now, Lead Plaintiff and Lead Counsel thoughtfully considered the risks of proving the claims alleged in the Amended Complaint.  For example, it was Defendants' position that clinician retention was not considered to be a key indicator of LifeStance's performance, and that a recent uptick in turnover was therefore not material, particularly in light of the risk disclosures contained in the Registration Statement and the fact that LifeStance met its financial targets when the Company began making disclosures about the decreased clinician retention rate.  Additionally, Defendants argue that a number of confounding factors contributed to the decline in LifeStance's stock following the IPO, which if accepted by the Court or jury would substantially limit the amount of damages Lead Plaintiff can recover under the Securities Act. Although Lead Plaintiff disputed (and continues to dispute) those assertions, it was clear that Defendants would attempt to marshal evidence in support of these arguments as the Action progressed, including possibly at summary judgment and at trial.

9.      In addition, Lead Plaintiff and Lead Counsel weighed the documents and information they believed supported the allegations against the other documents and information that could be used to undercut those allegations.  Indeed, the parties disagreed on the importance of much of the evidence in this Action – including the evidence the parties utilized at the mediation – and there is no way to predict which interpretations or inferences a jury would accept.  On balance, considering all of the circumstances and risks both sides faced if this Action progressed further, both Lead Plaintiff (for himself and the Class) and Defendants concluded that settlement on the terms agreed upon was in their respective best interests.

4892-4333-7110.v1

10.     To date, Lead Counsel has prosecuted this Action on a wholly contingent basis and has advanced and incurred substantial, albeit reasonably incurred, litigation expenses.  In doing so, Lead Counsel shouldered the substantial risk of an unfavorable result in a challenging case and has not received any compensation for its efforts thus far.

11.     The fee application of 25% of the Settlement Amount is fair, reasonable, and within the range of fee percentages frequently awarded in this type of action.  Indeed, the fee request here was approved by Nayani and is consistent with the fee arrangement agreed to between Lead Counsel and Nayani.  Under the facts and circumstances of this Action, the requested fee percentage is justified in light of the substantial benefits conferred on the Class, the risks undertaken on a contingency basis, the quality of representation, and the extent of legal services performed.

12.     Lead Counsel also seeks an award of expenses totaling $571,894.58 that were reasonably and necessarily committed to prosecuting the Action.  These costs include: (i) the costs associated with conducting and/or defending the depositions of Nayani and several current LifeStance employees, which included court reporter and videographer fees as well as travel expenses; (ii) fees and expenses of consultants and experts whose services Lead Counsel required in the prosecution and resolution of this Action; (iii) fees, expenses and other costs associated with Lead Counsel's investigative efforts; (iv) charges for photocopying, imaging, shipping, and managing over 145,000 documents (comprising approximately 796,000 pages) stored in an online repository; and (v) factual and legal research.  These charges and expenses were reasonable and necessary to obtain the successful result reflected in the Settlement.

13.     In addition, as provided in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Lead Plaintiff seeks an award of $5,970.90 in connection with his representation of the Class.  As explained below and in his accompanying declaration, Nayani reviewed drafts of filings,

4892-4333-7110.v1

provided input on litigation and settlement strategy, twice traveled to New York City from his home in the Houston, Texas area for the lead plaintiff hearings, assisted in gathering and producing documents in discovery, prepared and sat for a deposition, and participated in the mediation negotiations. Lead Plaintiff's investment of time and effort greatly contributed to the Settlement.

14.     The following is a summary of the principal events that occurred during the course of the Action and the legal services provided by Lead Counsel.

## II.     THE ACTION

### A.     The Commencement of the Action and Appointment of Lead Plaintiff

15.     The Action began on August 10, 2022, when Nayani filed a putative class action against LifeStance, Michael K. Lester ("Lester"), J. Michael Bruff ("Bruff"), Robert Bessler ("Bessler"), Darren Black ("Black"), Jeffrey Crisan ("Crisan"), William Miller ("Miller"), Jeffrey Rhodes ("Rhodes"), Eric Shuey ("Shuey"), Katherine Wood ("Wood," collectively the "Company Defendants" or the "LifeStance Defendants"). ECF 1. The complaint also alleged claims against Morgan Stanley & Co. LLC ("Morgan Stanley"), Goldman Sachs & Co. LLC ("Goldman Sachs"), J.P. Morgan Securities LLC ("J.P. Morgan"), Jefferies LLC ("Jefferies"), TPG Capital BD, LLC ("TPG Capital"), UBS Securities LLC, and William Blair & Company, L.L.C (collectively, the "Underwriter Defendants").[2]

16.     On October 11, 2022, Brittny Jordan ("Jordan") filed a motion for appointment as lead plaintiff and for her counsel to be approved as lead counsel. ECF 14-17.

17.     On October 14, 2022, the Court set a schedule for Nayani to file his motion and supporting papers for his motion to be appointed as lead plaintiff and to file an opposition to

---

[2]     The Company Defendants and the Underwriter Defendants are referred to collectively herein as "Defendants."

4892-4333-7110.v1

Jordan's motion to be appointed as lead plaintiff; for Jordan to file an opposition to Nayani's motion to be appointed lead plaintiff, and for Defendants to file an opposition to both motions to be appointed as lead plaintiff.

18.    Nayani filed his motion for lead plaintiff on October 17, 2022 (ECF 26-29) and his opposition to Jordan's motion for lead plaintiff on October 21, 2022 (ECF 34).  Both Defendants and Jordan filed an opposition to Nayani's motion for lead plaintiff on October 24, 2022.  ECF 37-38.

19.    On October 27, 2022, and November 3, 2022, Nayani traveled from his home in the Houston, Texas area to appear in-person at the scheduled oral arguments on the competing lead plaintiff motions, both of which were adjourned.  On November 4, 2022, the Court held oral argument on the competing lead plaintiff motions.  During the hearing, Mr. Nayani participated by phone and was questioned by the Court, by Jordan's counsel, and counsel for the LifeStance Defendants.  Lead Counsel questioned Jordan.

20.    On November 17, 2022, the Court appointed Nayani as lead plaintiff and approved his selection of Robbins Geller as lead counsel for the Class.  ECF 40.

### B.    Lead Counsel's Investigation and Filing of the Amended Complaint

21.    Before and after the initial complaint was filed in this Action, Lead Counsel directed an extensive investigation of the alleged securities law violations at issue.  Specifically, this investigation included, but was not limited to, a review and analysis of: (i) LifeStance's public filings with the Securities and Exchange Commission ("SEC"); (ii) interviews with former LifeStance employees; (iii) pleadings and evidence gathered in other civil proceedings pending against LifeStance, including the allegations in *Ryder v. LifeStance Health Group, Inc.*, Case No. 6:22-cv-02050 (M.D. Fla); (iv) transcripts of investor conference calls hosted by LifeStance in 2021 and 2022; and (v) analyst reports about LifeStance and its business.

4892-4333-7110.v1

22.    Based on this investigation, Lead Counsel prepared the Amended Complaint on behalf of LifeStance investors who purchased or otherwise acquired LifeStance's common stock pursuant and/or traceable to the Registration Statement, and who were damaged thereby.

23.    The Amended Complaint was filed on December 19, 2022.  Reflecting the significant amount of research conducted, the Amended Complaint outlined the alleged defects in LifeStance's IPO Registration Statement in extensive detail, including allegations supporting the materiality of the alleged decline in clinician retention rate to LifeStance's investors.  The Amended Complaint expounded on the allegations of the initial complaint and continued to allege claims pursuant to §§11 and 15 of the Securities Act against Defendants.

**C.    Defendants' Motion to Dismiss, the Court's Decision Denying That Motion, and Subsequent Events**

24.    Defendants filed and served the opening brief of their motion to dismiss on Lead Plaintiff on January 18, 2023.  ECF 47.

