# EXHIBIT 5

K1NAARCHps

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In Re:
                                   15-MC-40 (AKH)

AMERICAN REALTY CAPITAL
PROPERTIES, INC. LITIGATION,

                                   Fairness Hearing

------------------------------x

                                   New York, N.Y.
                                   January 23, 2019
                                   10:15 a.m.


Before:

               HON. ALVIN K. HELLERSTEIN

                                   District Judge


                     APPEARANCES

ROBBINS GELLER RUDMAN & DOWD LLP
      Attorneys for TIAA and Class Plaintiffs
BY:  DEBRA J. WYMAN, ESQ.
     MICHAEL J. DOWD, ESQ.
     ROBERT M. ROTHMAN, ESQ.
     ELLEN GUSIKOFF-STEWART, ESQ.

GLANCY PRONGAY & MURRAY LLP
      Attorneys for the Witchko Derivative
BY:  MATTHEW M. HOUSTON, ESQ.


MILBANK LLP
      Attorneys for Defendant ARCP
BY:  SCOTT A. EDELMAN, ESQ.

THE COURT:  Who is going to do the application for Robbins Geller?

MR. DOWD:  I will, your Honor.  Michael Dowd.

THE COURT:  Good morning, Mr. Dowd.

MR. DOWD:  Good morning, your Honor.

THE COURT:  I've read your extensive declaration, that is, the declaration of Ms. Wyman.

I want to take up just your fees, your activities. The first to file the class action lawsuit were four firms, who don't seem to be involved: Pomerantz LLP, Wolf Popper LLP, Wolf Haldenstein LLP, and the Rosen Law Firm.  Is it clear that they are making no claim?

MR. DOWD:  They are making no claim, your Honor.

THE COURT:  OK.  Did they do anything in the lawsuit?

MR. DOWD:  No, your Honor.  I mean, I'm sure they filed complaints early on.  But the Court, when it appointed us lead plaintiff, told us to work with other firms and form a working group, a global working group.  And there were a group of firms, I believe it was nine firms, that agreed to be part of that working group and to work on the case.  And we've submitted their time with our time.  And those are the only attorneys that would be entitled to fees in this casement.

THE COURT:  The second thing, I did not appreciate how many counsel there were.  My impression was that there were three or four at the time that I said what you said.

K1NAARCHps

MR. DOWD:  Pardon me, your Honor?

THE COURT:  I didn't know there were nine other law firms involved.

MR. DOWD:  There were, your Honor.  The Court --

THE COURT:  I didn't know that, I said.  When I asked you to coordinate services and organize the plaintiffs' group, I thought there were just two or three law firms.

MR. DOWD:  No, they were not.  And they each had clients in the case, except I believe there was one firm that did not.  But they each had clients.  They were all class reps.  They were all either on our "may call" or "will call" witness list.  And so they provided valuable service.  And they did a lot of work in the case.  We've limited it and tried to give them discrete projects or dealing with just their plaintiffs, you know, because that's what we thought the Court wanted with the working group, and we did do that.  Their time is about 10 percent of our time.  And I think that's fair considering what they did in the case.

THE COURT:  You have a rather detailed description of the various things you were doing.

MR. DOWD:  Yes, your Honor.  That would be in Ms. Wyman's, the longer declaration.

THE COURT:  The declaration in support of application for award of attorney's fees and expenses is what I'm looking at.  I have the larger one as well.

K1NAARCHps

Ms. Wyman's affidavit identifies the lawyers -- all your firm?

MR. DOWD:  Yes.  They're all our firm.

THE COURT:  Why so many lawyers?

MR. DOWD:  Well, your Honor, there are different people that helped with different tasks.  When I looked at it, this is what struck me.  We had a working group that I really thought were the people that were going to be responsible for trying this case.  That group was about 15 people, 13 lawyers and the two forensic accountants that were involved in it from beginning to end.  Those 15 people account for about 72 percent of our lodestar, $47 million, just those 15 people.  They were all people that the Court would probably be familiar with or would have seen their names.  Certainly most of us have been here in court.

And then if you add in the four people at our office, three of our internal staff attorneys and another associate, that were primarily responsible for the document review, so that would be another four people, bringing it to 19.  I think those people together would account for about 82 percent of our entire lodestar.

So it may look like a lot of people because there were timekeepers that did individual things or who were on the case for a given period of time.  But if you look at those people that really drove the case, you're talking about the 15 main

people that did everything.  That's 72 percent of the time.

And if you take in those other four that were responsible for a

lot of the document work, that's, I think, about 82 percent of

the lodestar.

THE COURT:  12 people billed more than a thousand

hours.

MR. DOWD:  Yes, your Honor.

THE COURT:  How many people were involved in your

firm, Mr. Edelman?  Roughly.

MR. EDELMAN:  Your Honor, I would bet a comparable

number.  This was complicated litigation in a big case.

THE COURT:  I understand.

MR. EDELMAN:  That doesn't sound at all outlandish to

me.  Their the core team.

THE COURT:  OK.  Then I pass that observation.

MR. DOWD:  That's just Mr. Edelman's firm.  There were

also Grant Thornton's lawyers.

THE COURT:  They had a separate job to do.

MR. DOWD:  Well, and we had to do the job on the other

side of them as well.

THE COURT:  That's true.

MR. DOWD:  They had, at summary judgment --

THE COURT:  Mr. Dowd, I withdraw that implied

criticism.

The hourly rates, for example, what did Jason Forge

do?

MR. DOWD:  Jason Forge, your Honor?  Jason Forge was a critical part of this team.  He worked on the case primarily towards the end at summary judgment, when he got ready for trial.  He did fantastic work with their damages experts.  He was a former assistant U.S. attorney.  He was an AUSA who did huge cases in LA and San Diego before I talked him into coming over to our firm.  He's a great lawyer, your Honor.  He's been in front of you.  I don't think he argued in this case.  He was certainly in the courtroom.  He's argued in other cases that I've been on with him in front of this Court.  So you've met him.

THE COURT:  Now, the top billing rate of $1,150 of Samuel Rudman, $1,250, he only had 29 hours.

MR. DOWD:  It's really, it's probably Mr. Coughlin, myself, and Mr. Robbins.

THE COURT:  Several billing more than a thousand dollars.  Those seem like New York rates rather than San Diego rates.