25.    In support of their motion to dismiss, Defendants made several arguments, any of which could have resulted in dismissal of the Action.  These arguments included, among other things, that: (i) the challenged statements were historically accurate, and therefore could not have been either false or misleading; (ii) LifeStance had no duty to disclose changes in its retention rate that occurred in the middle of a financial quarter, or 'interim financial data'; and (iii) that any alleged omission was immaterial in light of the Registration Statement's cautionary language, particularly surrounding the Company's clinician retention rate.

26.    On February 17, 2023, Lead Plaintiff filed and served his opposition to the motion to dismiss (the "MTD Opposition Brief").  ECF 49-51.  Lead Plaintiff's opposition explained how the Amended Complaint's allegations supported the denial of Defendants' motion to dismiss.  In particular, the MTD Opposition Brief outlined the material importance of LifeStance's clinician

4892-4333-7110.v1

retention rate to the Company's business, elucidated why a lower rate of retention impacts LifeStance's business and the many costs associated with clinician turnover, and explained the main drivers for increased turnover leading up to the IPO.

27.     Further, the MTD Opposition Brief outlined the relevant legal standard, and explained how the statements isolated in the Amended Complaint concerning LifeStance's retention rate and the impact of COVID-19 on LifeStance's business were alleged to be false and misleading.  Among other things, the MTD Opposition Brief argued that: the historical accuracy of Defendants' statements was irrelevant in light of Defendants' alleged failure to disclose material information necessary to make the statements made not misleading; Defendants had a duty to disclose interim data on clinician retention because it was material; and Defendants' inclusion of cautionary language in the Registration Statement provided no defense to liability.

28.     In short, Lead Counsel spent significant time and resources performing the legal and factual research necessary to demonstrate that the Amended Complaint sufficiently stated a claim for relief.

29.     On March 6, 2023, Defendants filed and served a reply brief in further support of their motion to dismiss, supplementing their arguments regarding dismissal of the Action.  *See* ECF 51.

30.     On March 31, 2023, the Court held oral argument on the motion to dismiss, and each party defended the positions outlined in their motion papers.  Lead Plaintiff attended this hearing telephonically.

31.     On April 10, 2023, the Court issued an Order denying Defendants' motion to dismiss in its entirety.  ECF 52.  The Court instructed the parties to submit a joint proposed case management plan by April 14, 2023.  *Id.*

- 8 -

32.     The parties negotiated and prepared a joint case management plan, which was submitted via email on April 14, 2023.  On April 17, 2023, the Court approved the parties' joint proposed case management plan (the "Case Management Plan"), and set a trial-ready date of November 16, 2023.

33.     Pursuant to the Case Management Plan, Defendants filed their Answers to the Amended Complaint on May 1, 2023, and all denied Lead Plaintiff's substantive allegations.  ECF 57-58.  In addition, both the Company Defendants and the Underwriter Defendants asserted numerous separate affirmative defenses.  *Id.*

### D.     Fact Discovery

34.     Lead Counsel immediately began fact discovery efforts following the April 10, 2023 Order denying the Motion to Dismiss.  ECF 52.  Until the parties reached an agreement in principle to settle this Action, Lead Plaintiff engaged in rigorous fact discovery.  As detailed below, Lead Counsel received approximately 796,000 pages of documents from Defendants and several non-parties.

### 1.     Protective Order

35.     To protect against the public disclosure of potentially sensitive personal or proprietary information, the parties negotiated and prepared a protective order based in large part on this Court's model protective order to govern the treatment, handling, and continued protection of confidential information produced in this Action.  The parties also negotiated the extent to which, and the conditions under which, such confidential information could be shown to deponents, non-parties, and others not previously privy to such information.

36.     The parties ultimately reached an agreement on all of their respective areas of concern and on May 24, 2023, according to this Court's Individual Rules of Practice, all parties participated

in a telephone conference to the Court to inquire about the best means for submitting the Stipulated Proposed Protective Order. That same day, pursuant to the teleconference with the Court, the parties jointly submitted the Stipulated Proposed Protective Order via email. On May 31, 2021, the Court entered the Protective Order. ECF 61.

### 2.    Written Discovery Directed to Defendants

#### a.    Initial Disclosure Statement

37.    On May 1, 2023, Lead Plaintiff served his Initial Disclosure Statement pursuant to the Case Management Plan and Rule 26(a)(1) of the Federal Rules of Civil Procedure. In it, Lead Plaintiff identified numerous individuals and entities likely to have discoverable information supporting the claims alleged in the Amended Complaint. To compile this information, Lead Counsel reviewed its internal investigation files, public information regarding LifeStance's corporate organization and employee hierarchy, as well as LifeStance's SEC filings. Lead Counsel also reviewed and compiled information from analyst reports covering LifeStance to identify individuals at analyst firms likely to possess knowledge and information regarding the Company.

#### b.    Document Requests

38.    As contemplated by the Case Management Plan, the parties exchanged initial requests for document production on May 8, 2023. Lead Plaintiff's First Set of Requests for the Production of Documents to the LifeStance Defendants consisted of 57 discrete requests germane to the parties' claims and defenses and called for the production of documents from January 1, 2021 to the present. Lead Plaintiff's First Set of Requests for the Production of Documents to the Underwriter Defendants consisted of 30 discrete requests germane to the parties' claims and defenses and called for the production of documents from January 1, 2021 to the present.

4892-4333-7110.v1

39.     In response, both the LifeStance Defendants and the Underwriter Defendants objected to nearly every request for production on the grounds of relevance, over-breadth, ambiguity and/or privilege; asserted positions reflecting material disagreements as to the relevant subject matter involved in this Action, including the relevance of documents concerning the timing of LifeStance's IPO; and disputed the relevant time period for the purposes of discovery and the claims alleged in this Action.

40.     In an effort to resolve these material, global disputes without judicial intervention, Lead Counsel engaged in numerous discussions, spanning several months, with Defendants' counsel. Lead Plaintiff worked diligently and in good faith to resolve the disputes with no judicial intervention to conserve the resources of the parties and the Court, and to ensure that production occurred in the most efficient manner possible under the circumstances.

### c.     Negotiations Concerning the Production of Defendants' Electronically Stored Information ("ESI")

41.     Multiple meet and confer discussions were also necessary to address the identification and production of relevant ESI.   Virtually all of the relevant materials were maintained electronically, making these discussions particularly important to the prosecution of this Action. Given the importance of ESI, the parties negotiated and Lead Plaintiff submitted to the Court a [Proposed] ESI Protocol to provide a framework for all ESI and hard copy productions by the parties to the Action.  The Court approved the Stipulation and [Proposed] Order of Electronic Discovery on June 21, 2023.  ECF 66.

42.     In addition, Lead Counsel, based on consultation with in-house ESI and information technology ("IT") personnel, posed detailed questions to Defendants concerning their IT systems, focused on the general electronic systems maintained by and for LifeStance and the location of potentially responsive ESI.  The ensuing discussions involved, *inter alia*: custodial and non-custodial

- 11 -

sources of ESI; search terms and date ranges for identifying relevant ESI; ESI retention and destruction policies and practices; file server and document management systems and policies; the volume of data by custodian, date and file type; and the accessibility and maintenance of documents sent via hyperlink to a live database, as opposed to email attachments.

43.     Lead Counsel also initiated and participated in written and telephonic exchanges with Defendants' counsel regarding the use of metadata, de-duplication, file type filtering, date filtering, and other potential methods to efficiently search, review, and produce documents from ESI custodians.  The parties additionally discussed and resolved Defendants' concerns regarding the burden of reviewing potentially vast amounts of ESI for privilege.

44.     Additionally, the parties worked cooperatively to reach agreement on search terms and custodians over a series of months, beginning in June 2023 and ending in August 2023.  This process involved running and testing various alternatives to Lead Plaintiff's and Defendants' proposed searches in an effort to reach a mutually agreeable set of search terms.  At each step, Lead Counsel utilized the services of in-house e-discovery personnel.

45.     By the time the parties had reached the Settlement, Defendants had made numerous individual productions.  All told, Defendants and non-parties collectively produced approximately 796,000 pages of documents which Robbins Geller electronically hosted and managed for the prosecution of this Action on an advanced platform in-house, as discussed below.