MR. DOWD:  Well, Mr. Rudman is in New York.  But I think you should look at the rates for lawyers that do this type of litigation.  If you look, the *National Law Journal* said over a thousand dollars an hour is common now for partners.  If you look at some of the firms on the other side of this case --

THE COURT:  I wouldn't try.

MR. DOWD:  We submitted a declaration showing that Weil Gotshal -- and they were on the other side of this case, good lawyers -- we showed that they filed an application in the Sears bankruptcy earlier last year, and they had nine lawyers, at $1500 an hour, and dozens at over a thousand dollars an hour.  So higher than us.

THE COURT:  The bankruptcy rates are out of sight, and that's often because the allowances are heavily discounted.

Tell me now how the other firms worked.

MR. DOWD:  How did the other firms work?  What did they do, your Honor?

THE COURT:  What did they do, yes.

MR. DOWD:  Well, I can tell you that, for example, if you just go down the list, if you start with Lowey Dannenberg, for example.  They represented Corsair.  And Corsair was a shareholder and class member for the Cole shares and also the May 2014 common stock offering.  Corsair produced, I believe, 145,000 pages of documents, all of which had to be reviewed for privilege.  They were on our "will call" witness list.  They are on, I believe, also a "may call" witness list.  Their client was deposed.  They also assisted with the summary judgment briefing on the discrete project that Ms. Wyman gave them.

THE COURT:  What project was that?

MR. DOWD:  Do you remember which briefing it was?

MS. WYMAN:  Your Honor, we needed some assistance with the research of some tricky issues, and we asked them to help us with that, and they prepared --

THE COURT:  You what?

MS. WYMAN:  We asked them to help us with some research and prepared an insert to one of the briefs.

MR. DOWD:  So you're looking at, your Honor, document review, analysis of the claims, data collection, motion to dismiss, negotiation of discovery disputes.  Ms. Wyman would have had to coordinate with them for what their --

THE COURT:  You're taking it out of their declaration, what you just said.

MR. DOWD:  Pardon me?

THE COURT:  What you just read, is that from their declaration?

MR. DOWD:  It's from their declaration, yes, your Honor, that was submitted.

THE COURT:  Now, Motley Rice makes no description in its declaration.  What did they do?

MR. DOWD:  Motley Rice, your Honor, they had two clients in the case.  They had the national sheet metal workers union.  And they were on both the Cole and the May 2014 offering.  They were on our "will call" witness list, Mr. Myers.  They had also Union Asset Management, which was a German entity that was on the July and December 2013 bond

claims.  They had two witnesses that they produced, Mr. Riechwald and Mr. Fischer, who came over from Germany, as I recall, to have their depositions taken.  Similarly, Sheet Metal Workers had Mr. Myers, so they had three days of deposition testimony.  And all three of those witnesses were on our "will call" witness list.  They are coming.

They also assisted us, as I recall, with the motion to dismiss briefing that related, I think, to the Exxon exchange.  They attended the first mediation.  And they would have spent a lot of time on depo prep and the depositions.  And they also would have interacted, I'm sure, with Ms. Wyman in terms of document production and disputes with the defendants, so that, you know, their views would be expressed to the defendants as well.

THE COURT:  Johnson Fistel.

MR. DOWD:  Johnson Fistel, your Honor, represented their client in the case.  There was a class rep.  It was Paul Matten.  He was an ARCT IV shareholder.  He was on our "may call" witness list, I believe.  They also assisted, they gave us an associate who came to our office, I believe, in New York, and assisted with document review of the defendants' documents.  They also produced documents for their client.  And I believe Mr. Matten was also interviewed by the Department of Justice when they were insistent that they wanted one of our class reps, or a couple of our class reps, to be interviewed about

their case.

THE COURT:  Cohen Milstein.

MR. DOWD:  Cohen Milstein, your Honor, represented the New York City funds.  They were in the July 2013 offering, the Cole offering, the May 2014 offering.  They produced two witnesses on behalf of the New York City funds, Horan and Jeter.  They were both deposed.  They were both on our "will call" witness list.  They had, your Honor, as I recall, produced 190,000 pages of documents, which had to be reviewed.  And they would have been involved, I'm sure, in checking class cert issues.  And I believe they assisted also with the motion to dismiss briefing as well, your Honor.  So they provided a valuable service.  A lot of their work was related to New York City funds.  Obviously, if we were trying a case in front of your Honor, in front of a New York jury, it would certainly be helpful to have New York City funds here.

THE COURT:  What would they testify on?

MR. DOWD:  They would have testified about their purchases in all the different offerings as class reps.

THE COURT:  Those would have come in by stipulation.

MR. DOWD:  Your Honor, they don't come in by stipulation.

THE COURT:  Well, it's a matter of record what they bought and when they bought.

MR. DOWD:  Yes.  And no one says, we're going to

stipulate to it, your Honor.  I've tried a couple of these cases.

THE COURT:  There would have been stipulations.

MR. DOWD:  Well, I've tried cases, and there weren't stipulations.

THE COURT:  You would not need any witnesses on this, and I don't know that the witnesses would have contributed anything.

I'm reacting because a million dollars for each of these law firms, given the $65 million of lodestar that you put into the case, seems excessive.

MR. DOWD:  I don't think it was, your Honor.  I think what they did, in terms of their clients and document production, producing the documents, defending them at depositions -- we didn't take their depositions.  The defendants deposed them.

THE COURT:  I understand.  But the knowledge of a class member is derivative and really irrelevant.  The knowledge is derivative of what the lawyer finds and irrelevant because it doesn't prove any proposition against the defendants.  I understand that these depositions are taken as a matter of course by defendants, and they have to be, the clients have to be represented and there's a certain time of preparation, but over a million dollars for each, without time records showing anything, I haven't seen any time records for

them.

MR. DOWD:  Well, your Honor, again, we started out from a different premise.  We seek a percentage of the fee, a percentage of the fund, as our fee.  And that's the trend in the Second Circuit.  I know I've argued with your Honor about this in the past.  But that's how we seek a fee.  When my firm is working on a case --

THE COURT:  I just don't do that, Mr. Dowd.  I told you in the past, I believe that people who just do it on a basis of percentage do not want to go through the rigor of review and time.  I'll award lodestar.  And I'll be candid with you right now; you will get an award for your lodestar as well, not as much as you asked for, but you'll get an award.  I'm not sure about those other firms.  I don't know what they contributed.  I don't have a justification of their time.  I don't know what activities took up their time.  I don't know how they distributed their work between partners and associates.  I don't understand the substantial expense factors that they put into this case.  It's hard questions.