### d.     Interrogatories

46.     On May 8, 2023, Lead Plaintiff served his First Set of Interrogatories to the LifeStance Defendants, consisting of ten interrogatories designed to identify LifeStance personnel responsible for various aspects of the IPO, including those responsible for, *inter alia*, meeting with investors, determining the price of shares sold in the IPO, and determining which statements to

4892-4333-7110.v1

include in the Registration Statement.  The interrogatories were also designed to identify individuals involved in tracking, reporting, or otherwise determining the retention rate for clinicians, including those responsible for, *inter alia*, calculating the Company's reported retention rate and conducting exit interviews with departing clinicians.  The interrogatories were designed to narrow the universe of relevant persons so as to streamline the discovery process.

47.    On the same day, Lead Plaintiff served his First Set of Interrogatories to the Underwriter Defendants, consisting of five interrogatories designed to identify personnel responsible for various aspects of LifeStance's IPO, including, *inter alia*, conducting due diligence, reviewing the Registration Statement during the drafting process, and meeting with investors during roadshows or similar events.

48.    Defendants served their objections and responses to these interrogatories on June 7, 2023.

49.    Defendants likewise jointly served their Interrogatories to Lead Plaintiff on May 8, 2023, which consisted of 23 interrogatories seeking information on, *inter alia*, the sources relied upon in the Amended Complaint, persons with knowledge regarding the allegations in the Amended Complaint – including specific interrogatories seeking information on persons knowledgeable about specific paragraphs in the Amended Complaint, persons with whom Lead Counsel had any communications with whatsoever regarding this Action, and the amount of alleged damages.

50.    Lead Plaintiff served his responses and objections on June 7, 2023.  The parties met and conferred regarding each side's responses and objections to each sides' interrogatories.

### 3.    Discovery Disputes with Defendants

51.    Lead Counsel devoted much time to reviewing and analyzing documents produced in discovery, preparing for and participating in conferences with counsel for Defendants, and drafting

4892-4333-7110.v1

correspondence memorializing these conversations and detailing our positions on discovery disputes. Through these efforts, which covered several months, the parties were able to resolve their differences with respect to many of the discovery disputes. Certain discovery disputes remained when the parties reached a settlement in principle.

### a.    Exemplar Clinician Turnover Reports

52.    Conscious of the timeline set forth in the Case Management Plan, Lead Counsel sought to formulate ways to expedite otherwise lengthy and contentious negotiations over search terms and custodians. One proposal was for Defendants to produce exemplar reports on clinician turnover and retention, as well as documents showing how they were transmitted throughout the Company, so Lead Plaintiff could assess the relevance and duplicative-ness of certain search terms or custodians. Lead Counsel first made this proposal on June 21, 2023.

53.    While awaiting a response from Defendants, and with an eye to further streamlining negotiations on search terms and custodians, Lead Plaintiff served a Rule 30(b)(6) notice of deposition on LifeStance seeking, among other things, Company testimony on how retention and turnover was tracked and reported throughout the Company. In the email serving the Rule 30(b)(6) notice, Lead Plaintiff identified eight of the seventeen topics that he believed would be helpful in facilitating negotiations on custodians.

54.    On June 30, 2023, the Company Defendants provided what they represented to be the three main types of clinician/retention reporting that were generally used at LifeStance (the "Exemplar Clinician Turnover Reports").

55.    On July 10, 2023, after a thorough review of the Exemplar Clinician Turnover Reports, Lead Counsel wrote a letter (the "July 10 Letter") to Defendants outlining Lead Plaintiff's reasons for finding this production deficient. First, the letter explained that certain reports only

4892-4333-7110.v1

tracked clinicians at risk of leaving, not turnover itself. Second, and explained in further detail below, the documents made clear that key reports were transmitted to LifeStance's executive committee via hyperlink, and were therefore not produced as part of the document families produced by Defendants. Third, the reports and accompanying documents provided no insight into how turnover and retention data was communicated through the Company, and thus provided only limited guidance on the negotiations for search terms and custodians.

56.     In the interest of reaching resolution on the issues raised by the Exemplar Clinician Turnover Reports, Lead Plaintiff agreed to sequence the Rule 30(b)(6) testimony, focusing initially on the Rule 30(b)(6) topics related to the tracking and reporting of turnover and retention information, while tabling the remaining requests and reserving the right to a second Rule 30(b)(6) deposition on the remaining topics at a later time.

57.     Through a combination of the Exemplar Clinician Turnover Reports and the related Rule 30(b)(6) testimony, Lead Plaintiff was able to gain meaningful insight into how retention was both tracked and reported at LifeStance, which permitted more effective and efficient litigation of Lead Plaintiff's claims. Lead Counsel believes that these efforts early on in discovery provided a meaningful roadmap to effectively litigating the Action, as well as reaching agreements with Defendants' counsel as to key discovery parameters in the Action.

### b.     Hyperlinked Documents

58.     Relying on its experience in previous securities cases, Lead Counsel raised the issue of documents or databases transmitted throughout the Company via hyperlink in an email – as opposed to a traditional email attachment – during early negotiations over the ESI protocol in April, 2023. Lead Counsel recognized, and brought to Defendants' attention, that hyperlinked documents

- 15 -

and databases are becoming more common, and obtaining point-in-time versions of hyperlinked documents often presents unique challenges.

59.     Lead Counsel's concerns with hyperlinked documents intensified when Defendants produced the Exemplar Clinician Turnover Reports, as described above.  One of the reports contained a hyperlink to a report about turnover hosted on Microsoft's Power BI system.

60.     Upon noticing this, Lead Plaintiff re-raised the issue on a meet and confer on July 7, 2023, and memorialized the conversation in the July 10 Letter.  While Defendants maintained that point-in-time versions of hyperlinked documents were impossible to recover, as the hyperlinks themselves led to live databases that updated in real-time, Lead Plaintiff understood the importance of these hyperlinked reports in demonstrating the existence of the alleged clinician retention issues before the IPO.

61.     Recognizing the limitations presented by hyperlinked documents, Lead Counsel negotiated the Stipulation Regarding Authenticity of Power BI PBIX Files Produced in Discovery with Defendants, which provided, among other things, that should Lead Plaintiff offer the PBIX files that Defendants did have as evidence at trial, such documents will be deemed authentic as that term is defined under the Federal Rules of Evidence.  *See* ECF 77.  This Stipulation was so-Ordered by the Court on August 16, 2023.  *Id.*

> **c.     Search Terms and Custodians of Relevant Documents from the Company Defendants**

62.     The Company Defendants provided their initial proposal for search terms and custodians in response to Lead Plaintiff's first set of document requests on June 12, 2023.  Lead Plaintiff worked diligently to craft a tailored counter-proposal congruent with the scope of the claims alleged in the Amended Complaint.  After reviewing LifeStance organizational charts produced by

4892-4333-7110.v1

the Company Defendants, Lead Plaintiff proposed what he believed to be a reasonable, narrowly-tailored list of document custodians on June 19, 2023.

63.     The parties met and conferred numerous times regarding their respective proposals. Lead Plaintiff maintained the position that this Action required a larger number of document custodians, and negotiated with Defendants in good faith to that effect.  Lead Plaintiff also sought to ensure the search terms used to locate responsive documents were precise and tailored to the needs of the Action.

64.     The Company Defendants provided the Exemplar Clinician Turnover Reports on June 30, 2023, and a counter-proposal on search terms and custodians on July 7, 2023, adding only six document custodians for a total of 13 proposed custodians.  The parties met and conferred that day, and Lead Counsel maintained that the Action required evidence from different parts of LifeStance's business to fully ascertain the impact of a loss of clinicians and an increase in clinician turnover.

65.     Lead Plaintiff sent a second counter-proposal on search terms on July 13, 2023, tabling the discussion on custodians pending the noticed initial Rule 30(b)(6) deposition of LifeStance.  Defendants sent a revised proposal on July 14, 2023, and a revised cumulative proposal taking into account Lead Plaintiff's second counter-proposal on August 1, 2023.