MR. DOWD:  They did break down their time by who the timekeepers were.  And they also broke down their expenses.  Those are attached to their declarations that they each submitted.

But, again, your Honor, when my firm goes into a case, we negotiated with TIAA.  We negotiated for a percentage fee.

K1NAARCHps

And we're not sitting there thinking, let's bring in 50 for attorneys to sit in a room reviewing documents so we can build up our lodestar. And that's the problem with the lodestar analysis. I'm just being honest with your Honor. It encourages lawyers to hire for people that do nothing to add value to the case. And we don't do that.

THE COURT: You don't do that.

MR. DOWD: No, we don't. We work for a percentage. That's what we asked for. If we put people on an assignment, it's because we needed it done. You know, at summary judgment the defendants had like 60 people in the courtroom.

THE COURT: You had expenses paid outside bankruptcy counsel, $171,000, so that they can file a motion in the bankruptcy court to get permission so that they could litigate in this court.

MR. DOWD: That's correct, your Honor.

THE COURT: That's a lot of money.

MR. DOWD: I understand that, your Honor. And when the Court ordered us to go protect those claims and get the stay lifted, we had to hire bankruptcy counsel. It's not like --

THE COURT: Did you pay them, or are they waiting to get paid?

MR. DOWD: No, we paid them.

THE COURT: You are out of pocket.

K1NAARCHps

MR. DOWD:  That's out of pocket for us.

And, again, you know, there was a court order saying, you know, go defend the thing in bankruptcy.  I'm not a bankruptcy lawyer.

THE COURT:  That's right.  It is a large amount.

MR. DOWD:  I understand.

THE COURT:  One is a simple motion, to lift stay, which is ordinarily granted in relationship to a large case like this.

MR. DOWD:  And then I think they also had to keep monitoring it, and I think they probably made other appearances.  I'm not positive -- I know they did.  Right?

THE COURT:  It's too high a fee.

MR. DOWD:  I understand, your Honor.  And we paid out of pocket.  We're not trying to give money away.  I mean, if you cut it, it just cuts my money.  I don't think they're going to give it back.

THE COURT:  Why weren't they required to make an application?

MR. DOWD:  Because we didn't consider them part of a contingent fee.  They wanted to get paid hourly, and that's what we paid.

THE COURT:  You paid over a million dollars to Crowninshield Financial Research, Inc.

MR. DOWD:  We absolutely did, your Honor.

THE COURT:  And you have people on in your firm who do the same work.  No?

MR. DOWD:  They do similar work.  And frankly a lot of the partners at our firm know a lot about damages.  I mean, that million dollars, your Honor, was, we had to spend it.  I cannot tell you how much work they did.

THE COURT:  Were they going to be witnesses?

MR. DOWD:  Pardon me?

THE COURT:  Were they going to be --

MR. DOWD:  Yes.  It's Dr. Feinstein.  He also testified in front of you on class cert.  He was going to testify again at trial, your Honor.

THE COURT:  Was his deposition taken?

MR. DOWD:  His deposition was taken four times, your Honor.

THE COURT:  So this million dollars reflects that activity.

MR. DOWD:  Absolutely.  And the defendant has six experts, on just loss causation.  And you throw in truth on the market, they had 12.  And I guarantee you, because I've worked with some of them, they paid a lot more than a million dollars for their 12 guys or six people, whatever you want to call them.

THE COURT:  They're not asking me to give them any allowances to have a law firm relationship with a client who

will or will not pay, I think, in advance.  I will not give you that.  You paid William H. Purcell Consulting over $350,000 --

THE COURT:  -- for testimony concerning due diligence issues.  I remarked that I did not see the due diligence issues as having experts.  It was really a fact and a law issue.

MR. DOWD:  Yes.  And then defendants --

THE COURT:  I understand that, given defendants' insistence to have experts of that like, and a certain degree of uncertainty whether they will or will not be able to use them, you need to have your own.

MR. DOWD:  Correct.  And they had three.

THE COURT:  What about Harvey Pitt?

MR. DOWD:  Harvey Pitt, your Honor --

THE COURT:  $200,000 to Harvey Pitt --

MR. DOWD:  Like 198,000.

THE COURT:  -- to trace securities.

MR. DOWD:  Well, and he was also going to testify about the SEC regulatory framework.

THE COURT:  I told you I wasn't going to allow that.

MR. DOWD:  No, I think you said I could award for that.  In fact, I'm pretty sure you awarded that --

THE COURT:  No.  When I commented, you said that he was going to trace shares, a job that an accountant could do.

MR. DOWD:  I think you also said he could testify

K1NAARCHps

about the SEC regulatory framework as well.

THE COURT:  No, I did not.

MR. DOWD:  I think you did, your Honor.

And, you know, your Honor, a lot of Mr. Pitt's bill is because the defendant showed up with between 15 and 20 lawyers in Washington, D.C., to take his deposition for two days.  At the end of the first day, I walked out, because I said, this is a waste of time.  And then defendants filed a letter brief complaining that I had walked out.  And we had to go back for a second day.

I didn't want to have Harvey Pitt get deposed twice to talk about stuff that, you know, frankly I thought was not that remarkable.

THE COURT:  You have almost $50,000 paid to John Barron and $384,000 to the firm that Barron went to.

MR. DOWD:  Correct.  Barron.

THE COURT:  Barron.

MR. DOWD:  We could have had several experts on accounting.  And we found a REIT auditor and accountant who was going to testify to both, as to the company and as to Grant Thornton.  I think his expenses are very reasonable.

THE COURT:  I find your lodestar reasonable, the rates appropriate and, in relationship to the work that you did, reasonable.  I'll go into lodestar a bit later.

The next firm I want to hear from is Lowey Dannenberg.

K1NAARCHps

MR. SKELTON:  Good morning, your Honor.  Thomas Skelton of Lowey Dannenberg.  Ms. Hart sends her apologies. She had a client meeting in California with a client who was in hospice care and may pass at any time and felt that she needed to keep that appointment.

THE COURT:  Thank you.

MR. SKELTON:  Your Honor, my firm represents the Corsair group of funds.  They had a $19 million loss and were the second largest shareholder at the lead plaintiff stage.  We were obviously not appointed lead counsel.  Throughout the course of the case, we took our direction from Robbins Geller. We worked on numerous aspects of the case, including, as set forth in Ms. Hart's declaration, motions to dismiss, motions for class certification, motions for summary judgment.