66.     The parties had numerous email exchanges and meet and confers over the course of July, August and September 2023 to strike a balance between narrowing the requests while still appreciating the scope of the claims in the Action.  Negotiations on these issues were ongoing at the time of the Settlement.

**d.     Search Terms and Custodians of Relevant Documents
from the Underwriter Defendants, and Disputes Over
Non-Lead Underwriters**

67.     The Underwriter Defendants made an initial custodian and search term proposal on June 1, 2023, containing eight total document custodians – two from each of the lead underwriters in the case, Morgan Stanley, J.P. Morgan, Goldman Sachs, and Jefferies – and proposing to forgo discovery on the non-lead underwriters, and dismiss the claims against them without prejudice. Lead Plaintiff rejected the Underwriter Defendants' proposal the very next day, on June 2, 2023.

68.     After reviewing the IPO working group list and other relevant materials, Lead Plaintiff sent a counter-proposal on search terms and custodians to the Underwriter Defendants on June 19, 2023, proposing a list of custodians for each of the underwriters in the IPO, including the non-lead underwriters.  Lead Plaintiff also included search terms devised to capture email communications with director defendants that may not be uncovered in the Company Defendants' search of the director's personal emails.

69.     Over the course of the meet and confer process, the Underwriter Defendants proposed and drafted a stipulation to forego discovery from the non-lead underwriters.  Lead Plaintiff ultimately rejected the Underwriter Defendants' stipulation proposal and continued pursuing discovery from the non-lead underwriters.

70.     The parties had numerous email exchanges and meet and confers over the course of months to strike a balance between narrowing the requests while still appreciating the scope of the claims in the case.  These negotiations were still ongoing when the Settlement was reached.

4892-4333-7110.v1

**e.      The Relevant Time Period for Discovery**

71.      Initially, Lead Plaintiff agreed to limit the start of the discovery period to January 1, 2021, because this time period appeared sufficient to capture the extent of the alleged clinician turnover issue, as well as any preparations for the IPO.

72.      As discovery progressed and Lead Counsel began reviewing documents, it became clear that the alleged increase in clinician turnover began earlier than January 2021.

73.      Accordingly, with respect to the Company Defendants, Lead Plaintiff successfully negotiated for an expansion of the relevant time period to begin in the latter half of 2020.

74.      The Underwriter Defendants maintained that their role was cabined to the pre-IPO period, and any materials from after the date of the IPO were either irrelevant or did not exist.  Lead Plaintiff vigorously contested this assertion.  This discovery issue remained unresolved at the time of the Settlement.

**4.      Discovery Efforts Directed Toward Third Parties**

75.      In addition to Defendants, relevant information in this Action was in the possession, custody, or control of third parties.  As with Defendants' productions, Lead Counsel expended significant time and resources negotiating the scope of the document requests with third parties and addressing their objections to the requests.  Lead Counsel subpoenaed documents and/or testimony from the following third parties:

| Subpoenaed Entity | Date | Relationship to LifeStance |
|---|---|---|
| TPG Global | July 5, 2023 | Selling Stockholder |
| Summit Partners, L.P. ("Summit") | July 5, 2023 | Selling Stockholder |
| Silversmith Capital Partners ("Silversmith") | July 6, 2023 | Selling Stockholder |
| PricewaterhouseCoopers ("PwC") | July 6, 2023 | Auditor/Advisor in the IPO |
| Merilytics, Inc. | July 26, 2023 | Analytics Services Provider |

- 19 -

4892-4333-7110.v1

76.     On July 19, 2023, Lead Plaintiff received a letter outlining PwC's responses and objections to its subpoena.  PwC raised numerous objections, including that the requests were overbroad, unduly burdensome, sought documents not relevant to the subject matter of the proceeding, and that more convenient means of obtaining the documents existed, such as through LifeStance.

77.     Lead Counsel met and conferred with counsel from PwC on August 1, 2023, and outlined the reasons for the third-party subpoena and explained which documents PwC was likely to have that would satisfy Lead Plaintiff's subpoena.  Following negotiations with Lead Counsel, PwC ultimately produced approximately 1,700 pages of documents in this Action.

78.     Also on July 19, 2023, Lead Plaintiff received a letter from Goodwin Procter LLP on behalf of Summit, attaching objections and responses to the subpoena served on Summit.  Summit raised a number of objections to the requests in the subpoena, including that they were overly broad and unduly burdensome.  Lead Counsel met and conferred with Summit's counsel, and negotiations over the subpoena were still ongoing at the time the Settlement was reached.

79.     On August 4, 2023, Lead Plaintiff received responses and objections from both TPG Global and from Silversmith, which were each represented by counsel from Kirkland & Ellis LLP. Both TPG and Silversmith raised a number of objections to the document requests in each of their respective subpoenas, arguing that the requests were overly broad, unduly burdensome, vague, and not proportional to the needs of the case.

80.     Lead Counsel met and conferred with attorneys for TPG and Silversmith to discuss the terms of the subpoenas and potential document productions from both TPG and Silversmith.  The parties agreed to negotiate search parameters, including search terms, to help satisfy the document

4892-4333-7110.v1

demands in the subpoenas.  Negotiations on search parameters and the terms of the subpoena were ongoing at the time the parties reached a Settlement.

81.     On September 1, 2023, Lead Counsel received Merilytics' responses and objections to the subpoena served on it, as well as a production of responsive documents.  Merilytics raised a number of objections, including that the requests were overly broad, unduly burdensome and expensive to Merilytics as a non-party, and sought information not relevant to the claims in this Action.  Lead Counsel met and conferred with attorneys from Merilytics, and negotiations on possible additional productions were ongoing at the time the Settlement was reached.

### 5.    Lead Plaintiff's Review and Analysis of Discovery Materials

82.     As a result of Lead Plaintiff's document requests to Defendants, subpoena requests to third parties, and Lead Counsel's extensive meet and confer discussions with both Defendants and third parties, Lead Plaintiff obtained approximately 796,000 pages of documents to support the claims alleged in the Amended Complaint.  These documents required careful examination and analysis, which resulted in considerable effort expended by Lead Counsel and its staff.

83.     First, Lead Counsel uploaded these documents to a database to manage the volume of documents produced, requiring Lead Counsel to advance and incur on an ongoing basis certain costs to establish and maintain the database.  Then, Lead Counsel utilized its e-discovery system and staff for, *inter alia*, identifying and tracking documents most likely to be used in depositions and further proceedings (by Lead Plaintiff or Defendants), identifying relevant witnesses for deposition or additional discovery requests, and establishing procedures to identify documents and information that had not been produced.

84.     Attorneys and staff reviewed documents and used search terms, date filters, custodian fields, and other metadata to analyze thousands of documents related to key issues in the case, which

4892-4333-7110.v1

issues were also included in coding sheets used to identify documents for responsive information. Throughout the document review process, counsel for Lead Plaintiff analyzed the information contained in the documents, determined the documents' relevance to the allegations, and located the evidence necessary to support certain of the claims and rebut certain of Defendants' defenses. In connection with this effort, Lead Counsel supervised and actively managed a team of attorneys in their Melville, New York office, and elsewhere.

### 6.    Depositions

#### a.    Depositions of Individuals

85.    In connection with class certification, Lead Counsel prepared for and defended the deposition of Lead Plaintiff on June 15, 2023.