THE COURT:  What did you do on the motion to dismiss?

MR. SKELTON:  We did discrete projects and we reviewed motion papers at the direction of lead counsel, particularly in any issues that might have related to Corsair.  And they would apply throughout the case.  Much of our work was specifically directed to issues that related to Corsair.  For example, one of the issues that went throughout the case was the issue of tracing, as Mr. Dowd alluded to.  We were able to find documents through our document platform that showed, in connection with the May 2014 offering, that Corsair purchased shares at the offering price on the date of the offering from

one of the underwriters at a price that was outside of the trading price on that given day.

THE COURT:  That's an accountant's work for Corsair. Why was it your work?

MR. SKELTON:  Corsair retained to us perform these services and to represent them in the case.  And the issue was whether we could trace the shares to the offering.  And our work, we did the work analyzing the documents and providing the information to --

THE COURT:  But normally that work would be done internally within a company.  Corsair is what, a management company?

MR. SKELTON:  It's an investment manager, yes.

THE COURT:  Investment manager.

MR. SKELTON:  Yes.

THE COURT:  An investment manager knows what he bought, what he sold, when he bought it, how much he paid.

MR. SKELTON:  An investment manager would have had to find all the documents and analyze them.  We analyzed them in the context of the arguments that the defendants were making regarding tracing.  They argued that we couldn't trace the shares to the offering because shares are fungible and they're held electronically and therefore we couldn't recover on the Section 11 claims.  And the client, this is --

THE COURT:  You bought these shares on the offerings,

did you not?

MR. SKELTON:  Corsair brought the shares on the offering, yes.

THE COURT:  Which offering did you buy on?

MR. SKELTON:  The May 2014 offering, as well as Cole merger shares.  But the offering at issue was the May 2014 offering.

THE COURT:  Did you buy from the underwriters?

MR. SKELTON:  Yes.

THE COURT:  So what was the big problem?

MR. SKELTON:  The problem was that the defendants were arguing in the in limine motions and in summary judgment that we couldn't trace the shares to the offering because shares are fungible and, because we couldn't say that these particular shares did not exist before the offering, we couldn't recover on the Section 11 claim.

THE COURT:  That's a legal issue.

MR. SKELTON:  Yes.  And we needed to argue that legal issue with supporting documents.  And the documents we were able to find showed that Corsair purchased, on the date of the offering, at the offering price, from one of the underwriters.  And we compared that to publicly available information that showed that the lowest trading price of the day was above the price at which Corsair purchased, so therefore they must have purchased on the offering.  This is not a routine analysis that

K1NAARCHps

Corsair would do.  They didn't understand the nuances of Section 11, of the 1933 Act.  We did.  They retained us to do this, and that was part of what we did.  And we were able to establish, through documentary evidence, that the shares were purchased on the offering.  And ultimately, your Honor ruled in favor of the plaintiffs on that issue.

Other matters that we dealt with --

THE COURT:  What was your contribution to the result?

MR. SKELTON:  Corsair was a certified class representative.  They purchased the shares on the open market.  They purchased shares in the Cole offering.  They purchased shares in the May secondary offering.  All of our work, your Honor, was done either at the direction of lead counsel or in consultation with lead counsel, and consult --

THE COURT:  Did you take any depositions of the defendants?

MR. SKELTON:  We did not, your Honor.  We were not asked to do that.

THE COURT:  So all you did was represent your client.

MR. SKELTON:  Well, we represented our client, who had issues relating to the various -- the offering and the merger and common shares.  We were asked to perform tasks on the summary judgment motion, on class certification.

THE COURT:  In relationship to your client.

MR. SKELTON:  Well, generally, in relation -- in

relation to our client and other tasks that Ms. Wyman called me and asked me if we could do certain research projects related to omissions and related to the admissibility of the financial restatement, which was an earlier issue that came up during the case.  Our client produced 145,000 pages of documents.  We reviewed the documents for responsiveness and privilege.  We dealt with issues relating to the ESI and follow-up questions from the defendants regarding the documents that were produced.  Mr. Mishaan of Corsair was deposed.  Mr. Rothman from Robbins Geller attended the prep sessions, worked with us to get ready for the deposition.  He attended the deposition.  And the deposition went very well, and Corsair was certified as a class representative by your Honor.

THE COURT:  What did the interview with the Department of Justice and the Securities and Exchange Commission have to do with this lawsuit?

MR. SKELTON:  Well, it involved parallel proceedings that the SEC and the U.S. Attorney's Office were contemplating bringing.  They wanted to interview Corsair as a witness, and we prepared our client -- and he was the same person who was ultimately deposed.

THE COURT:  So why should the class pay for that?

MR. SKELTON:  Well, that was time that was spent learning facts that the government had, and they presented hypotheticals to us that helped us to understand some of the

issues that they were considering.  And we recognized that the government has different burdens of proof and different elements, but the underlying facts and the approach that the government was taking helped to us understand better the underlying facts in this case.

THE COURT:  Why shouldn't that be a fee chargeable to your client, rather than to the class?

MR. SKELTON:  Well, the information that we learned and that the client provided to the government was very similar to the information that was being argued in the case.  The adjusted funds from operations was one of the issues that was discussed at that meeting.  And we believed that that helped sharpen our focus.  And Mr. Mishaan, who was the witness at the SEC and DOJ meeting, was also the deponent that Corsair proffered for his deposition.

THE COURT:  These interviews with the Department of Justice and with the SEC were not on the record, were they?

MR. SKELTON:  No, your Honor.

THE COURT:  They couldn't be used in the lawsuit.

MR. SKELTON:  No, they could not be used to be submitted as evidence.  But it was helpful to us in understanding the government's approach and learning facts about the case that helped us proceed.

Just to put a finer point on it, your Honor, the interview was a short interview.  It lasted a couple hours.  We

had a prep session the day before.  It was not a lengthy period of time.  But we do believe that the information that we learned during that process was helpful.

THE COURT:  How much of your fees went into that?

MR. SKELTON:  I could find it in our time sheets and submit this, your Honor, but it was probably six to eight hours of my time and a couple of hours of Ms. Hart's time.