86.    By the time the Settlement was reached, Lead Counsel had also deposed three current employees of LifeStance, as follows:

| Deponent | Position | Date |
|---|---|---|
| Laura Cervantes | Executive Vice President of Corporate Strategy | August 30, 2023 |
| Monica Prokocki | VP of Investor Relations | September 7, 2023 |
| Kevin Mullins | Chief Development Officer | September 12, 2023 |

87.    Lead Counsel also spent significant time determining key witnesses to be deposed, and was in the process of negotiating with Defendants the proper number and schedule for depositions given the scope of the case. Lead Plaintiff and Defendants had exchanged numerous emails and met and conferred numerous times regarding the proper number of depositions, and had agreed upon the following deposition schedule as of when the Settlement was reached:

4892-4333-7110.v1

| Deponent | Position | Date |
|---|---|---|
| Danish Qureshi | Chief Growth Officer | September 18, 2023 |
| Gwen Booth | Chief Operating Officer | September 21, 2023 |
| Rule 30(b)(6) of Jefferies | Representative of Corporate Entity | September 22, 2023 |
| Kelly Bartlett | Vice President, Finance | September 25, 2023 |
| Rule 30(b)(6) of Goldman Sachs | Representative of Corporate Entity | September 25, 2023 |
| Second Rule 30(b)(6) of LifeStance | Representative of Corporate Entity | September 26, 2023 |
| Anisha Patel-Dunn | Chief Medical Officer | September 28, 2023 |
| Rule 30(b)(6) of Morgan Stanley | Representative of Corporate Entity | September 29, 2023 |
| J. Michael Bruff | Chief Financial Officer | October 2, 2023 |
| Jeffrey Rhodes | Board Member | October 3, 2023 |
| Rule 30(b)(6) of J.P. Morgan | Representative of Corporate Entity | October 4, 2023 |
| Felicia Gorcyca | Chief People Officer | October 4, 2023 |

88.     When the Settlement was reached, the parties had also agreed to schedule depositions of the expert witnesses relied upon by each party, as follows:

| Deponent | Position |
|---|---|
| William Purcell | Lead Plaintiff's Due Diligence Expert |
| Gary Lawrence | Underwriter Defendants' Due Diligence Expert |
| Bjorn Steinholt | Lead Plaintiff's Damages Expert |
| Christopher James | Company Defendants' Damages Expert |
| Paul Regan | Lead Plaintiff's Accounting Expert |
| Steven Solomon | Company Defendants' Disclosure Expert |

### b.     Fed. R. Civ. P. 30(b)(6) Deposition of LifeStance and the Underwriter Defendants as Corporate Entities

89.     As mentioned above, in the interest of resolving discovery disputes, Lead Plaintiff provisionally agreed to sequencing Rule 30(b)(6) corporate testimony from LifeStance, with the first

4892-4333-7110.v1

deposition to focus on how turnover and retention was tracked and reported within LifeStance, and with the latter deposition to cover the remaining topics set out in Lead Plaintiff's Rule 30(b)(6) notice.

90.    Lead Plaintiff served his Rule 30(b)(6) deposition notice on June 26, 2023, outlining 17 deposition topics concerning, *inter alia*, how turnover was tracked and reported throughout LifeStance, and how its impact on other financial metrics was determined and reported throughout the Company. In addition, the notice contained topics regarding the costs of recruitment, documents providing a basis for quarterly financial reports, and the timing of the IPO. The deposition notice also requested testimony on the identity or description of any documents regarding the impact of the COVID-19 pandemic on LifeStance's retention rate in FY2021.

91.    The Company Defendants served their responses and objections to the Rule 30(b)(6) notice on July 14, 2023, in which they lodged both general objections and argued that each individual topic was improper, overly broad, and/or unduly burdensome.

92.    Lead Plaintiff deposed Laura Cervantes on July 28, 2023, in her capacity as a witness for LifeStance pursuant to Lead Plaintiff's Rule 30(b)(6) deposition notice.

93.    The parties reached the Settlement before Lead Plaintiff had taken the second Rule 30(b)(6) deposition on the outstanding topics.

### 7.    Lead Plaintiff's Response to Defendants' Discovery

94.    On June 7, 2023, Lead Plaintiff served written responses and objections to discovery requests directed to Nayani on May 8, 2023. Thereafter, the parties met and conferred regarding the scope of production and the objections asserted by Nayani.

95.    Lead Counsel worked with Nayani to identify, review, and produce responsive, non-privileged documents. Lead Plaintiff made his first production to Defendants on June 2, 2023, on

4892-4333-7110.v1

the same day that he served his opening brief for class certification, which consisted of 20 documents comprising over 2,100 pages.

96.     On August 4, 2023, Lead Counsel furnished a privilege log and a redaction log associated with this production.  That same day, according to an agreement reached over a series of meet and confers between the parties, Lead Plaintiff provided a supplement to his discovery responses identifying which of the individuals named on Lead Plaintiff's initial disclosures for potentially possessing relevant information about the Action he used as a basis for the allegations in the Amended Complaint.  At the time the Settlement was reached, Lead Plaintiff believed that he had fulfilled his obligation to produce documents and information to Defendants in this Action.

### 8.     Lead Plaintiff's Requests for Admission

97.     On August 18, 2023, after reviewing a significant number of documents produced by Defendants, Lead Plaintiff served his First Set of Requests for Admission to the LifeStance Defendants, containing over 500 requests for admission bearing on the authenticity of key documents produced in discovery.

98.     On September 5, 2023, Lead Plaintiff served his Second Set of Requests for Admission to the LifeStance Defendants, with an additional 285 requests for admission concerning the authenticity of key documents in the Action.

99.     Also on September 5, 2023, Lead Plaintiff served his First Set of Requests for Admission to the Underwriter Defendants, containing 45 requests for admission bearing on the authenticity of key documents produced in discovery.

100.     Defendants' responses to Lead Plaintiff's requests for admission were pending at the time of the Settlement.

4892-4333-7110.v1

### E.    Class Certification Proceedings

101.    As outlined above, Lead Counsel spent substantial time and effort collecting and producing documents on behalf of Lead Plaintiff in connection with class certification proceedings. This process entailed regular meetings by telephone with Lead Plaintiff concerning the nature, substance, and scope of documents responsive to Defendants' document requests.

102.    Moreover, as noted above, Lead Plaintiff was deposed in connection with his motion for class certification.  Lead Plaintiff spent a day in person with Lead Counsel preparing for the deposition.  Nayani thereafter sat for a deposition regarding, *inter alia*, his involvement in and supervision of the Action, his previous experiences managing attorneys, his involvement in prior lawsuits, and his investment strategy.

103.    On June 2, 2023, Lead Plaintiff filed and served his motion for class certification and supporting memorandum of law, a supporting declaration, and exhibits on Defendants, seeking to certify the Class, appoint himself as Class Representative, and appoint Robbins Geller as Class Counsel.  The memorandum of law addressed all of the requirements of Fed. R. Civ. P. 23.  ECF 62-65.

104.    Defendants filed and served their opposition to Lead Plaintiff's motion for class certification on June 30, 2023.  While Defendants did not contest that a class should be certified or that Nayani should be certified as the Class Representative or that Robbins Geller should be certified as Class Counsel, they raised two arguments regarding the appropriate class definition: (1) that the class period should be shortened to end on August 11, 2021, when Defendants argued the full truth of LifeStance's clinician retention problem had been disclosed to the market; and (2) in the alternative, that the class period should be shortened to December 21, 2021, when non-IPO shares of LifeStance common stock were allegedly co-mingled with IPO shares.  ECF 67-68.

105.    On July 28, 2023, Lead Plaintiff filed and served his reply in further support of the motion for class certification, wherein Lead Plaintiff vigorously contested Defendants' challenges to Lead Plaintiff's proposed class definition.  ECF 73-74.

106.    The Court held oral argument on the motion for class certification on August 24, 2023.

107.    The Court issued an Order granting Lead Plaintiff's motion for class certification on September 7, 2023.  ECF 80.  In the Order, the Court set an end-date of November 8, 2021 for the class period.  *Id.*

### F.    Expert Witnesses and Consultants

108.    To assist in investigating and proving Lead Plaintiff's claims and navigating the multitude of issues in this Action – including substantive issues, such as those relating to materiality, due diligence, damages and Defendants' duty to disclose, the services of several experts and consultants were required.  The work performed by these experts and consultants provided valuable insights to Lead Counsel in evaluating the merits of the claims and defenses and the prospects for settlement during the course of the Action.  Though the Settlement was reached before expert depositions took place, Lead Counsel had worked with each of these experts to serve reports on counsel for Defendants in the Action.