MR. DOWD:  Your Honor, could I just mention one thing?  This happens in our cases sometimes, and it did here, where DOJ reaches out and says, we want a victim witness, and since you already have a lawsuit, we want your victim witness.  And the first thing I say to them and I'm sure is what we said in this case -- I think Mr. Forge dealt with it -- is, get out of here, go find your own witnesses.  And then they say, well, you know, if we want, we can subpoena your witnesses.

And so I think at times, you get stuck in this position with the U.S. Attorney's Office.  And I say, you got to go in there and protect them because I don't know what they're going to write down, that your witness may or may not have said, and turn over in Jencks Act discovery before their trial.

And so you have to protect your witness.  And it's not our fault, your Honor.  We always tell them just go away, find your own witnesses, OK, you do your job, we'll do ours.  It's not like they are going to help us.

And I say that with all due respect.  I used to be an assistant U.S. attorney, so --

THE COURT:  One last question.  If I were to give a lesser bonus to your and to the other firms than I give to Robbins Geller, would that it be unjust?

MR. SKELTON:  Well, as I understand it, your Honor, Robbins Geller as lead counsel has the discretion, unless your Honor orders otherwise, to distribute the fees in accordance with its discretion as to the contributions that were made by the firms.  We believe that our contribution was valid and meritorious, but of course Robbins Geller, they did the lion's share of the work, they took the depositions, they did a phenomenal job and they got a phenomenal result.

THE COURT:  My thought was that I would make awards to each of your firms so that Robbins Geller would not have the burden of redistribution.

MR. SKELTON:  That is certainly within your discretion, your Honor, to do that and to award what you think our firms' contribution was.  We do believe we contributed to the success of the case.  I believe that Robbins Geller agrees with that.  Obviously Robbins Geller did the lion's share of the work.  They took the depositions.  And they created a tremendous result.  So I'm not going to sit here and tell you that your Honor has to award me the same multiplier that Robbins Geller gets.  They were lead counsel.  But we do

believe that our contribution was meritorious and that our time was valid and that our application should be granted.

THE COURT:  Thank you.

MR. SKELTON:  Thank you, your Honor.

THE COURT:  Tell me your name again?

MR. SKELTON:  Thomas Skelton from Lowey Dannenberg.

THE COURT:  I'll hear Motley Rice next.

MR. DOWD:  Your Honor, I'm not sure that all the co-counsel came.  I mean, we were here to present for them, just like everything else in this case.  We tried to keep a tight rein on everybody just so that there wouldn't be waste of time.  And I'm pretty sure Cohen Milstein was here on Tuesday and they may have sent a different person today because they couldn't be here again today.  But most of the people, we told them, we submitted your time and we'll argue for you.  And that's typically the way we did things in this case.  We didn't want ten firms showing up.  I mean, the Court's order said, "As reported in yesterday's status conference, lead plaintiff's counsel, Robbins Geller, will work with and lead a working group of all interested plaintiff's counsel."  And that's what we did.

THE COURT:  I understand, Mr. Dowd.  But I have to examine the reasonableness of all the constituent parts of your fee, of your fee request, notwithstanding that you're requesting for everybody.

K1NAARCHps

I'm looking at Mr. Levin's declaration, Mr. Levin being a member of Motley Rice. That firm does not have offices in New York, does it?

MR. DOWD: I don't know whether they have an office in New York.

They do. Mr. Rothman says they do.

THE COURT: But the lawyers that worked on the case, were they from the New York office or another office?

MR. ROTHMAN: There was one lawyer who was either from Westchester or Kentucky, maybe from Connecticut, and the rest, Mr. Levin is in the South Carolina office.

THE COURT: It doesn't seem to be right to charge for transportation. I will disallow that charge.

I don't know what they did. What did they do in the case?

MR. DOWD: Well, I talked to you about that already, your Honor. They had the sheet metal workers. They produced Mr. Myers for his deposition. They also had Union Asset Management.

THE COURT: Tell me what they did to contribute to the victory.

MR. DOWD: Well, that does contribute to the victory, your Honor. You're producing deponents and witnesses who bought different offerings that contribute to the victory. I mean, they flew these guys over, as I understand it, from

Germany to have their depositions taken, which is probably part of the travel expenses in this case.  They assisted with the motion to dismiss briefing on the Exxon exchange.  They attended the first mediation.  They did all that depo prep and depo work.  They produced respectively about, between them, the two plaintiffs, over 26,000 pages of documents, your Honor.

THE COURT:  Johnson Fistel.

MR. DOWD:  Johnson Fistel we talked about as well.  That was Paul Matten.  He was one of the ARCT IV witnesses.  They also assisted with the document review.  They lent us an associate to assist with document review.

They also produced about 1100 pages of documents on behalf of Mr. Matten.  I believe their client was also interviewed by the DOJ.

THE COURT:  The Weiss law firm, are they here?  Is Weiss here?

MR. DOWD:  I don't believe so, your Honor.  Again, we kept tight reins on everybody to try to keep the numbers down.

THE COURT:  This is an interest in their fee, not a matter of -- they're not getting paid for coming here today.  They just have an interest in getting paid.

What about the Weiss law firm?  What did they do?

MR. DOWD:  Their client was Simon Abadi.  He was, I believe, in the Cole offering.  And they produced documents for their client.  Their client was deposed in the case.  He was on

one of the "may call" witness lists.  And so they did do work that related to their client in the case.

THE COURT:  Stull Stull & Brody.

MR. DOWD:  Stull Stull & Brody represented Dr. Esposito and another gentleman named Noah Bender.  Esposito was one of the witnesses that really gave a standing on ARCT IV.  He was together with Mr. Matten.  But Dr. Esposito was deposed, and he was on our "will call" witness list because he gave a standing on the ARCT IV issue.  And so they would have represented Dr. Esposito at his deposition and assisted with anything related to Dr. Esposito's briefing.

THE COURT:  Gardy & Notis.

MR. DOWD:  Gardy & Notis, your Honor, they had a client who was not named as a class rep in this case named Shenker.  I think that he sought lead plaintiff appointment.  However, because they were on the Cole exchange, they went down to Maryland because there had been a securities case against Cole, and they tried to make sure, their primary role was to make sure that our claims, our claims asserted in this case, didn't get cut out in the release in the Maryland Cole case.  Not only did they argue below in this case, in the district court, but then I believe they also argued it on appeal as well, your Honor.  And so that was their main role in the case, was objections and appeals in the Cole case to protect our clients to make sure their claims didn't get released in

K1NAARCHps

Maryland, in sort of an end-around. And so that was the work we gave them to do, and they did it, and they did it well.