### 1.    Mr. Bjorn I. Steinholt, CFA

109.    Mr. Steinholt, managing director at Caliber Advisors, Inc., a full-service financial valuation and economic consulting firm, has over 30 years of experience being a consultant analyzing capital markets and valuing investments.  Mr. Steinholt provides a broad range of consulting services on financial and economic topics, including mergers and acquisitions, initial public offerings, fairness opinions, structured finance, portfolio risk management, market structure,

4892-4333-7110.v1

and securities analysis and financial valuations.  Mr. Steinholt has provided expert analysis and testimony in numerous complex securities class-action lawsuits.

110.    Lead Plaintiff utilized the services of Mr. Steinholt to conduct a thorough event study examining all industry, market, and company specific news following the IPO, and to review and analyze documents related to events surrounding the declines in LifeStance's common stock in August and November of 2022.  Mr. Steinholt prepared two expert reports on behalf of Lead Plaintiff, one opening report on the issues of materiality and damages, dated August 7, 2023, and one rebuttal report responding to the arguments made by the Company Defendants' expert, Christopher James, dated August 28, 2023.  Mr. Steinholt also prepared and analyzed damages models used in preparing the proposed Plan of Allocation.

### 2.    Mr. D. Paul Regan, CFA/CFF

111.    Mr. D. Paul Regan ("Regan") is a certified public accountant who specializes in financial forensics and is employed by Hemming Morse, LLP, Certified Public Accountants, Forensic and Financial Consultants.  Regan has been a CPA continuously since 1970, and has over 50 years of continuous experience as an auditor or consultant.  Regan also has provided accounting and/or auditing services in over 1,000 complex litigation matters, including securities litigation.

112.    Lead Plaintiff utilized the services of Regan on the disclosure obligations for companies under Regulation S-K, specifically Items 303 and 105.  Regan also, after thoroughly examining LifeStance's public filings, analyst reports, other third party sources, and documents produced by Defendants, prepared an expert report on behalf of Lead Plaintiff concerning Defendants' disclosure obligations under Items 303 and 105, dated August 7, 2023.

4892-4333-7110.v1

### 3.    William H. Purcell

113.    Mr. William H. Purcell ("Purcell") has over 50 years of experience in investment banking, and as such has provided extensive advice and assistance to companies and organizations on due diligence, financing issues, valuations, fairness opinions, and other related issues.  Mr. Purcell has also served as a director of various companies, and thus has experience with fiduciary duties, disclosure duties, diligence, and the general responsibilities of a board member.  Mr. Purcell also has extensive experience as a consulting and testifying expert regarding adequate due diligence. Lead Plaintiff consulted with Mr. Purcell regarding the Underwriter Defendants' due diligence defense.

114.    On August 28, 2023, Lead Plaintiff served a rebuttal report prepared by Mr. Purcell, wherein he refuted the analysis of the Underwriter Defendants' due diligence expert, Gary M. Lawrence.  Mr. Purcell outlined various ways in which the issue of increased turnover at LifeStance was either known or knowable to the Underwriter Defendants, and offered his opinion that the Underwriter Defendants therefore did not conduct adequate due diligence, because they either knew of the alleged clinician retention issue and failed to correct the misstatements in the Registration Statement, or they failed to adequately consider the materials showing the decline in the Company's retention rate and in any event did not conduct adequate due diligence.

## III.    THE RISKS OF LITIGATION

115.    Settlement in this Action was reached only after Lead Counsel had a thorough understanding of the strengths and potential weaknesses of the surviving claims in the Action. Indeed, at the time of the Settlement, Lead Plaintiff had completed class certification discovery, numerous document productions had been made by the parties, and Lead Counsel had reviewed a significant number of documents over the course of discovery and had taken several depositions.

- 29 -

Accordingly, Lead Plaintiff and Lead Counsel fully understood the strengths of their claims and Defendants' defenses, and the potential damages suffered by the Class.

116. Numerous hurdles remained before trial. For example, motions important to Lead Plaintiff's ability to obtain a verdict in the Class' favor at trial likely would have been filed, including summary judgment and other motions that would have determined the extent of the evidence (if any) that could be presented at trial and the issues (if any) upon which liability could be premised. Depending on their outcome, such motions could seriously undermine or altogether preclude Lead Plaintiff from proving his case.

A. **Falsity and Materiality**

117. Lead Plaintiff alleged that certain statements by Defendants regarding the Company's retention rate were false and misleading when made for failing to disclose that LifeStance had experienced a material decrease in its retention rate prior to the IPO.

118. Defendants, on the other hand, maintained that the 87% retention figure provided in the Registration Statement was historically accurate, and that Defendants could not have known whether the recent, purportedly limited increase in turnover was in fact material, or even rendered the 87% figure false.

119. Defendants also asserted that clinician retention was not a key performance indicator for the Company, but was merely one factor in assessing clinician headcount, and the rate of recruitment at LifeStance rendered the increase in clinician turnover immaterial to investors. In support of this argument, Defendants argued that the Company had modeled the potential impact of turnover and determined the Company would exceed its 2021 budget and analyst consensus targets even with the increased turnover.

4892-4333-7110.v1

120.    Additionally, Defendants argued that any increase in clinician turnover was industry-wide as a result of the so-called "Great Resignation" associated with the aftermath of the COVID-19 pandemic, and was therefore immaterial to investors insofar as competitor companies were affected in the same way.

121.    Defendants argued that all of these facts, in combination with the risk factors regarding clinician retention contained in the Registration Statement, disproved both falsity and materiality.  While the parties disagreed about the merits of these arguments, Lead Plaintiff recognized that if the Court or a jury found any of Defendants' arguments compelling, Lead Plaintiff would have had difficulty demonstrating that the Registration Statement was materially false or misleading or was otherwise actionable under the Securities Act.

**B.    Damages**

122.    Even if Lead Plaintiff succeeded in proving falsity and materiality, Defendants advanced a number of arguments with regards to damages that could have significantly limited Lead Plaintiff's recovery if the Court or a jury found them persuasive.

123.    First, Defendants argued that confounding information – including the Company's revised EBITDA guidance, which Defendants argued was driven by infrastructure investments, rather than an increase in turnover – during the Company's second-quarter 2021 earnings conference call (the "2Q21 Conference Call") caused or contributed to the decline in LifeStance's common stock, and Lead Plaintiff's recovery would thereby be limited to only those damages caused by the announcement of the increase in clinician turnover.

124.    Further, in light of the disclosures in the 2Q21 Conference Call, Defendants argued that any market declines after August of 2021 were not recoverable, because the full truth of the pre-IPO decline in the Company's retention rate had been fully disclosed.

4892-4333-7110.v1

125. While the parties disagreed about the merits of these arguments, Lead Plaintiff recognized that if the Court or a jury found any of Defendants' arguments compelling, the potential recovery for the Class could be substantially limited.

126. In addition, LifeStance was in a precarious financial condition at the time of the Settlement. Specifically, the Company's level of applicable insurance and current cash holdings was insufficient to withstand a judgment in the amount of damages being sought by Lead Plaintiff, and LifeStance would have likely had to seek bankruptcy protection in that event. In negotiating the Settlement, Lead Plaintiff was mindful of the economic realities facing the Company.

### C.     The Underwriter Defendants' Due Diligence Defense

127. Even if Lead Plaintiff had succeeded in proving the elements of his claims against the Company Defendants, the Underwriter Defendants urged a due diligence defense which, if accepted by the Court or a jury, could have defeated Lead Plaintiff's claims against the Underwriter Defendants in their entirety.

128. Specifically, as explained by their due diligence expert, Gary Lawrence, the Underwriter Defendants argued that they had conducted reasonable due diligence according to the guidance available for due diligence in IPOs. The Underwriter Defendants argued that due diligence need not be perfect, but is assessed only according to a reasonability standard, and that the Underwriter Defendants acted reasonably in light of the circumstances and of the information made available to them.