THE COURT: The Polaszek Law Firm.

MR. DOWD: The Polaszek Law Firm represented the City of Tampa funds. They were on the May 2014 offering. They produced their client, who was one of the class reps, was Ernest Carrera, on behalf of Tampa, obviously, and he was on our "may call" witness list at the end of the day. They produced documents. Their client was deposed.

Frequently, when I looked at their lodestar, I was thinking I would have thought it would have been higher. But that was just my view.

THE COURT: Cohen Milstein.

MR. DOWD: Cohen Milstein we discussed. They represented the New York City funds. They were on a host of offerings, I think three different offerings. They produced two witnesses, Mr. Horan and Mr. Jeter. They were both deposed. They were both on our "will call" witness list. They did significant work in the case. They produced 190,000 pages of documents that had to be reviewed for privilege and responsiveness. And they also assisted with the motion to dismiss briefing in the case, as I recall. And so I think that their work was very good, and they did a good job, and helped us with the case.

MR. LOMETTI: Your Honor, I'm sorry. It's Chris

K1NAARCHps

Lometti from Cohen Milstein.  Julie Reiser was here on Tuesday, is in court in California, had a mediation, actually, in California today.  She couldn't be here.  I'm here if you have any additional questions.

But I think there may have been four offerings that the New York City funds were involved with.

THE COURT:  Did you take part in any depositions against defendants?

MR. LOMETTI:  No, your Honor.

THE COURT:  Or any motions?

MR. LOMETTI:  I think the firm worked on the motion to dismiss, on class cert issues, and I believe -- Michael, correct me if I'm wrong -- but there was some work that the firm did in relation to the investment managers in general. New York City funds had five investment managers, and there was a time where the defendants were possibly wanting to depose some or all of them and we had to fight that, and which we did successfully.  And we may have been involved with other investment manager-type issues as well in the case, your Honor.

MR. DOWD:  That's correct, your Honor.

THE COURT:  Thank you.

And Levi & Korsinsky.

MR. DOWD:  They had clients Mitchell and Bonnie Ellis. They were on the ARCT IV offering.  They were on our "may call" witness list.  They produced documents.  The defendants did not

take their depositions.  I noted that their expenses were zero, which was consistent with that.  But that would have been their primary role: protecting their client, producing documents, reviewing them, and responding to issues on motion to dismiss that dealt with their clients.

THE COURT:  If I were to give you whatever I give you, as a fee for everyone, what would be the methodology of distribution?

MR. DOWD:  What would be our process?  I think we would have to --

THE COURT:  Your theory of distribution.

MR. DOWD:  We would have to look at what everyone did and then figure out how to divide it.  A large part of it would be based on what the Court ordered and how much we got, and we would have to think that through and then talk to the firms and make a decision.  That's what would happen.  It's not like there's some mathematical equation that we use.

THE COURT:  I feel I want to reward your law firm more than the others proportionally.

MR. DOWD:  Your Honor, I will say this.  In this case, we kept those co-counsel to 10 percent of our lodestar, basically.  And they did work on the case.  And they did good work, with everything they had to do.  And they cooperated with us.  And they worked with their witnesses.  And it added value to the case.  I don't think it's fair --

THE COURT: I'm sure they did. But the driving force in this case --

MR. DOWD: Absolutely.

THE COURT: -- and the reason that the result is uncommon, was the work of your firm.

MR. DOWD: I understand, your Honor. But I can't stand here and denigrate these other firms that I feel made a legitimate contribution to this case. And I won't do it.

THE COURT: OK. I'll take a short break and then I'll --

MR. DOWD: Your Honor, I would like to address some other issues too for the Court's consideration.

THE COURT: Go ahead.

MR. DOWD: Is that all right?

THE COURT: Yes, go ahead.

MR. DOWD: Because I know the Court goes with the lodestar approach. I understand. But, you know, in this case, TIAA, the lead plaintiff, did a great job. And the Court actually said they did an excellent job in this case. They held our feet to the fire. We had an ex ante negotiated fee agreement with them, before we were appointed lead plaintiff, calling for 12.4 percent of the fee.

THE COURT: How much?

MR. DOWD: 12.4 percent. You have to do some math on it. But that's what it comes out to. That's where the 127

million comes from, your Honor.

TIAA is one of the largest retirement systems in the world, your Honor.  They have almost a trillion dollars in assets.

THE COURT:  I'm familiar with that.

MR. DOWD:  All I'm saying is, they're used to dealing with lawyers, and they drove a good bargain on behalf of themselves and the class at 12.4 percent.  If you look at the Second Circuit law, it says an ex ante negotiated fee agreement, the Second Circuit has said, should be given serious consideration by the court.  Other judges in this court have said it's entitled to a presumption of reasonableness or correctness, starting with Judge Lynch, back in the *Global Crossing* case, probably almost 15 years ago.

THE COURT:  From the point of view of a client wanting to litigate, there's a choice of paying as you go on a time basis, but the model for defendants is, the client takes each bill that comes and looks at it and says, well, I don't need this service or that service or you billed me too much on that, and you make adjustments.  And at the end of the day, when you have a recovery, if the client has been paying you on a time basis and you want a bonus, the client will often say, well, I hired you because you're good, and I hired you because I'm willing to pay the high rates that you charge.  So why should I also pay a bonus?

K1NAARCHps

You're getting a percentage from TIAA in lieu of pay as you go.  Therefore you've had to wait.  And therefore, from the perspective of TIAA, which is one of the beneficiaries of many in this lawsuit, it's not really arm's-length bargaining.

MR. DOWD:  It is, though, your Honor.

THE COURT:  It's an indication.

MR. DOWD:  I understand.

THE COURT:  I accept it as an indication.

MR. DOWD:  I'll telling you just what some other courts have said.

THE COURT:  I understand.

MR. DOWD:  That 12.4 --

THE COURT:  I understand some give lodestar and some give percentages.

MR. DOWD:  Right.

THE COURT:  I give lodestar.  I don't give percentages.

MR. DOWD:  But the negotiated fee agreement is given a presumption of reasonableness in courts.  And that 12.4 percent, your Honor, it's lower, lower than what a lot of people get.  It is a contingent fee.  We're not getting paid by the hour.  It's contingent-fee litigation.  And people do it on a percentage basis.  That's how it works.  And in this courthouse last year somebody got 25 percent on 250 million. The Second Circuit in November affirmed 13 percent on 2.3

billion, your Honor, in a case.