129. While the parties disagreed about the merits of these arguments, Lead Plaintiff recognized that if the Court or a jury found any of the Underwriter Defendants' arguments compelling, they could limit any recovery from the Underwriter Defendants.

## IV.    SETTLEMENT NEGOTIATIONS AND TERMS

130.    While fact discovery continued to progress, the parties engaged in settlement discussions with the Hon. Layn R. Phillips (Ret.) of Phillips ADR, a nationally-recognized mediator with significant experience resolving complex litigation and class actions.  Before the mediation, the parties submitted to Judge Phillips and exchanged detailed mediation statements that outlined their respective critical facts and legal principles, as well as select pieces of evidence.

131.    On September 13, 2023, the parties participated in a mediation session in New York City with Judge Phillips.  In connection with the mediation process, Lead Plaintiff conducted arm's-length negotiations with respect to a potential compromise and settlement of the Action with a view to achieving the best relief possible consistent with the interests of the Class.

132.    Following the mediation, the parties reached an agreement-in-principle to settle the Action based on Judge Phillips' proposed recommendation.  This was memorialized in a binding term sheet executed and finalized on September 27, 2023.  That same day, the parties notified the Court of their agreement-in-principle and requested a stay of the Action, which was ordered on September 28, 2023.

133.    The parties then negotiated, drafted, finalized, and signed the formal settlement agreement detailing the terms of the proposed Settlement, which was submitted to the Court with the Motion for Preliminary Approval of Settlement on October 13, 2023.  *See* ECF 82-85.  On October 25, 2023, the Court granted preliminary approval of the Settlement, and approved the form and manner of notice of the Settlement to the Class.  ECF 86.

134.    The Settlement set forth in the Stipulation resolves the claims of the Class against all Defendants.  The Stipulation provides that LifeStance will pay or cause to be paid 50% of the Settlement Amount ($25,000,000) within 30 days of the Settlement receiving preliminary approval

from the Court, and the remaining 50% of the Settlement Amount ($25,000,000) will be paid within 30 days of the Settlement receiving final approval from the Court.  Notwithstanding the terms of the Stipulation, as of today LifeStance has paid or has caused to be paid the full $50,000,000 of the Settlement Amount to Lead Counsel.  The Settlement Amount is inclusive of attorneys' fees and expenses and any award to Lead Plaintiff.

135.    The recovery to individual Class Members will be determined according to the Plan of Allocation, which considers the amount of LifeStance common stock the Class Member purchased or acquired, when and at what price such purchases or acquisitions were made, and if any of those shares were sold during the relevant period.  If 100% of the eligible LifeStance common stock purchased or acquired by Class Members participate in the Settlement, the estimated average distribution per share of LifeStance common stock is $0.72, before deduction of any Court-approved fees and expenses.  Historically, actual claim rates are lower than 100%, resulting in higher distributions per share of common stock.

A.    **The Settlement Is in the Best Interest of the Class and Warrants Approval**

136.    Lead Plaintiff believes he would have prevailed on the merits at trial.  Defendants were just as adamant that Lead Plaintiff would not have.  There was a very real risk that Lead Plaintiff would not have convinced a jury that the alleged misrepresentations and omissions were materially false and misleading when made or that investors were damaged thereby.

137.    Having considered the foregoing, and evaluated Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and its extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement of this matter before the Court is fair, reasonable, and adequate, and in the best interest of the Class.  The Class agrees.  As of the date of this Declaration, not a single objection has been lodged, and none

- 34 -

have been sent to the Claims Administrator.  *See* Declaration of Rochelle J. Teichmiller Regarding: (A) Mailing of the Notice and Proof of Claim; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections, attached as Exhibit 2 hereto.[3]

138.    The Settlement represents a very favorable result.  The Settlement Amount reflects a recovery of between approximately 12.8% and 22.4% of reasonably recoverable estimated damages based on damages estimates provided by Lead Counsel's damages expert.  Given both the risks at trial and the recognition that not all damaged Class Members will seek recovery, the size of the recovery strongly supports approval.

### B.    The Plan of Allocation

139.    The Net Settlement Fund will be distributed to Class Members who, in accordance with the terms of the Stipulation, submit a valid and timely Proof of Claim and Release form and would receive a distribution of at least $10.  The Plan of Allocation provides that a Class Member will be eligible to participate in the distribution of the Net Settlement Fund only if the Class Member has an overall net loss on all of his, her, or its transactions in LifeStance common stock during the Class Period.

140.    For purposes of determining the amount an Authorized Claimant may recover under the Plan of Allocation, Lead Counsel conferred with its damages expert, Mr. Steinholt, and the proposed Plan of Allocation reflects an assessment of the damages that could have been recovered by Class Members had Lead Plaintiff prevailed at trial.  The plan is premised on the statutory formula provided in Section 11(e) of the Securities Act.

141.    To date, there have been no objections to the Plan of Allocation and Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable, and should be approved.

---

[3]    One purported request for exclusion was sent directly to Lead Counsel.

4892-4333-7110.v1

## V.    LEAD COUNSEL'S ATTORNEYS' FEES AND EXPENSES

142.    Lead Counsel respectfully requests that the Court award 25% of the Settlement Amount for attorneys' fees.  Lead Counsel believes such a fee is reasonable and appropriate in light of the efficiency with which Robbins Geller litigated this matter, the resources Robbins Geller committed to prosecuting the case, the inherent risk of nonpayment from representing the Class on a contingent basis, and the aggregate monetary benefit conferred on the Class in a challenging case. Lead Counsel further requests an award of $571,894.58 in litigation expenses.  The legal authorities supporting the requested fees and expenses are set forth in the accompanying memorandum of law.

### A.    Time, Labor and Fee Percentage Requested

143.    Lead Counsel has devoted a significant amount of time and resources in the research, investigation, and prosecution of this Action.

144.    Robbins Geller has substantial experience representing investors in securities class action cases, including in this District.  The identification and background of my firm and its partners is attached as Exhibit F to the Declaration of Michael G. Capeci Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Fee Decl."), attached as Exhibit 3 hereto.

145.    Robbins Geller's representation of the Class in this Action consisted of considerable pre-filing investigation, as well as substantial work during the Action, including: analyzing a massive amount of information, including LifeStance SEC filings, conference calls, and analyst reports and other third-party materials such as news and journal articles; thoroughly researching the law pertinent to the claims and defenses asserted; drafting the Amended Complaint; opposing the motion to dismiss; obtaining class certification; conducting substantial document discovery that involved the review and analysis of approximately 796,000 pages of documents produced by

4892-4333-7110.v1

Defendants and third parties; consulting with internal and external experts and serving expert reports on behalf of three external experts; conducting four fact witness depositions; drafting a mediation statement and amassing significant evidentiary support for use at the mediation; and preparing for and participating in a full-day mediation session, as well as subsequent negotiations and work on the Settlement.

146.    Robbins Geller's experience and advocacy were required in presenting the strengths of the Action from its inception to the mediation and thereafter, in an effort to achieve the best possible settlement and convince Defendants, their insurers, defense counsel, and the mediator of the risks Defendants faced from not settling.

147.    The fee requested is based upon a percentage of the recovery after discussion with and approval by Lead Plaintiff, and is consistent with the fee agreement reached between Lead Counsel and Nayani as discussed at the lead plaintiff hearing in the Action. *See* Declaration of Nizar S. Nayani, ¶8 ("Nayani Declaration"), attached as Exhibit 1 hereto. The fee request is similar to other requests approved by judges in this District, as set forth in the accompanying memorandum.

148.    The fee request is also reasonable when cross-checked against Robbins Geller's lodestar to date.

149.    The number of hours spent on the Action by Robbins Geller is $6,324.30. A breakdown of the lodestar from Robbins Geller is provided in Exhibit A to the Robbins Geller Fee Declaration. The lodestar amount for attorney/paraprofessional time based on Robbins Geller's current rates is $4,761,286.00, which translates to a multiplier of approximately 2.6 if the 25% attorneys' fee request is granted by the Court.