THE COURT:  The Court of Appeals does not want to substitute itself for my judgment in the case.  It's tough work.  There are very few legal principles involved.

MR. DOWD:  Your Honor, can I just ask you to consider two other issues?

The defendants, in connection with the audit committee investigation and, you know, our suit, as well as other issues, totaled $264 million that they spent.  Now, that's not just our case.

THE COURT:  Say that again.

MR. DOWD:  264 million.

THE COURT:  Who?

MR. DOWD:  The defendants.  That's what ARCP paid for everything that resulted from the audit committee investigation, a lot of which we had to duplicate and a lot of which was probably directly on our case.  They spent $69 1/2 million just in the first three quarters of 2019.  In the first three quarters of 2019 I know the lion's share of that money had to be defending our case.  69 1/2 million, that's more than my lodestar, just for three quarters last year.

I would ask the Court to consider that.  These numbers are not crazy.

When you look at what happened in this case, your Honor, I mean, the quality of the representation, I can tell

K1NAARCHps

you, your Honor --

THE COURT:  I'm not going to cut your lodestar, if that's what you're worrying about.

MR. DOWD:  No, no, I'm not worried about that.  I'm worried about trying to get more than my lodestar.

THE COURT:  You'll get more.

MR. DOWD:  I would like to get as much as I could.

THE COURT:  I could give you all 12.2 percent, but I'm not going to give you that much.

MR. DOWD:  All right, your Honor.  Just consider this. Bloomberg News, 2017, had an analyst that said this case would settled for between 33 and 117 million dollars.  We got 1.052 billion.  Last summer, JPMorgan said, based on what they paid the opt-out litigants in this case, which were huge funds, huge funds -- Vanguard, PIMCO, BlackRock -- they said that we get 450.  And we got 1.025 billion, your Honor.

I just, I can't sit down before I tell you that.  I mean, we did a remarkable job.  And we should benefit from that -- for not taking the 450 and coming in and getting the same lodestar award, for saying, no, we're going to roll the dice on summary judgment and make this case worth more for the class, your Honor.  And that's what we did.  And we should be rewarded for taking that risk.

That's all I ask the Court to consider.  I know the Court wants to rule, and I don't want to belabor it, but I ask

K1NAARCHps

you to consider that.

THE COURT:  What did you perceive to be the risk, the probability, of my granting summary judgment to the defendant?

MR. DOWD:  I don't know.  To be honest, your Honor, I thought that we could very possibly get thrown out on Grant Thornton, who ended up paying 50 million --

THE COURT:  What did you think that?

MR. DOWD:  I don't know.  Because I think that auditors get out of these cases an awful lot.  I think they did a study and only like 2 percent --

THE COURT:  They were not responsible for the AFFO --

MR. DOWD:  Exactly.

THE COURT:  But they were responsible to know how their numbers were being used.

MR. DOWD:  No, I understand that.

THE COURT:  And their numbers were being used in a way that you considered and you were likely to prove to be false and misleading.

MR. DOWD:  But it was a risk.  And you look at some of these other people that filed opt-out cases, they weren't taking that risk.

THE COURT:  I don't mean to denigrate what you did.  Because I think what you did was very good.  A 50 percent discount of proveable damage is a much lower figure than that, because the number of over $2 billion ascribable to the overall

K1NAARCHps

damage is subject to many, many pitfalls, failures of claims and the like.  So your achieving over a billion dollars is highly significant.

MR. DOWD:  Thank you.

THE COURT:  And I don't want to take away from it.  I think you did outstanding work.  I think you have to be rewarded for your persistence and your stubbornness and for your leadership in the case.  You stood up to the most powerful law firms in the City of New York and were their equal.

MR. DOWD:  Thank you, your Honor.

THE COURT:  However, your lodestar rates for partners are pretty high.

MR. DOWD:  They're also lower than the rates of the firms on the other side.

THE COURT:  Yes.  But they had to get it on a pay-as-you-go basis, and you're getting it from me.

MR. DOWD:  Well, that's even better, your Honor.

THE COURT:  You have a significantly lower expense.

MR. DOWD:  They're $1500 an hour, your Honor.

THE COURT:  I know.

MR. DOWD:  They got it in 2014 and 2015, some of these firms.  That money is worth 50 percent more now, because they got it then and they had higher rates than us.  You know, I mean, it's not -- our rates are not high, you know what.  I mean --

K1NAARCHps

THE COURT:  We have an imperfect world.

MR. DOWD:  I understand that.  But, you know, my world isn't much different from theirs when it comes to, you know, meeting salary obligations and funding expenses and everything else.  I don't get paid on the 30th day of every month like they do.

THE COURT:  Is the transportation from San Diego -- you're in San Diego, right?

MR. DOWD:  Yes, your Honor.

THE COURT:  And Ms. Wyman is in San Diego.

MR. DOWD:  Yes.

THE COURT:  Are your transportation costs chargeable as an expense?

MR. DOWD:  Yes, it is an expense.

THE COURT:  You're taking advantage of a lower cost structure in San Diego, significantly lower structure.  Charging the transportation cost and asking to be paid New York rates, that's significant.

MR. DOWD:  Your Honor, our transportation costs were significantly higher because we cut out a lot of the airline fees.  So out of pocket I'm losing about 130 grand on that, your Honor.

THE COURT:  I'll take a short recess.

(Recess)

THE COURT:  I've considered the arguments, read the

K1NAARCHps

fee justifications and the expense itemizations.  I find the lodestars of each of the firms reasonable and appropriate and the expenses reasonable as well.

My award for all of the counsel who will be sharing this fee is $100 million, plus allowance of expenses of $5,164,539.91.

It comes out to a multiplier of 1.376, but regardless of the accuracy of my arithmetic, the number is $100 million of fee and $5,164,539.91.

I believe that, in this case, as I said before, the services delivered by the Robbins Geller firm were outstanding, that Ms. Wyman, Mr. Dowd, and your colleagues, Mr. Rothman, did outstanding work.  I think in the fees of some of the other firms it was hard for me to see the same amount of productivity, in terms of obtaining the result, and in some cases whether or not all the fees that were presented were fees that should be allowed.  But it's very hard to pierce through this, as Mr. Dowd has suggested that everything went into the final result, and so I determined that each of the firms would be considered as having had a full lodestar, and that the add-on, the bonus, would be done in the aggregate for all firms.