4892-4333-7110.v1

### B.    Risk, Magnitude and Complexity of the Litigation

150.    As detailed above, the Action involved challenging issues of law and fact that presented considerable risk to Lead Plaintiff's case.  This Action involved litigating alleged violations of §§11 and 15 of the Securities Act.  Thus, when Lead Counsel undertook this representation, there was no assurance that the Action would survive a motion to dismiss or other proceedings, and therefore no assurance Lead Counsel would recover any payment for its services.

151.    Lead Counsel accepted the representation of the Class on a contingent basis in this securities class action wherein, even if a recovery was obtained, any payment for Lead Counsel's services was likely to be delayed for several years.  These cases present formidable challenges as there are numerous decisions ruling in favor of defendants at each stage of the action.  And although a recovery is never guaranteed, Lead Counsel in this case had developed sufficient evidence before Settlement to convince LifeStance and its insurers to pay $50,000,000 to settle these claims.  Had this case not settled, Lead Counsel was prepared to litigate this case through the remaining stages of discovery, summary judgment, trial, and appeal.  Each of those stages would have posed considerable challenges and expenses.

### C.    Quality of Representation

152.    Lead Counsel worked efficiently and diligently to obtain an exceptional result for the Class.  From the outset, Lead Counsel employed considerable resources and spent considerable time researching and investigating facts to support a pleading that could survive a motion to dismiss and position the Action for class certification.  Lead Counsel devoted much time working with experts and analyzing potential defenses to liability and damages.

153.    The recovery obtained for the Class is the direct result of the significant efforts of highly-skilled attorneys who possess substantial experience in prosecuting complex securities class

4892-4333-7110.v1

actions.  Lead Counsel is among the most experienced securities practitioners in the country.  The Settlement represents a substantial recovery for the Class – one that is attributable to the diligence, determination, hard work, and reputation of Lead Counsel.

154.    The quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work.  The Company Defendants were represented by experienced lawyers from Ropes & Gray LLP ("Ropes"), and the Underwriter Defendants were represented by experienced lawyers from Davis Polk & Wardwell LLP ("Davis Polk"), which are both among the largest and most well-respected defense firms.  Defense counsel has a reputation for vigorous advocacy in defending complex securities cases such as this.  The ability of Lead Counsel to obtain a favorable settlement for the Class in the face of such opposition confirms the excellence of Lead Counsel's representation.

155.    When Lead Counsel undertook to represent Lead Plaintiff and the Class, it was with the expectation that it would have to devote a significant amount of time and effort in its prosecution and advance large sums of expenses on experts, mediation, and discovery.  The time spent by Lead Counsel on this case was at the expense of time that it could have devoted to other matters.  Lead Counsel undertook this case solely on a contingent fee basis, assuming a substantial risk that the case would yield no recovery and leave Lead Counsel uncompensated.  Unlike counsel for Defendants, who are paid an hourly rate and paid for their expenses on a regular basis, Lead Counsel has not been compensated for any time or expenses since this case began.  When Lead Counsel undertook to represent Lead Plaintiff and the Class in this matter, it was with the knowledge that Lead Counsel would spend many hours of hard work against capable defense lawyers with no assurance of ever obtaining any compensation for its efforts.  The only way Lead Counsel would be compensated was to achieve a successful result.

4892-4333-7110.v1

156.    As discussed above, the Settlement is a very good result for the Class in light of the risks and obstacles to recovery presented in this case, including the difficulty in establishing liability and damages at trial, if Lead Plaintiff had prevailed at the summary judgment stage.  Instead of facing additional years of uncertain, costly and time-consuming litigation, the Settlement will provide Class Members a benefit now without the risk of no recovery if the Action were to continue.

## VI.    THE REQUESTED EXPENSES ARE FAIR AND REASONABLE

157.    Robbins Geller seeks an award of $571,894.58 in expenses in connection with the prosecution of the Action.  Those expenses and charges are summarized by category in Exhibit B to the Robbins Geller Fee Declaration.  These expenses are: (i) reflected in the books and records maintained by Robbins Geller; and (ii) accurately recorded in the Robbins Geller Fee Declaration.

158.    Robbins Geller submits that the expenses are reasonable and were necessary for the successful prosecution of this Action.  Lead Counsel was aware that it may not recover any of these expenses unless and until this Action was successfully resolved.  Accordingly, Robbins Geller took steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of Lead Plaintiff's claims.

159.    Robbins Geller's expenses reflect routine and typical expenditures incurred in the course of litigation, such as the costs of travel, investigation, document duplication, document management, transcript fees, expert fees, consultant fees, mediation fees, and expedited mail delivery.  Lead Counsel believes these expenses are reasonable and were necessary for the successful prosecution of the Action.

## VII.    REIMBURSEMENT OF THE LEAD PLAINTIFF'S COSTS AND EXPENSES IS FAIR AND REASONABLE

160.    Additionally, in accordance with 15 U.S.C. §77z-1(a)(4), Nayani seeks reimbursement of his reasonable costs and expenses incurred directly for his work representing the

Class in the amount of $5,970.90. The amount of time and effort devoted to the Action by Mr. Nayani is detailed in the accompanying Nayani Declaration, ¶¶3-6, 9, attached as Exhibit 1 hereto.

161. As discussed above, and in the Nayani Declaration, Lead Plaintiff has been fully committed to pursuing the Class' claims since he became involved in the Action. Among other things, Nayani: (i) oversaw and authorized the initial pleading filed in this Action; (ii) traveled to New York City from his home in the Houston, Texas area on two separate occasions to attend the lead plaintiff hearing, and, after both hearings were rescheduled, participated telephonically in the lead plaintiff hearing; (iii) engaged in time-consuming discovery efforts and searches to obtain and produce documents responsive to discovery requests; (iv) expended substantial time and effort preparing for, and testifying during, a deposition conducted by the Company Defendants' counsel; and (v) participated in the mediation process and the efforts thereafter to document the Settlement. These efforts required Nayani to dedicate considerable time and resources to this Action that would have been otherwise devoted to his regular employment duties.

162. As more fully set forth in the accompanying memorandum, the efforts expended by Nayani during the course of this Action are precisely the types of activities courts have found adequate to support an award, and fully support the instant request by Lead Plaintiff.

## VIII. MISCELLANEOUS EXHIBITS

163. Attached as Exhibit 4 is a true and correct copy of Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements, 2022 Review and Analysis* (Cornerstone Research 2023).

164. Attached as Exhibit 5 is Hr'g Tr. at 160:22-24, *In re Am. Realty Cap. Props., Inc. Litig.*, No. 15-MC-40 (AKH) (S.D.N.Y. Jan. 23, 2019).

4892-4333-7110.v1

165.    Attached as Exhibit 6 is Hr'g Tr. at 25:12-16, *Kaess v. Deutsche Bank AG*, No. 09-cv-01714 (GHW) (RWL) (S.D.N.Y. June 11, 2020).

166.    Attached as Exhibit 7 is a compendium of unreported cases, in alphabetical order, cited in the accompanying Fee Memorandum.

## IX.    CONCLUSION

167.    In light of the significant recovery to the Class and the substantial risks presented by this Action, as described above and in the accompanying memorandum, Lead Counsel respectfully submits that the Settlement and Plan of Allocation should be approved as fair and reasonable.  In addition, as a result of the recovery obtained in the face of substantial risk, including the contingent nature of the fees and the complexity of the case, Lead Counsel respectfully submits that the Court should award attorneys' fees in the amount of 25% of the Settlement Amount, plus $571,894.58 in expenses, plus the interest earned thereon at the same rate and for the same period as that earned on the Settlement Fund until paid, plus an award to Nayani of $5,970.90.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 20th day of December, 2023, at Melville, New York.

_____
MICHAEL G. CAPECI

4892-4333-7110.v1