How the fees are ultimately allocated is something, I guess, the firms are going to have to work out for themselves. As I understand it, I have no continuing jurisdiction, should

there be any dispute.

There's no interest to be awarded on this amount.  It will be paid, how did you say, about third, Mr. Dowd, one third on when?

MR. DOWD:  Yes, your Honor.  There's a third now, a third in 90 days, and a third on the initial distribution, the big distribution.

THE COURT:  OK.  And it will be payable by the funds that have already been paid by the defendants.

MR. DOWD:  Yes, your Honor.  The money, we got the money in October, your Honor.

THE COURT:  All the money.

MR. DOWD:  Yes.  And that actually, if we had awaited the final approval like a lot of firms do -- they don't fight for that.  We've made the class about $4 million on that alone, just by standing, holding out for that.

THE COURT:  That's not unusual.  Payment on the agreement.

MR. DOWD:  A lot of people won't fight for it anymore, your Honor.

THE COURT:  OK.  That's my award.  And I congratulate all of you.  Thank you very much.

MR. DOWD:  Thank you, your Honor.

MS. WYMAN:  Thank you, your Honor.

MS. GUSIKOFF STEWART:  Thank you, your Honor.

K1NAARCHps

MR. HOUSTON:  Your Honor --

THE COURT:  Two minutes.

MR. DOWD:  Your Honor, we have an order that we adjusted, I think we filed it yesterday, to reflect a third, a third, a third.  And I think our expenses went down about $9,000.

THE COURT:  Hand it up.  Then I'll talk to Mr. Houston.

MR. DOWD:  Oh, it has a percentage in it.  So if you want us to just submit one later?

THE COURT:  Yes.

MR. DOWD:  Or I can write it in now, whichever you prefer.

THE COURT:  You can write it in now.

Meanwhile, I'll hear from Mr. Houston.

MR. HOUSTON:  Your Honor, very briefly.  We had a couple issues with process on the submissions in the derivative matter.  We have asked for, with counsel for VEREIT, that we be given the opportunity to file a reply statement once they have gone through our time records and identified their issues.  We think this will create the greatest and clearest record.

THE COURT:  I think this is what you do.  Without giving me anything, give Mr. Edelman what you propose.  Mr. Edelman will then give you his objections.  You will negotiate to whatever extent you feel appropriate.  And then

there will be a filing on a joint basis, just the way you do with a 2(e) letter, so I don't get separate filings.  So just give me the outside date by which you can accomplish all that.  Discuss it with Mr. Edelman.  And then we'll issue an order.

MR. HOUSTON:  Your Honor, that was the second issue.  We have discussed some dates.  We had asked for a month to put together the records in accordance with your Honor's directive on Tuesday.

THE COURT:  How much time do you want?

MR. HOUSTON:  OK.  So we'll take that month.  Mr. Edelman, how long do you want?  Do you want your two weeks that you suggested, or longer than that, to review what we are submitting?

MR. EDELMAN:  Your Honor, so as I understand it, you want us to do a joint letter.

THE COURT:  At the end.

MR. EDELMAN:  At the end?

THE COURT:  Outlining the positions.

MR. EDELMAN:  And do you want us to be limited to the page limits?  Because as I understand it, Mr. Houston is planning on now submitting a different set of time records.

THE COURT:  What do you propose?

MR. EDELMAN:  I would propose that Mr. Houston submit whatever he wants to submit.  To the extent that there was stuff in the time records that shouldn't have been in there,

take them out, put them in a letter responding to our position. We put in a letter responding to that. And then your Honor is in a position to decide. And we do it as quickly as we can. We've already had extensive briefing and argument on this.

MR. HOUSTON: The only problem with that is that we never did get the chance to respond to the initial issues. And Mr. Edelman has already said that, on review of the next submission of records, there may be additional issues.

THE COURT: Mr. Houston, February 21, you file with the Court your submission, backed up by whatever supporting data you think is appropriate.

Mr. Edelman, on March 13, you respond.

MR. EDELMAN: Thank you, your Honor.

THE COURT: And Mr. Houston, another week, March 20, to reply. And I'll endeavor to decide on the papers or, if I need to see you, I'll do that as well.

OK? Are those dates satisfactory?

MR. EDELMAN: Thank you, your Honor.

MR. HOUSTON: Yes. Thank you, your Honor.

THE COURT: All right.

Anything further?

MR. EDELMAN: Yes. Your Honor, on behalf of VEREIT and, I think, all the counsel, we want to thank you for all your work and your attention and your good humor throughout what was a very contentious fight. Thank you.

MR. DOWD:  Thank you, your Honor.  And I would also thank your staff as well.  They were fabulous too.

THE COURT:  Yes.  The staff is fantastic and they make people look good, to the extent I look good.  Metaphorically speaking.

It's been a pleasure to have you.  It's not common to have a case this well argued, this well presented.  There were lots of discovery issues throughout.  Your ability to cooperate in this procedure that I have facilitated my work enormously, and where I couldn't resolve it, we had hearings on a short basis.  My goal in this, which I don't suppose was accomplished, was to reduce transaction costs as much as possible and move the case along as much as I could.  You'll judge me whether I succeeded or not, but that was my goal.  And I think it was facilitated by the way you cooperated with each other, while at the same time representing your respective clients most zealously.  So I thank you.

MR. DOWD:  Thank you.

MR. EDELMAN:  Thank you, your Honor.

MS. WYMAN:  Thank you, your Honor.

THE COURT:  When is finality, Mr. Dowd?

MR. DOWD:  Well, there's no objection, so it should be 30 days from judgment, which I believe the Court entered yesterday.

THE COURT:  What about my not giving a fee award yet?

K1NAARCHps

I've done everything in the class action.

MR. DOWD:  Oh, no, they are separate cases.  They weren't even consolidated ever.  They were coordinated for discovery but not consolidated, so my case is down right now, and it will be final in 30 days because there are no objections.

MR. EDELMAN:  Also, it's our understanding that the derivative judgment makes that case final and the fee issue is separate.

THE COURT:  Will be supplementary to the judgment.

MR. HOUSTON:  Yes.  That's right, your Honor.

THE COURT:  OK.  Thank you.

MR. DOWD:  Thank you.

MR. EDELMAN:  Thank you again, your Honor.

(Adjourned)